**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

|  |  |
|---|---|
| AMERICAN CHEMISTRY COUNCIL, ALLIANCE FOR AUTOMOTIVE INNOVATION, AMERICAN COATINGS ASSOCIATION, ASSOCIATION OF HOME APPLIANCE MANUFACTURERS, NATIONAL ASSOCIATION OF MANUFACTURERS, NATIONAL ELECTRICAL MANUFACTURERS ASSOCIATION, NATIONAL FEDERATION OF INDEPENDENT BUSINESS, INC., NEW MEXICO RETAIL ASSOCIATION, and POWER TOOL INSTITUTE, <br><br> *Plaintiffs*, <br><br> v. <br><br> JAMES C. KENNEY, *in his official capacity as Secretary of New Mexico Environment Department*; and RAÚL TORREZ, *in his official capacity as Attorney General of New Mexico*, <br><br> *Defendants*. | Case No.: 1:26-cv-02130 <br><br><br> **ORAL ARGUMENT REQUESTED** |

**<u>PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION</u>**

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................... 1

BACKGROUND ...................................................................................................... 5

I.  PFAS IS A BROAD CATEGORY ENCOMPASSING SUBSTANCES USED IN MANY EVERYDAY PRODUCTS WITH NO ESTABLISHED HEALTH RISK. ............ 5

II.  NEW MEXICO PFAS PROTECTION ACT AND CHALLENGED REGULATION........ 7

    A.  The New Mexico Legislature imposes a ban on many PFAS, while authorizing the EIB to require labeling................................................................ 7

    B.  The EIB imposes a sweeping labeling mandate. ..................................... 7

LEGAL STANDARD ............................................................................................. 10

ARGUMENT ......................................................................................................... 11

I.  PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS. .................................. 11

    A.  The Regulation does not satisfy any elements of the *Zauderer* test. .................... 12

        1.  The required pictograph does not convey purely factual information. ...... 12

        2.  The science concerning the risks posed by all PFAS is at best unsettled. .................................................................. 16

        3.  *Zauderer* does not permit the State to compel speech premised on impacts disconnected from the service provided to the consumer............ 18

        4.  The Regulation is unduly burdensome. ....................................... 19

    B.  The Regulation cannot survive First Amendment scrutiny................................. 22

II.  THE REMAINING FACTORS SUPPORT PRELIMINARY INJUNCTIVE RELIEF. .................................................................. 25

    A.  Plaintiffs' member companies will suffer irreparable harm. ............................... 26

    B.  The public interest favors a preliminary injunction. ........................................ 26

III.  AT A MINIMUM, THE COURT SHOULD ENJOIN THE REGULATION WITH RESPECT TO FLUOROPOLYMERS AND PFAS TO WHICH CONSUMERS ARE NOT EXPOSED ................................................................. 27

CONCLUSION...................................................................................................... 27

# TABLE OF AUTHORITIES

**Cases**

*Am. Beverage Ass'n v. City & Cnty. of S.F.*,
916 F.3d 749 (9th Cir. 2019) ................................................................................. 19

*Aptive Env't, LLC v. Town of Castle Rock*,
959 F.3d 961 (10th Cir. 2020) ............................................................................... 23

*Ass'n of Home Appliance Mfrs. v. Weiser*,
2025 WL 4642378 (D. Colo. Dec. 19, 2025) .................................... 13, 16, 22, 23, 24

*Att'y Gen. of Okla. v. Tyson Foods, Inc.*,
565 F.3d 769 (10th Cir. 2009) ............................................................................... 11

*Awad v. Ziriax*,
670 F.3d 1111 (10th Cir. 2012) .............................................................................. 26

*Brewer v. City of Albuquerque*,
18 F.4th 1205 (10th Cir. 2021) ......................................................................... 23, 25

*Cal. Chamber of Com. v. Bonta*,
781 F. Supp. 3d 1071 (E.D. Cal. 2025) .................................................................. 23

*Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics* ("*CERT*"),
29 F.4th 468 (9th Cir. 2022) ............................................................................ 16, 23

*Cent. Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.*,
447 U.S. 557 (1980) ............................................................................................... 23

*Disc. Tobacco City & Lottery, Inc. v. United States*,
674 F.3d 509 (6th Cir. 2012) ........................................................................... 15, 22

*Elam Constr., Inc. v. Reg'l Transp. Dist.*,
129 F.3d 1343 (10th Cir. 1997) .............................................................................. 26

*Elrod v. Burns*,
427 U.S. 347 (1976) ............................................................................................ 4, 26

*Ent. Software Ass'n v. Blagojevich*,
469 F.3d 641 (7th Cir. 2006) ................................................................................. 22

*Free Speech Coalition, Inc. v. Paxton*,
95 F.4th 263 (5th Cir. 2024) .................................................................................. 12

*Hobby Lobby Stores, Inc. v. Sebelius*,
723 F.3d 1114 (10th Cir. 2013) .............................................................................. 27

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
    515 U.S. 557 (1995) ................................................................................................. 19

*Ibanez v. Fla. Dep't of Bus. & Pro. Regul., Bd. of Acct.*,
    512 U.S. 136 (1994) ................................................................................................. 12

*Iowa Ass'n of Bus. & Indus. v. Ommen*,
    799 F. Supp. 3d 795 (S.D. Iowa 2025) ................................................................... 19

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*,
    585 U.S. 878 (2018) ................................................................................................. 11

*Kansas ex rel. Kansas Dep't for Child. & Fams. v. SourceAmerica*,
    874 F.3d 1226 (10th Cir. 2017) ............................................................................... 26

*Kimberly-Clark Corp. v. Dist. of Columbia*,
    286 F. Supp. 3d 128 (D.D.C. 2017)................................................................... 13, 24

*McCullen v. Coakley*,
    573 U.S. 464 (2014) ................................................................................................. 25

*Nat'l Ass'n of Mfs. v. SEC*,
    800 F.3d 518 (D.C. Cir. 2015)................................................................................. 13

*Nat'l Ass'n of Wheat Growers v. Bonta*,
    85 F.4th 1263 (9th Cir. 2023) ............................................................... 13, 16, 23, 24

*Nat'l Inst. of Fam. and Life Advocs.*,
    585 U.S. 755 (2018) ....................................................................... 18, 19, 23, 24

*Pac. Frontier v. Pleasant Grove City*,
    414 F.3d 1221 (10th Cir. 2005) ............................................................................... 26

*Pers. Care Prods. Council v. Bonta*,
    799 F. Supp. 3d 1075 (E.D. Cal. 2025) ....................................................... 13, 15, 23

*R.J. Reynolds Tobacco Co. v. FDA*,
    696 F.3d 1205 (D.C. Cir. 2012)........................................................... 13, 15, 23, 24

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) ................................................................................................. 11

*Rocky Mtn. Gun Owners v. Polis*,
    121 F.4th 96 (10th Cir. 2024) ........................................................................... 11, 26

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011) ................................................................................................. 11

*United States v. Stevens*,
  559 U.S. 460 (2010) ...................................................................................... 27

*Utah Licensed Beverage Ass'n v. Leavitt*,
  256 F.3d 1061 (10th Cir. 2001) .................................................................. 26

*Verlo v. Martinez*,
  820 F.3d 1113 (10th Cir. 2016)................................................................... 25

*Wooley v. Maynard*,
  430 U.S. 705 (1977) ..................................................................................... 11

*Zauderer v. Off. of Disciplinary Couns.*,
  471 U.S. 626 (1985) ................................................ 1, 11, 12, 13, 16, 18, 19

**Statutes**

Cal. Health & Safety Code § 109011............................................................. 25

Cal. Health & Safety Code § 109011(a) ......................................................... 25

