**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

| | |
|---|---|
| AMERICAN CHEMISTRY COUNCIL, ALLIANCE FOR AUTOMOTIVE INNOVATION, AMERICAN COATINGS ASSOCIATION, ASSOCIATION OF HOME APPLIANCE MANUFACTURERS, NATIONAL ASSOCIATION OF MANUFACTURERS, NATIONAL ELECTRICAL MANUFACTURERS ASSOCIATION, NATIONAL FEDERATION OF INDEPENDENT BUSINESS, INC., NEW MEXICO RETAIL ASSOCIATION, and POWER TOOL INSTITUTE,<br><br>*Plaintiffs*,<br><br>v.<br><br>JAMES C. KENNEY, *in his official capacity as Secretary of New Mexico Environment Department*; and RAÚL TORREZ, *in his official capacity as Attorney General of New Mexico*,<br><br>*Defendants*. | Case No.: 1:26-cv-02130 |

**DECLARATION OF STEPHEN H. KORZENIOWSKI, PH.D.**

I, Stephen H. Korzeniowski, hereby declare and state as follows:

1. I have been retained by counsel for Plaintiffs as an expert in connection with the above-captioned litigation. I am a private consultant with nearly 50 years of experience in the chemical industry, including over 35 years in working with fluorotelomers and the last 10 years also working with fluoropolymers. I have over 25 years of experience in various industry groups, including multiple chair positions.

2. I have been asked to provide my expert opinions on: (1) the physical and chemical properties of PFAS as a class; (2) the diversity of physical and chemical properties within the PFAS class; and (3) the current state of scientific debate regarding how to define PFAS as a class.

3. I have actual knowledge of the matters stated herein. If called to testify in this matter, I would testify truthfully and based on my expert opinions.

4. In preparing this declaration, I reviewed the New Mexico Per- and Poly-Fluoroalkyl Substances Protection Act (the "PFAS Act"), N.M. Stat. § 74-15-1 *et seq.*, the New Mexico Environment Improvement Board's (the "EIB") implementing regulation, NMAC § 20.13.2, and all other documents cited herein. I am also relying on my scientific education and training, my industry experience, my research experience, and my knowledge of the scientific literature in the pertinent fields, as set out in my curriculum vitae, attached hereto as **Exhibit A**.

5. I served as an expert witness for Plaintiff American Chemistry Council in proceedings before the EIB regarding adoption of the PFAS labeling regulation. In that capacity, I provided both written testimony, as well as live testimony before the EIB. That testimony is attached hereto as **Exhibit B**.

6. The materials I have relied upon in preparing this declaration are the same types of materials that experts in my field regularly rely upon when forming opinions on these subjects. These materials are listed in **Exhibit C** to this Declaration.

7. I may wish to supplement the opinions stated in this declaration or the bases for them as a result of new scientific research or publications or in response to statements and issues that may arise in my area of expertise.

## I. BACKGROUND AND QUALIFICATIONS

### A. Qualifications

8. I hold a BA in Chemistry from Rutgers University (1972), a PhD in organic chemistry from Penn State University (1977), and an MBA from Widener University (1985). For the majority of my career, I was employed by DuPont. My roles at DuPont included Global Technology Manager for Surface Protection Solutions, and Global Business Manager for fluoroadditives and custom chemicals. I have extensive, first-hand knowledge of the regulatory, commercial, and scientific dimensions of fluorinated chemistries. Since leaving Chemours (a DuPont spinoff) in July 2015, I have remained active in matters related to fluorochemistry science and regulation. Currently, I am a self-employed consultant at BeachEdge Consulting, where I help businesses understand global trends in fluorotechnology and provide technical/scientific help as needed. I have published more than 50 papers, posters, and major talks throughout my industrial career, including 20 peer-reviewed journal articles, a majority of them focused on the topic of fluorotelomers.

### B. Compensation

9. I am being compensated at a rate of $400 per hour. My compensation does not depend on the outcome of this litigation, the opinions I express, or the testimony I provide.

### C. Previous Testimony

10. I have previously testified as an expert witness, including in the proceedings before the EIB regarding the regulation at issue in this litigation. My curriculum vitae, attached hereto as **Exhibit A**, identifies the proceedings in which I have previously provided expert testimony.

## II. SUMMARY OF OPINIONS

11. PFAS is a broad category that may include more than 14,000 substances. The scientific community is still divided as to how to identify PFAS. The substances that fall under

the broad umbrella term "PFAS" all vary with respect to chemical and physical properties. And the differences across substances have a direct impact on how each PFAS interacts with human health and the environment.

12. I understand that New Mexico law defines PFAS broadly: as a "substance in a class of fluorinated organic chemicals containing at least one fully fluorinated carbon atom." N.M. Stat. § 74-15-2(S). That is a very broad definition, and it is not the only one used to define PFAS. I also understand that New Mexico bans the sale and distribution of certain products that it defines as PFAS, but it has exemptions for certain categories and any products designated by regulators as a "currently unavoidable use"—meaning the use of PFAS in the product is "essential for health, safety, or the functioning of society" and "alternatives are not reasonably available." *Id.* §§ 74-15-2(H), 74-15-3(A)(15).

13. I also understand that, using the very broad definition provided by state law, the EIB adopted a rule requiring a warning label on *all* products containing intentionally added PFAS, even those exempted from the PFAS Act's phased statutory ban.

14. This approach fails to provide for any differentiation among different types of PFAS, including hazards, toxicity, or means of exposure. There is no scientific basis for treating all PFAS alike. To the contrary, New Mexico's approach contradicts the growing scientific consensus that all PFAS are not the same and should not be assumed to possess the same properties.

15. For example, fluoropolymers—a subcategory of PFAS that includes PTFE (polytetrafluoroethylene)—are large molecules that are neither water-soluble nor fat-soluble. This means they do not get into your drinking water. These high molecular weight polymers are too large to cross cell membranes. As a result, they are neither absorbed into nor accumulated in the human body. They are also regarded as stable and resist environmental degradation. This makes

them different from other types of PFAS—for example, non-polymeric, water-soluble PFAS, and precursors to perfluorocarboxylates (PFCAs), many of which have been voluntarily phased out by manufacturers.

16. PFAS encompass substances with significantly different chemical, physical, and toxicological properties that inform their uses, potential exposure, and risk profiles. Applying a single, uniform warning overtly implies comparable risk across all PFAS, which is not supported by any of the publicly available scientific evidence.

## III. BACKGROUND

### A. PFAS is a Broad Category of Substances and Encompasses Materials that are Critical Components in Everyday Products

17. Per- and polyfluoroalkyl substances—collectively referred to as "PFAS"—is a broad term for a category of more than 14,000 substances with diverse physical, chemical, and toxicological properties.

18. There is no universal definition of a "PFAS." At their most general definition, however, PFAS are characterized simply by the presence of covalent bonds between carbon and fluorine atoms, the strongest single bond in organic chemistry. The broadest definition says that a PFAS must have one single fully fluorinated carbon, such as a $-CF_3$ or $-CF_2-$. A simple figure that

shows the evolution of the definition is given below.




Figure 1. PFAS Definition and Evolution

19. As a result of this strong bond and other properties, many PFAS are water-resistant, grease-resistant, and chemically and thermally stable. These properties make PFAS uniquely useful across industries worldwide. Fluoropolymers, for example, are often characterized as having a unique combination of properties that provide the performance properties required in many end-use applications.

20. Many applications of PFAS involve highly technical materials that serve as critical enablers of industries underpinning modern life. In numerous contexts—such as healthcare, energy systems, transportation, electronics, and other infrastructure—these substances are essential to safety, durability, or performance, and viable alternatives are not reasonably available without compromising function or introducing other risks. As noted above, fluoropolymers have a set of properties that make them unique. While non-fluorinated polymers can offer some of the

desired properties, none of them can match the required end-use properties such as durability, dielectric properties, mechanical strength, low coefficient of friction, weatherability, barrier properties, optical clarity, chemical and thermal stability, among others. And fluoropolymers are used in critical applications precisely because they possess these properties, in a range of different products essential to everyday life: in the automotive industry, aerospace, medical devices, oil and gas and chemical/pharmaceutical processing, filtration media, electronics, batteries, semiconductors and internet and wireless communications (*i.e.*, 5G technology in our cell phones).

### B. There is an Unresolved Scientific Debate About What Substances Qualify as "PFAS"

21. There is a legitimately unresolved scientific debate about how to define which substances can be described as PFAS. Some scientists, regulators, non-governmental organizations, and others apply broad definitions that capture more than 14,000 potential PFAS substances, while others use more precise definitions that encompass hundreds of substances. But these definitions ultimately do not reflect the differences in chemical properties, toxicology, health hazards, or environmental fate-and-transport effects.

22. One of the earliest definitions of PFAS was developed in 2011 by a multidisciplinary group of scientists led by Dr. Robert C. Buck. Under that definition, PFAS were defined as "aliphatic substances containing one or more C atoms on which all the H substituents presented in the nonfluorinated analogues from which they are notionally derived have been replaced by F atoms, in such a manner that … [a molecule] contains the perfluoroalkyl moiety $C_nF_{2n+1}$." I refer to this as the "Buck Definition." Or, in plain English, a PFAS molecule has a tail or backbone made entirely of carbon and fluorine, with no hydrogens. This fully fluorinated structure, either tail or backbone, is not expected to break down under normal operating or generally expected or encountered environmental conditions. Robert C. Buck et al., *Perfluoroalkyl*

*and Polyfluoroalkyl Substances in the Environment: Terminology, Classification, and Origins*, 7 Integrated Envn. Assessment & Mgmt. 513, 515 (2011). See Figure 1.

23. The Organisation for Economic Co-operation and Development defines "PFAS" as "fluorinated substances that contain at least one fully fluorinated methyl or methylene carbon atom (without any H/Cl/Br/I atom attached to it), i.e., with a few noted exceptions, any chemical with at least a perfluorinated methyl group ($–CF_3$) or a perfluorinated methylene group ($–CF_2–$)." Zhanyun Wang et al., *A New OECD Definition for Per- and Polyfluoroalkyl Substances*, 55 Envtl. Sci & Tech. 15575, 15576 (2021). Again, in plain English, that means a chemical is a PFAS if the molecule contains at least one carbon atom that is fully fluorinated—the carbon can carry three fluorines ($–CF_3$), or two ($–CF_2–$). The OECD definition differs from the Buck Definition because it does not require the entire tail to be fully fluorinated, and it does not require the molecule to be shaped like a chain. See Figure 1.

24. Fluoxetine, the active ingredient in the antidepressant Prozac, is one example of a chemical that would qualify as a PFAS under the OECD definition, but not the Buck Definition. Emily Hammel et al., *Implications of PFAS Definitions Using Fluorinated Pharmaceuticals*, 25 iScience 104020 (2022).

25. The U.S. Environmental Protection Agency has a different view of how to define PFAS. In 2021, as part of the process for putting out a reporting rule under the Toxic Substances Control Act, the EPA provided a structural definition of PFAS: "per- and polyfluorinated substances that structurally contain the unit R-(CF2)-C(F)(R′)R″. Both the CF2 and CF moieties are saturated carbons and none of the R groups (R, R′ or R″) can be hydrogen." *TSCA Section 8(a)(7) Reporting and Recordkeeping Requirements for Perfluoroalkyl and Polyfluoroalkyl Substances*, 86 Fed. Reg. 33,926, 33,929 (June 28, 2021). The EPA's 2021 definition differs from

the Buck and OECD definitions because it requires a pair of adjacent carbon-based moieties—one with two fluorines, the other with one—that are linked to one another.

26. In 2023, when EPA finalized the rule, it expanded the definition of PFAS to adopt two other structures: (1) "R–CF2OCF2-R′, where R and R′ can either be F, O, or saturated carbons," and (2) "CF3C(CF3)R′R″, where R′ and R″ can either be F or saturated carbons." *Toxic Substances Control Act Reporting and Recordkeeping Requirements for Perfluoroalkyl and Polyfluoroalkyl Substances*, 88 Fed. Reg. 70,516, 70,518 (2023). The first definition captures two fluorinated carbons that are connected by oxygen; the second is intended to cover a bundle of fluorinated carbons. In adopting the final rule, the EPA stated that it deliberately decided that it was "not appropriate" to adopt the OECD definition, because the "chemical substances covered by the OECD definition are unlike the structures of the PFAS of concern … which have more fluorinated carbons are more likely to be present in the environment." *Id.* at 70,533.

27. Applying just these three definitions of PFAS would lead to inconsistent results for a broad range of products. Take, for example, HFO-1234yf (2,3,3,3-tetrafluoropropene, or "R-1234yf"). R-1234yf is the refrigerant used for the air conditioning systems in most cars manufactured in the United States today; it is considered an eco-friendly successor to R-134a, which is commonly known as Freon.

28. R-1234yf is a three-carbon molecule. One carbon holds two hydrogen atoms, and it is double-bonded to another carbon that holds a single fluorine. The single-fluorine carbon is bonded on the other side to a carbon holding three fluorine.

29. R-1234yf would not be considered PFAS at least under the EPA's definition, because it does not meet any of the three physical structures identified by the EPA. The EPA definition excludes unsaturated fluorinated compounds (olefins) and single fluorinated

compounds. Buck et al.'s 2011 classic peer-reviewed publication did exclude compounds that were registered and regulated by other agencies such as the FDA and those that fall under the Montreal Protocol (i.e., refrigerants).

30. New Mexico, in effect, adopted the definition of PFAS put forth by OECD. All New Mexico requires is "at least one fully fluorinated carbon atom." The OECD's definition is also based on a fully fluorinated carbon atom.

31. Needless to say, because the scientific community does not yet have a consensus on what a PFAS is, there is no consensus that all PFAS should be assumed to have the same properties and treated the same. To the contrary, if any consensus is emerging, it is that all PFAS are *not* the same, and that PFAS chemicals should not be uniformly assumed to possess the same properties.

32. PFAS chemicals are grouped together mainly because of their inherent persistent quality and the common carbon-fluorine bond, but that does not mean the same broad brush should be used to paint all PFAS as toxic and hazardous. Persistence, by itself, does not make a substance hazardous, and calling a chemical hazardous based on its persistent quality alone contradicts the existing science.

33. For example, Anderson et al. reports on the opinions of an expert panel "convened to provide insight and guidance on per- and polyfluoroalkyl substances (PFAS) grouping for the purposes of protecting human health from drinking water exposures, and how risks to PFAS mixtures should be assessed." Janet K. Anderson, et al., *Grouping of PFAS for human health risk assessment: Findings from an independent panel of experts*, Regul. Toxic. & Pharmacol., Oct. 2022, at 1. Most of the panelists agreed that PFAS should not be grouped together for risk

assessment purposes and that it is scientifically inappropriate to assume equal toxicity/potency across the diverse class of PFAS. *Id.* at 7.

34. The OECD, for its part, also recognizes that not all PFAS are the same. In 2021, it issued a report developed under the auspices of its Chemicals and Biotechnology Committee that states, "PFASs are a chemical class with diverse molecular structures and physical, chemical and biological properties, it is highly recommended that such diversity be properly recognized and communicated in a clear, specific and descriptive manner. The term 'PFASs' is a broad, general, non-specific term, which does not inform whether a compound is harmful or not, but only communicates that the compounds under this term share the same trait for having a fully fluorinated methyl or methylene carbon moiety." OECD, *Reconciling Terminology of the Universe of Per- and Polyfluoroalkyl Substances: Recommendations and Practical Guidance* 8 (July 9, 2021), https://one.oecd.org/document/ENV/CBC/MONO(2021)25/En/pdf.

35. The Drinking Water and Groundwater Protection Division of Vermont's Department of Environmental Conservation was specifically charged by the state legislature to develop a class regulation or to explain why such a regulation was not possible. In its final report, the Department said: "The Review Team spent over a year deliberating, researching, and discussing the potential to regulate PFAS as a Class. After reviewing the current peer-reviewed literature, as well as the available toxicology data for PFAS, the Review Team determined that at the current time it is not feasible to regulate PFAS as a Class." Agency of Nat. Res., Dep't of Env't Conservation, *Drinking Water and Groundwater Protection Division. Advance Notice on the Regulation of Perfluoroalkyl, Polyfluoroalkyl Substances (PFAS) as a Class* (August 14, 2020), https://dec.vermont.gov/sites/dec/files/PFAS/20180814-PFAS-as-a-Class.pdf.

36. In a Congressionally-mandated report, the U.S. Department of Defense recognized the diversity of PFAS chemistries, cautioning that "Congress and the Federal regulatory agencies should avoid taking a broad, purely 'structural' approach to restricting or banning PFAS. It is critical that future laws and regulations consider and balance the range of environmental and health risks associated with different individual PFAS, their essentiality to the U.S. economy and society, and the availability of viable alternatives." Dep't of Def., *Report on Critical Per- and Polyfluoroalkyl Substance Uses* (Aug. 2023), https://www.acq.osd.mil/eie/eer/ecc/pfas/docs/reports/Report-on-Critical-PFAS-Substance-Uses.pdf.

37. The U.S. Food and Drug Administration ("FDA") has similarly recognized that all PFAS are not the same. Based on a review of more than 1,700 published and peer-reviewed scientific articles, FDA concluded that fluoropolymers do not present health or safety concerns when used in medical devices. FDA, *PFAS in Medical Devices* (Aug. 6, 2025), https://www.fda.gov/medical-devices/products-and-medical-procedures/pfas-medical-devices.

