**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

|  |  |
|---|---|
| AMERICAN CHEMISTRY COUNCIL, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> JAMES C. KENNEY*, in his official capacity as Secretary of the New Mexico Environment Department*; and RAÚL TORREZ, *in his official capacity as Attorney General of New Mexico*, <br><br> *Defendants*. | Case No.: 1:26-cv-02130 <br><br><br> **ORAL ARGUMENT REQUESTED** |

**DEFENDANTS' JOINT RESPONSE TO PLAINTIFFS'
<u>MOTION FOR PRELIMINARY INJUNCTION</u>**

**INTRODUCTION**

Whether on a cereal box or a battery, American consumers are familiar with labels that tell them what is inside the products they buy. For some consumers, those labels help them make healthier lifestyle choices. Other consumers might rely on labels to reduce their environmental footprint. Some may simply want to know what is in the product. Whatever the individual's purpose, informational labels give consumers more freedom and agency over their lives.

One category of ingredients, per- and poly-fluoroalkyl substances (PFAS), matters to New Mexico because of well-established risks that PFAS pose to human and environmental health. And New Mexico has already experienced negative consequences of those risks firsthand. Despite that, and to account for industry input during rulemaking, New Mexico has taken a measured approach to PFAS labeling. New Mexico does not require manufacturers to *warn* consumers that PFAS in their products may be harmful. Instead, New Mexico requires that manufacturers simply *inform* consumers if their products contain intentionally added PFAS, while offering a host of narrowing exceptions that make this already-vanilla requirement less onerous. Yet Plaintiffs, a group of manufacturers, now ask the Court to enjoin New Mexico's PFAS labeling requirement entirely.

In support, Plaintiffs offer a specious theory that New Mexico's label—which requires no text other than "PFAS"—might be interpreted by some consumers as a "warning" label simply because it depicts an Erlenmeyer flask. Plaintiffs' theory defies common sense, and it finds no support in the First Amendment: Plaintiffs' First Amendment interests in this case are minimal, and they agree the label's text is factually accurate. Further, the record here is undeveloped, and Plaintiffs fail to demonstrate that the labeling requirement is unconstitutional in *any* application, let alone a substantial number. This Court should deny Plaintiffs' Motion in full.

1

**FACTUAL AND PROCEDURAL BACKGROUND**

**A.      PFAS are "forever chemicals" with known environmental and human health effects.**

PFAS are a class of chemicals with "at least one fully fluorinated carbon atom." N.M. Stat. Ann. § 74-15-2(S) (2025). This bond, between carbon and fluorine, is the strongest single bond in organic chemistry. Chapman Decl. ¶ 75. Because of this bond, PFAS are extremely durable. *Id.*

But this prized durability also means PFAS do not naturally degrade like other chemicals. *Id.* ¶ 75. PFAS enter the environment in many ways—through the production of PFAS; the manufacturing, use, and disposal of consumer products (food packaging, fertilizers and pesticides, non-stick pans, textiles, and paints); the discharge from wastewater treatment plants; the application of fertilizers and pesticides; and the use of firefighting foams. *Id.* ¶¶ 102, 112. Once in the environment, PFAS circulate through air, water, and the ground. *See id.* ¶ 110. And ultimately, PFAS accumulate in plants, waterways, soil, animal tissue, and our bodies. *Id.* ¶ 110; DeWitt Decl. ¶ 15 (explaining that nearly every American has PFAS in their blood).

Take, for example, the lifecycle of a nonstick pan. Nonstick pans have a type of PFAS known as a fluoropolymer (specifically, polytetrafluoethylene (PTFE), or Teflon), in their nonstick coating. Chapman Decl. ¶ 85. During fluoropolymer production, manufacturers use a variety of PFAS, including particularly toxic PFAS, like GenX. *Id.* ¶ 94. Despite containment techniques, some of the highest global PFAS concentrations (fluoropolymers *and* otherwise) are found in the water, groundwater, and human blood around fluoropolymer production plants. *Id.* ¶¶ 86, 88.

When a home chef uses the nonstick pan to make a stir fry, the pan naturally gets scratched, and even small perforations can cause pieces of the pan's coating to break off into the food. *Id.* ¶ 85. At expected cooking temperatures, PTFE often emits gases containing harmful PFAS such

as PCFA. *Id*. Thus, when the chef's family inhales the intoxicating smell of stir fry, they could also be inhaling PFAS fumes. *Id*. After years of dutiful use, the nonstick pan gets dropped off at the dump. If put in a landfill, nonpolymeric PFAS will be found in the water leaching through the waste field. *Id*. ¶ 36. If incinerated, nonpolymeric PFAS will be found in the stack emissions. *Id*. Once back in the environment, PFAS can again find their way into our bodies—whether through the water we drink or the plants and animals we eat. *Id*. ¶ 132. Importantly, many PFAS *never* degrade. *Id*. ¶ 17. And those PFAS that *can* degrade, such as fluoropolymers, transform into other species of persistent PFAS. *Id*. PFAS are difficult to remediate and continue to contaminate even after best efforts at remediation. *Id*. ¶¶ 16, 109. The bottom line is that all PFAS are persistent in the environment.

Not only do PFAS contaminate the environment, many make us sick. PFAS can be cancer-causing. DeWitt Decl. ¶¶ 41–45. PFAS can hinder the development of our children: Infants are often exposed to PFAS (through breastfeeding and contact with the ground), which can result in low birth weight and decreased growth. *Id*. ¶¶ 47–51. PFAS can be immunotoxic, suppressing our responses to vaccines and making it more likely we develop allergies and asthma. *Id*. ¶¶ 52–58. PFAS can also hurt our cardiovascular systems and livers. *Id*. ¶¶ 59–65. Because PFAS can be toxic, the EPA established legal thresholds for several PFAS in our water. *Id*. ¶¶ 38, 44.