Cal. Health & Safety Code § 109011(c) ......................................................... 25

Colo. Rev. Stat. § 25-15-604.......................................................................... 25

Colo. Rev. Stat. § 25-15-604(2)(a)................................................................. 25

Colo. Rev. Stat. § 25-15-604(2)(c)................................................................. 25

Colo. Rev. Stat. § 25-15-604(2.5) .................................................................. 25

Conn. Gen. Stat. § 22a-903c .......................................................................... 25

Conn. Gen. Stat. § 22a-903c(c)(1) ................................................................. 25

Conn. Gen. Stat. § 22a-903c(c)(3) ................................................................. 25

NMSA 1978, § 74-15-3..................................................................................... 7

NMSA 1978, § 74-15-4(B) ............................................................................... 7

NMSA 1978, § 74-15-7................................................................................. 7, 10

**Regulations**

NMAC § 20.13.2.6............................................................................................ 7

NMAC § 20.13.2.9(C) ...................................................................................... 7

iv

NMAC § 20.13.2.13.................................................................................................................. 1

NMAC § 20.13.2.13(A) .......................................................................................................... 10

NMAC § 20.13.2.13(B) ............................................................................................................ 9

NMAC § 20.13.2.13(C) .............................................................................................. 7, 8, 9, 10

NMAC § 20.13.2.13(D) .......................................................................................................... 10

NMAC § 20.13.2.23................................................................................................................ 10

**INTRODUCTION**

The First Amendment protects both the right to speak and the right *not* to speak. The Supreme Court created a limited exception to this rule in *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985), allowing governments to require companies to deliver specific messages to consumers only if the messages are (1) purely factual, (2) uncontroversial, (3) related to the terms under which services are being offered, and (4) not unduly burdensome. If a government-mandated message fails any part of that test, then it is subject to normal First Amendment scrutiny for content-based laws. Courts applying this framework repeatedly have held that government-mandated warning labels are unconstitutional if they require anything more than the straightforward presentation of facts or if the existence of the underlying risk is debatable.

This case is being brought by trade associations representing companies in broad segments of the American economy to challenge a regulation proposed by the New Mexico Environment Department ("NMED") and adopted by the New Mexico Environmental Improvement Board ("EIB"). *See* NMAC § 20.13.2.13 (the "Regulation"). The Regulation compels Plaintiffs' member companies to mark products that contain *any* amount of *any* per- or poly-fluoroalkyl substances, or "PFAS," with an image of an Erlenmeyer flask labeled "PFAS":



This pictographic warning label is not "purely factual," but instead is designed to invoke fear of chemicals. The supposed dangers of PFAS about which the label warns are not "uncontroversial." For many PFAS, the warning has nothing to do with alleged risks posed to consumers themselves. And compliance with the mandate will be incredibly burdensome on Plaintiffs' member

companies—financially, reputationally, and by forcing companies to deliver a message with which they disagree. The Regulation therefore fails the *Zauderer* test and is unconstitutional.

By this motion, Plaintiffs are asking the Court to enjoin enforcement of the Regulation well in advance of its January 1, 2027 compliance deadline, before Plaintiffs' member companies must incur hundreds of millions of dollars in unrecoverable compliance costs. Each prong of the four-factor test for preliminary injunctive relief is satisfied here.

First, Plaintiffs are likely to succeed on the merits. PFAS are a broad category comprising thousands of very different substances that are commonly found in a wide number of products, including razor blades, non-stick cookware, water-resistant fabrics, home appliances, vehicles, air conditioners, power tools, medical devices, consumer electronics, and cosmetics. While health and environmental concerns have been raised for *some* types of PFAS, the evidence does not support such concerns for all types of PFAS. Despite this, the labeling mandate applies to products with *any* type of PFAS in *any* amount, and whether or not consumers are exposed to the PFAS.

The labeling mandate does not come close to satisfying the *Zauderer* standard. First, the pictograph does not convey "purely factual" information—commercial-scale factories do not use Erlenmeyer flasks. The pictograph instead is designed to incite consumers' fears, by exploiting a belief that chemicals are dangerous. Indeed, while countless other products contain man-made chemical substances, Plaintiffs cannot find *any* mandate imposed by *any* government with respect to *any* other chemical that it be called to consumers' attention with an Erlenmeyer flask. Many consumers will therefore understand the label to be a warning that, among the universe of chemicals, all PFAS are *especially* dangerous in some unspecified way.

Second, whether PFAS *as a category* pose heightened risks to which consumers should be alerted is far from "uncontroversial." While manufacturers have phased out some PFAS materials,

2

fluoropolymers such as polytetrafluoroethylene ("PTFE") are widely and safely used in consumer products as diverse as non-stick cookware and razor blades. There is no scientific consensus that fluoropolymers pose any risk to human health or the environment. And NMED officials have acknowledged that the science with respect to many other PFAS, such as certain newer-generation PFAS, is at best nascent. New Mexico's first of its kind mandated warning applicable to all PFAS thus rests on an intensely disputed scientific foundation.

Third, the mandated warning is not tied to the terms under which companies are offering products to consumers. Forced to concede during the rulemaking that not all PFAS in all products pose direct risks to consumers, NMED officials pivoted to arguing that fluoropolymers, and PFAS inside a product, pose a risk to the environment during product manufacturing and disposal. But the evidence does not support that claim, because modern controls at factories and incinerators can keep PFAS releases to a *de minimis* amount. Manufacturing may occur in states and countries far from New Mexico consumers, so that hypothetical environmental concern does not relate to the transaction between manufacturers and consumers. And concerns about *disposal* have nothing to do with the manufacturers who are subject to the Regulation.

Fourth, the burden that the Regulation will impose on Plaintiffs' member companies is staggering—likely hundreds of millions of dollars or more. The Regulation requires that products themselves be labeled, and in many cases requires the packaging to be labeled too. Companies will need to retool manufacturing lines producing thousands or millions of products per day to change existing labels or to add new labels. And because many of these companies have national or global distribution networks, they will need to do this for *all* the PFAS-containing products they make, not just those that find their way to New Mexico. Companies also will bear the burden of communicating a controversial message—that all PFAS are dangerous—with which many

3

fundamentally disagree.

Because the Regulation fails under *Zauderer*, it can survive only if it is narrowly tailored to further a compelling or substantial governmental interest. It is not. Courts considering similar state warning labels have noted that governments can communicate their concerns to consumers through government websites, public service announcements, and other media. Other states have enacted far less onerous labeling requirements for PFAS, which further shows that New Mexico's mandate fails the narrow-tailoring standard. And NMED has no good explanation why the consumer-facing labeling mandate must cover products that pose no risk to consumers, such as products with only fluoropolymers or PFAS to which consumers are not exposed.

The remaining factors also strongly favor preliminary injunctive relief. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). It also will be disruptive and expensive for Plaintiffs' member companies to retool their factories to create products and packaging bearing the confusing mandated warning label by the January 1, 2027 deadline. New Mexico, on the other hand, has no legitimate interest in enforcing a law that is likely unconstitutional. And the requested injunction would not bar New Mexico from making its own statements concerning PFAS.

Plaintiffs and their member companies share a commitment to making safe, environmentally-responsible products. But the EIB greatly overstepped the bounds here. The Court should quickly enjoin enforcement of the Regulation's labeling mandate while this case is pending. At a minimum, it should enjoin enforcement of the Regulation as to products containing only fluoropolymers or PFAS to which consumers are not exposed.