**C. Fluoropolymers are Chemically Distinct From Other Categories of PFAS**

38. As noted above, fluoropolymers are a category of PFAS known as fluorinated polymers and include materials such as PTFE (polytetrafluoroethylene) and PVDF (polyvinylidene fluoride). These two fluoropolymers are the number-one and number-two fluoropolymers globally. They provide an example of why the identification of PFAS is such a complicated and controversial area, transcending chemical and physical properties alone given how unique these two compounds are and their myriad use cases (which are valuable and important).

39. Fluoropolymers do meet the structural definitions for PFAS. But knowing the structure alone is not nearly enough to determine whether a molecule is harmful to human health and the environment. And making assumptions about hazard is simply bad science.

40. I was the lead author of a paper first published in 2022, which explained why fluoropolymers should be of low concern despite the fact that they meet some definitions of PFAS. Stephen H. Korzeniowski et al., *A critical review of the application of polymer of low concern regulatory criteria to fluoropolymers II: Fluoroplastics and fluoroelastomers*, 19 Integrated Env't Assessment & Mgmt. 326 (2023). I, along with my co-authors (including Dr. Buck, who was the lead author of the study that provided the Buck Definition), concluded that structural makeup was not enough to determine what might cause harm. Instead, we proposed evaluation of a broad range of chemical properties to assess the level of concern that should be ascribed to a PFAS chemical: (1) polymer composition (structure and elemental composition); (2) molecular weight; (3) molecular weight distribution; (4) particle size; (5) percent of low molecular weight oligomers; (6) electrical charge; (7) reactive functional groups; (8) presence of low molecular weight residues that might leach from the PFAS; (9) resistance to physical, chemical, and biological transformation; and (10) thermal stability. This scientific work built on the prior peer-reviewed paper of Dr. Barb Henry and her colleagues. Barbara J. Henry et al., *A critical review of the application of polymer of low concern and regulatory criteria to fluoropolymers*, 14 Integrated Env't Assessment & Mgmt. 316 (2018).

41. In the 2022 Korzeniowski et al. publication, the various fluoropolymers were assessed against over ten criteria to determine whether these polymers would be considered "polymers of low concern." Each of the 14 assessed fluoropolymers met the criteria to be considered polymers of low concern for human health and the environment. This and the prior study noted above by Henry et al. in 2018 encompass approximately 96% of the global fluoropolymer market. These two studies are considered to be "In-Life" studies that deal with the fluoropolymers during their industrial and consumer use.

42. These fluoropolymers are large molecules, meaning they have a large molecular weight. The European Union has concluded that "most potential health concern polymers have an average molecular weight" of less than 1,000 Da (Daltons), and oligomer content of more than 1%. *See* Henry et al. at 323. Fluoropolymers are somewhere between *50 to 300 times larger* than the molecules identified as polymers of health concern. Large molecules such as fluoropolymers are not water-soluble and cannot cross cell membranes, meaning their ability to adversely affect critical bodily functions has a low to no probability.

43. Another factor is the degree of reactivity of the polymer: the more reactive the polymer is, the higher the association with adverse effects on human health and the environment. Fluoropolymers don't have the atoms or group of atoms necessary for a reaction to occur—what our paper described as "reactive functional groups."

44. Fluoropolymers are also resistant to physical, chemical, and biological transformation—in other words, they remain stable and do not break down. They are abiotically stable, meaning sunlight, water, and oxygen do not cause fluoropolymers to break down. They are biotically stable, meaning bacteria and enzymes (and other organisms and biological molecules) cannot break down fluoropolymers, either. And they are thermally stable up to certain specified high temperatures that significantly exceed the range of normal use conditions. Each fluoropolymer has a given operating temperature, and these guidelines must be followed to maintain the fluoropolymer integrity. That means the current evidence shows fluoropolymers do not break down in a manner that they can become a risk to human health or the environment under normal operating conditions.

45. However, not all PFAS have these "low concern" characteristics, even if they may have some structural similarities with fluoropolymers (because they have one or more fully

fluorinated carbons). Consider perfluorooctanoic acid (PFOA) and perfluorooctane sulfonate (PFOS). PFOA and PFOS share some overlap with fluorinated polymers in that all three are made of several fully fluorinated carbons—the carbon-fluorine bond makes them "persistent." But PFOA and PFOS differ vastly on the factors described above. They are, for example, much, much smaller in size than fluoropolymers—small enough to enter the human body in various environmental compartments (air and water). Because of their size and water solubility, they are much more mobile in the environment. Both PFOA and PFOS have been voluntarily phased out by industry. *See* EPA, *Fact Sheet: 2010-2015 PFOA Stewardship Program* (Feb. 26, 2026), https://www.epa.gov/assessing-and-managing-chemicals-under-tsca/fact-sheet-20102015-pfoa-stewardship-program; EPA, *EPA And 3M Announce Phase Out of PFOS* (May 16, 2000), https://perma.cc/KA6N-WANC.

46. Because of these differences, I, along with other scientists who study fluoropolymers and other chemicals that might be categorized as "PFAS," disagree with any approach to PFAS that groups fluoropolymers with other characteristically different chemicals, like PFOA and PFOS. New Mexico's approach to PFAS does just that.

## IV. OPINIONS

47. The regulation's generalization of PFAS is not supported by science and runs contrary to a growing scientific consensus that all PFAS are not the same and they should not be assumed to possess the same properties.

48. The regulation's warning labeling provisions are based on an incorrect understanding and interpretation of PFAS chemistry. A single PFAS label does not differentiate between the various types of PFAS and therefore implies all PFAS are the same—which is directly contrary to the current scientific evidence.

49. EIB's approach appears to be based on an assumption that all PFAS are the same and therefore possess the same properties and potential risk to human health and the environment. As explained above, that is simply not the case.

50. PFAS encompass substances with significantly different chemical, physical, and toxicological properties that inform their uses, potential exposure, and risk profiles. There is a legitimately unresolved scientific debate about what substances qualify as "PFAS," with some definitions encompassing more than 14,000 substances and others encompassing significantly fewer substances.

51. At the same time, there is a growing scientific consensus around the diversity of PFAS chemistries and that such diversity should have been accounted for in PFAS regulation. Experts agree that PFAS should not be grouped together for risk assessment purposes and that it is scientifically inappropriate to assume equal toxicity/potency across the diverse class of PFAS. *See supra* ¶¶ 33-37.

52. Recognizing the diversity of physical and chemical properties within the PFAS family of chemistries is critical for understanding whether a particular PFAS or subgroup of PFAS might be of potential concern to human health or the environment. For example, fluoropolymers have markedly different physical and toxicological characteristics compared to non-polymeric PFAS. As peer-reviewed journal articles have shown, fluoropolymers have a unique combination of properties that set them apart from other PFAS. In particular, fluoropolymers are neither bioavailable nor bioaccumulative, nor do they transform into non-polymeric PFAS under normal environmental conditions. As such, they are properly classified as polymers of low concern for human health or environment.

53. EIB's approach, which fails to differentiate among different types of PFAS, stands in stark contrast to the scientific consensus that PFAS is a diverse class of substances with vastly different physical and chemical properties.

54. PFAS are not monolithic in their properties or uses. A uniform, one-size-fits-all warning would obscure these distinctions and could mislead consumers into believing all of these materials pose similar risks, which is not consistent with the available scientific evidence.

55. In many contexts—such as healthcare, medical devices and implants, electronics, telecommunications, automotive and aerospace transportation, and energy systems, chemical processing and pharmaceuticals—viable alternatives to PFAS are not reasonably available without significantly compromising critical functionality or introducing other often substantial risks.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 1st day of July, 2026, in Media, Pennsylvania.

DocuSigned by:
Stephen Korzeniowski
51FA74897414441...

Stephen H. Korzeniowski, Ph.D.

# EXHIBIT A

# STEPHEN H. KORZENIOWSKI

**Media, PA 19063 and Point Pleasant Beach, NJ 08742** **610.316.8205**
**www.beachedgeconsulting.com** **shkorzo@gmail.com**


## Consulting Business: Aug 2015 - Present

Adjunct Professor at Penn State Brandywine teaching Corporate Finance Jan 2016-May 2021
Consultant in Fluorotechnology Industry with two major active clients, one in the AFFF industry and the other in various fluorotechnology end-uses Jan 2016 - Present
Participant and Member of the Fire Fighting Foam Coalition Jan 2016 - Present
Participant in the Industry Group FluoroCouncil (now PFP and ATCS) for the two two noted clients advising on Global PFAS Regulatory and Science Matters Jan 2016 - Present
Science Work Group Chairman of FluoroCouncil Jan 2017-Dec 2019
ITRC PFAS Team, Analytical and AFFF Workgroup 2017 - Present

## EXPERIENCED TECHNOLOGY AND BUSINESS MANAGER: 1994 - 2015

### Project Management & Major Technology Program Leader

Led multiple cross-functional teams through complex projects and a global technology transformation, meeting critical milestones and driving delivery of on-time, sustainable results. Expert in business and technology strategic options creation and execution, with critical results delivered year-over-year. Recognized subject matter expert in fluorotelomer technology industry; sought out to tackle and resolve difficult issues by business and industry groups. Forward thinker who fosters collaboration and has demonstrated multiple team development successes.

Core competencies:

- Plant project and integrated supply chain management
- Complete global transformation of 'long-chain' to 'short-chain' Capstone® fluorotelomer products
- Technology and business interface with global regulatory agencies
- Leadership roles in Telomer Research Program, FluoroCouncil and Fire Fighting Foam Coalition
- Product stewardship and advocacy
- Profit & loss and strategy development for surfactants & coatings business
- Commercial business development, including acquisition expertise

## PROFESSIONAL EXPERIENCE

**THE CHEMOURS COMPANY**, Wilmington, DE (July 2015)
**E.I. DU PONT DE NEMOURS & CO, INC.**, Wilmington, DE

**Global Technology Manager**, Surface Protection Solutions 2002 – 2015

- Oversaw research & development and plant project execution for 4 major projects, including: 2 at plants, 1 integrated complete supply chain transformation and 1 international technology transfer.
- Led completion of Capstone® products technology development and market introductions in textiles, coatings, AFFF surfactants and telomer intermediates.
- Acted as a global regulatory agency interface primarily in USA, Germany, Canada, England as well as Australia, S. Korea and China.

- Led fluorotelomer business' US EPA 2010 / 2015 voluntary product stewardship program through developing and execution of detailed plant and product changes to essentially eliminate unwanted impurities, unwanted long-chain materials and minimize all global plant emissions.
- Led fluorotelomer technology global stewardship program and supply chain transformation that helped provide for a sustainable product line and meet all critical regulatory deadlines for both the US and Canada.
- Earned Corporate Marketing Excellence, Engineering Excellence and Sustainable Growth awards. Selected as the only DuPont "Triple Crown" award winner.

**Global Business Manager**, Fluoroadditives and Custom Chemicals 1996 – 2002

- Directed business and marketing responsibility for multiple complex small business units with total revenues of >$50MM.
- Detailed fluoroadditives business analysis and strategy development, laying foundation for significant future growth.
- Managed DuPont Chemoswed Active Pharmaceutical Intermediates site in Malmo, Sweden, directing all business and marketing activities.
- Received Corporate Marketing Excellence Award for Stone & Tile business development.

**Business Development Manager**, Specialty Chemicals 1994 – 1996

- Performed commercial business development to scope out custom chemicals as a strategic segment. Ultimately decided not to move forward.
- Completed long-range strategic planning, resulting in complete restructuring of business unit into a significantly healthier set of businesses.
- Executed pharmaceutical acquisition to help build out custom chemicals capability.

### Prior Positions Held: 1977 - 1994

**Marketing Manager**, White Pigments

**Regional Sales Manager**, White Pigments

**Tech Service / Market Development / R&D Manager**

**Field Sales**, Industrial Chemicals

**Research & Development/Technical Service / Market Development**

**Business and Financial Analysis**

## EDUCATION

**MBA**, Finance / Marketing, Widener University, Chester, PA
**PhD**, Organic Chemistry, Penn State University, University Park, PA
**BA**, Chemistry, Rutgers University, New Brunswick, NJ

## ADDITIONAL TRAINING / EXPERIENCE

Industry group leadership: Global Regulatory Interface Experiences (2000 – 2015)

Former business manager of spouse-owned veterinary business; responsibility for all business, marketing and personnel matters of 6-doctor AAHA-certified hospital (1984 – 2011)

**Stephen H. Korzeniowski, Ph.D**

**Record of Expert Testimony (as of July 1, 2026)**

1. *In Re Aqueous Film-Forming Foams Products Liability Litigation*, No. 2:18-mn-2873 (D.S.C.) (deposition testimony).

2. *City of Rome, Georgia v. 3M Company*, No. 19CV02405JFL003 (Ga. Super. Ct., Floyd Cnty.) (deposition testimony).

3. *Parris v. The 3M Company*, No. 4:21-cv-40 (N.D. Ga.) (deposition testimony).

4. *State of Vermont v. 3M Company*, No. 2:25-cv-660 (D. Vt.) (deposition testimony).

5. *Woodward Iodine Corporation vs. E. I. du Pont de Nemours and Company* (deposition and arbitration hearing testimony).

6. *New Jersey Dep't of Env't Protection v. E. I. Du Pont de Nemours & Co.*, No. 1:19-cv-14758 (D.N.J.) (deposition and in-court testimony).

7. *Town of Lyerly v. 3M Company*, No. 24SCA4052 (Ga. Super. Ct., Chattoga Cnty.); *Moss Land Co., LLC v. City of Calhoun*, No. 24CV73929 (Ga. Super. Ct., Gordon Cnty.); *Brooks v. City of Calhoun*, No. 24CV74289 (Ga. Super. Ct., Gordon Cnty.); *Stephens v. 3M Co.*, No. 25CV75072 (Ga. Super. Ct. Gordon Cnty.) (deposition testimony).

8. *Moss Land Co., LLC v. City of Calhoun*, No. 24CV73929 (Ga. Super. Ct., Gordon Cnty.) (deposition testimony).

9. *The Water Works and Sewer Board of the Town of Centre v. 3M Company*, (Ala, Cherokee Cnty.) (trial testimony).

10. *In the Matter of Proposed Adoption of 20.13.2 NMAC, Per- and Polyfluoroalkly Substances in Consumer Products*, N.M. Env. Dep't, Env't Improvement Bd. Dkt. No. 25-61(R) (administrative hearing testimony).

**Upcoming:**

1. *Christiana Ins. LLC EIDP, Inc. v. Everen Specialty Ltd.* (arbitration testimony)

# EXHIBIT B

ACC Exhibit 2

**STATE OF NEW MEXICO**
**BEFORE THE ENVIRONMENTAL IMPROVEMENT BOARD**

**IN THE MATTER OF PROPOSED**
**ADOPTION OF 20.13.2 NMAC**
***Per- and Poly-Fluoroalkyl Substances in Consumer Products*** **No. EIB 25-61(R)**

# DIRECT TESTIMONY OF DR. STEPHEN KORZENIOWSKI
## ON BEHALF OF AMERICAN CHEMISTRY COUNCIL

January 16, 2026

My name is Stephen Korzeniowski, and I am submitting direct testimony on behalf of the American Chemistry Council. I am a self-employed consultant. My company is BeachEdge Consulting. For the majority of my career, I was employed by DuPont. Among my roles was Global Technology Manager for surface protection solutions and Global Business Manager for fluoroadditives and custom chemicals. I have extensive, first-hand knowledge of the regulatory, commercial, and scientific dimensions of fluorinated chemistries. Since retiring in 2015, I have remained active in the matters related to fluorochemistry science and regulation. I hold a PhD in organic chemistry from Penn State University. My resume and qualifications are provided in ACC Exhibit 1.

I have reviewed the text of the proposed rule in this matter, particularly the text provided as an exhibit to the Petition filed by the New Mexico Environment Department ("NMED") on October 8, 2025. My testimony will refer to that version as the "proposed rule." The purpose of my testimony is to support the ACC's position that the warning label provisions in the proposed rule treat all PFAS as if they are the same, when PFAS are in fact a diverse group of substances with different physical and chemical properties. The proposed rule would require that all products, including those exempt from the reporting and currently unavoidable use provisions of the law, bear a warning label, which implies that all types of PFAS and all types of products containing intentionally added PFAS present similar concerns. However, recognizing the diversity of physical and chemical properties within the PFAS family of chemistries is critical for understanding whether a particular PFAS or sub-group of PFAS might be of potential concern to human health or the environment.

NMED's generalization of PFAS is not supported by science and runs contrary to a growing scientific consensus that all PFAS are not the same and should not be assumed to possess the same properties. For example,

a. Anderson et al. reports on the opinions of an expert panel "convened to provide insight and guidance on per- and polyfluoroalkyl substances (PFAS) grouping for the purposes of protecting human health from drinking water exposures, and how risks to PFAS mixtures should be assessed." Most panelists agree that PFAS should not be grouped together for risk assessment purposes and that it is scientifically inappropriate to assume equal toxicity/potency across the diverse class of PFAS.

b. Two peer-reviewed scientific papers, one for which I was the primary author, demonstrate that fluoropolymers, a specific subset of PFAS, meet criteria that can be used to identify polymers of low

concern for human health or environment.[1,2] Those criteria include consideration of chemical properties such as:

- Polymer composition (structure and elemental composition);
- Molecular weight;
- Molecular weight distribution (consistency of molecule size in a sample);
- Particle size;
- Percent of low molecular weight oligomers;[3]
- Electrical charge;
- Reactive functional groups;
- Presence of low molecular weight residues that might leach from the fluoropolymer;
- Resistance to physical, chemical, and biological transformation; and
- Thermal stability.