The public health community continues to learn more about the health impacts of PFAS. But those research efforts cannot keep pace with the real-world need to understand and remediate the already-mounting adverse effects of PFAS. Indeed, it is easier to synthesize a new chemical in a laboratory than conduct yearslong longitudinal studies on that chemical's long-term impacts on

plant, animal, and human health. And scientists agree that new PFAS are being identified faster than they can conduct individualized, species-specific studies. *Id.* ¶ 70.

So, rather than attempt the near-impossible task of developing individual toxicological thresholds for over 14,000 chemicals, scientists instead view PFAS as a category. *Id.* ¶ 70. Of course, subcategories of PFAS may occasionally be relevant for specific research or regulatory purposes, but there is broad agreement that all PFAS—all chemicals with a fully fluorinated carbon atom—share several pertinent characteristics. All PFAS are persistent in the environment. Chapman Decl. ¶ 25. And many PFAS are a threat to our health. *See generally* DeWitt Decl.

**B.      New Mexico took action to protect its environment and people.**

PFAS are proliferating in New Mexico. On the shores of Holloman Lake, scientists have recorded the highest PFAS concentrations ever found in wildlife. Chapman Decl. ¶¶ 149–50. And in Curry County, a family-run farm was forced to euthanize thousands of dairy cows due to PFAS exposure. Smithkier Decl. Ex. A. at 1. With the federal government and private industry shirking financial responsibility, New Mexico is shouldering the cost and efforts of remediation, spending $12 million to help just one community access clean water. *Id.* at 2; Smithkier Decl. Ex. C at 3.

In response to PFAS contamination and resulting challenges, the New Mexico Legislature took action. *Id.* at 2–3. Last year, it passed the landmark Per- and Poly-Fluoroalkyl Protection Act ("PFAS Protection Act"). *See* N.M. Stat. Ann. §§ 74-15-1 to -7 (2025). The Act takes a three-pronged approach to PFAS regulation. First, the Act bans, in phases, the sale of products with intentionally added[1] PFAS by 2032, unless manufacturers can demonstrate the use of PFAS is

---

[1] "Intentionally added" is a defined term meaning "the continued presence, at any level or concentration, of [PFAS] is desired or expected in the final product or one of the product's components." N.M. Stat. Ann. § 74-15-2(N).

currently unavoidable, or the product falls into one of seventeen other exceptions. § 74-15-3(A), (F); 20.13.2.10 NMAC. Second, the Act requires manufacturers to report the amount of PFAS in their products. § 74-15-5. Third, the Act allows the Environmental Improvement Board (the "Board") to "adopt rules . . . requiring the labeling of products" for PFAS. § 74-15-4(B)(1).

**C.      The Board adopted a flexible, science-backed PFAS labeling requirement.**

Pursuant to the PFAS Protection Act, the Board adopted the labeling requirement. 20.13.2.3, 20.13.2.13 NMAC. For some products that contain intentionally added PFAS manufactured after January 1, 2027, the product's label must contain "an outline of an Erlenmeyer flask with the word 'PFAS' inside the flask." 20.13.2.13(C)(1) NMAC. The label must be "clearly visible and legible" prior to sale, and to that end, if the label is obscured by other packaging, or sold online, the flask pictogram must be made visible prior to sale on that other packaging or online. 20.13.2.13(C)(3), (4) NMAC. Manufacturers, however, are free to include other text or graphics to contextualize the label.

The labeling requirement does not apply to all products. Some products, like medical devices and used products, are exempted entirely. 20.13.2.13(A)–(B) NMAC. Complex durable goods (those goods with a hundred or more manufactured components) enjoy a relaxed labeling requirement that applies only to the product specification sheet and product manual, not the packaging or product itself. 20.13.2.7(C), 20.13.2.13(D) NMAC. And if a product or product class can be sold after 2032 (under one of the seventeen exemptions to the PFAS ban), a manufacturer can apply for a waiver of the labeling requirement if no PFAS "will ever come into direct contact with a consumer" and a waiver is consistent with the overall purposes of the Regulation. 20.13.2.13(F) NMAC. Applications submitted before the end of October this year are deemed

approved unless denied by the New Mexico Environment Department (the "Department")—meaning that an application automatically stays enforcement. *Id.*

Further, for any product that requires a label, manufacturers can comply instead with another state's labeling requirements for PFAS: The submission of an application to use another state's label "constitutes compliance" unless the Department notifies the manufacturer otherwise within ninety days. 20.13.2.13(E) NMAC. Other states have adopted PFAS labeling requirements that use text-only disclosures or other variations of the flask pictogram.[2]

The flask pictogram and PFAS text in New Mexico's label represent a scientific and political consensus that consumers want to know, and should know, about PFAS in their products. As witnesses—including Plaintiffs' own—agreed, "[i]f the intent of the label is to identify the presence of [PFAS]," the text "PFAS" is scientifically accurate. Smithkier Decl. Ex. D at 1228:18–23. An expert testified that the PFAS label, with the flask, was an effective way of communicating to consumers that the product contained a chemical, PFAS. Smithkier Decl. Ex. E at 632:12–18.

As adopted, the labeling requirement contains important concessions to manufacturers. Unlike initial versions, the final labeling requirement: exempts specific categories of products; allows manufacturers to request waivers for products or product classes; no longer requires labeling to be permanently affixed; does not require a label that states "PFAS are a family of

---

[2] *See, e.g.*, Conn. Gen. Stat. § 22a-903c(2)–(3) ("Whenever a product . . . contains intentionally added PFAS and is a component of another product, the product that contains the component shall be labeled . . . using words or symbols approved by the department."); Connecticut Department of Energy & Environmental Protection (DEEP), *PFAS in Products* (Dec. 1, 2025), https://portal.ct.gov/deep/p2/pfas-in-products (illustrating that DEEP's Commissioner approved an Erlenmeyer flask pictogram, including an exclamation mark, for compliance with its labeling requirement); Cal. Health & Safety Code §§ 109010–12 (requiring product label for cookware containing intentionally added PFAS); Colo. Rev. Stat. § 25-15-604 (requiring labeling of PFAS products that come into contact with food, until those products are banned).

chemicals, exposure to which are associated with negative health and environmental effects"; and provides for relaxed labeling requirements for complex durable goods. Chapman Decl. ¶ 63. Trade groups recognized that "the simplified Erlenmeyer flask label is far less onerous than the original proposal and makes sense for those who are captured by the statute." Smithkier Decl. G at 0354.