4

**BACKGROUND**

I.    **PFAS IS A BROAD CATEGORY ENCOMPASSING SUBSTANCES USED IN MANY EVERYDAY PRODUCTS WITH NO ESTABLISHED HEALTH RISK.**

PFAS is a catchall term for a broad category of substances with diverse physical, chemical, and toxicological properties.  *See* Korzeniowski Decl. ¶ 17.  The term has several different definitions, ranging from broad definitions that capture more than 14,000 substances, to more precise definitions that encompass as few as hundreds of substances.  *See id*. ¶ 21.  In its most general definition, this class of substances is characterized simply by the presence of covalent bonds between carbon and fluorine atoms, the strongest single bond in organic chemistry.  *See id*. ¶ 18.  This strong bond imparts a combination of properties, including thermal stability, corrosion-resistance, and water and grease repellency, making PFAS uniquely useful across industries worldwide.  *See id*. ¶ 19.

Many applications of PFAS "involve highly technical materials that serve as critical enablers of industries underpinning modern life."  Korzeniowski Decl. ¶ 20.   "In numerous contexts—such as healthcare, energy systems, transportation, electronics, and other infrastructure—these substances are essential to safety, durability, or performance, and viable alternatives are not reasonably available without compromising function or introducing other risks."  *Id*.; *see also, e.g.*, Espinoza Decl. ¶¶ 7–8.

There is ongoing scientific debate regarding the toxicity and bioaccumulation of certain types of PFAS, leading companies to phase out the use of those PFAS.  *See* Rackl Decl. ¶¶ 34, 51-52; Korzeniowski Decl. ¶ 45.  But other types of PFAS are not associated with such concerns.  Experts have acknowledged the diversity of PFAS with respect to properties, behavior, hazards, and risks and agree that statements suggesting all PFAS are bioaccumulative and toxic are overgeneralized.  Rackl Decl. ¶¶ 51-52.  Most experts "agree that PFAS should not be grouped

5

together for risk assessment purposes" and further agree "that it is scientifically inappropriate to assume equal toxicity/potency across the diverse class of PFAS." Korzeniowski Decl. ¶ 33.

For example, fluoropolymers are a subcategory of PFAS that includes materials such as PTFE. Fluoropolymers like PTFE are used in a wide range of consumer products, such as non-stick cookware, razor blades, and many others. Rackl Decl. ¶¶ 39-40, 43; Bhalla Decl. ¶¶ 15-16. In addition, PTFE has been used in medical devices implanted into humans since the 1950s, including devices like stents and pacemakers. U.S. Food and Drug Administration ("FDA"), *PFAS in Medical Devices* (Aug. 6, 2025). Fluoropolymers are chemically and toxicologically distinct from other PFAS. *See* Rackl Decl. ¶¶ 26-28, 34, 38-40, 45. Fluoropolymers are high-molecular-weight substances; are not bioavailable, toxic, bioaccumulative, mobile, water-soluble, or volatile; and so do not share the same hazard or exposure profiles as some other PFAS. *See* Korzeniowski Decl. ¶ 52; Rackl Decl. ¶¶ 38, 47. Experts consider fluoropolymers to be of low concern for human health and the environment. *See* Rackl Decl. ¶¶ 38-40, 47. Further, fluoropolymers do not degrade into other types of PFAS that may be toxic or bioaccumulative. *See id*. ¶¶ 28, 41, 49.

Some products contain PFAS that are entirely enclosed or sequestered within the product. *See* Rackl Decl. ¶¶ 41, 45-46. These sequestered PFAS pose no meaningful risk to human health or the environment. *See id.* ¶¶ 19-21.

International and federal entities, such as the Organisation for Economic Co-operation and Development ("OECD") and the Department of Defense, have advised against broad-brush approaches to regulating PFAS. Snyder Decl., Ex. 11, at 8; *id*., Ex. 12, at 16. The FDA has recognized that fluoropolymers specifically "are very unlikely to cause toxicity to patients." *Id*., Ex. 13. And the U.S. Environmental Protection Agency ("EPA") has stated that fluoropolymers are "believed to pose less risk to human and ecological health relative to

nonpolymer PFAS." *Id*., Ex. 14, ¶ 3.1.2.

## II.  NEW MEXICO PFAS PROTECTION ACT AND CHALLENGED REGULATION

### A.  The New Mexico Legislature imposes a ban on many PFAS, while authorizing the EIB to require labeling.

In April 2025, New Mexico enacted the Per- and Poly-Fluoroalkyl Substances Protection Act (the "PFAS Act").  NMSA 1978, § 74-15-3.  The PFAS Act's core feature is a phased ban on the sale, offering for sale, and distribution for sale of products containing certain types of intentionally-added PFAS, which begins in January 2027 and is completed by 2032.  *Id*. § 74-15-3; NMAC § 20.13.2.9(C).  But the ban is not universal.  The PFAS Act exempts many types of products from the ban.  As particularly relevant to this litigation, the PFAS Act exempts any "product that contains fluoropolymers," such as PTFE.  NMSA 1978, . § 74-15-3(A)(16).

The PFAS Act delegates rulemaking authority to the EIB, providing, in most relevant part, that the EIB "may" "adopt rules … requiring the labeling of products in English and Spanish." NMSA 1978, § 74-15-4(B).  The Act also authorizes enforcement mechanisms, including steep civil penalties, for each day a violation occurs.  *Id.* § 74-15-7.

### B.  The EIB imposes a sweeping labeling mandate.

In October 2025, NMED petitioned the EIB to adopt a proposed rule mandating labeling of products containing intentionally-added PFAS.  Snyder Decl., Ex. 1.  The proposed rule did not differentiate between PFAS or provide the same exemptions as the statutory ban, so the labeling mandate applies to products containing any kind of PFAS, including fluoropolymers.  *Id*. § 20.13.2.6.  Under the initially proposed rule, any product sold, offered for sale, distributed or distributed for sale in New Mexico containing any intentionally-added PFAS would need to include "words and symbols approved by [NMED] that the product contains intentionally added per- and poly-fluoroalkyl substances."  *Id*., § 20.13.2.13(C)(1).  As initially proposed, consumer-

7

facing products also would need to provide a link to an NMED website stating NMED's anti-PFAS views. *Id*., § 20.13.2.13(C)(3).

Many trade associations and others submitted comments in response to NMED's proposed rule. *See generally* EIB Dkt. No. 25-61(R), *available* at https://www.env.nm.gov/opf/docketed-matters/ ("EIB Docket").  They explained that there are many types of PFAS with different properties, and they do not all pose risks to human health or the environment. *See generally, e.g.,* Snyder Decl., Ex. 2 at 2 (ACC comment).  Imposing a labeling mandate for *all* types of PFAS, commenters explained, would create costly and complex challenges for manufacturers, while forcing them to label their products with warnings falsely and controversially signaling that all PFAS are dangerous. *See*, *e.g.*, *id*.

NMED issued revisions to the proposed rule in January 2026 and again a month later. *See id.*, Ex. 3; *id.*, Ex. 4.  The amended proposal dropped the website requirement, but included a mandate that covered products be labeled with a pictograph comprising "an outline of an Erlenmeyer flask with the word 'PFAS' inside the flask." *Id*., Ex. 4 § 20.13.2.13(C)(1).  According to NMED, it made this change in response to industry comments. *Id*., Ex. 5 at 9-10.

Trade associations again commented on the revised proposal, explaining that it still did not address their concerns about requiring manufacturers to warn that all PFAS are dangerous. *See generally* EIB Docket.  During an evidentiary hearing before the EIB, industry organizations presented evidence regarding the scientific community's lack of a consensus view as to what even constitutes PFAS, as well as the wide body of scientific literature demonstrating that certain PFAS, like fluoropolymers or PFAS entirely sealed within a product, pose little to no risk to human health or the environment.  *See* Snyder Decl., Ex. 9, at 1225, 1237, 1272, 1285.