The authors of the two papers conclude that fluoropolymers are large, stable, and insoluble substances that have properties fundamentally different from those of non-polymeric, water soluble PFAS. Because fluoropolymers are insoluble in water, concerns about environmental mobility do not apply to fluoropolymers. Fluoropolymers are neither bioavailable nor bioaccumulative and do not transform into non-polymeric PFAS in the environment.

c. In 2021, the 38-nation Organisation for Economic Co-operation and Development (OECD) issued a report developed under the auspices of its Chemicals and Biotechnology Committee that states, "PFASs are a chemical class with diverse molecular structures and physical, chemical and biological properties, it is highly recommended that such diversity be properly recognized and communicated in a clear, specific and descriptive manner. The term "PFASs" is a broad, general, non-specific term, which does not inform whether a compound is harmful or not, but only communicates that the compounds under this term share the same trait for having a fully fluorinated methyl or methylene carbon moiety."[4]

---

[1] Henry, B.J., Carlin, J.P., Hammerschmidt, J.A., Buck, R.C., Buxton, L.W., Fiedler, H., Seed, J. and Hernandez, O. (2018), A critical review of the application of polymer of low concern and regulatory criteria to fluoropolymers. Integr Environ Assess Manag, 14: 316-334, https://doi.org/10.1002/ieam.4035.

[2] Korzeniowski, S.H., Buck, R.C., Newkold, R.M., El kassmi, A., Leganis, E., Matsuoka, Y., Dinelli, B., Beauchet, S., Adamsky, F., Weilandt, K., Soni, V.K., Kapoor, D., Gunasekar, P., Malvasi, M., Brinati, G. and Musio, S. (2022), A critical review of the application of polymer of low concern regulatory criteria to fluoropolymers II: Fluoroplastics and fluoroelastomers. Integr Environ Assess Manag, https://doi.org/10.1002/ieam.4646.

[3] Oligomers are a polymer or polymer intermediate containing relatively few structural units. See https://www.merriam-webster.com/dictionary/oligomer. Accessed January 14, 2026.

[4] Organisation for Economic Co-operation and Development. Reconciling Terminology of the Universe of Per- and Polyfluoroalkyl Substances: Recommendations and Practical Guidance. 2021. OECD Environment, Health and Safety

d. The Drinking Water and Groundwater Protection Division of Vermont's Department of Environmental Conservation was specifically charged by the state legislature to develop a class regulation or to explain why such a regulation was not possible. In its final report, the Department said, "The Review Team spent over a year deliberating, researching, and discussing the potential to regulate PFAS as a Class. After reviewing the current peer-reviewed literature, as well as the available toxicology data for PFAS, the Review Team determined that at the current time it is not feasible to regulate PFAS as a Class."[5]

e. In a Congressionally mandated report, the Department of Defense recognized the diversity of PFAS chemistries, cautioning that "Congress and the Federal regulatory agencies should avoid taking a broad, purely 'structural' approach to restricting or banning PFAS. It is critical that future laws and regulations consider and balance the range of environmental and health risks associated with different individual PFAS, their essentiality to the U.S. economy and society, and the availability of viable alternatives."[6]

f. The U.S. Food and Drug Administration (FDA) has similarly recognized that all PFAS are not the same and based on a review of more than 1,700 published and peer reviewed scientific articles, FDA concluded that fluoropolymers do not present health or safety concerns when used in medical devices.[7]

In conclusion, the warning labeling provisions in NMED's proposed rule are based on an incorrect understanding of PFAS chemistry. NMED would require a warning label on all products containing intentionally added PFAS, even those exempt from the public reporting and currently unavoidable use provisions of the law. NMED's approach appears to be based on an assumption that all PFAS are the same and therefore possess the same properties and potential risk to human health and the environment. The work cited previously on fluoropolymers demonstrates that NMED's approach is not robust. The agency does not differentiate among different types of PFAS with different physical and chemical properties, which is in stark contrast to the growing

Publications Series on Risk Management No. 61. Paris, France. Available at https://one.oecd.org/document/ENV/CBC/MONO(2021)25/en/pdf. Accessed January 14, 2026.

[5] Agency of Natural Resources, Department of Environmental Conservation, Drinking Water and Groundwater Protection Division. Advance Notice on the Regulation of Perfluoroalkyl, Polyfluoroalkyl Substances (PFAS) as a Class. August 14, 2020. Available at https://dec.vermont.gov/sites/dec/files/PFAS/20180814-PFAS-as-a-Class.pdf. Accessed January 14, 2026.

[6] Department of Defense. Report on Critical Per- and Polyfluoroalkyl Substance Uses. August 2023. Available at https://www.denix.osd.mil/cmrmp/denix-files/sites/14/2025/07/2025-DoD-Update-on-PFAS-Critical-Uses.pdf. Accessed January 14, 2026.

[7] U.S. Food and Drug Administration. PFAS in Medical Devices. Available at https://www.fda.gov/medical-devices/products-and-medical-procedures/pfas-medical-devices Accessed January 15, 2026.

scientific consensus around the diversity of PFAS chemistries and that such diversity should be accounted for in PFAS regulation.

*/s/ Dr. Stephen Korzeniowski*
Dr. Stephen Korzeniowski

**STATE OF NEW MEXICO**
**ENVIRONMENTAL IMPROVEMENT BOARD**

**IN THE MATTER OF PROPOSED**
**ADOPTION OF 20.13.2 NMAC**
*Per- and Poly-Fluoroalkyl Substances in*
*Consumer Products*

**No. EIB 25-61 (R)**

**NEW MEXICO ENVIRONMENT DEPARTMENT,**
**Office of Strategic Initiatives**

**PETITIONER.**

**REBUTTAL TESTIMONY OF**
**DR. STEPHEN KORZENIOWSKI**
**ON BEHALF OF AMERICAN CHEMISTRY COUNCIL ("ACC")**

February 16, 2026

## I. <u>INTRODUCTION</u>

**Q. PLEASE STATE YOUR NAME AND BUSINESS ADDRESS.**

**A**. My name is Stephen Korzeniowski. I am currently a self-employed consultant. My company is BeachEdge Consulting, located at 350 Darlington Rd, Media, PA 19063.

**Q. ON WHOSE BEHALF ARE YOU SUBMITTING REBUTTAL TESTIMONY?**

**A**. I am submitting rebuttal testimony on behalf of the American Chemistry Council ("ACC").

**Q**. **DID YOU PREVIOUSLY SUBMIT DIRECT TESTIMONY IN THIS CASE?**

**A**. Yes. My direct testimony is identified as ACC Exhibit 2.

## II. <u>PURPOSE OF TESTIMONY</u>

**Q. WHAT IS THE PURPOSE OF YOUR TESTIMONY?**

**A**. The purpose of my rebuttal testimony is to respond to the direct testimony of the New Mexico Environment Department ("NMED") and other parties to this proceeding. More specifically, I will address the numerous PFAS generalizations and lack of specificity in the testimony of various NMED witnesses regarding the fact that PFAS are a diverse group of substances with different properties and should not be treated in regulation as if they are all the same.

**Q. HAVE YOU REVIEWED THE NOTICES OF INTENT TO PRESENT TECHNICAL TESTIMONY AND EXHIBITS FILED BY NMED?**

**A.** Yes.

## <u>III. REBUTTAL TESTIMONY</u>

**Q. HAVE YOU REVIEWED NMED'S WITNESS – DR. MITCHELL OLSON, DR. ERIC CHAPMAN, AND DR. ALISON LING'S WRITTEN TESTIMONY AND ASSOCIATED EXHIBITS?**

**A**. Yes.

**Q. IN YOUR OPINION, DID THE TESTIMONY PRESENTED BY NMED IN THIS PROCEEDING USE SCIENTIFICALLY PRECISE TERMINOLOGY WHEN REFERRING TO "PFAS"?**

**A.** No. The term "PFAS" is an umbrella term encompassing more than 14,000 substances with diverse physical, chemical, and toxicological properties, and, to the best of my knowledge, only a small subset of substances classified as PFAS are in commerce.[1] The Department's testimony largely relied on data specific to perfluoroalkyl acids (PFAAs), yet framed conclusions as applying to "PFAS" broadly[2]. That approach does not reflect the scientific distinctions among PFAS subclasses and may create confusion in risk communication. It would be helpful, and in most cases necessary, to be clear, specific and descriptive when talking about PFAS – which ones are being referred to in each case. An example is the statement that PFAS are persistent and mobile.[3] This is an over generalization as many PFAS are not mobile in any manner i.e., fluoropolymers and fluoroelastomers.

**Q. DOES THE SCIENTIFIC EVIDENCE PRESENTED BY NMED SUPPORT REGULATING OR LABELING ALL PRODUCTS CONTAINING ANY SUBSTANCE WITH ONE FULLY FLUORINATED CARBON ATOM IN THE SAME MANNER?**

---

[1] Buck et al. 2021. Identification and classification of commercially relevant per- and poly-fluoroalkyl substances (PFAS). J. Integr Environ Assess Manag 17(5):1045-1055. doi: 10.1002/ieam.4450.

[2] *See e.g. NMED Exhibit 32* at 2; *NMED Exhibit 3 at 6-8; NMED Exhibit 57 at 6, 14*

[3] *NMED Exhibit 32* at 2

**A.** No. A structure-based definition of PFAS that captures all substances with at least one fully fluorinated carbon does not align with the hazard, exposure, and risk conclusions presented. Much of the Departments expert testimony focused on PFAAs and certain related compounds.[4] Extending those conclusions to all PFAS-containing products is not supported by the scientific data discussed in this proceeding.

**Q. WHAT TYPES OF PFAS SUBSTANCES HAVE BEEN PHASED OUT VOLUNTARILY OR RESTRICTED VIA REGULATION IN THE UNITED STATES?**

**A**. PFOA, PFOS, and closely related substances have been voluntarily phased out by industry.[5] PFOS was phased out by the sole U.S. manufacturer in 2000, and PFOA was phased out through a voluntary stewardship program with the U.S. EPA by 2015. Some states are regulating products containing intentionally added PFAS by restricting the distribution and selling of such products.

**Q. HOW DOES THIS DISTINCTION APPLY TO INTERNATIONAL AGREEMENTS SUCH AS THE STOCKHOLM CONVENTION ON PERSISTENT ORGANIC POLLUTANTS?**

A. The Stockholm Convention addresses specific non-polymeric PFAS, such as PFOS, PFOA, and other perfluoroalkyl acids. The Stockholm Convention does not address PFAS

---

[4] *See e.g. NMED Exhibit 32* at 2; *NMED Exhibit 3* at 6-8; *NMED Exhibit 57* at 6, 14

[5] United States Environmental Protection Agency, FACT SHEET: 2010-2015 PFOA STEWARDSHIP PROGRAM https://www.epa.gov/assessing-and-managing-chemicals-under-tsca/fact-sheet-20102015-pfoa-stewardship-program (last accessed February 16, 2026); United States Environmental Protection Agency, EPA AND 3M ANNOUNCE PHASE OUT OF PFOS, May 16, 2000, https://www.epa.gov/archive/epapages/newsroom_archive/newsreleases/33aa946e6cb11f35852568e1005246b4.html

as a single, undifferentiated class.[6] Its listings reflect evaluations based on persistence, bioaccumulation, and toxicity, rather than a blanket approach to all PFAS.

**Q. WHY IS THIS DISTINCTION IMPORTANT FOR ACCURATELY CHARACTERIZING THE CURRENT PROPOSED RULE BY THE DEPARTMENT?**

A. Suggesting that PFAS broadly have been phased out or restricted implies a scientific and regulatory consensus that all PFAS present comparable risks.[7] In reality, most regulatory actions have been narrowly focused on specific non-polymeric PFAS based on substance-specific evidence.

---

[6] United Nations Environment Programme. 2009. Decision SC-4/17. Listing of perfluorooctane sulfonic acid, its salts and perfluorooctane sulfonyl fluoride. In: Conference of the Parties to the Stockholm Convention on Persistent Organic Pollutants. Geneva (CH). http://www.pops.int/Portals/0/download.aspx?d=UNEP-POPS-COP.4-SC-4-17.English.pdf

United Nations Environment Programme. 2019a. Decision SC-9/4: Listing of perfluorooctane sulfonic acid, its salts and perfluorooctane sulfonyl fluoride. In: Conference of the Parties to the Stockholm Convention on Persistent Organic Pollutants. Geneva (CH). [accessed 2020 Sep 15]. http://www.pops.int/Portals/0/download.aspx?d=UNEP-POPS-COP.9-SC-9-4.English.pdf

United Nations Environment Programme. 2019b. Decision SC-9/12: Listing of perfluorooctanoic acid (2019), its salts and PFOA-related compounds. In: Conference of the Parties to the Stockholm Convention on Persistent Organic Pollutants. Geneva (CH). [accessed 2020 Sep 15]. http://chm.pops.int/Portals/0/download.aspx?d=UNEP-POPS-COP.9-SC-9-12.English.pdf
United Nations Environment Programme. 2019c. Decision SC-10/13. 2023. Listing of perfluorohexane sulfonic acid (PFHxS), its salts and PFHxS-related compounds. http://chm.pops.int/Portals/0/download.aspx?d=UNEP-POPS-COP.10-SC-10-13.English.pdf

United Nations Environment Programme. 2025. UNEP/POPS/COP.12/32/Add.1.
Decisions adopted by the Conference of the Parties to the Stockholm Convention on Persistent Organic Pollutants at its twelfth meeting. https://www.pops.int/TheConvention/ConferenceoftheParties/Meetings/COP12/tabid/9744/Default.aspx

[7] *NMED Exhibit 46* at 12

It should be noted that the New Mexico Legislature itself determined that certain classes of PFAS - such as fluoropolymers that are solids at standard temperature and pressure[8] - do not present risks warranting regulation, and NMED appropriately recognized and implemented that legislative judgment in the proposed rule.[9] It is important that the record and supporting testimony accurately characterize those substances and not conflate them with PFAS classes that the Legislature expressly chose to treat differently.

## IV. LABELING REQUIREMENTS

**Q. WOULD LABELING ALL PFAS-CONTAINING PRODUCTS IN THE SAME MANNER ACCURATELY REFLECT DIFFERENCES IN HAZARD, EXPOSURE, AND POTENTIAL RISK?**

A. No. PFAS encompass substances with significantly different chemical, physical, and toxicological properties that inform their uses and potential exposure, and risk profiles. Applying a single, uniform warning implies comparable risk across all PFAS, which is not supported by the scientific distinctions discussed in this proceeding.

**Q. HOW DOES THAT CONCERN APPLY TO FLUOROPOLYMERS?**

A. Recognizing the diversity of physical and chemical properties within the PFAS family of chemistries is critical for understanding whether a particular PFAS or sub-group of PFAS might be of potential concern to human health or the environment. Fluoropolymers have markedly different physical and toxicological characteristics compared to non-polymeric PFAS such as PFOA or PFOS. A general statement or pronouncement that 'as a whole,

[8] NMSA 1978 § 74-15-3 (A)(16)
[9] *NMED Exhibit 2* at 4

PFAS are bioaccumulative, persistent and mobile,' is simply incorrect and misleading.[10] In addition, two recently peer-reviewed journal publications[11] make a compelling case that fluoropolymers have a unique set of properties that set them apart from other PFAS. For one of the witness statements to label these important publications as "tainted"[12] because industry did them, is a clear mischaracterization of the compelling property, analytical, testing and toxicology data presented in these publications. Another generalization noting that fluoropolymers are not safe[13] is directly contrary to what is published in the two journal articles cited above. A uniform, one-size-fits-all warning could mislead consumers into believing all of these materials pose similar risks, which is not consistent with the available scientific evidence.

**Q. HOW DOES THAT CONCERN APPLY TO THE OTHER EXEMPTIONS IN THE STATUTE?**

**A.** The same concern about misleading consumers applies to blanket labeling of the other exemptions listed in the statute.[14] PFAS are not monolithic in their properties or uses, and many of the exempted applications involve highly technical materials that serve as critical enablers of industries underpinning modern life. In numerous contexts - such as health care,

---

[10] *NMED Exhibit 3* at 44

[11] Henry BJ, Carlin JP, Hammerschmidt JA, et al. 2018. A critical review of the application of polymer of low concern and regulatory criteria to fluoropolymers. *Integrated Environmental Assessment and Management* 14: 316–3

Korzeniowski SH, Buck RC, Newkold RM, et al. 2023. A critical review of the application of polymer of low concern regulatory criteria to fluoropolymers II: Fluoroplastics and fluoroelastomers. *Integrated Environmental Assessment and Management* 19: 326–54.