The Department is actively preparing for the labeling requirement to go into effect on January 1, 2027. Two weeks ago, the Department released a guidance document explaining the labeling requirement and giving examples of compliant labels. Smithkier Decl. Ex. B. At the time of filing, the Department is in ongoing discussions with manufacturers about how to comply with labeling requirements and apply for exemptions or waivers. Chapman Decl. ¶¶ 67–71.



**Figure 1:** Smithkier Decl. Ex. B at 5, 8–9 (showing sample labels).

### ARGUMENT

Plaintiffs request an extraordinary injunction against an ordinary label. To succeed, they must establish: (1) a likelihood of success on the merits;[3] (2) that they will suffer irreparable harm

---

[3] Although this brief focuses on the merits, New Mexico preserves and emphasizes that federalism and comity principles counsel against federal review and especially against premature

if the injunction is denied; (3) that their threatened injury outweighs the harm an injunction would cause New Mexico; and (4) that the injunction is in the public interest. *Att'y Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 776 (10th Cir. 2009). Here, because Defendants represent state interests, the third and fourth factors merge into a single inquiry. *Rocky Mtn. Gun Owners v. Polis*, 121 F.4th 96, 112 (10th Cir. 2024). Because a preliminary injunction is an "extraordinary remedy" that is "the exception rather than the rule," the movant's right to relief must be "clear and unequivocal." *Mrs. Fields Franchising, LLC v. MFGPC*, 941 F.3d 1221, 1232 (10th Cir. 2019) (citation omitted).

Plaintiffs choose to focus primarily on a facial challenge to the labeling requirement, and "that decision comes at a cost." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024). A facial challenge seeks to enjoin a law in all its applications. In First Amendment facial challenges, a Court "must evaluate the full scope of the law's coverage, . . . . then decide which of the law's applications are constitutionally permissible and which are not, and finally weigh the one against the other." *Id.* at 744. Plaintiffs must demonstrate that New Mexico's labeling mandate "prohibits a substantial amount of protected speech relative to its plainly legitimate sweep." *Id.* (citation omitted). This complex, fact-specific inquiry "is the price of [Plaintiffs'] decision to challenge the laws as a whole." *Id.*; *see also id.* at 760–61 (Thomas, J., concurring) (noting that "even [with]

---

injunctive relief. Such principles are animated through abstention doctrines that may apply here. *See, e.g.*, *Burford v. Sun Oil*, 319 U.S. 315 (1943); *R.R. Com. of Tex. v. Pullman Co.*, 312 U.S. 496, 501 (1941); *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976). Regulations under the PFAS Protection Act are currently being litigated in a parallel state court proceeding brought by one of Plaintiffs' member-companies. *See Diamond Vogel, Inc. v. N.M. Env't Improvement Bd.*, No. A-1-CA-43483 (N.M. Ct. App.). If the appellant is successful on state law grounds, there will be no reason for this Court to consider whether the regulations are constitutional. Even if the appellant is only partially successful, such decision could still substantially modify the Court's constitutional analysis here.

simple fact patterns, a court has little chance of determining whether a novel, never-before-enforced state law can be constitutionally enforced . . . without resorting to mere speculation").

Plaintiffs also raise an as-applied challenge to the labeling of certain products that only contain fluoropolymers. "[A]n as-applied challenge under the First Amendment 'asks a court to assess a statute's constitutionality with respect to the particular set of facts before it.'" *United States v. Gray*, 652 F. Supp. 3d 112, 132 (D.D.C. 2023) (quoting *Hodge v. Talkin*, 799 F.3d 1145, 1156 (D.C. Cir. 2015)).

**A.      Plaintiffs are unlikely to succeed on the merits because the record confirms that the PFAS disclosure is factual and uncontroversial.**

Plaintiffs' claims rest on the thinnest of First Amendment interests. To start, Plaintiffs agree this case concerns only commercial speech. Pl.'s Mot. Prelim. Inj. ("PI Mot.") at 11, Dkt. No. 3 (discussing commercial speech standards). Commercial speech "occup[ies] 'a subordinate position in the scale of First Amendment values.'" *United States v. Wenger*, 427 F.3d 840, 846 (10th Cir. 2005) (quoting *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 455–56 (1978)). Unlike other First Amendment doctrines that focus just on the speaker's interests, "protection of commercial speech largely derives from the *listener's* First Amendment interests." *Id.* at 847 (cleaned up). "[T]he State's power to regulate commercial transactions justifies its concomitant power to regulate commercial speech that is linked inextricably to those transactions." *Id.* at 846 (citation omitted). So, most commercial speech falls under a "form of intermediate scrutiny." *Id.* (citing *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 564–65 (1980)).

But the inquiry does not start with intermediate scrutiny. Because commercial speech jurisprudence recognizes "societal interest in the fullest possible dissemination of information," *Cent. Hudson*, 447 U.S. at 561–62, the label at issue here is subject to a less stringent standard:

*Zauderer* scrutiny. *See Zauderer v. Off. of Disciplinary Counsel*, 471 U.S. 626 (1985). Under *Zauderer*, courts uphold disclosure requirements where the government's interest is substantial, only "factual and uncontroversial information" must be disclosed, and the requirements are "not unduly burdensome." *Wenger*, 427 F.3d at 849. Plaintiffs do not assert that the State's interests in protecting health, safety, and the environment are not substantial ones. *See Nat'l Inst. of Fam. & Life Advocs. v. Becerra* ("*NIFLA*"), 585 U.S. 755, 775 (2018); *Am. Meat Inst. v. U.S. Dep't Agric.* ("*AMI*"), 760 F.3d 18, 24 (D.C. Cir. 2014) (en banc).