In testimony before the EIB, NMED witnesses admitted that "[t]he vast majority of PFAS

have not been studied at all," and that the study of PFAS "continue[s] to evolve as additional data becomes available." *Id.*, Ex. 7 at 383; *id.*, Ex. 6 at 301. NMED witnesses further admitted that "[i]f there is zero exposure" to PFAS from a product then "there is zero risk." *Id.*, Ex. 7 at 430. But they insisted the labeling mandate was needed because no PFAS exposure supposedly is safe, and fluoropolymers and even fully-sequestered PFAS still posed environmental risks from upstream manufacture or downstream disposal. *Id.*, Ex. 6 at 118-19. Multiple NMED witnesses therefore urged the EIB to adopt the labeling mandate "to turn off the spigot at the source of PFAS entering New Mexico through consumer products." *Id.* at 81-82; *see also id.* at 52-53, 60, 104, 106, 109, 111, 129, 165, 166, 224-25; *id.*, Ex. 8 at 792, 795. According to NMED, the PFAS warning label will "empower consumers to choose to reduce their exposure and environmental release." *Id.*, Ex. 5 at 29. Regarding use of the flask symbol specifically, NMED witnesses said they believed it "will convey the message that there is a chemical that goes by the acronym or initials 'PFAS' in this product," and that it "would be an excellent element that would convey to the consumer that there is a chemical that they might want to know about," *id.*, Ex. 7 at 630, 632.

In May 2026, the EIB adopted a final version of the Regulation, requiring manufacturers to label numerous categories of products containing any amount of any PFAS, even in purely internal components, with the Erlenmeyer flask pictographic warning. NMAC § 20.13.2.13(C)(1). The EIB explained that it had explicitly considered and determined that "PFAS should be regulated as a class." Snyder Decl., Ex. 10 ¶ 78 (EIB Final Order and Statement of Reasons). The final label mandate includes only narrow exemptions for complex durable goods, used products, and certain products regulated by federal labeling requirements. NMAC § 20.13.2.13(B).

The Regulation provides that the label must be "printed, mounted, molded, engraved, embossed, or otherwise affixed to the product." *Id.* § 20.13.2.13(C)(2). And "[i]f the product is

9

sold in consumer packaging that obscures the label on the product," the product packaging must "also" be labeled. *Id.* § 20.13.2.13(C)(3). The Regulation also imposes size specifications. The label must be "clearly visible and legible prior to sale" and "displayed with such conspicuousness as compared with other words, statements, design or devices on the product as to render the label likely to be seen, read, and understood by an ordinary individual under customary conditions of purchase or use." *Id.* § 20.13.2.13(C)(1). The label's text must "be no smaller than the largest font used for other consumer information on the product." *Id.*

The Regulation also includes labeling requirements that apply when a consumer cannot see the product or packaging at the time of sale, such as when products are sold online. *See id.* § 20.13.2.13(C)(4). In those circumstances, the manufacturer or retailer must "clearly" present the Erlenmeyer flask pictograph to the consumer at the time of purchase by, for example, including the pictograph on the website. *Id.* And the Regulation includes a separate, but similar, labeling requirement for what it calls "complex commercial goods." Manufacturers of those goods must include the Erlenmeyer-flask pictograph in the consumer facing product specification sheet available to potential consumers prior to purchase, and the consumer facing operation and maintenance manual associated with the complex durable good. *Id.* § 20.13.2.13(D).

The labeling mandate becomes effective on January 1, 2027. *Id.* § 20.13.2.13(A). Starting then, any product sold, offered for sale, distributed, or distributed for sale in New Mexico without the mandated label is unlawful and will be subject to civil penalties of, *e.g.*, $15,000 for each day a violation occurs. N.M. Stat. § 74-15-7. NMED and the New Mexico Attorney General are responsible for enforcing the Regulation. NMAC § 20.13.2.23; N.M. Stat. § 74-15-7.

## LEGAL STANDARD

"To obtain a preliminary injunction, the moving party must demonstrate: (1) a likelihood

10

of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest." *Att'y Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 776 (10th Cir. 2009) (quotation marks omitted). When a state agency is the defendant, the third and fourth factors "merge." *Rocky Mtn. Gun Owners v. Polis*, 121 F.4th 96, 112 (10th Cir. 2024).

## ARGUMENT

### I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

Under the First Amendment, "[c]ontent based laws—those that target speech based on its communicative content—are presumptively unconstitutional." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). This rule applies to commercial speech: "The commercial marketplace, like other spheres of our social and cultural life, provides a forum where ideas and information flourish," and "[t]he State may not burden the speech of others in order to tilt public debate in a preferred direction." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 578-79 (2011) (quotation marks omitted).

The First Amendment "includes both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). Indeed, laws that compel speakers to communicate a message raise particularly serious First Amendment concerns, because they are inherently content-based. *See Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 892 (2018). The Supreme Court has recognized a limited exception for laws that compel commercial speech, but *only* if the disclosure is limited to "purely factual and uncontroversial information about the terms under which … services will be available." *Zauderer*, 471 U.S. at 651. If a law satisfies those conditions, there is no First Amendment violation, provided the compelled disclosures are not "unjustified or unduly burdensome." *Id.* By contrast, if the mandated commercial speech falls outside the *Zauderer* exception, then it is subject to heightened scrutiny, which requires the government to show, at a minimum, that the law is narrowly tailored

11

to directly advance a substantial government interest.  *See Free Speech Coalition, Inc. v. Paxton*, 95 F.4th 263, 283 (5th Cir. 2024).

New Mexico's mandate that products with any intentionally-added PFAS include a pictograph of an Erlenmeyer flask labeled "PFAS" does not meet the requirements for the *Zauderer* exception.  That is fatal to the State's case, because the mandate fails any level of First Amendment scrutiny.  Plaintiffs are therefore likely to succeed in their claim that the mandate is facially unconstitutional.  At a minimum, the mandate is clearly unconstitutional as applied to products containing only fluoropolymers or PFAS to which consumers are not exposed.

## A.   The Regulation does not satisfy any elements of the *Zauderer* test.

For the State to rely on *Zauderer*, it must show that the compelled disclosures are "purely factual and uncontroversial," relate to "the terms under which" services are provided, and are not unduly burdensome.  471 U.S. at 651.  The State has the burden to justify compelling commercial speech.  *See Ibanez v. Fla. Dep't of Bus. & Pro. Regul., Bd. of Acct.*, 512 U.S. 136, 142-43 (1994).  Here, the Regulation satisfies none of the *Zauderer* conditions.

### 1.   The required pictograph does not convey purely factual information.

The narrow *Zauderer* exception is built on the premise that, since the value of commercial speech inheres in "the information such speech provides" to consumers, the government has greater leeway to compel a company to provide consumers "purely factual and uncontroversial information about the terms under which [its services] will be available." *Zauderer*, 471 U.S. at 651.  Thus, in *Zauderer*, the Court upheld a requirement that attorney advertising disclose that clients could be liable for costs after an unsuccessful contingent-fee action, explaining that a requirement to provide "accurate information regarding [an attorney's] services" was "reasonably related to the State's interest in preventing deception of consumers." *Id.* & n.14.