[12] *NMED Exhibit 3* at 48

[13] *Id*. at 46

[14] *NMED Exhibit 3* at 48

energy systems, transportation, electronics, and other infrastructure - these substances are essential to safety, durability, or performance, and viable alternatives are not reasonably available without compromising function or introducing other risks. Applying a uniform label to these categories would obscure these distinctions, potentially confuse consumers, and fail to reflect the careful policy judgments already embedded in the statutory exemptions. Due to these concerns, the American Chemistry Council is proposing to exclude the proposed exemptions in Section 20.13.2.10 NMAC[15] from labeling requirements.[16]

**Q.** **DOES THIS CONCLUDE YOUR TESTIMONY?**

**A**. Yes.

*<u>/s/ Stephen Korzeniowski</u>*
Stephen Korzeniowski

[15] *NMED Exhibit 2* at 3
[16] *See ACC Exhibit 6*

# Proposed Adoption of PFAS in Consumer Products

Dr. Stephen Korzeniowski

American Chemistry Council

# Purpose of Testimony

- Central concern:
  - Proposed rule treats **all PFAS as the same**
  - Requires warning labels on **all products with intentionally added PFAS**
  - Includes products otherwise exempt under reporting and unavoidable use provisions


PFAS Definition and Evolution
Banks 1994
• Perfluoro, Perfluorinated
Kyoto Protocol, 1997
• PFC's, Perfluorocarbons
Hekster, 2002, 2003
• PFAS, Perfluorinated Substances
OECD 2007
• Lists of PFOS, PFAS, PFOA, PFCA Related Compounds and Chemicals that Degrade to PFCAs
Buck et al, 2011
• PFAS, Per- and Poly-fluorinated Substances; Aliphatic $CF_3$-, Some Exclusions
OECD 2018
• PFAS: $-C_nF_{2n}-$ where $n \geq 3$ and ($-C_nF_{2n}OC_mF_{2m}-$, n and $m \geq 1$)
ITRC 2018-2020
• PFAS: $C_nF_{2n+1}-R$ where $n > 2$
Strategic Roadmap
USEPA 2021
• $R-CF_2-CF(R')(R'')$
EU CfE 2020
• ALL PFAS with $CF_3$ or $CF_2$
Terminology Paper
OECD 2021
• ALL PFAS with $CF_3$ or $CF_2$

# PFAS Are Not One Uniform Substance

- PFAS = Diverse group of chemicals
- Significant variation in:
  - Physical properties
  - Chemical properties
  - Environmental behavior
  - Toxicological profiles
- Assuming equal risk across all PFAS is not scientifically supported

# An Important Question - Are They All The Same?

## A Big Universe of Very Different Substances

SOLID

Polyethylene
$H(CH_2CH_2)_xH$

LIQUID

Ethyl Alcohol
$CH_3CH_2OH$

GAS

Propane
$CH_3CH_2CH_3$

**C-H Compounds**

**We would never group them together and say "they are the same," because they are Not the same.**

## Fluorocarbons – Also a Big Universe of Very Different Substances

**C-F Compounds**

**Fluorocarbons: C-F Substances**

SOLID

Polytetrafluoroethylene
PTFE $F(CF_2CF_2)_nF$
A Fluoropolymer

LIQUID
6:2 Fluorotelomer Alcohol
$C_6F_{13}CH_2CH_2OH$
A Fluorotelomer

GAS


HFC-134a
$CF_3CH_2F$
A Refrigerant

**We should Not group them together, because they are Not "the same."**

# Hydrocarbon Examples

## Common Chemical Examples

$CH_3 - CH_2 - OH$

Ethanol or
Ethyl Alcohol

Common Use: Alcoholic Beverages; Beer; Wine

Ingestion Effects: Light Headed; Intoxication

$CH_3 - OH$

Methanol or
Methyl Alcohol

Common Use: Windshield Washer Fluid

Ingestion Effects: Abdominal Pain; Blurred Vision and/or Blindness

## Common Chemical Examples

### Ethylene Glycol

$$\begin{matrix} OH & OH & \\ | & | & \\ CH_2 - & CH - & H \end{matrix}$$

Common Use: Automotive Antifreeze & Engine Coolant

Ingestion Effects: Toxic to Humans & Wildlife; Dogs, Cats – Kidney Damage, Failure & Death

### Propylene Glycol

$$\begin{matrix} OH & OH & \\ | & | & \\ CH_2 - & CH - & CH_3 \end{matrix}$$

Common Uses: “Non-toxic” Antifreeze; Food & Pharma

Ingestion Effects: Generally Regarded As Safe (GRAS) by FDA and Much Safer

# PFAS* include many different substances with *very different* properties

## Similarities




1 fully fluorinated carbon
**or $CF_2$-$CF_2$-$CF_2$- or ....**

## Differences




*Per- and Poly-Fluoroalkyl Substances

***Be Clear, Specific and Descriptive***

# Fluoropolymers are Fundamentally Different

- Fluoropolymers meet "polymer of low concern*" criteria
- Key characteristics:
  - High molecular weight
  - Insoluble in water
  - Large, stable structures
  - Not bioavailable
  - Not bioaccumulative
  - Do not degrade into smaller PFAS
- Environmental mobility concerns do not apply to fluoropolymers.

*defined as polymer properties predictive of low health and environmental hazard

# Problems with NMED’s Proposed Labeling

- **Proposed Rule Assumption**
  - All PFAS = Same properties + Same risk
- **Scientific Reality**
  - PFAS vary significantly
  - Fluoropolymers differ fundamentally from small, water-soluble PFAS
- **Uniform warning labels imply uniform hazard**
  - Growing scientific consensus: PFAS are diverse
  - Fluoropolymers are materially different from other PFAS
- **NMED’s warning label approach:**
  - Fails to differentiate among chemistries
  - Is inconsistent with current scientific understanding
  - Is not scientifically robust

# *PFAS Regulation and Grouping: As One Group or Class*

- Premise for Treating All PFAS the Same – as ***One* or "The Chemical Class of PFAS"***
  - Regrettable substitution of long chains; large number of PFAS on commercial market; not conducive to classic risk assessment; intrinsic property of persistence alone is sufficient justification to group as ***One***; increased probability of adverse effects on human health and environment; irreversible and increasing contamination
- Considerations:
  - Persistence is an intrinsic property but not an intrinsic hazard and it does not by itself imply an adverse effect
  - Not scientifically justified to classify inert solids, salts, liquids and gases in a single class – as ***One*** – where properties like vapor pressure, environmental partitioning, hydrophobicity/lipophilicity, aqueous solubility and hazard itself**, as well as surface and material properties vary greatly

***Strategies for grouping per- and polyfluoroalkyl substances (PFAS) to protect human and environmental health**
Ian T. Cousins, Jamie C. DeWitt, Juliane Glüge, Gretta Goldenman, Dorte Herzke, Rainer Lohmann, Mark Miller, Carla A. Ng, Martin Scheringer, Lena Vierkej and Zhanyun Wang ***Environ. Sci.: Processes Impacts***, 2020,**22**, 1444-1460

***Scientific Basis for Managing PFAS as a Chemical Class** Carol F. Kwiatkowski, David Q. Andrews, Linda S. Birnbaum, Thomas A. Bruton, Jamie C. DeWitt, Detlef R. U. Knappe, Maricel V. Maffini, Mark F. Miller, Katherine E. Pelch, Anna Reade, Anna Soehl, Xenia Trier, Marta Venier, Charlotte C. Wagner, Zhanyun Wang, and Arlene Blum *Environmental Science & Technology Letters* **2020** 7 (8), 532-543

****Application of a Framework for Grouping and Mixtures Toxicity Assessment of PFAS: A Closer Examination of Dose-Additivity Approaches**
Philip E. Goodrum, Janet K. Anderson, Anthony L. Luz, and Graham K. Ansell *Toxicological Sciences, **2020:** doi: 10.1093/toxsci/kfaa123*

# Rebuttal Testimony of Dr. Korzeniowski

# Overgeneralization in NMED Testimony

- NMED relied primarily on data for **Perfluoroalkyl acids (PFAAs)**
- Conclusions framed as applying to **all PFAS**
- This approach:
  - Ignores PFAS subclasses
  - Risks misleading risk communication

# ACC Recommendation

- Exclude statutory exemptions in **Section 20.13.2.10 NMAC** from labeling requirements
- Align labeling with:
  - Science
  - Risk-based regulation
  - Legislative judgments already embedded in statute

BEFORE HONORABLE FELICIA L. ORTH

Deposition of : VOL IV HEARING

taken on: February 26, 2026

CUMBRE

531 Harkle Road, Suite A
Santa Fe, NM 87505

505-984-2244
www.cumbrecourtreporting.com

STATE OF NEW MEXICO

ENVIRONMENTAL IMPROVEMENT BOARD

IN THE MATTER OF PROPOSED) EIB NO.:
ADOPTION OF 20.13.2 NMAC,)
) 25-61(R)
Per- and Poly-Fluoroalkyl)
Substances in Consumer )
Products. )
_________________________)

BEFORE THE HONORABLE FELICIA L. ORTH

THURSDAY, FEBRUARY 26, 2026

9:01 A.M.

EVIDENTIARY HEARING VOLUME IV

CERTIFIED TRANSCRIPT

REPORTED BY:

DAVID M. LEE, RMR, CCR,
Certificate Number 50391
New Mexico CCR Number 537
Cumbre Court Reporting Services, LLC
513 Harkle Road
Suite A
Santa Fe, New Mexico 87505
(505) 984-2244
cumbrecourt@comcast.net

APPEARANCES

FOR THE ENVIRONMENTAL IMPROVEMENT BOARD:
SANDRA ELY, BOARD CHAIR
PHOEBE SUINA, BOARD VICE CHAIR
J. BARRY BITZER, BOARD MEMBER
GUADALUPE CARRASCO, BOARD MEMBER
RONALD CURRY, BOARD MEMBER
KAREN GARCIA, BOARD MEMBER
FELICIA L. ORTH, HEARING OFFICER
felicia.l.orth@gmail.com

NEW MEXICO DEPARTMENT OF JUSTICE
BY: EDUARDO UGARTE, II, ESQ.
BOARD COUNSEL
eugarte@nmdoj.gov
Post Office Box 1508
Santa Fe, New Mexico 87504-1508
(505) 264-5741

FOR NEW MEXICO ENVIRONMENT DEPARTMENT:

NEW MEXICO ENVIRONMENT DEPARTMENT
BY: GREGORY S. SMITHKIER, ESQ.
Gregory.smithkier@env.nm.gov

ANDREW P. KNIGHT, ESQ.
Andrew.knight@env.nm.gov
MARK F. ROSEBROUGH, ESQ.
Mark.rosebrough@env.nm.gov

PAMELA JONES, PARALEGAL
Pamela.jones@env.nm.gov
LUIS LOPEZ, PARALEGAL
luis.lopez@env.nm.gov

1190 South St. Francis Drive
Suite N-4050
Albuquerque, New Mexico 87507
(505) 531-7736



FOR CROPLIFE AMERICA AND AMERICAN CHEMISTRY COUNCIL:

GALLAGHER & KENNEDY, P.A.
BY: DALVA L. MOELLENBERG, ESQ.
dlm@gknet.com

ANTHONY J. TRUJILLO, ESQ.
ajt@gknet.com
SERAFINA SELUJA, ESQ.
serafina.seluja@gknet.com

1239 Paseo de Peralta
Santa Fe, New Mexico 87501-2758
(505) 989-7278

FOR PFAS PHARMACEUTICAL WORKING GROUP (PPWG):
MODRALL, SPERLING, ROEHL, HARRIS & SISK, P.A.
BY: STUART R. BUTZIER, ESQ.
stuart.butzier@modrall.com

STANLEY HARRIS, ESQ.
stan.harris@modrall.com
BENJAMIN C. ROSSI, ESQ.
benjamin.rossi@modrall.com

Post Office Box 2168
Albuquerque, New Mexico 87103-2168
(505) 848-1823
(505) 848-9710 (Facsimile)

FOR HOUSEHOLD & COMMERCIAL PRODUCTS ASSOCIATION:

HOUSEHOLD & COMMERCIAL PRODUCTS ASSOCIATION
BY: STEVEN BENNETT, PH.D.
Executive Vice President
SCIENTIFIC & REGULATORY AFFAIRS
sbennett@thehcpa.org
1625 I Street Northwest
Suite 700
Washington, D.C. 20006



FOR COMPLEX PRODUCTS MANUFACTURERS COALITION:

WILEY REIN, L.L.P.
BY: HENRY M. RIVERA, ESQ.
hrivera@wiley.law

REBECCA J. FIEBIG, ESQ.
rfiebig@wiley.law
MARTHA MARRAPESE, ESQ.
marrapese@wiley.law
2050 M Street Northwest
Washington, D.C. 20036
(202) 719-7000

FOR ALLIANCE FOR AUTOMOTIVE INNOVATION:
WILEY REIN, L.L.P.
BY: HENRY M. RIVERA, ESQ.
hrivera@wiley.law
REBECCA J. FIEBIG, ESQ.
rfiebig@wiley.law

MARTHA MARRAPESE, ESQ.
marrapese@wiley.law
2050 M Street Northwest
Washington, D.C. 20036
(202) 719-7000

FOR BRUCE WETHERBEE, PRO SE:
BY: BRUCE WETHERBEE
editor@thecandlepublishing.com
60 Thoreau Street
Suite 103
Concord, Massachusetts 01742
(505) 501-1570

ALSO PRESENT: LISA O'GRADY
INTERPRETER
AMELIA CARDEÑA
INTERPRETER

MELINDA MAASS
INTERPRETER



I N D E X


| EXAMINATION | PAGE |
|---|---|
| ALEX STANTON, PH.D. | |
| Cross-Examination By Mr. Smithkier | 1149 |
| ALEX STANTON, PH.D. | |
| MARTHA MARRAPESE, ESQ. | |
| Examination By Chair Ely | 1162 |
| Examination By Vice Chair Suina | 1168 |
| Examination By Mr. Ugarte | 1176 |
| BARBARA JAYNE HENRY, PH.D. | |
| Direct Examination By Mr. Trujillo | 1210 |
| Cross-Examination By Mr. Rosebrough | 1226 |
| Cross-Examination By Mr. Wetherbee | 1239 |
| Examination By Board Member Bitzer | 1247 |
| STEPHEN H. KORZENIOWSKI, PH.D. | |
| Direct Examination By Mr. Trujillo | 1251 |
| Cross-Examination By Ms. Fiebig | 1293 |
| Cross-Examination By Mr. Knight | 1328 |
| Redirect Examination By Mr. Trujillo | 1343 |
| Examination By Chair Ely | 1346 |
| ERIC CHAPMAN, PH.D. | |
| Examination By Chair Ely | 1355 |
| Cross-Examination By Ms. Fiebig | 1358 |
| Examination By Mr. Ugarte | 1362 |

A. Yes.
Q. Okay. I just wanted a little clarification. I had heard "molecular weight," and that makes sense to me.
BOARD MEMBER BITZER: That's all I have. Thank you.
HEARING OFFICER ORTH: Thank you.
Member Carrasco.
Let's see, Member Carrasco, do you have questions of Dr. Henry?
Member Curry, do you have questions of Dr. Henry?
BOARD MEMBER CURRY: I do not.
HEARING OFFICER ORTH: Thank you.
Counsel.
MR. UGARTE: No questions, Madam Hearing Officer. Just a comment to tell Dr. Henry that I grew up in Beaver Falls, Pennsylvania, so I figured I'd get a smile from you.
THE WITNESS: I did; the land of Joe Namath.
MR. UGARTE: Yes, and Geneva



College.
THE WITNESS: And Geneva College.
MR. UGARTE: Thank you.
HEARING OFFICER ORTH: All right. Any reason not to excuse Dr. Henry?
Will you offer exhibits?
MR. TRUJILLO: Madam Chair, I move for the admission of the exhibits associated with Dr. Henry.
HEARING OFFICER ORTH: I'll pause for a moment in the event there are objections. No.
They are admitted. Thank you.
(ACC Exhibit 4 was received in evidence.)
(ACC Exhibit 5 was received in evidence.)
HEARING OFFICER ORTH: Thank you very much, Dr. Henry.
THE WITNESS: Thank you very much.
MR. TRUJILLO: Madam Chair, next we'd call -- I call him Dr. K.



I've got to get used to saying his name; Dr. Korzeniowski.
Thank you, Dr. K.
HEARING OFFICER ORTH: All right.
Dr. Korzeniowski, would you -- good morning -- spell your first and last name, please.
THE WITNESS: Stephen, S-T-E-P-H-E-N; last name is K-O-R-Z-E-N-I-O-W-S-K-I.
HEARING OFFICER ORTH: Thank you.
Do you swear or affirm to tell the truth.
THE WITNESS: I do.
HEARING OFFICER ORTH: Thank you very much.
Go ahead, Mr. Trujillo.

STEPHEN H. KORZENIOWSKI, PH.D.,
after having been first duly sworn,
was examined and testified as follows:
///
///



DIRECT EXAMINATION
BY MR. TRUJILLO:
Q. Good morning, Dr. K.
Who is your current employer?
A. My current employer is my own company, BeachEdge Consulting. I started my company ON August 1st, 2015, when I retired from my corporate job.
Q. And on whose behalf are you Testifying today?
A. ACC, or the American Chemistry Council.
Q. Did you provide a Resumé filed as ACC Exhibit 1?
A. I did.
Q. And that states your employment history, qualifications, and experience.
A. Through today, yes.
Q. Can you briefly summarize your relevant experience for the Board.
A. Yeah, I guess I can.
I started in this chemistry, and they didn't call it "PFAS" at the time, but I started in 1977. I worked

for about 7 years, 6, 7 years in the lab and doing a few other things in this kind of chemistry.

Like many large companies I got the opportunity to do many other jobs between 1984 and 1996.

Then I came back in 1996, and for the last 30 years, I've been in this business, so about 36 years direct experience in fluorochemical technology.

Q. Thank you.

Can you briefly describe any peer-reviewed papers you have authored that are important to this proceeding?

A. What I've done is as an industry person you often don't get a lot of chance to publish, but I was fortunate. I got a chance to publish as well as do a number of posters and major talks, and so I have about 60, about 20 of which are peer-reviewed publications.

Those publications are on:

Analytical chemistry;



Toxicology;

Pharmacokinetics;

Degradation or biodegradation;

Sources;

Fate; and,

Transport.

We, me and 3 other authors, did the first major publication to figure out where PFOA came from, from the companies and in the environment in 2006.

Then we published one of the "Polymers of Low Concern" papers in 2022/2023.

In that span I did a whole host of different chemistries, but I think my publication days are done.

Q. Thank you, Dr. K.

Did you provide Written District Testimony that was filed in this matter as ACC Exhibit 2?