The PFAS labeling requirement satisfies *Zauderer* because it only requires Plaintiffs to make a factual disclosure that their products contain chemicals that are scientifically classified as PFAS. Plaintiffs do not meet their burden for preliminary, facial, or as-applied relief.

**1.    The mere presence of a synthetic carbon and fluorine bond is factual and uncontroversial.**

This Court should reject Plaintiffs' attempts to manufacture controversy about the PFAS labeling requirement. Plaintiffs concede that their products contain PFAS, and their conjecture about the flask pictogram has no basis in fact or law.

The PFAS label is a consumer awareness label, not a warning label. Dickerson Decl. ¶ 14. Consumer awareness labels help consumers "make informed decisions regarding product use" by disclosing product components. *Id.* ¶ 13. Courts treat consumer awareness labels more favorably than warning labels because they fall into a robust history of regulation permitted by the First Amendment. *N. Y. State Rest. Ass'n v. N.Y. City Bd. of Health* ("*NYSRA*"), 556 F.3d 114, 134 (2d Cir. 2009) (upholding caloric disclosure requirements for restaurants); *AMI*, 760 F.3d at 28 (country-of-origin disclosure); *Grocery Mfrs. Ass'n v. Sorrell*, 102 F. Supp. 3d 583 (D. Vt. 2015) (genetic engineering disclosure). On the other hand, where a label asserts a particular ingredient

10

will pose *a specific risk*, courts can conduct a more searching inquiry. *See, e.g.*, *Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1266 (9th Cir. 2023) (finding a warning that glyphosate is a carcinogen was not purely factual and uncontroversial).

The PFAS label fits comfortably within *Zauderer*'s tradition of consumer awareness labels because it requires only the disclosure of true information. The label does not state that PFAS will pose a specific risk to consumers. Dickerson Decl. ¶ 15. It does not fit into accepted definitions of a warning because it (1) does not state there is exposure to a hazard; (2) does not describe negative consequences from exposure; and (3) does not explain how to avoid exposure. *Id.*

Plaintiffs do not and cannot dispute that their products contain PFAS. The label (flask and text) correctly, factually, and uncontroversially alerts consumers to the presence of PFAS, a class of chemicals. It does not, as Plaintiffs suggest, signal a hazard or "falsely and controversially signal[] that all PFAS are dangerous." PI Mot. at 8. Again, Plaintiffs' own expert testified the text "PFAS" does not signal danger, Smithkier Decl. Ex. D at 1228:18–23, and Plaintiffs concede that the label does not "tell[] a consumer . . . what type of risk [PFAS] poses," PI Mot. at 16.

Because New Mexico's label does not require words other than "PFAS," Plaintiffs cannot point to any warning message that might support an argument of unconstitutionality. Plaintiffs' argument is instead much weaker—they submit that consumers may draw different conclusions about PFAS based on the Erlenmeyer flask image, and that some of those conclusions may be out of proportion to the actual hazard, if any. Plaintiffs' argument is wrong. While "[f]acts can disconcert, displease, provoke an emotional response, spark controversy, and even overwhelm reason, . . . that does not magically turn such facts into opinions." *Disc. Tobacco City & Lottery, Inc. v. United States*, 674 F.3d 509, 569 (6th Cir. 2012).

11

The lack of characterization in New Mexico's PFAS label is a feature, not a bug. Plaintiffs would like to put New Mexico in a double bind: if New Mexico were to adopt a more aggressive labeling requirement that indicated a specific hazard, Plaintiffs would argue that the warning is false and "patently unconstitutional." PI Mot. at 16. But if, as it did here, New Mexico adopts a more measured approach that requires mere disclosure of ingredients, then Plaintiffs argue New Mexico does not adequately justify the label. But the First Amendment is not offended by New Mexico's approach. There is no requirement under *Zauderer* that a disclosure law "get at all facets of the problem it is designed to ameliorate." *Zauderer*, 471 U.S. at 651 n.14. It is more than enough that the disclosure be "proportional." *Wenger*, 427 F.3d at 849 (citation omitted).

Plaintiffs' arguments boil down to the idea that PFAS's hazards cannot be uniformly characterized. Of course, New Mexico disagrees—there are traits, like environmental persistence, that are relevant to *all* PFAS. Chapman Decl. ¶ 16. But inasmuch as some PFAS might present different types or levels of danger, that is no First Amendment obstacle under *Zauderer*.

The D.C. Circuit's decision in *AMI* is instructive. There, a group of meat producers challenged a USDA regulation requiring country-of-origin labeling on meat products. 760 F.3d at 20. The court recognized that some consumers may care about "buy[ing] American." *Id.* at 24 (citing congressional record). Others might think American meat "would in truth be better." *Id.* Still others might be concerned about contamination and food safety regulations abroad. *Id.* But the court upheld the label even though not all meat produced abroad is unsafe or of inferior quality. *See generally id.* at 24–26. Importantly, the label gives consumers enough information to empower them to decide for themselves how country-of-origin labeling matters. *See Nat'l Elec. Mfrs. Ass'n v. Sorrell* ("*NEMA*"), 272 F.3d 104, 115 (2d Cir. 2001) (acknowledging the goal of "protecting

human health and the environment" is "inextricably intertwined with the goal of increasing consumer awareness of the presence" of a chemical).

So too here. A consumer may care about PFAS because all PFAS are persistent. DeWitt Decl. ¶ 70. A consumer may care about PFAS' environmental impacts at the manufacturing or disposal stage. Melstrom Decl. ¶ 28; Chapman Decl. ¶ 36. A consumer may have already been exposed to PFAS and wants to limit their cumulative exposure. DeWitt Decl. ¶ 69. A consumer may worry about particular kinds of PFAS and take the label as an invitation to do more research. Smithkier Decl. Ex. E at 632. And we know that informational labeling is valuable to consumers because some consumers are willing to pay for PFAS-free products. Melstrom Decl. ¶¶ 26–28. Treating PFAS as a class aligns New Mexico with a broad national and international regulatory and scientific consensus. Chapman Decl. ¶¶ 29–32; DeWitt Decl. ¶¶ 13, 70.