Critically, "[t]he disclosures approved in *Zauderer*" and other Supreme Court precedents

12

have been "clear statements that were both indisputably accurate and not subject to misinterpretation by consumers." *R.J. Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205, 1216 (D.C. Cir. 2012). Courts have recognized that even if a compelled disclosure is "factually accurate," "a statement may be literally true but nonetheless misleading." *Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1276 (9th Cir. 2023) (quotation marks omitted). Courts therefore do not review compelled messages in isolation, but rather "consider whether the totality of the disclosure is misleading." *Ass'n of Home Appliance Mfrs. v. Weiser*, 2025 WL 4642378, at *6 (D. Colo. Dec. 19, 2025). They exercise care not to "miss[] the forest for the trees" in assessing "the overall message" conveyed. *Pers. Care Prods. Council v. Bonta*, 799 F. Supp. 3d 1075, 1085-86 (E.D. Cal. 2025) (quotation marks omitted). And they have explained that graphic warnings raise particular concerns, since they may serve as attempts to "evoke an emotional response" rather than merely convey unbiased information. *See R.J. Reynolds*, 696 F.3d at 1216.

Applying those principles here, the mandated pictograph of an Erlenmeyer flask labeled "PFAS" does not present "purely factual" information. *Zauderer*, 471 U.S. at 651. No manufacturer is making products at commercial scale using Erlenmeyer flasks, and there is scientific debate about what substances even qualify as PFAS. Korzeniowski Decl. ¶ 21. NMED witnesses in the EIB proceeding tried to sidestep this debate by noting that the PFAS Act contains its own definition of PFAS. Snyder Decl., Ex. 6 at 161-63. But courts have rejected this argument—a government cannot sidestep factual debates by definitional *diktat*, particularly as consumers are unlikely to know obscure governmental definitions. *Kimberly-Clark Corp. v. Dist. of Columbia*, 286 F. Supp. 3d 128, 142 (D.D.C. 2017); *Nat'l Ass'n of Mfs. v. SEC*, 800 F.3d 518, 530 (D.C. Cir. 2015).

Rather than convey purely factual information, the label conveys a *warning*: this product

13

contains a chemical known as PFAS that, more than other chemicals, should concern you.  Wilcox Decl. ¶ 29.  After all, consumers are accustomed to seeing pictographic *warnings* on products:  a skull and crossbones for poison, or a stylized fire for something flammable or explosive.  *See id.* ¶ 31.  Many consumers are therefore likely to assume that the Erlenmeyer flask is a warning.  *Id.* ¶ 29, 31.   On top of this, many consumers will be familiar with Erlenmeyer flasks from chemistry classes in school, where they learned that chemicals are potentially dangerous—*e.g.*, they may be caustic, warranting the use of safety goggles and gloves.  *Id.* ¶ 29.  Consumers also know that many consumer products contain chemicals of one kind or another, but only PFAS is being singled out for their attention with the Erlenmeyer flask pictograph.  *Id.* ¶¶ 31, 40.  Many consumers will therefore assume that PFAS must be unusually dangerous, and that is why it, alone in the universe of chemicals, is being called to their attention with the flask graphic.  *Id.* ¶¶ 31-33.

Recognizing that the Regulation raises First Amendment issues, NMED witnesses strained during the EIB hearings to contend that the label is "not designed to communicate about hazards," but rather only to note that the product contains "a chemical that goes by the acronym or initials 'PFAS,'" that consumers might want to learn more about.  *See* Snyder Decl, Ex. 7 at 618, 630; *id.* at 632 (the label "convey[s] to the consumer that there is a chemical that they might want to know about"); *id.*, Ex. 6 at 110-111 (similar).  For the reasons given above, that testimony does not pass the straight face test.  New Mexico does not require the Erlenmeyer flask graphic for any other chemical on the neutral theory that consumers "might want to know about" it.  The flask is plainly designed as a warning about the presence of PFAS.  Research also shows that consumers are quick to make in-store purchasing decisions for everyday products.  Wilcox Decl. ¶¶ 12, 16-17.  A consumer picking up a product with the PFAS pictographic warning will not stand in the aisle doing research on PFAS and their highly varying properties.  *Id.* ¶¶ 17, 28-29.  Confronted with a

14

warning label on a product, consumers will quickly make a gut decision whether to purchase that product or an alternative lacking the warning label. *Id*. ¶¶ 18-19.

Because "it is reasonable for the average consumer" to read the pictograph as communicating a hazard, it cannot be characterized as "purely factual." *Pers. Care Prods.*, 799 F. Supp. 3d at 1086-87. Indeed, the Erlenmeyer flask itself does not even convey *any* actual "information," because it says *nothing* about the risk PFAS supposedly poses. Wilcox Decl. ¶¶ 28-29. A consumer seeing the label will have no idea whether PFAS are supposedly toxic, flammable, explosive, environmentally deleterious, or present some other risk of harm entirely. *Id*. ¶¶ 27, 37. They will only assume it poses some unspecified risk of harm. *Id*. ¶ 38. For this reason, it is clear that the flask image is designed to invoke fear in consumers, not to educate them. *See id*. ¶¶ 38, 42, 44-45. That is fatal under *Zauderer*. Other courts have recognized that images are vulnerable to "misinterpretation by consumers," as they work in part by "evok[ing] an emotional response" rather than merely providing neutral, factual information. *R.J. Reynolds*, 696 F.3d at 1216-17 (holding that the use of graphic images to supplement warning statements "fall outside the ambit of *Zauderer*"). That is the whole purpose of graphic labels: to "create a visceral reaction." *Disc. Tobacco City & Lottery, Inc. v. United States*, 674 F.3d 509, 528-29 (6th Cir. 2012) (Clay, J., dissenting in part).

The lack of any real information in the flask image is especially problematic when it comes to fluoropolymers like PTFE or to PFAS to which a consumer will not be exposed. At the EIB hearing, NMED witnesses conceded that fluoropolymers and sequestered PFAS pose no direct risk to consumers. *See* Snyder Decl., Ex. 7 at 416-17, 430. But they argued that the warning label is still justified, because other types of PFAS may either escape the factory when products are made, or from an incinerator when products are destroyed. *See id.* at 436-37. Putting aside that those

15

propositions are debatable, *see infra*, pp. 16-18, nothing in the Erlenmeyer flask pictograph tells a consumer what kind of PFAS is present, where, or what type of risk it poses. A consumer might reasonably assume that the product carries the warning label because it poses a direct risk to them, even if that is not the case. Wilcox Decl. ¶¶ 27-38. This risk of consumer confusion is fatal under *Zauderer's* "purely factual" requirement. *See Wheat Growers*, 85 F.4th 1263, 1278; *Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics* ("*CERT*"), 29 F.4th 468, 472-73, 479 (9th Cir. 2022).

The origin of the Erlenmeyer flask mandate also is revealing. Under NMED's initially proposed rule, there was no required graphic, but products instead needed to provide directions to an NMED website attacking PFAS. *See supra*, pp. 7-8. In an apparent acknowledgement the website provision was patently unconstitutional, *see Ass'n of Home Appliance Mfrs.*, 2025 WL 4642378, at *7, NMED dropped that provision but added the Erlenmeyer flask graphic in its place. Snyder Decl., Ex. 6 at 113-14. But that change did not cure the basic First Amendment problem: pictographic warnings that suggest to consumers that a product poses some unspecified risk because it contains any kind of PFAS anywhere in the product are not "purely factual."

### 2.    The science concerning the risks posed by all PFAS is at best unsettled.

The Regulation also fails *Zauderer* because the required warning message is not "uncontroversial." *See* 471 U.S. at 651. "A compelled statement is 'uncontroversial' for purposes of *Zauderer* where the truth of the statement is not subject to good-faith scientific or evidentiary dispute and where the statement is not an integral part of a live, contentious political or moral debate." *Ass'n of Home Appliance Mfrs.*, 2025 WL 4642378, at *6 (alteration and citation omitted)). By contrast, "controversy" exists where an "objective evaluation" demonstrates that there is "robust disagreement by reputable scientific sources." *Wheat Growers*, 85 F.4th at 1277 (quoting *CERT*, 29 F.4th at 478). If there is no "strong scientific consensus" to support a warning

label, then the label fails under *Zauderer*. *Id.* at 1278.