A. I did.

Q. Do you have any corrections to your Written Direct Testimony?

A. I do not.



Q. Do you adopt your Written Direct Testimony as your own Testimony for this matter?

A. I do.

Q. What is the purpose of your Direct Testimony?

A. What I wanted to do was to take a few moments -- and I'm only going to take about 15 or 16 in my Direct, and I have about 11 or 12 in the Rebuttal, just to frame for the Board and those in the room some of the things that I saw in the Testimony that was given by others that didn't quite make sense to me.

I wanted to take the opportunity to give my point of view, as did Dr. Henry, on what we see and what the Board needs to hear from an alternative point of view from chemistry and science.

Q. Go ahead and please present your summary of your Direct Testimony today.

A. Okay. Madam Hearing Chair and



the Members of the Board, good day to you all. Thank you for allowing me to be here today.

I'm an Organic Chemist, as you heard, who started in fluorochemistry in 1977. I have a Bachelor's of Arts degree in Science and Chemistry from Rutgers. I went and got a Ph.D. in Organic Chemistry from Penn state University. Then after 3 or 4 years of working, I went back and got an MBA in finance.

I transitioned to many roles, as I described, and all of those roles where science and business allowed me to take the science as well as put in perspective what it means in:

Business;

Environmental; and,

Other worlds.

I've been a member of ITRC, as Dr. Olson had testified the other day, the same thing since 2017.

I've been a member of the Fire Fighting Foam Coalition since 2021;

that's the uses AFFF or firefighting foam with fluorinated surfactants.

I've been a member of a number of industry groups since 2000, of which ACC has been a partner for many of those years.

I'm here today on behalf of ACC in support of the ACC position that the Warning Label provisions in the Proposed Rule treat all PFAS the same, when PFAS, as we know, are quite different. I'll spend a fair amount of time describing that today:

There are very, very diverse group of substances with vastly different physical and chemical properties. The central concern is that this Proposed Rule treats all PFAS the same despite the huge differences, and I'll explain some of those differences.

It requires a Warning Label on all products with intentionally added PFAS, but it includes products otherwise exempt under Reporting and



Unavoidable Use provisions.

As you've heard over the past 3 days of hearings, and in the documents you have received, there are several...

Well there is a few schools of thought on how to treat the PFAS chemicals. Since they all have carbon and fluorine, they have a fully fluorinated carbon in their structure, and more on this in a minute.

One group says, and you've heard this many times this week, that if it meets the PFAS definition, and given that persistence is sufficient, PFAS should be grouped together and treated as 1, group them as 1.

Others, like me myself, say that PFAS are not the same. Even if they have a fully fluorinated carbon, they should not be treated -- they should be treated separately and not grouped as 1.

If the question is whether there is a consensus, absolutely not.



There is no consensus. I'm not sure there is ever going to be consensus.

You all have seen and agreed on the definition of PFAS; that, over the past few days in the Rule, 1 fully fluorinated carbon, and Barb Henry talked about that a few minutes ago. This definition was proposed by OECD in 2021.

As the definition has changed, so have the number of potential number of PFAS compounds in the list. You've heard nonstop either today and the past 3 days, as well as in all the Testimony how many PFAS really are there.

I put this chart together, and it's evolved, obviously. The last time I put this together was 2021, but what's the definition and what does it mean? Really, are there 14- or 15,000 PFAS compounds hanging around? The answer is no.

There is lists and databases where you can say there is 14,000, but



the fact of the matter is, as the definition has evolved, the number of PFAS have evolved that are captured in that list.

I mean I charted this back to 1994. There were no real numbers at that point, and Hekster in the Netherlands starting using "PFAS," but only mentioned "perfluorinated substance," not "PFAS" as we know it today.

The OECD in 2007 created sort of the first list. That was 982 when the OECD in 2007. 982 compounds is a far cry from where we are today.

Buck in 2011, they are credited with the first creation of the definition of PFAS in 2011, the Buck/Franklin paper.

HEARING OFFICER ORTH: Please keep it slow.

THE WITNESS: Okay. Then in the OECD paper in 2018, which we base one of our studies on, which I'll talk about in a moment, because the

definition changed, and there was that 4730.

When the EU called for evidence in 2020, it was about 8,000.

Then you have got the new OECD definition from 2021 and EPA database and lists, and now it's about 14,000.

I said this a minute ago, the 14,000 are based on lists and databases, not a commercial context, and we heard that this morning.

The EPA list was 7- or 800; when we did our study it was 600, so same ballpark.

The work we did and we published in a peer-reviewed article in 2021 took the OECD list from 2018, and of the 4730, and we found 6%. The survey we did, it was 256, but it was only 3 companies, so we extrapolated that to be maybe it was 6- or 700 directly on top of what you just heard this morning.

If you're looking at what compounds are relevant and important



in commerce and potentially consumer products, it's hundreds, not thousands.

Next chart.

PFAS are not 1 uniform substance; Dr. Henry gave you a little flavor of that this morning.

Also Drs. Chapman and Olson gave a broad overview of what PFAS is with their Testimony, and I don't need to repeat that. I don't think you want a chemistry lesson this morning; enough is enough. You will see some chemistry in a few minutes.

You have heard that PFAS are a diverse group of chemicals that vary very significantly in their physical and chemical properties:

Their environmental behavior;

Environmental fate and effects;

Their toxicological profiles.

Assuming equal risk across all PFAS is simply not scientifically justified.

On the other hand, many believe,



and you heard this a few minutes ago too, despite what I just said here, many believe that if you have a PFAS with a fully fluorinated carbon -- go back one -- and given that they are viewed as persistent, persistence is sufficient. My view is it's not. I am not in that camp; we are opposed to the grouping as 1.

Now you can change the chart.

All right. Perspective:

I want to give you some examples, and, you know, you hear me say that they are not the same, but give me a moment here to provide a little education and then see if I can help you as to why we believe they are not the same: This is on Labeling and grouping at a high level. After this -- don't change yet -- I'm going to go to a granular level:

An important question that we've been asking for several days now is are they all the same? Let me start with carbon and hydrogen compounds:



You see the solid, which is "polyethylene," which is a tubing that you use in your home and water systems.

You see "ethyl alcohol," and we'll talk a little bit about that in a minute. You know what ethyl alcohol is and where it's used, and where it comes from.

Then if you're like me at home, I have no services in my house. I have to have propane for heat so I have gas.

These are carbon and hydrogen compounds. Are they the same? Would you group them the same just because they have carbon and hydrogen in their backbone? The answer is no.

That is the same question you should ask for fluorocarbons. They are also really a large universe of very different, very diverse substances.

For the carbon and fluorine compounds, you can say they're CF3s; solid is PTFE,

polytetrafluoroethylene.

The liquid could be what we call the 6:2 fluorotelomer alcohol. This alcohol is what you've heard over the past few days as the newer chemistry, or the short chains, but that's a liquid.

Then for gas would be refrigerants or blowing agents.

And so, you know, you look at these and you say, "Okay. Are these compounds the same?" The answer is I don't think so.

Let's go to a more granular example, actually 2 of them on the next chart. These substances will be very familiar to you:

These are hydrocarbon examples, and I'll follow with fluorocarbon in just a second.

On the left-hand side you have 2 common chemical examples. You have ethanol, and you know what ethanol is. It's in your beer, your wine, your spirits. It's used as a solvent.



Then if you just change the structure and you get rid of that CH2 in the middle, you have ethanol. They look the same. They are carbon, hydrogen, and oxygen, they are alcohols, but they have vastly different hazards. Ethanol you can drink; methanol, if you drink it, you go blind.

Saying something is in the same family implying the same hazards makes no sense with 2 simple hydrocarbon examples.

Let me give you one more on the right-hand side:

For those of you who have ever worked on a car, you know you need antifreeze. Ethylene glycol was the common antifreeze that's been used for years and years and years. It's great if you don't have a pet, because if that antifreeze is leaking and your dog or cat licks that antifreeze, they can have kidney failure or die. My Wife's a veterinarian, so I get this story all the time.



However many years ago you may remember there was an alternative glycol called propylene glycol that just had one more carbon, but had vastly different properties such that it's generally regarded as safe by the FDA.

The fact that you have a structure, 2 simple examples, doesn't mean they have the same hazards and they don't require the same labels.

Next chart please.

All right. You heard a fair amount of this from Mark:

"PFAS include many different substances with very different properties."

They are similar, yes. They have CF3, but from that point on it changes because you do have gases, liquids, and solids. I said that a few minutes ago.

Barb started to highlight some of the key features you have to really think about when you think about PFAS



as a class. In this case you've got stability from seconds to thousands of years. Do they degrade?

Do they photolyze?

Do they degrade in soil?

Mobility? Barb talked about this also.

Are they insoluble or are they highly mobile and soluble in the environment, either in te air or in water?

Toxicity.

There is different grades. You heard Dr. DeWitt talk about the gradation. This is low to high. There is gradients in between, and size.

How big are these? From really large back to really small; Barb highlighted that in several of her charts.

One of the things that I have been saying and my colleagues have been saying over the years, and that's one of my major criticisms and one of

the reasons I'm talking today, is that PFAS is so big. Unless you tell people what you're talking about, they don't know. They assume it's all the same.

PFAS includes hundreds, if not thousands of compounds, so my motto is pretty simple, and I said that I think in my Testimony and elsewhere. To be clear, be specific and be descriptive when you're talking about PFAS.

Next chart.

You've heard this from us and you've heard this from Barb:

Fluoropolymers are fundamentally different. They meet the criteria of what we call "polymer of low concern," and as Barb said, and you might have missed it, but it's defined as:

"Polymer properties predictive of low health and environmental hazard."

I'll elaborate more when I do my Rebuttal, but you don't see the word "no" there. These are not



"polymers of no concern," they are "polymers of low concern," and that's an important distinction.

What you need to do is you need to assess -- which is what we've done, and Barb did with her group in 2018. I did that with my colleagues in 2022 -- the world of fluoropolymers against 12, 13 different criteria.

What we look at is molecular weight or size.

We look at solubility in water.

We look at whether the structures are large and stable. Barb was talking about that in terms of degradation either in soil or in air.

Are they bioavailable?

Are they bioaccumulative?

Do they degrade into smaller pieces?

Are they precursors, which is a really, really important concept.

Environmental mobility concern generally does not apply to



fluoropolymers because they are solids and they don't have solubility and they don't have vapor pressure.

Now is that an absolute? I can't say it's an absolute, but it's pretty good. It holds pretty good.

All right. One of things I want to talk about here, and I'm going to say it again in the Rebuttal in a little bit more detail, but there are 2 papers, one by Dr. Henry and her global colleagues in 2018, and another paper in 2022 by myself and 7 other global companies where we talk about "polymers of low concern."

These studies combined cover about 96% of the major global fluoropolymers, and include all the properties; residuals, monomers, extractables, and all the fundamental properties.

I am going to come back to that because it's really important, because there was a lot of questions yesterday and even today about life



cycle.

Next chart.

There we go; two more charts, this one and the next one.

Before I finish with my final 2 slides, I want to reiterate that in both of the "polymer concern" papers both 2018 and 2022, that was online, and in 2023 in print. We not only discuss the end of life, which we heard today, the end of life properties of the fluoropolymer life cycle, but we also discuss beginning of life, which is how they are made, and end of life. I'll talk about the life cycle in a few minutes.

What do we see as the problems with the proposed Labeling? We've all talked about that for the past four days.

"All PFAS have the same properties and the same risk."

No, they don't, And a label that covers all of them, which is

Page 1272

what's proposed, even though there are exceptions, doesn't make scientific sense in my view, and I am a scientist.

The scientific reality is that PFAS vary very significantly. Fluoropolymers differ fundamentally from the very small water soluble PFAS or the PFAAs that Barb talked about this morning.

There is growing scientific consensus that PFAS are diverse. As I said earlier, there are different groups that think about these, and I'm not sure we're ever going to get together. We, in good spirit, have spirited discussions and we end up agreeing to disagree.

Fluoropolymers -- and you heard this also -- are materially different from other PFAS because of the properties I talked about.

NMED's Warning Label approach fails to differentiate amongst the chemicals. It is inconsistent with

Page 1273

current scientific understanding, some of which I talked about today. It's not scientific and robust.

You know, my question is, and we all have many questions, but I'm still trying to figure out what an Erlenmeyer flask with a "PFAS" symbol in it is really going to do here. I am not a label expert, but I've used many Erlenmeyer flasks in my day with "PFAS" in them. We're going to need to figure out what it really means in the end; not an expert there.

Last chart.

I'll finish up with the concept we've talked about 3 times already in this. It's important Because there's 2 major schools of thought:

The premise for treating PFAS the same as one, well, if you take it historically, historic or legacy long-chain, and you substitute it with another PFAS, that's called a "regrettable substitution."

"There is a large number of PFAS on the commercial market."

Page 1274

Well that's not really true and not conducive to classic risk assessment, and that's one of the reasons why we did our 2021 paper. We wanted to put perspective on how many of these chemicals really there were.

The big barrier, my view -- and I'm not an Epidemiologist, I'm an Organic Chemist. The big barrier to doing risk assessment is there's too many of them. The answer is no, there's not; that's what we concluded in 2021, but There's still a lot. Can you subgroup them and then do them as a risk assessment? That was our message coming out of that 2021 paper.

"The intrinsic property of persistence alone is sufficient justification."

That's what the one group thinks.

What you also heard Monday or Tuesday is that there's increased

Page 1275

probability of adverse effects in human health and the environment if these are put in the environment Even if they are not bioavailable, not soluble, not bioaccumulative, and too big to do anything, but then there is the other side.

The other side is persistence is an intrinsic property, but not an intrinsic hazard, and it does not, by itself, imply an adverse effect just because it's persistent. It is not scientifically justified to classify inert solids, salts, liquids, and gases in a single class as 1, where properties like vapor pressure, environmental partitioning, aqueous solubility and hazard itself, as well as surface and material properties vary greatly. Thank you.

Q. Thank you, Dr. Korzeniowski.

Let me next turn to Rebuttal and ask you a few questions, and then we'll get into your summary.

A. All right.

Q. Did you review the Direct Written Testimony of NMED's witnesses filed in this matter, particularly Dr. Chapman's, Dr. Olson's, and Dr. Ling's Testimonies?
A. I did.
Q. Did you also provide written Rebuttal Testimony of these NMED witnesses that was filed in this matter as ACC Exhibit 3?
A. I did.
Q. Do you have any corrections to your written Rebuttal Testimony?
A. They are not corrections, but what I did, and I discussed this with Dal, is I didn't change the headings, I didn't change the references, I just added some more text, so I'm happy to provide a copy of that to the Board and to the group.
Q. Okay. Thank you.
A. No corrections, it's just, again, the same references; no change in references, no change in context.
Q. Do you adopt your written



Rebuttal Testimony, then, with those additions, as your own Testimony here today?
A. I do.
Q. Let's proceed with your summary.
For this round, before we begin, I'm going to ask you questions, and when you're done with your answer I'll ask you the next question?
A. Please do. Thank you.
Q. Thank you.
In your opinion, did the Testimony presented by NMED in this proceeding use scientifically precise terminology when referring to PFAS?
A. No.
The term "PFAS" is an umbrella term encompassing more than 14,000 substances, which we just talked about a few minutes ago, as included in databases and lists, but not in commerce, with very diverse chemical, physical, and toxicological properties.
To the best of my knowledge



only a small subset of substances classified as PFAS are actually in commerce or of commercial relevance.
This set of commercially relevant PFAS, as I said a few minutes ago, likely numbers in the hundreds and not tens of thousands, and that's the Buck, et al., as a co-author with Bob and 2 others in 2021.
The Department's Testimony appeared to largely rely on data specific to PFAAs, or the per-fluoroalkyl acids, yet framed conclusions as applying to PFAS broadly. That approach does not reflect the scientific distinctions among PFAS subclasses and may create confusion in risk communication.
It would be helpful, and in most cases necessary, to be clear, specific, and descriptive when talking about PFAS and which ones are being referred to in each case.
As an example is the statement that:



"PFAS are persistent and mobile."
This is an overgeneralization, as many PFAS are not considered mobile due to their very limited solubility and lack of vapor pressure.
Q. Does the scientific evidence presented by NMED support regulating or Labeling all products containing any substance with 1 fully fluorinated carbon atom in the same manner?
A. No.
A structure-based definition, which is what we're talking about, of PFAS that captures all substances with at least 1 fully fluorinated carbon does not align with hazards, exposure, and risk conclusions presented.
Much of the Department's Expert Testimony focused on PFAAs and certain related compounds. Extending those conclusions to all PFAS-containing products is not supported by the scientific data discussed in this proceeding.

Q. What types of PFAS substances have been phased out voluntarily or restricted via regulation in the United States?
A. I'm going to go off script for just a second:
We've heard that PFOA and PFOS are still sort of used and back in the U.S., and we can comment on that at some point.
PFOA and PFOS, and closely related substances, have been voluntarily phased out by industry. PFAS and related long-chain PFSAs, perfluorosulfonic acids, were phased out by the sole U.S. manufacturer in the early 2000s.
Nd PFOA and its related higher homologues and precursors were phased out through the U.S. EPA 2010/2015 PFOA voluntary Stewardship Program. This Program was global in nature and included the 8 major global manufacturers. The Program included both products and plant emissions.