The flask pictogram conveys the uncontroversial fact that PFAS are chemicals, and so "serves important communicative functions." *Zauderer*, 471 U.S. at 647. In rulemaking, the Board heard testimony from Dr. Dickerson, a labeling expert, that an Erlenmeyer flask with the initials "PFAS" is an "excellent element" that would "convey to the consumer that there is a chemical [PFAS]" inside. Smithkier Decl. Ex. E at 632. In disclosing the presence of PFAS, the label joins "[i]nnumerable federal and state regulatory programs [that] require the disclosure of product and other commercial information" without impinging on free speech. *NEMA*, 272 F.3d at 116.

Plaintiffs disagree. They argue that *any* image is outside the *Zauderer* analysis altogether, and that the flask specifically is problematic. But Plaintiffs contradict themselves. They at times argue that the flask conveys too much information—that PFAS are "potentially dangerous," that they are "toxic, flammable, explosive, environmentally deleterious, or present some other risk of

harm entirely." PI Mot. at 14–15. At other times, Plaintiffs argue the flask "does not even convey *any* actual 'information,' because it says *nothing* about the risk PFAS supposedly poses." *Id.* at 15. It cannot *both* be true that the flask conveys no information *and* conveys a warning.

The Erlenmeyer flask conveys the message that PFAS is a chemical: no more, no less. Dickerson Decl. ¶¶ 14–15. But Plaintiffs argue the flask indicates danger because other pictograms, like a skull and crossbones, are warnings. PI Mot. at 14. This comparison is inapt because a skull and crossbones sign is part of internationally harmonized warning symbol systems; no such system uses an Erlenmeyer flask, and a flask is generally associated with science, not danger. Dickerson Decl. ¶ 16. Moreover, consumers are familiar with all kinds of graphic labels, not just warnings, like the recycling logo. Pls. Thompson Decl. ¶ 12, Dkt. No. 3-10 (showing that Plaintiffs' products use battery recycling logos). Accordingly, courts have summarily rejected the idea that "pictures can never be factually accurate, only written statements can be" as "at odds with reason." *Disc. Tobacco*, 674 F.3d at 559.[4]

An Erlenmeyer flask does not inherently convey danger or warning, and that is fatal to Plaintiffs' Motion and case. Plaintiffs speculate as to what consumers might think about flasks based on their experience in chemistry class. PI Mot. at 14. But flasks and chemicals are part of everyday modern life. Indeed, $H_2O$, or water, is a chemical compound. And flask logos like New Mexico's indicate the use of medical materials or to signify test or "beta" software features.

---

[4] Plaintiffs cite to *R.J. Reynolds* for the proposition that "the use of graphic images to supplement warning statements 'fall[s] outside the ambit of *Zauderer*.'" PI Mot. at 15 (quoting 696 F.3d at 1216–17). Setting aside Plaintiffs' failure to disclose that *R.J. Reynolds* was overruled en banc, *AMI*, 760 F.3d at 22–23, because it did not recognize the array of government interests labeling requirements could serve, *R.J. Reynolds* only held that the specific images in that case failed *Zauderer*, not that graphic labels are categorically outside of *Zauderer*'s reach. 696 F.3d at 1216–17.

Dickerson Decl. ¶¶ 18–19. The innocuousness of flasks and chemicals is no accident—since the 1950s, Plaintiffs' member-companies, like DuPont, have used the flask logo to indicate innovation, science, and the benefit of science to industry. *Id.* ¶ 20. The Erlenmeyer flask in New Mexico's label is factual and uncontroversial—it signals that the product contains a chemical, PFAS.

### i.       Plaintiffs do not engage with exceptions or other material aspects of the regulations, highlighting why facial relief is inappropriate.

Compounding their meritless argument regarding the Erlenmeyer flask pictogram, Plaintiffs also disregard the many exceptions and narrowing provisions of the relevant regulations. That matters here because, for purposes of a facial challenge, the Court must consider all the ways the relevant regulations could apply to Plaintiffs.

That principle is exemplified in *Discount Tobacco*. There, the Sixth Circuit evaluated a challenge to an FDA tobacco labeling requirement that required a graphic warning. 674 F.3d at 552–53. Plaintiff tobacco companies challenged the requirement before the FDA finalized all permissible labeling requirements. *Id.* at 553. Accordingly, the court could not look just at a specific problematic label, but at all possible ways the regulation could apply to the plaintiffs. *Id.*

Applying *Discount Tobacco*'s lessons to this case, Plaintiffs cannot satisfy their burden by simply attacking New Mexico's label. They must also show how the relevant regulations impact the constitutional analysis. But they make no attempt to do so, and their facial challenge must fail because it assumes an incomplete and distorted view of New Mexico's labeling requirements.

For example, consider that 20.13.2.13(E) NMAC permits Plaintiffs to comply with other states' labeling requirements, subject to the Department's approval, and that other states permit text-only labels for products that contain PFAS. *Supra*, at 6. Because Plaintiffs' core grievance is with the flask depiction, 20.13.2.13(E) NMAC may cure any purported constitutional infirmity

15

because the Department could approve a text-only label as compliant. Thus, Plaintiffs must not only show that New Mexico's label is unconstitutional in its sweep but also that every other state's PFAS labeling requirements are unconstitutional, including those, like Connecticut's, that are text-only. In other words, Plaintiffs' challenge must be judged by *all potential mechanisms* for Plaintiffs to comply with the labeling requirement at the time they seek relief. That is "is the price of [Plaintiffs'] decision to challenge the [regulation] as a whole." *Moody*, 603 U.S. at 744.