Here, the scientific evidence concerning PFAS as a class is unsettled at best. The evidence shows that PFAS widely vary in their characteristics and they have not all been shown to pose risks, whether to human health or to the environment, yet the Regulation requires them all to carry the identical "PFAS" pictographic warning. As recounted above, both international organizations and the federal government agree that broad generalizations about PFAS should not be used to make regulatory decisions. *See supra*, pp. 6-7. In the specific case of fluoropolymers, for example, the available evidence strongly suggests that their use in products presents little to no risk to human health and the environment. *See* Rackl Decl. ¶¶ 38-40. FDA has continued to approve the use of fluoropolymers in medical devices embedded in patients. Snyder Decl., Ex. 7, at 390. Many experts also have concluded that because fluoropolymers are chemically and biologically inert, they pose little risk of contaminating the environment. *See* Rackl Decl. ¶¶ 20-21, 38.

At the EIB hearing, NMED witnesses debated whether fluoropolymers are actually safe, suggesting the science is not yet settled on this point. *E.g.*, Snyder Decl., Ex. 6 at 90, 116. But even if NMED is correct that the science around fluoropolymers is uncertain, that *uncertainty* does not help Defendants, because it means that the question is not "uncontroversial." Korzeniowksi Dec. ¶¶ 38-46; Rackl Decl. ¶¶ 32-35. Under *Zauderer*, the existence of this scientific debate means the government cannot require third parties to communicate the government's preferred viewpoint. If the government wants to present its position concerning an unsettled scientific topic to consumers, then it must do so itself.

NMED witnesses also opined at the EIB hearing that even if fluoropolymers do not themselves pose a risk, other PFAS may be used during the manufacture of fluoropolymers or generated during their disposal, and these other PFAS could escape into the environment from

17

factories and incinerators.  Snyder Decl., Ex. 7, at 416-17.  They opined similarly about PFAS within a product to which consumers are not exposed.  *Id*., Ex. 6 at 119.  But these assertions are also contested.  Modern emissions controls at factories result in, at worst, only a negligible amount of PFAS entering the environment, if any at all.  Rackl Decl. ¶¶ 53-55.  And modern incinerators are capable of destroying up to 99.9999% of PFAS in products, to keep it from entering the environment.  *Id*. ¶ 54.  Thus, to the extent NMED intends the Erlenmeyer flask symbol to convey to consumers that the manufacture and disposal of the product pose environmental concerns, that message too is far from "uncontroversial."

**3.  *Zauderer* does not permit the State to compel speech premised on impacts disconnected from the service provided to the consumer.**

Defendants may try to argue that the labeling mandate is supported by the alleged manufacturing (upstream) and disposal (downstream) impacts of PFAS.  But the alleged upstream and downstream impacts of PFAS cannot support the Regulation because messaging on such topics falls outside the *Zauderer* framework entirely.

In applying *Zauderer*, the Supreme Court has instructed that the doctrine only applies to speech relating to "the terms under which … services will be available."  *Nat'l Inst. of Fam. and Life Advocs.*, 585 U.S. 755, 768 (2018) ("*NIFLA*") (quoting *Zauderer*, 471 U.S. at 651).  The doctrine provides no basis for a government to use a company as its mouthpiece for other concerns, even if factual.  In *NIFLA*, for example, the Court held that clinics providing services to pregnant women could not be required to post notices regarding the availability of free or low-cost services provided by the State, including abortions.  *Id.* at 775.  Among other problems with the law, the Court explained that because the mandatory notice "in no way relates to the services that licensed clinics provide," "*Zauderer* ha[d] no application."  *Id.* at 769.  "[O]utside that context," a "speaker

18

has the right to tailor [its] speech," including to omit "statements of fact the speaker would rather avoid." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995).

Put simply, the *Zauderer* exception exists to ensure that consumers receive accurate information related to their transactions, and nothing more than that. Here, the alleged upstream and downstream environmental impacts on which NMED witnesses relied do not concern the transaction between Plaintiffs' member companies and consumers, within the meaning of precedents such as *Zauderer* and *NIFLA*. Those alleged upstream and downstream impacts sometimes involve third parties—manufacturers of components containing intentionally-added PFAS and the emissions controls *they* used at *their* factories to prevent PFAS from escaping into the environment. Those impacts may be based on hypothetical, future events—how some third party *might* dispose of the product, and again what emissions controls they might use. Those impacts, which are the subject of regulation and oversight in the relevant jurisdictions, are simply too far afield from consumer transaction in question to allow New Mexico to invoke them as the basis for a labeling requirement. *Zauderer* does not allow the EIB to force Plaintiffs' member companies to warn consumers about these potential upstream and downstream issues.

### 4.    The Regulation is unduly burdensome.

Finally, the Regulation fails to satisfy *Zauderer* because it imposes undue burdens on Plaintiffs' members and other regulated entities. "Even under *Zauderer*, a disclosure requirement cannot be 'unjustified or unduly burdensome.'" *NIFLA*, 585 U.S. at 776 (quoting *Zauderer*, 471 U.S. at 651). "[A] government-compelled disclosure that imposes an undue burden fails for that reason alone." *Am. Beverage Ass'n v. City & Cnty. of S.F.*, 916 F.3d 749, 757 (9th Cir. 2019).

Here, the Regulation imposes staggering "implementation costs and competitive ramifications" that "exceed constitutional boundaries." *Iowa Ass'n of Bus. & Indus. v. Ommen*, 799 F. Supp. 3d 795, 851 (S.D. Iowa 2025). As detailed in the accompanying declarations from

19

some of Plaintiffs' member companies, it will be extraordinarily expensive, disruptive and time-consuming for those companies to come into compliance with the Regulation's labeling mandate. *See* Bhalla Decl. ¶¶ 22-30; Yon Decl. ¶¶ 12-19; Hall Decl. ¶¶ 14-22; Bowers Decl. ¶¶ 15-20; Thompson Decl. ¶¶ 10-20; Espinoza Decl. ¶ 11.   Modern product manufacturers use highly automated systems which move products smoothly and automatically through each step of the manufacturing process and often directly into packaging and off for shipment. *E.g.*, Bhalla Decl. ¶ 22.  For a product that was *itself* not previously labeled—for which all labeling was provided on the associated packaging—the new labeling mandate will require completely reworking manufacturing lines to add a new labeling step.  *E.g.*, *id.* ¶¶ 22-27; Hall Decl. ¶¶ 15-18.   For products that were previously labeled, the mandate will still require manufacturers to rework molds, dies, and etching machinery to add the new pictographic warning to the existing label.  *E.g.*, Thompson Decl. ¶ 12-13.  For products on which the new pictographic warning does not easily fit, the product itself may need to be altered in dimension or layout to accommodate the label.  *E.g.*, *id*.  And where permanent solutions to all this cannot be implemented by January 1, 2027, manufacturers will need to quickly introduce disruptive, temporary solutions.  *E.g.*, Bhalla Decl. ¶ 27.  Many of these problems are then repeated for those manufacturers who must also include the mandated warning on their product packaging.  *E.g.*, *id.* ¶¶ 28-30; Thompson Decl. ¶¶ 14-16.