The U.S. EPA, however, did grant a few SNUR Exemptions for PFOS-type products to be used until replacements were found. This could be the thinking that PFOS products are still coming back into the United States.
It has not been discussed here, but many of these products were used in very specific formulations. Like in the photographic industry, photolithography, the hydraulic fluid in your jets and your aircraft. There were no replacements even in the 2000s.
EPA provided at least 4 PFOS compound Exemptions, and then the right to manufacture outside the U.S., so that's like 5 SNURs. That might be the source of...
Listen, I don't know whether there's replacements yet; some of these were very difficult to requalify.
Some states are regulating products containing intentionally added



PFAS by restricting the distribution and selling of such products, and we've talked about this; Maine and Minnesota are 2 examples.
Q. How does this apply to international agreements such as the Stockholm Convention on Persistent Organic Pollutants?
A. The Stockholm Convention addresses specific non-polymeric PFAS, such as PFOA and PFOS, and other per-fluoroalkyl acids, normally hyperchain links like C9 to C20, or C9 to C21.
The Stockholm Convention does not address PFAS as a single undifferentiated class. Its listings reflect evaluations based on the combination of persistence, bioaccumulation, and toxicity rather than a blanket approach to all PFAS.
Q. Why is this distinction important for accurately characterizing the current Proposed Rule by the Department?
A. Suggesting that PFAS broadly



have been phased out or restricted implies a scientific and regulatory consensus that all PFAS present comparable risk.
In reality most regulatory actions have been narrowly focused on specific non-polymeric PFAS based on substance-specific evidence.
It should be noted that the New Mexico Legislature itself determined that certain classes of PFAS, such as fluoropolymers that are solids at standard temperature and pressure, do not present risk warning regulation, and NMED appropriately recognized that implementing Legislative judgment in the Proposed Rule.
It is important that the record and supporting Testimony accurately characterize those substances and not conflate them with PFAS classes that the Legislature expressly chose to treat differently.
Q. I'm going to move on to Labeling requirements now.

A. Sure.
Q. Would Labeling all PFAS-containing products in the same manner accurately reflect differences in hazard, exposure, and potential risk?
A. No.
PFAS encompasses substances with significantly different chemical, physical, and toxicological properties that inform their uses and potential exposure and risk profiles. Applying a single uniform warning, like an Erlenmeyer flask with "PFAS" embedded in the middle implies comparable risk across all PFAS, which is not supported by the scientific distinctions discussed in this proceeding.
Q. How does that concern, then, apply to fluoropolymers?
A. Recognizing the diversity of physical and chemical properties within the PFAS family of chemistries is critical for understanding whether a particular PFAS, or subgroup of PFAS, might be of potential concern to human



health or the environment.
Fluoropolymers do have a markedly different physical and toxicological characteristics compared to non-polymeric PFAS, such as PFOA or PFOS, even versus what you heard talked about this morning; these side-chain fluorinated polymers.
A general statement or pronouncement that, as a whole, PFAS are bioaccumulative, persistent, and mobile is simply incorrect and misleading.
In addition, 2 recently peer-reviewed publications that we talked about a few minutes ago -- 1 in 2018 by Dr. Barb Henry and her colleagues at Gore, and the other in 2022 online, and 2023 in print by myself and members of 7 global fluorocarbon manufacturers -- made a compelling case that fluoropolymers have a unique set of properties that set them apart from the other PFAS.
From one of the witness



statements and Testimony on Monday, to label these important publication as tainted or conflicted because industry did them is a clear mischaracterization of the compelling analytical testing and toxicological data presented in these publications.
Another generalization noting that fluoropolymers in use or in life are not safe is directly contrary to what is published in the 2 journal articles cited above.
Directly contrary to what you have read in Exhibit 71 and heard on Monday in Testimony, fluoropolymer manufacturers have recognized that there are potential emissions of fluorinated species across the complete life cycle, manufacturing, which is beginning of life; end use or end life; and end of life disposal. That can be recycled; that can be incineration.
There are no disingenuous claims about no emissions and no



claims about polymers of no versus low concern.
For example, the fluoropolymer manufacturing group in Europe called FPG have created and are executing a Manufacturing Emissions Reduction Program with defined goals.
You have also heard a fair amount of talk about the use of fluorinated polymerization aids. You heard that this morning, FPAs. They are no longer in use. These particular ones are generally no longer in use, not by at least the Stewardship companies. Some companies have replaced them with short-chain, and you heard that this morning also.
What is more important, though, about that is that the fluoropolymer industry has been working for years to eliminate the use of these fluorinated polymerization aids, and as of 2022 -- I don't have new data -- when we published our paper, about 55% of those FPAs have

already been eliminated from use in manufacture; I don't know whether it's 70 today or 75. I don't know what the percentage is, but it's clear the industry understands there is potential emissions and is doing what it needs to do to eliminate them.

As far as end of life -- you heard about it this morning also -- there have been several incineration studies since 2019 with several more in the works. Many of these studies show, as Barb said, several '9s destruction -- I think she said 99.9999%, something like that -- of the fluoropolymer and what they call PICs, or "Products of Incomplete Combustion."

The studies that have been done recently are done in commercial-waste-to-energy plants, and they are getting several '9s destruction.

Now can you get incomplete destruction in PICs, if you do backyard burning, which is illegal,



sure you can. If you do the destruction and incineration in a regulated facility, and that facility is operating properly, the potential for emissions is extremely low. I can't say it's zero, but extremely low, and many other studies are going on at the moment.

In 2018 and 2022 papers that we have talked about as conflicted covered 96% of the global fluoropolymer market in terms of polymer types, 18 major types of fluoropolymers. If one actually reads these 2 papers, the actual assessment data and criteria as described in excruciating detail either in the paper or the supplementary information, it is clear that there is complete life cycle discussion particularly in the 2022 paper.

The "Conflict" designation, which we've heard a few times in the Testimony, appears to arise because, like myself no longer, but I was an industry guy. That "Conflict" means



that the work we were doing wasn't good and wasn't genuine, but the fact of the matter is that these authors, including myself, we have to sign a Conflict of Interest or a Disclaimer Statement from the journal or we can't publish the paper; it's a requirement.

Does the fact that we signed Disclaimers and Conflict statements, does that mean that there is something wrong? No, it raises no flags; it's required. You see that in all major journals, and I've always had to sign a Disclaimer.

A uniform one-size-fits-all warning could mislead consumers into believing that all of these materials pose similar risks, which is not consistent with the available scientific evidence as described above and elsewhere.

Q. Dr. K, my final question is how does that concern apply to other Exemptions in the Statute?

A. The same concern about



misleading consumers applies to blanket Labeling of the other exceptions listed in the Statute.

PFAS are not monolithic in their properties and uses. Many of the exempted applications involving highly technical market materials are critical in the industry to serve as the underpinning for modern life in numerous contexts such as:

Healthcare;

Energy systems;

Transportation;

Electronics; and,

Other infrastructure. These substances are essential to:

Safety;

Durability; and,

Performance.

Viable alternatives are not reasonably available without compromising function or introducing other risks.

Applying a uniform label to these categories would:

Obscure these distinctions;
Potentially confuse consumers; and,
Fail to reflect the careful policy judgments already embedded in the statutory Exemptions.
Due to these concerns the American Chemistry Council is proposing to exclude the proposed Exemptions in Section 20.13.2.10 from the Labeling requirements.
Q. I believe that concludes your Testimony.
A. It does.
MR. TRUJILLO: Madam Hearing Officer, we offer Dr. K up for questioning.
HEARING OFFICER ORTH: All right. Thank you very much, Mr. Trujillo.
Ms. Fiebig, do you have questions of Dr. K?
MS. FIEBIG: Just a couple. Thank you.
///



CROSS-EXAMINATION
BY MS. FIEBIG:
Q. Dr. K, you've been present in the hearing room for the duration of these proceedings.
A. Monday I was actually online. But yes, I've been here every day, yes.
Q. You've been observing how things have gone.
A. I have, yes.
Q. I wanted to ask you a couple of questions about some of the information that we've learned over the course of the week:
In your report, or in your Written Testimony, and as you've described today, you've highlighted the relatively safe nature of fluoropolymers as a subclass of PFAS chemicals; right?
A. I have, and Barb has also. We both have, yes.
Q. Right, due in large part to they don't really bioaccumulate, they are not soluble in water, those sorts



of characteristics.
A. Understood, yes.
Q. We've also seen some concern raised over the course of the week by different witnesses about, you know, learning information later on about risks. You know, science is such that it evolves. Sometimes we learn later there are risks associated with products that we didn't appreciate earlier.
With that context I wanted to ask you if there are any fluoropolymers that have a lengthy history of safe use.
A. Well I think I'm going to agree with Barb; I'm not going to use the same, when I was 18, I thought I knew everything. I'm not going to use the same language she did.
Barb should have done herself justice. Her and her Gore colleagues published a paper in 2018. This was the first of the 2 "Polymers of Low Concern" studies, but what Barb didn't mention, but is a good example, is



these fluoropolymers, particularly PTFE and things like PTFE, have been used in body for 40-, 50 years as implants and so on.
The significant amount of data that Barb put in that paper, as well as all the requirements that fluoropolymers need to be used in the body is a pretty good example of a 40- or 50-year history of safe fluoropolymer use.
PTFE is the largest, by the way, about 50% or 65% of the global fluoropolymer use. If we're looking at the majority of the fluoropolymers, and there is various PTFE grades, as Barb talked about, but that's a really good example of in your body and being safe.
Q. Are there any other examples of PFAS substances, fluoropolymer or otherwise, that have a long history of safe use?
A. Well I think, you know, one of the things that I did as part of my

work with T.J. and his colleagues at ACC is, you know, you've heard about doing your own regulatory Rulemaking process here, but Europe has been very active in this area.

One of the things that we needed to do was to provide substantiation of the safety and use and utility of fluoropolymers in commerce. One of the things we heard -- I'm thinking it was Monday or Tuesday -- was from the coatings industry where he was talking about how it would impact coatings.

Most people don't appreciate the value of fluoropolymers in coatings and not necessarily in body, but in the external world as an example.

There is PBDF, which is a fluoropolymer. There is the Lumiflon fluoropolymer, and these are used in solar panels, building panels, bridges and thinks like that. Without these materials, as an example, you would see your bridges full of scaffolding.



They would have to replace and repair every 5 to 7 years. If you use the fluoropolymers like the Lumiflon or PBDF in solar panels, you're 50- to 100-year replacement. They not only work, but they are very effective in what they do.

These products are used in sunlight and weather and saltwater, and they function perfectly fine, so it is a good example of how tough they are as an example.

Q. My last question:

In your Written Testimony, you had referred to the proposal that the Erlenmeyer flask be added. We've been characterizing that as sort of a Warning Label. I think we have heard some evidence this week to suggest that the Department is contending that it's really just intended to be informative and not a warning. I wanted to hear your reaction to that.

A. Well I'm going to start off first by saying I've got great respect



for what you're doing, and I don't disagree that labels can have significant importance.

I also don't disagree with the fact that Labeling and informing consumers is a really good thing to do; I have no issue with that. I think to the extent that you can educate the consumers on a subject like this is really important.

I mean I've been in this a long time, so I've been involved in the ups and downs for all these years and seen all that's gone on in the company I worked for. It is important to educate, and we are learning new things.

The question for this label is what is it going to do, particularly an Erlenmeyer flask? I made a model for my cell phone, but it was blue, or about what color your water is. My water was blue. But does it have the appropriate impact on a set of chemistries that are, by the



literature that we see and literature that we're adding every day with properties, hazards, exposure, which is largely completely different than the other PFAS.

That's what I was concerned about. Is that label going to have benefit to consumer products when there is no real exposure in most cases?

The risk of that exposure, given what I'll cautiously say is the potential inertness of fluoropolymers, that inertness also has a graduated meaning, but I'm not sure it's appropriate.

That's my thoughts. Nothing against the Labeling, and noting that it might not have a benefit for other consumer products who want to know what's in their products, and I think it's a good idea. The question is where is that label applied?

Q. Do you think it's likely to be perceived as a warning?

Page 1300

A. Well --

MR. ROSEBROUGH: Madam Hearing Officer, I object to the question; he stated he is not an expert on Labeling.

HEARING OFFICER ORTH: Can you rephrase this question, Ms. Fiebig.

MS. FIEBIG: I will. I was just -- he had referred to it as a "warning" in his papers, and so I just wanted to see if he still perceives it as potentially sending that message.

HEARING OFFICER ORTH: I happen to remember that actually.

THE WITNESS: When I see a label I try to figure out what it means. Normally when I see a label, it's on products, and it's usually a warning. It's implying some risk. It often will prompt you to go look, especially if you don't know what the label means.

If there is an explanation with the label, then you don't have to go look any further. But with an Erlenmeyer flask with "PFAS" in the

Page 1301

middle, if I weren't doing this for a living I'd be scratching my head.

The idea is it might prompt consumers to go look, and if that's what it does, that's probably a good thing, but it is a Warning Label in some form.

MS. FIEBIG: Thank you.

HEARING OFFICER ORTH: All right. We are 6 minutes before noon, so rather than proceeding to the next examiner, let's take our lunch break. We will return at 1:00 for Public Comment.

Sir, as soon as the Public Comment is over we will go back to you. Thank you.

(The Evidentiary Hearing recessed from 11:54 a.m. to 1:00 p.m.)

HEARING OFFICER ORTH: Good afternoon. Let's come back from the lunch break.

We are at Day 4 of the hearing in EIB 25-61, the Per- and Poly-Fluoroalkyl Rulemaking. We've reached

Page 1302

our fourth Public Comment session.

I have at least 3 names here to call on, and I'll issue a general invitation.

Just a few things about Public Comment:

The hearing is being recorded and transcribed in its entirety by David Lee of Cumbre Reporters, so he will be trying to capture your words.

The hearing is also being interpreted between English and Spanish and Spanish and English, so we also have Interpreters trying to catch your words, so I would just ask you to speak slowly and clearly.

Ms. O'Grady, would you please tell people how to find the interpretation.

MS. O'GRADY: Madam Hearing Officer, clarification:

Do you want me to explain for the afternoon session how to find the channels again, or just for the Public Comment?

Page 1303

HEARING OFFICER ORTH: For the Public Comment.

MS. O'GRADY: Thank you.

(Speaking Spanish.)

If there is anybody present in this hearing room that would also like to offer Public Comment, would you please let us know, and that way we can be ready when you're ready. Thank you.

HEARING OFFICER ORTH: Thank you, Ms. O'Grady.

Just 2 more things:

One, I'll ask you to Comment just once. You can submit as much written Public Comment as you'd like, But I'll ask you to keep your oral Comments to 3 minutes;

I will ask you to spell your first and last name; and,

Pursuant to the Board rules I'll ask if you swear or affirm to tell the truth.

We'll start with Mr. Meiklejohn.

Mr. Meiklejohn, if you'd come up to this lighted microphone at the front of the room.

MR. DOUGLAS MEIKLEJOHN: Thank you, Madam Hearing Officer.

HEARING OFFICER ORTH: Would you spell your first and last name, please.

MR. DOUGLAS MEIKLEJOHN: Yes, certainly.

The first name is Douglas, D-O-U-G-L-A-S; last name is Meiklejohn, M- as in Mary, E-I-K-L-E-J-O-H-N. That's all one word.

HEARING OFFICER ORTH: All right. Thank you.

Do you swear or affirm to tell the truth.

MR. DOUGLAS MEIKLEJOHN: Yes.

HEARING OFFICER ORTH: I'll start your time.

MR. DOUGLAS MEIKLEJOHN: Thank you, Madam Hearing Officer, Board Members:



As I said, my name is Douglas Meiklejohn. I'm an Attorney, and I work on water quality issues for Conservation Voters New Mexico.

Conservation Voters applauds the Environment Department and the Environmental Improvement Board for addressing the proliferation of PFAS -- pardon me, I can't pronounce the full name of that -- and the pollution that they cause, particularly pollution of water, and especially pollution of groundwater, which, as you know, is the source of drinking water for many people in New Mexico.

Conservation Voters has some concern about some of the Exemptions that are in the proposed regulations. We recognize that some of those Exemptions are not discretionary; that is, they are required by the Statute passed by the Legislature or required by the preemptive effect of federal law.



On the other hand, some of the Exemptions are discretionary with the Board and possibly also the Department. They are generally classified as Currently Unavoidable Use.

Conservation Voters urges that because of the problems that PFAS have caused in the environment, that those and any other discretionary Exemptions be construed and applied as narrowly as possible.

Finally, as an Attorney who spent several decades litigating for protection of communities and the environment, I personally am gratified to see the meaningful enforcement provisions that were enacted by the Legislature included in the proposed regulations. Thank you very much.

HEARING OFFICER ORTH: Thank you, Mr. Meiklejohn.

Is there anyone else in the room here to offer Public Comment? I know we have a few folks online.

No. All right.



Let's turn to Lindsey "Hueer" or "Hueer." If I'm mispronouncing your name, please just let me know.

MS. LINDSEY HUEER: No worries.

Good afternoon; I'll spell my name.

HEARING OFFICER ORTH: Thank you.

MS. LINDSEY HUEER: It is L-I-N-D-S-E-Y, and my last name is H-U-E-E-R.

HEARING OFFICER ORTH: Do you swear or affirm to tell the truth?

MS. LINDSEY HUEER: Yes, I do.

HEARING OFFICER ORTH: Thank you. I'll start your time.

MS. LINDSEY HUEER: Thank you.

Good afternoon, Madam Hearing Officer and Members of the Board:

Again, my name is Lindsey Hueer and I'm with The Toy Association. The Toy Association represents more than 800 businesses, some inventors, designers, manufacturers, and

retailers, all committed to bringing safe, fun, educational toys to children.

In New Mexico specifically the toy sector generates $238 million in annual economic impact. We're deeply invested in ensuring that children and families in the state continue to have access to safe and affordable play.

We share many of the concerns expressed by other associations, but for my public comments today I want to focus specifically on concerns related to toys.

Toy safety and environmental stewardship are core values of our industry. PFAS is found only in a small percentage of toys, primarily in internal electronic components. In those cases the materials serve critical fire prevention and heat resistant functions. We don't want Kids' toys to catch fire due to overheating.

The components are fully



enclosed, inaccessible to children during play, and present no risk of exposure to the child or the caregiver.