Next, Plaintiffs' claims rely on the premise that the Erlenmeyer flask could be interpreted as a warning. But to the extent manufacturers may disagree with a consumer's interpretation of the PFAS label, Plaintiffs are free to correct them by providing additional context on the packaging. Unlike other more onerous labeling requirements, New Mexico's does not prevent manufacturers from adding their own messages about PFAS. And while New Mexico disagrees with Plaintiffs about the impacts of fluoropolymers, the regulations do not prevent Plaintiffs from adding as much context about fluoropolymers to their products' packaging as they would like. *See, e.g.*, *Grocery Mfrs. Ass'n*, 102 F. Supp. 3d at 630 (upholding genetic engineering disclosure because nothing prevented manufacturers "from 'correcting' that message with their own disclosures").

Finally, facial relief is inappropriate and premature because Plaintiffs have not explained, much less established, how the label is controversial and not factual across a wide range of industries and products. Plaintiffs do not create a record explaining what products they produce, which specific products are subject to the labeling requirement, and of those, for which products the label is overstating the health or environmental consequences of PFAS. Neither do Plaintiffs show how those supposedly "unconstitutional applications substantially outweigh [the] constitutional ones." *See Moody*, 603 U.S. at 723. Those deficiencies are again compounded by

16

Plaintiffs' failure to engage with relevant exceptions—some of Plaintiffs' products may be eligible for waiver provisions, 20.13.2.13(F) NMAC, but Plaintiffs do not indicate if they are seeking waivers for their products or product classes, or how nonparty manufacturers' applications for product-class waivers might affect their claims. Setting aside that Plaintiffs fail to show controversy under *Zauderer*, facial relief is entirely inappropriate.

### ii. A narrower or as-applied injunction for fluoropolymer or no-contact products is also inappropriate because the label remains uncontroversial.

Plaintiffs also have not demonstrated that the label is controversial, even as applied to fluoropolymers or no-consumer-contact PFAS. Courts are hesitant to "affix[] the 'controversial' label lightly, and the fact that Plaintiffs would prefer not to make the required disclosure is insufficient to render it 'controversial.'" *Grocery Mfrs. Ass'n*, 102 F. Supp. 3d at 628 (citing record); *see id.* at 597, 628 (finding genetic engineering disclosure label not controversial even where there were "conflicting studies" and "public and political controversy" about its safety). Plaintiffs protest the idea that *all* PFAS should be subject to the labeling requirement because, they argue, fluoropolymers and no-consumer-contact PFAS might pose different or more limited risks to consumers and the environment than other types of PFAS.

That Plaintiffs are willing to hire lawyers and experts[5] to support such argument is insufficient to show controversy. If it were sufficient, then any well-resourced plaintiff could easily

---

[5] Plaintiffs rely on the declaration of Dr. Korzieniowski to suggest that grouping PFAS for scientific or regulatory purposes is controversial, especially fluoropolymers. PI Mot. at 17. Dr. Korzieniowski declares himself an expert because of his time researching PFAS at DuPont from 1977 to 2015. Pl.'s Korzieniowski Decl. ¶ 8 & Ex. A, ECF No. 3-2. In 2004, DuPont was subject to the then-largest fine in EPA history for "multiple failures to report information to EPA about substantial risk of injury to human health or the environment that DuPont obtained about PFOA [a type of PFAS used in fluoropolymer manufacturing] from as early as 1981 and as recently as 2004." Press Release, EPA, *EPA Settles PFOA Case Against DuPont for Largest Environmental*

win a *Zauderer* challenge. But *Zauderer*'s requirement that a label be uncontroversial exists to protect a speaker from compelled speech that would "interfer[e] with an individual's right to . . . express his or her own personality," or from "adopt[ing] disagreeable state-sanctioned positions," *NEMA*, 272 F.3d at 114, not to prevent a mundane and indisputable disclosure of a product's ingredients.

There is no dispute that Plaintiffs' products contain PFAS, even if those PFAS are fluoropolymers or will have no contact with consumers during the products' useful life. Indeed, New Mexico joins a national and international consensus that PFAS should be labeled and regulated without carve-outs for fluoropolymers. Chapman Decl. ¶¶ 29–32; DeWitt Decl. ¶¶ 13, 70. And even if fluoropolymers and no-consumer-contact products might have different health and environmental effects than other PFAS, they still have health and environmental effects. For example, the Organisation for Economic Co-operation and Development has explained that fluoropolymer production is a "key source[] of environmental PFAS emissions and contamination." Chapman Decl. ¶ 98. And when disposed and incinerated, fluoropolymers may emit other, more concerning PFAS. Chapman Decl. ¶¶ 36, 40, 85–91. Even if, as Plaintiffs suggest, some facilities may have advanced technologies to avoid that type of pollution, the label may serve to help consumers "properly dispose of [PFAS-containing products] and thereby reduce [PFAS] pollution." *NEMA*, 272 F.3d at 115. And Plaintiffs say nothing about the environmental impacts of the manufacturing and disposal of no-consumer-contact PFAS products.

---

*Administrative     Penalty     in     Agency     History*     (Dec.     14, 2005), https://www.epa.gov/archive/epapages/newsroom_archive/newsreleases/fdcb2f665cac66b b852570d7005d6665.html.

Importantly, Plaintiffs never affirmatively state that all fluoropolymers are categorically harmless from cradle to grave. That is because they cannot. And it is dispositive that their as-applied arguments, like their facial challenge, lack any product-by-product analysis. Plaintiffs' fluoropolymer and no-contact arguments do not merit a narrower injunction or as-applied relief. [6]

### 2.    The labeling requirement poses a de minimis burden on Plaintiffs' speech.

The labeling requirement presents a de minimis intrusion on Plaintiffs' already "minimal" First Amendment interest in "*not* providing any particular factual information." *Zauderer*, 471 U.S. at 651. In *NIFLA*, the Supreme Court found compelled speech unduly burdensome when it "drown[ed] out" a speaker's message, requiring that a two-word advertisement be accompanied with "a 29-word statement from the government, in as many as 13 different languages," in larger text than the advertisement itself. 585 U.S. at 778.