The burden the Regulation imposes on manufacturers is multiplied by the fact that many companies operate with national and global supply chains, or sell to major retailers with national and global distribution chains.  A manufacturer may make a product and sell it to a major retail chain not knowing whether the retailer will ship that specific product to Santa Fe, New Mexico; Rancho Santa Fe, California; or the Santa Fe district of Mexico City, Mexico.  *E.g.*, Bhalla Decl. ¶¶ 31-33; Bowers Decl. ¶ 23; Yon Decl. ¶ 18.  For such companies, the only way to avoid the fines

20

imposed by the Regulation may be to label *all* their products with New Mexico's mandated label. *E.g.*, Thompson Decl. ¶¶ 17-20; Yon Decl. ¶ 19.

The cost of this for Plaintiffs' member companies and other regulated entities will likely stretch into the hundreds of millions of dollars or more. NMED's witness in the EIB proceeding conducted a survey of literature concerning labeling compliance costs for genetically-engineered foods, and opined that median estimates of compliance costs *for that one industry alone* were about $2.30 per consumer. *See* Snyder Decl., Ex. 7 at 602. Because the Regulation will result in many affected companies changing their labeling on a nationwide basis, that alone suggests compliance costs approaching $1 billion. And that estimate was just for the food industry, whereas the Regulation impacts each of the highly varied industries represented by the Plaintiff trade associations (and more besides). The declarations from companies filed in support of this motion, suggesting compliance costs in the tens of millions of dollars for even a single company, confirm the immense financial burden the regulation will impose. *E.g.*, Bhalla Decl. ¶ 30.

Even beyond the cost of coming into compliance, the Regulation is certain to impose ongoing losses on Plaintiffs' member companies. As discussed above, the pictographic warning is clearly designed to trigger an emotional reaction in consumers with the intent of causing them not to purchase the labeled products. *See supra*, pp. 13-16. Hence, the Regulation requires Plaintiffs' member companies to include a message that actively turns consumers *against* those companies' own products and potentially toward their competitors' products, leading to lost sales.

Relatedly, the Regulation's requirement that the Erlenmeyer flask label be included on websites imposes its own set of burdens. Many manufacturers and retailers maintain a single website page for items. As a result, retailers generally display California's Proposition 65 warnings nationwide, rather than only to consumers in California. *See, e.g.*, Hall Decl. ¶ 17. Complying

21

with the Regulation's online labeling mandate would therefore require displaying the Erlenmeyer flask label to any consumer nationwide who views a covered product, not just consumers in New Mexico. Consumers outside New Mexico will have even less context for understanding the label than consumers in New Mexico.

These burdens are fatal under *Zauderer*. But accepting, for sake of argument, NMED's assertion that the pictograph is not even meant to be a warning (*see supra*, p. 14), makes the imposition of these burdens on manufacturers all the more unreasonable. American industry should not be required to incur hundreds of millions of dollars in compliance costs for the purpose of neutrally informing consumers that their products contain a chemical they might just want to learn more about. *Supra*, p. 14. The *Zauderer* exception does not exist so that governments can impose tremendous costs on companies to satisfy consumers' mere curiosity.

*****

For all these reasons, Defendants cannot show that the Regulation's labeling mandate fits within the *Zauderer* exception. New Mexico cannot force Plaintiffs' member companies to spend hundreds of millions of dollars relabeling their products to communicate a controversial warning based on unsettled science with which many of the member companies fundamentally disagree.

**B.      The Regulation cannot survive First Amendment scrutiny.**

As a form of compelled speech that does not satisfy the *Zauderer* standard, the Regulation's labeling mandate is subject to strict scrutiny. *See Disc. Tobacco City & Lottery, Inc.*, 674 F.3d at 554; *Ent. Software Ass'n v. Blagojevich*, 469 F.3d 641, 652 (7th Cir. 2006); *Ass'n of Home Appliance Mfrs.*, 2025 WL 4642378, at *6. At a minimum, the Regulation faces intermediate scrutiny under *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*,

22

447 U.S. 557 (1980).[1]  Yet the Regulation comes nowhere close to satisfying either form of scrutiny.  Indeed, in the Proposition 65 context, courts have uniformly struck down labeling mandates after determining they do not qualify under *Zauderer*.  *See, e.g.*, *Wheat Growers*, 85 F.4th at 1282-83; *CERT.*, 29 F.4th at 480; *Pers. Care Prods. Council*, 799 F. Supp. 3d at 1094-95; *Cal. Chamber of Com. v. Bonta*, 781 F. Supp. 3d 1071, 1088-89 (E.D. Cal. 2025).

A law survives strict scrutiny only "if the government proves that [it is] narrowly tailored to serve compelling state interests." *NIFLA*, 585 U.S. at 766.  And under the intermediate scrutiny test, the government must show that the regulation "directly advances" a "substantial" government interest and "is not more extensive than is necessary to serve that interest." *Central Hudson*, 447 U.S. at 566.  Even that test "is significantly more stringent than *Zauderer*'s standard," including because the government bears the burden of proof under any form of heightened scrutiny.  *R.J. Reynolds*, 696 F.3d at 1212, 1218; *see also Brewer v. City of Albuquerque*, 18 F.4th 1205, 1221 (10th Cir. 2021) (the government "bears the burden of making the requisite narrow tailoring showing" under intermediate scrutiny).  Under either form of scrutiny, the government "must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Aptive Env't, LLC v. Town of Castle Rock*, 959 F.3d 961, 987-89 (10th Cir. 2020).

The Regulation fails to satisfy either standard.  To start, Defendants cannot identify a compelling or substantial interest in requiring products containing *any* type of PFAS *anywhere* in the product to bear the mandated warning.  The prospect that a State interest in safety or

---

[1] Mandated commercial speech that falls outside the *Zauderer* exception is subject to strict scrutiny as a content-based restriction.  *See NIFLA*, 585 U.S. at 766.  Some courts have concluded that compelled commercial speech that does not qualify for the *Zauderer* exception is evaluated under *Central Hudson* intermediate scrutiny instead.  *See Wheat Growers*, 85 F.4th at 1282; *R.J. Reynolds*, 696 F.3d at 1217.  That is wrong because "*Central Hudson* only applies to speech restrictions and not compulsions." *Ass'n of Home Appliance Mfrs.*, 2025 WL 4642378, at *6.

environmental protection is advanced by this categorical requirement is "purely hypothetical," not "potentially real." *NIFLA*, 585 U.S. at 776.  As noted above, NMED has admitted that "the vast majority of PFAS have not been studied at all."  *Supra*, pp. 8-9.  Moreover, there is no evidence of material risk associated with some broad categories of PFAS like fluoropolymers, and NMED agreed that PFAS within a product do not endanger consumers.  *Supra*, pp. 9, 17-18.  Therefore, on the evidence, the mandated warning label does not solve "an actual concrete problem."  *Ass'n of Home Appliance Mfrs.*, 2025 WL 4642378, at *9 (citation omitted).  Nor can the label mandate be justified on the basis of a putative neutral interest in encouraging New Mexico's citizens simply to learn more about PFAS.  It is doubtful such an interest would qualify as compelling or substantial, and regardless, New Mexico "has not provided a shred of evidence" showing that the Erlenmeyer flask symbol will "directly advance" that interest.  *R.J. Reynolds*, 696 F.3d at 1219.

New Mexico also could pursue its objectives in a more targeted fashion.  It could require a warning only for products with PFAS demonstrated to directly harm consumers.  New Mexico also could rely on its own "advertising campaign" about PFAS without conscripting product manufacturers to serve as the State's mouthpiece.  *Wheat Growers*, 85 F.4th at 1283; *see also NIFLA*, 585 U.S. at 775; *Kimberly-Clark Corp.*, 286 F. Supp. 3d at 145.