Additionally, there is no suitable alternative yet available to ensure safety of these products.

The products are expressly exempted from the ban in Senate Bill 212, but they would fall under the Labeling and reporting requirements in the Proposed Rule.

For toys, a mandate to label these products doesn't empower consumer choice over non-exposure. On the contrary, requiring a Warning Label on a product that presents no exposure risk would mislead consumers into believing that a toy poses a danger when it does not, undermining consumer confidence in safe products.

As a Mom myself, I know that a Warning Label should be a meaningful notice of a bona fide toxic risk, which is not the case with toys.



Over-Labeling will lead consumers to not knowing the actual risk presence and leading to consumer fatigue for the label itself.

We think that the goals of Senate Bill 212 can be met with a few changes. We submitted comments, but again, for today's Public Comment, I want to focus on a couple of toy-specific items:

First, while we appreciate that there has been a label Exemption process in the proposed rules, we ask to outright exempt Labeling requirements where the PFAS in a toy is fully enclosed and inaccessible in those electronic component. A label is inappropriate for these products and should not be required to go through a recurring waiver process.

Second is having practical label standards for small toys and packaging. As we all know toys can be incredibly small, and requiring larger packaging to accommodate a label



actually is worse for the environment.

Last, toy manufacturers are continually introducing new products. We would like to see streamlined reporting requirements at the product category level rather than SKU by SKU with the fees applying per manufacturer, not per product.

I appreciate your consideration of these issues and for the opportunity to provide comment today.

HEARING OFFICER ORTH: Thank you, Ms. Hueer.

We go now to Mr. Parkhomenko, Konstantin Parkhomenko.

MR. KONSTANTIN PARKHOMENKO: Can you hear me? I will spell my name.

HEARING OFFICER ORTH: Thank you.

MR. KONSTANTIN PARKHOMENKO: K-O-N-S-T-A-N-T-I-N, Konstantin; Parkhomenko is P-A-R-K-H-O-M-E-N-K-O.

HEARING OFFICER ORTH: Thank

you. Do you swear or affirm to tell the truth?

MR. KONSTANTIN PARKHOMENKO: I do.

HEARING OFFICER ORTH: Thanks. I'll start your time.

MR. KONSTANTIN PARKHOMENKO: Thank you. Madam Hearing Officer, esteemed members of the Board:

My name is Konstantin Parkhomenko. I am an Environmental Attorney for the Sandia National Laboratories complex.

You may be asking yourselves, you know, if this is about protecting consumers, why is a National Laboratory Attorney giving Public Comment here?

Well as we all understand very well, the devil is really in the details in these kind of rules. We have some concerns about potentially an overbroad, potentially an unintentionally overbroad definition of "consumer" that will rope in



organizations such as ours, which are really very sophisticated laboratories who really know what they are doing in the industry and understand the chemicals they are working with, and engaged in very important and sometimes classified work for the good of the nation. E are concerned about potentially overbroad rules that might impact the mission.

I do have some more specific comments, and they are a little bit technical, so please bear with me:

So we all know the Act defines "consumer product"; right?

"'Consumer Product' means tangible personal property that's distributed in commerce, normally used for personal, family, or household use, including product categories that are normally used in households," so on and so forth.

We are aware of that



definition. We are also aware of the definition of "product," which, strictly speaking, is:

"An item created, produced, assembled, packaged, or otherwise prepared for sale to a consumer," and it goes on.

The Rule proposes to define "consumer" in a very broad way as:

"An individual, partnership, corporation, state agency, or subdivision of a state who seeks or acquires to purchase or lease any goods or services."

My comment, my supplemental comment, and I did submit written comments, which I do encourage everybody to review. My supplemental comment deals with the fact that I think the definition of the term "consumer" really should be defined in a way that's compatible with the definition of "consumer product" in



the Act such that we don't get overbroad with the definition and rope in unintentional parties that really weren't ever meant to be within that scope.

As to Labeling, the Board may adopt rules to carry out the provisions of the Per-Fluoroalkyl Substances Act, including the requirement of Labeling products in English and Spanish. This appears to allow the Labeling of products as defined by the Act, but the Act really only concerns products sold to a consumer.

Organizations such as the National Laboratories, we are never really meant to be "consumers" within that scope of the Act. Therefore, I would encourage this body to adopt a suitably broad exception that will exclude or clarify the definition of "consumer" in a way that really makes it clear that it doesn't apply to entities such as ours.

HEARING OFFICER ORTH: Thank

Page 1316

you, Mr. Parkhomenko.

MR. KONSTANTIN PARKHOMENKO: Thank you. I will submit written comments as well.

HEARING OFFICER ORTH: Sir, a Board Member has a question.

Chair Ely.

CHAIR ELY: Thank you for your comments this afternoon. I'm just wondering if your comments are comments from the lab, or are they your own personal comments? Thank you.

MR. KONSTANTIN PARKHOMENKO: Yes, my comments today do represent the position of the Sandia National Laboratories.

HEARING OFFICER ORTH: Thank you very much.

Let's see. Next we have Bill Rodgers.

There you are.

Are you unmuted?

Mr. Rodgers.

Okay. We'll wait a minute.

Page 1317

MR. BILL RODGERS: How's that?

HEARING OFFICER ORTH: Much better, sir.

If you would spell your first and last name, please.

MR. BILL RODGERS: Yes, my name is Bill Rodgers. That's "B" as in boy, I-L-L; R-O-D as in dog, G-E-R-S.

HEARING OFFICER ORTH: Do you swear or affirm to tell the truth?

MR. BILL RODGERS: I do.

HEARING OFFICER ORTH: I'll start your time.

MR. BILL RODGERS: Good afternoon, Members of the Environmental Improvement Board and Hearing Officer:

My name is Bill Rodgers and I live in La Cieneguilla. My Wife and I bought our home in 2016 and learned in 2025 that we live within a massive groundwater plume of PFAS chemicals. Tests of our water told us that we have 4 times the level of PFAS that the EPA deems safe.

Page 1318

I reported on this for 505OMATIC, and my neighbors talk to me about it almost every time they see me because they, like me, are afraid what this means for themselves and their families.

Though we are getting a filter system through the State, we have unknowingly drank, ate, and bathed in dangerous cancer-causing chemicals for almost 10 years. I cannot describe the terror we have lived with since getting these results.

I don't want people like ourselves to have to navigate this issue on their own. This issue is so esoteric that even my doctor didn't know what to advise when I told her I was exposed to these chemicals.

No one should have to live with this fear. No one should suffer fatal health consequences because of the companies who have exposed us to these chemicals and hid information about how harmful they are.

Page 1319

I am grateful to see our state working to address these issues. The prohibition of some PFAS and Labeling are good first steps, but New Mexico is offering polluters loopholes that would limit the benefit people could get from these rules. That would be unacceptable to people like myself who cannot do something as simple as drink a glass of water from their tap.

We need to ban all PFAS for all the harms from its production, use, and disposal. I hope that this task force approved in this Legislative session will make sure we are truly and fully safe.

Please help us. Approve this Rule, but make it stronger by closing any Labeling loopholes and give New Mexicans greater safety, safety that industry and malfeasance has so far kept from us. Thank you.

HEARING OFFICER ORTH: Thank you, Mr. Rodgers.

Let me ask if there is anyone

else on the platform who would like to offer Public Comment in this Public Comment session, which is very likely our final oral comment session.

I see Mr. Holm. John Holm.

Can you unmute yourself?

Pam or Luis, please...

I think you should be able to unmute now.

MR. JOHN HOLM: Thank you. Hi, my name is John Holm.

HEARING OFFICER ORTH: You're going to have to speak much closer to your microphone.

MR. JOHN HOLM: I'm so sorry. Can you hear me now? John Holm.

HEARING OFFICER ORTH: Yes, thank you.

Spell your first and last name, please.

MR. JOHN HOLM: Sure. John, J-O-H-N; last name Holm, H-O-L-M.

HEARING OFFICER ORTH: Do you swear or affirm to tell the truth?

MR. JOHN HOLM: I do swear to



tell the truth.

HEARING OFFICER ORTH: Thank you. I'll start your time.

MR. JOHN HOLM: Hi. My name is John Holm, and I reside in Washington, D.C. I'm speaking on behalf of my organization, the Circular Supply Chain Coalition, and a lot of the work that we're doing, both in New Mexico and broadly across the United States and the globe.

I'm providing this comment today in strong support of the New Mexico Environment Department's Proposed Rule which implements the PFAS protocol. I urge the Board to adopt the Environmental Department's Rule as proposed.

Specifically, a lot of the work that we're focusing on is around leveraging urban mining, leveraging material reuse. When we look at PFAS in the space of materials and look at the landscape for materials, PFAS are known to be harmful; harming local



communities of which we're operating in, harming the drinking waters of which is ubiquitous across the United States and across the globe.

New Mexico's way of looking and dealing with this within this Rule really provides clear context about how to be proactive about dealing with the PFAS solution by leveraging the power to design out PFAS's from inception and bring in materials that consumers can use that will not have this component in it that is harming and causing so much environmental and human harm.

Moving forward, I would really like to say that I thank the Environment Department for drafting such a strong and protective Rule.

Thank you to the Board and Hearing Officer for your time and commitment to protect New Mexicans and leveraging this as a model that can potentially be lifted across the other 48 states that do not have this type



of proposal. I strongly urge you to adopt the Environment Department's Rule. Thank you.

HEARING OFFICER ORTH: Thank you very much, Mr. Holm.

Elena F.

MS. ELENA FERNANDEZ: Thank you. My name is Elena Fernandez. I am a Project Specialist for Amigos Bravos.

HEARING OFFICER ORTH: Hold on please.

If you would spell your first and last name.

MS. ELENA FERNANDEZ: My apologies; Elena, E-L-E-N-A, last name Fernandez, F-E-R-N-A-N-D-E-Z.

HEARING OFFICER ORTH: Thank you.

Do you swear or affirm to tell the truth.

MS. ELENA FERNANDEZ: Yes, I do.

HEARING OFFICER ORTH: I'll start your time.

MS. ELENA FERNANDEZ: Thank you.

Again, my name is Elena Fernandez. I am a Project Specialist with Amigos Bravos. Amigos Bravos serves the entire State of New Mexico for water quality, protection, and restoration.

One of my projects is concerned with toxic pollutants across the State. I have worked closely with the Environment Department and communities that are impacted by toxic pollutants.

PFAS doesn't cause just physical harm, it causes mental harm or psychological fear from the unknown. I'm asking that the Environmental Improvement Board please adopt the PFAS Substances Consumer Protection Act.

New Mexico should adopt this Act to protect the health and well-being of New Mexicans and our State from the harms from intentionally added PFAS in our consumer products,



which provide only minor convenience when compared to the very real dangers to ourselves and the State.

The choice to reject this Act will have big consequences for New Mexicans' long-term health, negative impacts to medical treatment, and affordability from diseases related to long and constant exposure to PFAS, as well as the constant remediation of waters, lands, and agricultural.

Essentially, all New Mexicans and our State's well-being will be negatively affected by continued PFAS pollution and prolonged exposure. Please choose New Mexicans and choose New Mexico to be a leader against PFAS pollution.

Lastly, Labeling provides New Mexicans information such that they can make informed personal independent choices and decisions as to which products they deem safe or appropriate for their everyday use and livelihood.

Transparency is not punishment



or blame, it is the right thing to do. Industry is good at adapting to business needs, and doing the right thing by consumers would be a positive change.

I thank you for your time, and I send my thoughts to the people of La Cieneguilla who have been impacted by the groundwater pollution. Thank you.

HEARING OFFICER ORTH: Thank you, Ms. Fernandez.

Member Curry, do you have your hand raised?

BOARD MEMBER CURRY: I do, Madam Hearing Officer. I just wanted to follow up on Chairman Ely's question from the gentleman from Sandia. He said he had a written statement, and I was just curious if he is still on the line or if we've got it.

Does the written statement also reflect the position of Sandia Labs?

HEARING OFFICER ORTH: Let's



see.

Mr. Parkhomenko, are you still on the platform?

MR. KONSTANTIN PARKHOMENKO: Hello. Can you hear me?

HEARING OFFICER ORTH: Yes, hello.

MR. KONSTANTIN PARKHOMENKO: Yes, I'm still on the platform.

It is on our letterhead, so it should reflect that. There will also be a supplemental set of Public Comments, which will also be on official letterhead and it will also state that it's our official position.

BOARD MEMBER CURRY: Thank you.

MR. KONSTANTIN PARKHOMENKO: Thank you.

HEARING OFFICER ORTH: Thank you, Member Curry, and thank you Mr. Parkhomenko.

Is there anyone else on the platform here in what, I believe, will be our final oral Public Comment

session?
I see no hands. I don't see that anyone has joined us, and no in the room.
I think we'll return to the Technical Case. Please know if you are aware of someone who would like to offer Public Comment for this Rulemaking, written Public Comment may still be submitted here for several days more.
All right. Let's see. Dr. K, would you rejoin us at the front of the room?
Thank you very much. Good afternoon.
Let's see, Mr. Smithkier.
All right. Mr. Knight.
MR. KNIGHT: Thank you.

CROSS-EXAMINATION
BY MR. KNIGHT:
Q. Dr. Korzeniowski, I take it from your Testimony, and I think you may have stated this, that you consider



yourself to be an expert on PFAS. Is that correct?
A. I don't think anybody can be an expert on all PFAS, but certainly I'm a Subject Matter Expert in telomer chemistry with a fair amount of knowledge in fluoropolymers also, no refrigerants.
Q. So what specific type of PFAS, if you know what specific types of PFAS are used in food packaging for example.
A. They would have been, in general, fluorotelomer-based polymers. There is also some oxygenated materials from companies like Solvay and others, small PFPEs or small molecules, but largely fluorotelomer-based products.
They have largely been phased out, but those were generally what was used to provide the oil and water, particularly the oil or grease repellants that was needed on paper products.
Q. And what about a product like



Scotchgard, what specific types of PFAS, as far as you know, are used in a waterproofing product such as Scotchgard?
A. Well I mean, you know, Scotchgard wasn't made by us, it was made by 3M. They had a different set of chemistry and different backbone, but they would start with either the PFOS, which we heard about a lot here, as a raw material, or what we would call the sulfonyl chloride, the PFOS here and the sulfonyl chloride here. They would bolt on different additives and make polymers out of it.
They would be applied in the same manner. They are different chemistries, but the end function would be the same for particularly oil, oil and grease repellency.
Q. How about a product such as Rain-X; are you familiar with that product?
A. Rain-X I thought was silicone based.



Q. So not containing PFAS.
A. Not that I know of.
Q. Okay. Baking paper or something also known as parchment paper.
A. Parchment paper.
Q. Yes.
A. In the old days, many, many -- this is 25, 30 years ago, they would use some of the fluorotelomer products or some of the PFAS products, particularly polymers to coat the butter paper, but that's long done. That's long been done.
People at FDA that I worked with, I personally spent a lot of time at FDA because some of the products that we had made would have to go through FDA registration, so I spent a lot of time there, but never worked on parchment paper.
Q. Do you know whether parchment paper commonly contains PFAS as sold today?
A. I don't know that. I think, I

mean, we all know, and really know, because of the amount of news on PFAS chemistries, many companies have market deselection. They decided they don't want to deal with PFAS chemistries any longer.

Many end-use applications have decided to give up the properties of oil repellency. Textiles is a good example. That industry has largely moved to durable water repellents that have no fluorine.

What that means is you will get water repellency, but you couldn't get the durability. You won't get the severe weather protection, and you certainly won't get oil protection, but it works.

If you don't need something in hazard areas, then you don't need it, So many markets have moved away for obvious reasons.

Q. And what do you know about the use of PFAS in common brands of dental floss? Is; that still something that



commonly contains PFAS to your knowledge?

A. Dental floss is a polymeric, like a floor polymer, not telomer-based, and that's been studied. I believe that dental floss is still FDA approved.

Q. Can you briefly describe the differences between a fluorotelomer and a fluoropolymer?

A. Sure. You ready?

Q. Go ahead.

A. I promised I wasn't going to do chemistry; I lied.

For fluorotelomer chemistry, we'll do polymer and polymer. I think that's the easiest way because that's what I think we want to compare:

A fluorotelomer-based polymer has a hydrocarbon backbone, not a fluorinated backbone, so just carbon and hydrogen in the backbone. It has appendages, like if you look at a comb or pull out a comb, you've got the backbone and you've got tines in the



comb. There is side chains that sit on the side of that backbone of carbon and hydrogen.

Now they work relatively well. I mean they do their job. But as we've heard today and during the week and in the literature, they can fall apart. They can hydrolyze.

Now it's going to depend on what the media is. We have done studies that show half life of some of these polymers in soil, sediment, and sludge is thousands of years. Others who have done studies say it's hundreds of years, but they will break down.

When they break down, they give what we heard about as precursors, And those precursors will break down to PFAAs. That is a fact. It might take a long time, but that'll work.

Now fluoropolymers have a backbone of carbon and fluorine. Some of them have oxygen, and that's the perfluoropolyethers. That completely changes the properties. They are not



going to break down into the PFAA precursors that we've heard talked about.

The fundamental difference is the backbone and how much fluorine is in that molecule. With fluoropolymers it's carbon and fluorine. With fluorotelomer, you've got a hydrocarbon backbone, and the appendages which can be labile depending on what the polymer is and what it's treated with.

Q. These side-chain fluorinated polymers represent a high percentage of all PFAS-containing products. Is that correct?

A. No, I would not agree with that.

Q. What percentage of all PFAS-containing products would you say side-chain fluorinated polymers represent if you could attach a number to it?