---

[6] New Mexico disputes Plaintiffs' characterization of Department testimony as to the safety of fluoropolymers. With respect to fluoropolymers, Department witnesses testified that the greatest concerns are manufacture and disposal, and that "[i]f I assume my home is a bubble and my actions have no impact on people in the environment around me, then yes, my risk from exposure . . . is likely low." Pl.'s Snyder Decl. Ex. 7 at 416–17, Dkt. No. 3-1. Even so, it should be noted that fluoropolymers "are not without the harmful properties of PFAS." DeWitt Decl. Ex. B at 131; *see also* Chapman Decl. ¶¶ 90−91 (noting that many of the studies finding fluoropolymers to be of low concern were authored by representatives of the PFAS industry).

With respect to no-consumer-contact PFAS, Department witnesses merely conceded the obvious: that where a consumer is not exposed to a hazard, there is no *immediate* risk. Pl.'s Snyder Decl. Ex. 7 at 430. But the use or handling of a product is not the only way to be exposed to a hazard it contains—PFAS can also "leach" from products after they are disposed, contaminating public drinking water sources and food-growing soils, among other environmental mediums. DeWitt Decl. Ex. B at 133; Chapman Decl. ¶¶ 36, 43, 102, 124, 129, 132−34. Plaintiffs' arguments disregard the cumulative, rather than acute, nature of PFAS contamination.

By contrast, New Mexico's labeling requirement is not onerous. The pictogram and text need only be the same size the manufacturer uses for other consumer text. Smithkier Decl. Ex. B at 5, 7–9 (sample labels). The label is a single acronym identifying an undisputed classification.

Tellingly, Plaintiffs do not argue that the label's form or design requirements are unduly burdensome. *See generally* PI Mot at 19–22. Rather, Plaintiffs complain "it will be extraordinarily expensive, disruptive and time-consuming" to comply "with the . . . labeling mandate." *Id.* at 20. But economic burdens are nowhere to be found in *Zauderer*'s analysis: "To prevail in a First Amendment challenge, . . . the [plaintiff] must demonstrate a burden on *speech*." *Am. Hosp. Ass'n v. Azar*, 983 F.3d 528, 541 (D.C. Cir. 2020) (disregarding plaintiffs' financial burden arguments). Plaintiffs' economic claims are of no moment—notwithstanding that their supporting expert's analysis is deeply flawed, conclusory, and is unlikely to pass muster under *Daubert v. Merrel Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); Melstrom Decl. ¶¶ 22–25, 41–43.

Not only do Plaintiffs fail to identify a burden on their speech, but they again ignore the fact that they can counter the labeling requirement with their own speech. That matters in the constitutional analysis. Again, Plaintiffs can "correct[]" the purportedly negative connotations of the Erlenmeyer flask with their own message, in the same font, *Grocery Mfrs. Ass'n*, 102 F. Supp. 3d at 630, so their own message is not "drown[ed] out," *NIFLA*, 585 U.S. at 778.

**3.      The labeling requirement is rationally related to consumer protection, public health, and environmental protection.**

Under *Zauderer*, a labeling requirement need not satisfy a less restrictive, or least restrictive means analysis. The First Amendment is satisfied under *Zauderer* "by a rational connection between the purpose of a commercial disclosure requirement and the means employed to realize that purpose." *NEMA*, 272 F.3d at 115. The government can satisfy this standard based on

"common sense" rather than "some quantum of proof that a disclosure will realize the underlying purpose . . . [a]nd the disclosure has to advance the purpose only slightly." *Disc. Tobacco*, 674 F.3d at 557 (citing *NEMA*, 272 F.3d at 115). Plaintiffs, however, argue that "messaging on such topics" as the "manufacturing" and "disposal" impacts of PFAS falls outside the *Zauderer* framework because it does not "relate[] to the terms under which services will be available." PI Mot. at 18–19 (citation modified). But Plaintiffs are wrong twice over.

First, courts have held both that concerns about (1) manufacturing and (2) environmental contamination due to disposal are cognizable goals under *Zauderer*. *AMI*, 760 F.3d at 24 (stating that the interest in "enabl[ing] consumers to choose American-made products . . . suffice[d] under *Zauderer*" and drawing from legislative history commenting on manufacturing impacts like "buy[ing] American"); *NEMA*, 272 F. 3d at 115–16 (recognizing that reducing the environmental impacts of mercury pollution via disposal is a "legitimate and significant public goal"). The argument that the State cannot use labels to protect public health, the environment, and consumer choice runs headlong into a circuit consensus that states *can* pursue those interests via labels. *CTIA v. City of Berkeley, Cal.*, 928 F.3d 832, 843–44 (9th Cir. 2019) (collecting cases and citing *NIFLA*, 585 U.S. at 775). Second, Plaintiffs' member companies already comply with (and have not challenged) disposal-based labeling requirements, such as for battery recycling (that also disclose battery chemicals). *See, e.g.*, Pl.'s Thompson Decl. ¶ 12; 42 U.S.C. § 14322(b)(2)(A) (1996).

The labeling requirement is rationally related to New Mexico's interests in consumer protection, public health, and environmental protection.

**B.      The labeling requirement would also survive intermediate scrutiny.**

Should the Court conclude that *Zauderer* does not apply, it should apply *Central Hudson*'s form of intermediate scrutiny. *See* 447 U.S. at 566, 573. The Fifth, Sixth, Ninth, and D.C. Circuits have all applied *Central Hudson* to compelled commercial speech that falls outside of *Zauderer*—representing a majority view that intermediate, not strict, scrutiny, applies to labeling regulations that do not first pass *Zauderer* muster. *Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 283 (5th Cir. 2024); *Disc. Tobacco*, 674 F.3d at 527; *Wheat Growers*, 85 F.4th at 1266; *R.J. Reynolds*, 696 F.3d at 1217 (2012), *overruled on other grounds by AMI*, 760 F.3d at 24. And Tenth Circuit precedent is consistent with the reasoning of the majority view. *See Wenger*, 427 F.3d at 846–47 ("Typically state regulation of commercial speech must satisfy a form of intermediate scrutiny.").