"[T]here is no indication the State tried—or even considered—less burdensome alternatives," confirming that the Regulation is not narrowly tailored.  *Ass'n of Home Appliance Mfrs.*, 2025 WL 4642378, at *10.  For example, NMED never evaluated the "cost to implement the Labeling portion" of the rule, Snyder Decl., Ex. 8 at 838, and its labeling expert professed ignorance about whether there were other "mechanisms through which the State could provide information about the contents of PFAS product, *see id.*, Ex. 7 at 646 ("I don't really feel like I can speak to other methods of communication."). "That the [State] barely considered less-restrictive

24

means—if it considered them at all—merely underscores the fact that the [State] did not meaningfully tailor" the Regulation to any substantial interest. *Brewer*, 18 F.4th at 1226.

The absence of tailoring is further underscored by the sweeping nature of New Mexico's approach compared to those of other jurisdictions. Only a minority of states (13) have any laws specifically addressing PFAS, and just three (California, Connecticut, and Colorado) have adopted any sort of labeling mandate. *See* Cal. Health & Safety Code § 109011; Colo. Rev. Stat. § 25-15-604; Conn. Gen. Stat. § 22a-903c. Those states limited their labeling mandates to narrower product categories than New Mexico did. *See* Cal. Health & Safety Code § 109011(a); Colo. Rev. Stat. § 25-15-604(2)(a); Conn. Gen. Stat. § 22a-903c(c)(1). And none of those states requires the inclusion of anything like the Regulation's pictographic warning. Rather, they require only disclosure of the presence of PFAS in a product. *See* Cal. Health & Safety Code § 109011(a); Colo. Rev. Stat. § 25-15-604(2)(a), (2.5); Conn. Gen. Stat. § 22a-903c(c)(3). Moreover, California and Colorado explicitly exempt products that are too small to accommodate a label and do not have exterior packaging that can be labeled. *See* Cal. Health & Safety Code § 109011(c); Colo. Rev. Stat. § 25-15-604(2)(c). The EIB was apprised of these alternative approaches and never explained why they are insufficient. *See, e.g.*, Snyder Decl., Ex. 8 at 956. The State's failure to "consider[] different methods that other jurisdictions have found effective" confirms a lack of narrow tailoring. *McCullen v. Coakley*, 573 U.S. 464, 495 (2014).

## II.    THE REMAINING FACTORS SUPPORT PRELIMINARY INJUNCTIVE RELIEF.

Because Plaintiffs are likely to succeed on their claim that the Regulation violates the First Amendment, the remaining preliminary injunction factors also are readily satisfied. Indeed, "[i]n the First Amendment context, the likelihood of success on the merits will often be the determinative factor because of the seminal importance of the interests at stake." *Verlo v. Martinez*, 820 F.3d 1113, 1126 (10th Cir. 2016) (quotation marks omitted).

### A.    Plaintiffs' member companies will suffer irreparable harm.

Plaintiffs' member companies will suffer irreparable harm if the Regulation is not promptly enjoined.  The Regulation will compel them to speak in violation of their First Amendment rights, and  "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod*, 427 U.S. at 373; *see also Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012) ("[W]hen an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.").  This "presumption of irreparable injury" fully applies "in commercial speech cases," if the law results in "the deprivation of … commercial speech rights."  *Utah Licensed Beverage Ass'n v. Leavitt*, 256 F.3d 1061, 1076 (10th Cir. 2001).

Preliminary injunctive relief is needed well before January 1, 2027, because of the lead time Plaintiffs' members otherwise will need to come into compliance.  As discussed above, it will be extraordinarily expensive for those companies to rework their manufacturing processes, and many may need to institute costly temporary fixes to meet the January 1 deadline.  *See supra*, p. 19-22.  These costs constitute irreparable harm because, in light of sovereign immunity, Plaintiffs' members will have no way to recover damages from the State even if Plaintiffs prevail.  *See Kansas ex rel. Kansas Dep't for Child. & Fams. v. SourceAmerica*, 874 F.3d 1226, 1251 (10th Cir. 2017).

### B.    The public interest favors a preliminary injunction.

The balance of hardships and the public interest factors "merge" in this case where the Defendants are state actors.  *Rocky Mtn. Gun Owners*, 121 F.4th at 112.  Those factors support preliminary injunctive relief given Plaintiffs' likelihood of success.  "Vindicating First Amendment freedoms is clearly in the public interest."  *Pac. Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1237 (10th Cir. 2005); *see also Elam Constr., Inc. v. Reg'l Transp. Dist.*, 129 F.3d 1343, 1347 (10th Cir. 1997) ("[t]he public interest ... favors plaintiffs' assertion of their First Amendment rights.").  And "when a law ... is likely unconstitutional, the interests of those the government represents,

26

such as voters, do not outweigh a plaintiff's interest in having its constitutional rights protected."

*Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013) (citation omitted).

### III.   AT A MINIMUM, THE COURT SHOULD ENJOIN THE REGULATION WITH RESPECT TO FLUOROPOLYMERS AND PFAS TO WHICH CONSUMERS ARE NOT EXPOSED

For the reasons given above, the Regulation's labeling mandate is overly broad on its face and should be enjoined in its entirety—no one should be compelled to communicate the controversial message that all PFAS are dangerous.  Even if NMED could craft a limited labeling mandate targeting some products containing some types of PFAS, that is not what NMED did and so the entire mandate is unconstitutional.  *E.g.*, *United States v. Stevens*, 559 U.S. 460, 473 (2010) ("In the First Amendment context … this Court recognizes a second type of facial challenge, whereby a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.").

If, however, the Court decides not to enjoin the mandate in its entirety, then it should at least enjoin Defendants from enforcing it as applied to products containing only fluoropolymers and PFAS to which consumers will not be exposed.  The New Mexico legislature distinguished between fluoropolymers and other PFAS, when it carved fluoropolymers out of the PFAS Act's statutory ban.  *See supra*, p. 7.  And NMED witnesses repeatedly conceded before the EIB that fluoropolymers, and PFAS to which consumers are not exposed, do not pose a direct risk to consumers. *See supra*, pp. 8-9.  Plaintiffs therefore have a high likelihood of success in challenging the constitutionality of the labeling mandate as applied to products falling in those two categories.

### CONCLUSION

Plaintiffs respectfully request that the Court grant their request for a preliminary injunction. At a minimum, the Court should enjoin enforcement of the mandate with respect to products containing only fluoropolymers, or PFAS to which consumers will not be exposed.

27

Dated: July 1, 2026                                       Respectfully submitted,


                                        */s/ John C. Anderson*

                                        JOHN C. ANDERSON
                                        **HOLLAND & HART LLP**
                                        215 Lincoln Ave., Suite 100
                                        Santa Fe, NM 87501
                                        Phone: +1 505 988 4421
                                        jcanderson@hollandhart.com

                                        KEVIN P. MARTIN (*pro hac vice* pending)
                                        **GOODWIN PROCTER LLP**
                                        100 Northern Avenue
                                        Boston, MA 02210
                                        Phone: +1 617 570 1000
                                        KMartin@goodwinlaw.com

                                        BRIAN T. BURGESS (*pro hac vice pending*)
                                        ANDREW KIM (*pro hac vice pending*)
                                        CASSANDRA SNYDER (*pro hac vice pending*)
                                        NOELLE WILSON (*pro hac vice pending*)
                                        **GOODWIN PROCTER LLP**
                                        1900 N Street NW
                                        Washington, DC 20036
                                        Phone: +1 202 346 4000
                                        BBurgess@goodwinlaw.com
                                        AndrewKim@goodwinlaw.com
                                        CassandraSnyder@goodwinlaw.com
                                        NWilson@goodwinlaw.com

                                        *Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on July 1, 2026, a true and correct copy of the foregoing was electronically filed and served on all parties of record via the Court's CM/ECF system.

/s/ John C. Anderson
John C. Anderson

29