A. Well I don't think I can answer that now because, as I said a minute ago, there has been very significant market deselection. The textile and carpet industry has

basically gone from these chemicals and they have been for years.

The textile market has been under tremendous siege, particularly in Europe and the U.S., so people have gone away from those, or away from fluorine, those were side-chain fluorinated polymers.

The paper industries may still use some, but they are largely moving away. They are trying to create non-fluorinated alternatives that may not give you the right performance, but they will give you some.

We have firefighting foams. We have talked about that, too, where they have gone to fluorine-free foams, but they don't work as well.

The military, at least in land-based systems, not ocean or not water-based systems, land-based system have shifted to fluorine free.

I mean a lot of it is public pressure and political pressure, so the market has shifted so



dramatically. I mean I can't keep up.

All I know is it is significantly different than 10 years ago, and another 5 years from now it will be significantly different also.

Q. All right. Your typical non-stick skillet, is that using fluoropolymers or something else?

A. Well I mean there are some non-stick skillets that are ceramic and they have other technologies.

If you're looking at a skillet coated with PTFE, for example, if it was PTFE from DuPont, now Chemours, it was branded "Teflon," but Teflon is a brand that goes with performance.

But yes, this is an FDA-regulated use, and my colleagues -- I wasn't in the fluoropolymer business 25 years ago, but they spent a lot of time at FDA. In order for you to get FDA approval, you have to do what they call "Extraction Tests." Those Extraction Tests are based on the use that pan is going to get. That's



normal use, that's not 500 degrees centigrade. It's normal use of what you would cook at home.

They would take the oils, they'd take the pan itself, they heat it up, and then you would measure what transferred from that pan or skillet into the oil, and then they'd measure it. They'd calculate the potential hazard based on the hazard of the coating and what extracted. That's how you get FDA certification. As far as I know, it's still certified.

FDA obviously continues to look at this because this is an area that's got a lot of people's focus for sure.

Q. But you would acknowledge that a non-stick pan that is left on the stove too long and gets too hot is going to emit fluorinated gases or vapors. Is that right?

A. I'm not saying -- I think anything you abuse has the potential to do that. I mean you're not supposed to put your pan on and walk away. If



you put the pan on and walk away or you put the pan on and you turn it up to a degree it's not supposed to use, it has the potential to degrade in some manner.

Normally what you will see, and you can argue, if you like, that you're not supposed to do that to the pan. Do people make mistakes? Probably. Should they replace the pan? Absolutely.

Q. Thank you for that.

A. Sure.

Q. Your Testimony acknowledges that there are environmental effects from the manufacture of fluoropolymers. Isn't that correct?

A. I think that history is long out there. I mean I think the emissions from the fluoropolymer manufacturers has been probably the major issue for this industry for many years.

As I mentioned when T.J. was asking me about my background, myself

and 3 other colleagues, 2 of which were from the University of Stockholm, we decided in 2004 that we wanted to look at particularly PFOA, but it was PFCAs. We wanted to look at where PFOA was coming from, And it was, I guess, all of a 2-year project.

What we did is we looked at every emission source or potential source for PFOA in the environment, and fluoropolymer manufacturing was at the top of the list, yes.

Q. And as I think I heard in your Testimony, you stated that the manufacture of fluoropolymers still to this day typically involves the use of non-polymeric PFAS. Is that correct?

A. What they do is, as I said -- and I don't have a current number, but I think Barb did say this:

If the technical end use requires a certain specification of fluoropolymer that the only way you can get that is using a polymerization aid, those companies are still doing



that, But they are also doing something else.

They are doing everything they can to switch all the other uses over to the non-fluorinated polymerization aids, and they are trying to work on creating new ones. They want to get out of using the small molecules, the fluoropolymerization aids, and I've said that.

We've been talking about this for 20 years, And they've made significant progress. I think PVDF, which is the second largest fluoropolymer, is largely out of using the fluorinated polymerization aids.

As Barb talked about today, there are some specific uses for PTFE, that's still needed because the customer requirements require it. In other words, the technical purity or the technical properties of the fluoropolymer are required.

But the goal is to find a way, and I can tell you this: If the



industry could find a way to not use them, they would, and that's their goal.

Q. Well that's great to hear, but they are not quite there yet. Is that right?

A. You're correct.

Q. As you pointed out in your Testimony, "low concern" is not the same as "no concern"; correct?

A. That's what I said, yes.

Q. Okay.

MR. KNIGHT: I think that's all the questions I have.

THE WITNESS: Thank you.

HEARING OFFICER ORTH: Thank you, Mr. Knight.

Mr. Harris, any questions?

MR. HARRIS: No questions, Madam Hearing Officer.

HEARING OFFICER ORTH: He said "No questions..."

Mr. Wetherbee, do you have questions of Dr. K?

He may have stepped away.



All right. Is there Redirect?

MR. TRUJILLO: At this time, I do have some Redirect questions, Madam Hearing Officer.

HEARING OFFICER ORTH: Great. Go ahead.

REDIRECT EXAMINATION

BY MR. TRUJILLO:

Q. Dr. K, thank you for your Testimony. I do have a couple questions for you:

I want to return to your comments on Labeling at the end of your Direct Testimony.

A. Okay. Sure.

Q. Can you give us some context on your comments?

I'm summarizing here, but "Labeling can't be good." Can you give us the context of --

A. What I was saying about that is I was giving credit to the State and for having a program to work with their constituents, and clearly based

on the comments you heard today and yesterday, it's an important thing to do. My comments were particularly related to -- I'll answer your question in a second:

In the Bill you have a list of exempted products. Our position is they should not be labeled because of what I had said this morning and again this afternoon, which is that the risk of exposure from a fluoropolymer...

In the days that I've been in this industry there is no such thing as zero, but it's vanishingly small if there is going to be any risk of exposure from a fluoropolymer given all the testing that's been done over the years.

What I also did say, though, is that if there is consumer products that have PFAS chemicals that can expose the population, and they can and it does potentially have a risk that can be quantified, then it's possible then that a label would be



beneficial.

My comments also were -- again, I may get counseled on this, but it is that I'm not sure that label would do it, but that's an aside. I'm not a label expert, but to me, as a Chemist, I wouldn't know what to do with that.

Q. One last question:

Do you have any final thoughts that you would like to leave with the Board relative to your Testimony?

A. Listen, the Board needs to understand that I really do appreciate being able to come here today.

I would hope, because you've heard lots of Testimony, and you've heard completely different testimonies from different people, especially Barb and I, but I would hope you would take into consideration our backgrounds, our experience, and then take into consideration some of the things that we've given you to think about today. Thank you.



MR. TRUJILLO: That's all of my questions. Thank you very much, Madam Hearing Officer.

HEARING OFFICER ORTH: Thank you, Mr. Trujillo, and Dr. K.

We'll move to the Board:

Vice Chair Suina, do you have questions?

VICE CHAIR SUINA: No questions. Thank you.

HEARING OFFICER ORTH: All right. Chair Ely.

CHAIR ELY: Good afternoon, Dr. K. Thank you for being here, too. I appreciate your Testimony.

THE WITNESS: Thank you.

EXAMINATION

BY CHAIR ELY:

Q. You talked about some studies that looked at incineration of fluoropolymers and --

A. I did, yes.

Q. -- and the potential for a 99+ destruction rate, provided the



temperature was high enough. Is that right?

A. Yeah, there is no question, no question whatsoever that if you don't have something above 900 C, for example, or 980 C, you have a significant potential of not finishing the job, that's true.

Most municipal waste incinerators, if they're running on their permit and following their permit, are going to run at 1,000, 1,000 degrees. Hazardous waste may be 11-, 1150.

We have done a lot of work studying this. When you look at the studies that have been done under controlled conditions, as well as commercial conditions, as Barb said, we're getting several '9s destruction, and you need that.

Just for the Board to understand, 99.9% is a wonderful thing, but that's 1,000 parts per million that's still left over, and

that is very different from PPTs, which is what we're talking about today. You need several '9s destruction.

What you need to do is you need to run the equipment the way it's supposed to. You need to have your proper emission controls in place, and you need to have the right analytical. As long as you do all of that, you have a really good chance of...

You know, I mean you're supposed to operate with no emissions, so we're pretty close to that, but we have to get agreement with EPA.

Our particular group has been working back and forth with the U.S. EPA; they have extensive experience in incineration.

We have been working with a lab out of North Carolina to try to get guidance so that when we do our work, they will say it's okay. They are hard to get to say it's okay, but that's what we're doing.

The studies Barb cited and



what I cited are really good. The thing that people don't want to see, and you heard this today, is the little things that don't get burned, or the PICs, but the products that get complete combustion. They are the small non-polymerics.

Developing the analytical methods to measure those has been a huge challenge, but they are now in place. We can now measure what's coming out to a very, very small amount.

Q. So you're talking about needing the 900 C.

A. You probably need to be above that.

It depends on the polymer also. PTFE is the hardest fluoropolymer to destruct, so if you're using Number 2, which is PPDF, 900 probably would be fine.

Q. Okay.

A. But we've started with PTFE because that's the hardest, and most



people have done the same thing.

There is one study that used a mixture and, you know, I didn't design the study and I find it hard to interpret, but the whole idea is if you can get the PTFE to completely burn, you probably got the conditions you need to be safe.

Q. I'm just thinking of conditions where, say in New Mexico, I've seen people burning their trash, you know. What kind of --

A. Do you want me to cringe now or later?

Q. It may not be legal, but it happens.

A. Yeah.

Backyard burning, you can't control it. That's where a public service campaign would probably be good, though I don't work in New Mexico except for this week.

Backyard burning is not a good idea, especially with these products. They are likely not to do you any



harm, but the fact of the matter is you're then putting emissions in the air, and that can travel.

And it may not be you, but backyard burning, you know, I worked for many years with the U.S. military and the Department of Defense. A lot of work I had done has been in firefighting foams and related products.

I spent a lot of time at DOD, and they are just like us today. You really want to discourage burning of these kinds of products.

I mean they have armaments. The military coats a number of their products with fluoropolymers and the like to keep them waterproof, and, you know, they need to destroy them.

Armament destruction or warfare destruction is a big program. That's where I read about all the backyard burning stories; not a good idea.

Q. I think back to the days when my Mother would burn our family trash;

Page 1352

I shutter and wish I could go back and tell her.
A. If I cringe, I'm sorry.
Q. Please stop.
All right. You mentioned waste-to-energy plants.
A. Yes.
Q. Those are regulated.
A. They are regulated, yes.
Q. In New Mexico I think we only have 1, and I believe they are outlawed in the State's jurisdiction. Do you know of waste-to-energy plants in New Mexico?
A. I do not.
Just to be on the up-and-up, incineration is tough to do because there is not enough incinerators, so that's the second issue. If you wanted...
You know, the...
A lot of states, for their own reasons, won't take waste like this, hazardous waste. If you try to find a hazardous waste incinerator, sometimes

Page 1353

you have to go to other states. Then if they will take it, great; if they won't, you have to go to Plan B.
CHAIR ELY: All right. That's all of my questions. Thank you.
THE WITNESS: Thank you.
HEARING OFFICER ORTH: Thank you.
On the platform, Member Bitzer, do you have questions of Dr. K?
Member Carrasco, do you have questions of Dr. K?
BOARD MEMBER BITZER: Sorry, I couldn't get to the button properly; it wasn't expanding for me.
HEARING OFFICER ORTH: Okay.
BOARD MEMBER BITZER: Yeah, no, I don't have any questions. I'm just also old enough to remember burning trash out in the backyard with my Dad once a week. We lived in the Bay Area of California, too; it was pre-EPA days.
Anyway, thank you; it's been

Page 1354

informative.
THE WITNESS: Thank you.
HEARING OFFICER ORTH: Thank you.
Member Curry, do you have questions of Dr. K?
All right. Anything further before we excuse Dr. K?
No. Thank you very much, sir.
THE WITNESS: Pleasure. Thank you.
HEARING OFFICER ORTH: Let me ask the parties if there is anything else they are aware of that we would need to do?
We do have a request from the Board for a bit of additional Testimony, but let me ask the parties first. No.
MR. MOELLENBERG: Madam Hearing Officer, nothing.
Our Technical Testimony has concluded and other than the post-hearing proceedings, I don't think we have anything else.

Page 1355

HEARING OFFICER ORTH: All right. Thank you very much.
Chair Ely, would you like to describe what you would like to hear? I might mangle it otherwise.
CHAIR ELY: Probably not any worse than me, Madam Hearing Officer.

EXAMINATION

BY CHAIR ELY:
Q. I have a question on Labeling of Complex Durable Products; it's in the Rule. I don't know if Dr. Chapman would be the best person to answer that question probably. It relates to Paragraph 2.13D(1).
You were talking about all the "mays" and "shalls" earlier today, and I'm particularly interested in the last sentence there.
The way I read this paragraph, it looks like the Erlenmeyer flask with "PFAS" is a requirement, and there is additional language that needs to be included, or an additional

# <u>EXHIBIT C</u>

## REFERENCES

Buck, R. C.; Franklin, J.; Berger, U.; Conder, J. M.; Cousins, I. T.; de Voogt, P.; Jensen, A. A.; Kannan, K.; Mabury, S. A.; van Leeuwen, S. P. J. Perfluoroalkyl and Polyfluoroalkyl Substances in the Environment: Terminology, Classification, and Origins. *Integr. Environ. Assess. Manage.* 2011, *7* (4), 513–541. DOI: 10.1002/ieam.258.

Wang, Z.; Buser, A. M.; Cousins, I. T.; Demattio, S.; Drost, W.; Johansson, O.; Ohno, K.; Patlewicz, G.; Richard, A. M.; Walker, G. W.; White, G. S.; Leinala, E. A New OECD Definition for Per- and Polyfluoroalkyl Substances. *Environ. Sci. Technol.* 2021, *55* (23), 15575–15578. DOI: 10.1021/acs.est.1c06896.

Hammel, E.; Webster, T. F.; Gurney, R.; Heiger-Bernays, W. Implications of PFAS Definitions Using Fluorinated Pharmaceuticals. *iScience* 2022, *25* (4), 104020. DOI: 10.1016/j.isci.2022.104020.

Anderson, J. K.; Brecher, R. W.; Cousins, I. T.; DeWitt, J.; Fiedler, H.; Kannan, K.; Kirman, C. R.; Lipscomb, J.; Priestly, B.; Schoeny, R.; Seed, J.; Verner, M.; Hays, S. M. Grouping of PFAS for Human Health Risk Assessment: Findings from an Independent Panel of Experts. *Regul. Toxicol. Pharmacol.* 2022, *134*, 105226. DOI: 10.1016/j.yrtph.2022.105226.

Korzeniowski, S. H.; Buck, R. C.; Newkold, R. M.; El kassmi, A.; Laganis, E.; Matsuoka, Y.; Dinelli, B.; Beauchet, S.; Adamsky, F.; Weilandt, K.; Soni, V. K.; Kapoor, D.; Gunasekar, P.; Malvasi, M.; Brinati, G.; Musio, S. A Critical Review of the Application of Polymer of Low Concern Regulatory Criteria to Fluoropolymers II: Fluoroplastics and Fluoroelastomers. *Integr. Environ. Assess. Manage.* 2023, *19* (2), 326–354. DOI: 10.1002/ieam.4646.

Henry, B. J.; Carlin, J. P.; Hammerschmidt, J. A.; Buck, R. C.; Buxton, L. W.; Fiedler, H.; Seed, J.; Hernandez, O. A Critical Review of the Application of Polymer of Low Concern and Regulatory Criteria to Fluoropolymers. *Integr. Environ. Assess. Manage.* 2018, *14* (3), 316–334. DOI: 10.1002/ieam.4035.

U.S. Environmental Protection Agency. TSCA Section 8(a)(7) Reporting and Recordkeeping Requirements for Perfluoroalkyl and Polyfluoroalkyl Substances; 86 Fed. Reg. 33,926 (June 28, 2021).

U.S. Environmental Protection Agency. Toxic Substances Control Act Reporting and Recordkeeping Requirements for Perfluoroalkyl and Polyfluoroalkyl Substances; 88 Fed. Reg. 70,516 (Oct. 11, 2023).

Organisation for Economic Co-operation and Development (OECD). *Reconciling Terminology of the Universe of Per- and Polyfluoroalkyl Substances: Recommendations and Practical Guidance*; Series on Risk Management No. 61; OECD: Paris, July 9, 2021. https://one.oecd.org/document/ENV/CBC/MONO(2021)25/En/pdf.

Vermont Agency of Natural Resources, Department of Environmental Conservation, Drinking Water and Groundwater Protection Division. *Advance Notice on the Regulation of Perfluoroalkyl, Polyfluoroalkyl Substances (PFAS) as a Class*; Aug 14, 2020. https://dec.vermont.gov/sites/dec/files/PFAS/20180814-PFAS-as-a-Class.pdf.

U.S. Department of Defense. *Report on Critical Per- and Polyfluoroalkyl Substance Uses*; Aug 2023. https://www.acq.osd.mil/eie/eer/ecc/pfas/docs/reports/Report-on-Critical-PFAS-Substance-Uses.pdf.

U.S. Food and Drug Administration. *PFAS in Medical Devices*; Aug 6, 2025. https://www.fda.gov/medical-devices/products-and-medical-procedures/pfas-medical-devices.

U.S. Environmental Protection Agency. *Fact Sheet: 2010–2015 PFOA Stewardship Program*; Feb. 26, 2026. https://www.epa.gov/assessing-and-managing-chemicals-under-tsca/fact-sheet-20102015-pfoa-stewardship-program.

U.S. Environmental Protection Agency. *EPA and 3M Announce Phase Out of PFOS*; May 16, 2000. https://perma.cc/KA6N-WANC.