A law or rule satisfies *Central Hudson* if it provides more than "ineffective or remote support for the government's purpose." *Cent. Hudson*, 447 U.S. at 564. Such scrutiny "does not require that" the regulation "be the least restrictive measure available. All that is required is a proportional response." *Mainstream Mktg. Servs. v. FTC*, 358 F.3d 1228, 1238 (10th Cir. 2004).

Plaintiffs attempt to hold New Mexico to a higher standard than *Central Hudson* requires, arguing that New Mexico must demonstrate that its interest in human and environmental health must require labeling of "*any* type of PFAS *anywhere* in the product." PI Mot. at 23. But New Mexico has no such burden. "All that is required is a proportional response." *Mainstream Mktg.*, 358 F.3d at 1238. The labeling requirement is easily proportional because it simply asks manufacturers to make a factually accurate disclosure about PFAS in their products. And while Plaintiffs argue that some types of PFAS pose lower risks to consumers and the environment, they

do not show that a majority or even a substantial portion of the products subject to the labeling requirement pose these supposedly lower risks or otherwise do not qualify for an exception.

Plaintiffs also argue that the label could be "more targeted." PI Mot. at 24. But intermediate scrutiny does not require the least restrictive means. *See Mainstream Mktg.*, 358 F.3d at 1238. As Plaintiffs acknowledge, the label was tailored to assuage many industry concerns during the rulemaking process. PI Mot. at 16. Indeed, some industry groups praised the responsive changes. Chapman Decl. ¶ 63; Smithkier Decl. Ex. F at 0354. In light of the arguments above and the relevant narrowing provisions, New Mexico's requirements easily pass *Central Hudson* scrutiny.

**C.     Plaintiffs have shown no, or minimal, irreparable harm.**

Irreparable harm "is the single most important prerequisite for the issuance of a preliminary injunction." *DTC Energy Grp., Inc. v. Hirschfeld*, 912 F.3d 1263, 1270 (10th Cir. 2018) (citation omitted). "Demonstrating irreparable harm is not an easy burden to fulfill." *First W. Cap. Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1141 (10th Cir. 2017) (citation modified). "To constitute irreparable harm, an injury must be certain, great, actual and not theoretical." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (citation modified). Despite this heavy burden, Plaintiffs devote little to demonstrating irreparable harm. PI Mot. at 26. Plaintiffs allege only the loss of alleged First Amendment freedoms, and alleged costs to comply. *Id.* Neither is persuasive.

First, Plaintiffs argue that the labeling requirement "will compel them to speak in violation of their First Amendment rights." PI Mot. at 25. While this could potentially be sufficient irreparable harm in non-commercial contexts, it is not a "great" harm here, *Heideman*, 348 F.3d at 1189, because the First Amendment interest Plaintiffs assert is "minimal," *Zauderer*, 471 U.S. at 651. Second, Plaintiffs' alleged First Amendment injury acts as a mere smokescreen for its real

complaint: financial harm. And Plaintiffs' financial burdens are speculative and unproven. Plaintiffs complain of the great costs to make new labels. But what is relevant is the "but for" cost of relabeling. Melstrom Decl. ¶ 23. Plaintiffs have not shown to what extent they would have updated their labels anyway, and admit many of their products already comply with other labeling requirements—it is not as difficult to comply as Plaintiffs suggest. *See, e.g.*, Pl.'s Thompson Decl. ¶ 12. Moreover, Plaintiffs' costs are speculative for the same reasons their facial challenges fail. They provide no accounting of which products are labeled, and for those subject to the labeling requirement, whether costs could be avoided by complying with other states' labels or a waiver.

**D.      Injunctive relief is not in the public interest.**

While the likelihood-of-success and irreparable-harm factors are the "most critical," movants for a preliminary injunction must also show that the injunction will not adversely affect the public interest. *Polis*, 121 F.4th at 112. When issuing its final rule adopting the labeling requirement, the Board expressly found that it was "in the public interest." Smithkier Decl. Ex. F ¶¶ 136–37. There can be little doubt that PFAS-containing products sold, manufactured, or disposed of in New Mexico implicate its interests in consumer protection, public health, and environmental protection. *See* DeWitt Decl. Table 1; Chapman Decl. ¶ 145; *Zauderer*, 471 U.S. at 651; *NEMA*, 272 F.3d at 115 n.6 (acknowledging a state's "substantial interest in protecting human health and the environment" realized via labeling requirements for mercury-containing light bulbs). Those interests easily outweigh Plaintiffs "minimal" interest in not providing factually accurate information that their products contain PFAS. *Zauderer*, 471 U.S. at 651.

**CONCLUSION**

The Court should deny Plaintiffs' Motion for preliminary, facial, and as-applied relief.

24

Respectfully submitted,

RAÚL TORREZ
Attorney General

JAMES C. KENNEY
Secretary of Environment

*/s/Alexander W. Tucker*
ALEXANDER W. TUCKER
*Assistant Solicitor General*
New Mexico Department of Justice
201 Third St. NW, Suite 300
Albuquerque, NM 87123
505-490-4060
atucker@nmdoj.gov

DANIEL AHRENS
*Assistant Solicitor General*
ESTHER C. JAMISON
*Assistant Attorney General*
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, NM 87501
505-490-4060
dahrens@nmdoj.gov
ejamison@nmdoj.gov

*Counsel for Defendants Raúl Torrez*
*and James C. Kenney*

GREGORY S. SMITHKIER
*Assistant General Counsel*
*Special Assistant Attorney General*
New Mexico Environment Department
Office of General Counsel
1190 South St. Francis Drive
Santa Fe, New Mexico 87505
505-531-7736
gregory.smithkier@env.nm.gov

*Counsel for Defendant James C. Kenney*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 3, 2026, a true and correct copy of the foregoing was electronically filed and served on all parties of record via the Court's CM/ECF system.

*/s/Alexander W. Tucker*
Alexander W. Tucker