**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

AMERICAN CHEMISTRY COUNCIL, *et al.*,

*Plaintiffs*,

v.

JAMES C. KENNEY*, in his official capacity as Secretary of the New Mexico Environment Department*; and RAÚL TORREZ, *in his official capacity as Attorney General of New Mexico*,

*Defendants.*

Case No.: 1:26-cv-02130-MIS-SCY

**ORAL ARGUMENT REQUESTED**

**DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' COMPLAINT UNDER FEDERAL RULES OF CIVIL PROCEDURE 12(B)(1) AND 12(B)(6)**

## INTRODUCTION

Plaintiffs have sued New Mexico for requiring them to label their products that contain PFAS with a label that tells consumers Plaintiffs' products contain a family of chemicals called PFAS. Plaintiffs do not dispute their products contain PFAS. Instead, Plaintiffs present the Court with a Complaint that contains nothing more than legally irrelevant allegations about the label.

Plaintiffs' Complaint should be dismissed as a matter of law. On their First Amendment claims, Plaintiffs allege that the label's flask image will trigger an "emotional reaction" in consumers about the safety of PFAS. But even if true, emotional reactions do not render otherwise permissible, factual labeling mandates, unconstitutional. And on their dormant Commerce Clause claims, Plaintiffs allege "staggering costs." Again, even if true, because those costs are not discriminatory, the labeling mandate remains constitutional. Plaintiffs allege no factual inaccuracy on the label or discriminatory effects of the mandate. Because "whether a particular chemical is within any given product" is a factual and uncontroversial disclosure under the First Amendment, the Court must dismiss their complaint. *See Ent. Software Ass'n v. Blagojevich*, 469 F.3d 641, 652 (7th Cir. 2006) (citing *Nat'l Elec. Mfrs. Ass'n v. Sorrell* (*NEMA*), 272 F.3d 104, 114 (2d Cir. 2001)).

## FACTUAL AND PROCEDURAL BACKGROUND

PFAS are a class of chemicals with "at least one fully fluorinated carbon atom." N.M. Stat. Ann. § 74-15-2(S) (2025).[1] This bond, between carbon and fluorine, is "the strongest single bond in organic chemistry." Compl. ¶ 27. As Plaintiffs acknowledge, the Department has publicly stated

[1] The Court may consider the full text of the PFAS Protection Act and the Department's regulations without converting the motion into a motion for summary judgment. *See Zimomra v. Alamo Rent-A-Car, Inc.*, 111 F.3d 1495, 1503–04 (10th Cir. 1997).

that PFAS "are often called 'forever chemicals . . . .'"; "[s]ome PFAS are associated with health effects such as cancer, reproductive damage, increased cholesterol, and other problems"; and "[b]ecause PFAS can build up in the body, even small, repeated exposures over time can matter." *Id.* ¶ 53 (quoting NMED, *PFAS in New Mexico* (last visited July 1, 2026), https://www.env.nm.gov/pfas/); *see Chamber of Com. of U.S. v. EPA*, ___ F.4th ___, No. 24-1193, 2026 WL 2409748, at *2 (D.C. Cir. Aug. 18, 2026). Plaintiffs at least agree that "health and environmental concerns have been raised for *some* types of PFAS," although they dispute those claims apply to *all* types of PFAS. Compl. ¶ 1.

In response to the environmental and health effects of PFAS, the New Mexico Legislature enacted the Per- and Poly-Fluoroalkyl Substances Protection Act (the "PFAS Protection Act" or the "Act"), N.M. Stat. Ann. §§ 74-15-1 to -7 (2025). Compl. ¶ 2. The Act defines PFAS objectively as a substance "in a class of fluorinated organic chemicals containing at least one fully fluorinated carbon atom." N.M. Stat. Ann. § 74-15-2(S); *see* Compl. ¶ 27 ("PFAS have covalent bonds between carbon and fluorine atoms . . . ."). The Act takes a phased approach to PFAS regulation: it prohibits, in stages, the sale of products containing intentionally added PFAS unless an exception applies, § 74-15-3; it requires manufacturers to report the PFAS content of their products, § 74-15-5; and it authorizes the New Mexico Environmental Improvement Board (the "Board") to adopt rules "requiring the labeling of products" for PFAS, § 74-15-4(B)(1).

Exercising that authority, and after public rulemaking in which industry participated, *see* Compl. ¶¶ 49–69, the Board adopted 20.13.2.13 NMAC (the "Regulation") in May 2026. Compl. ¶ 3. For covered products manufactured on or after January 1, 2027 that contain intentionally added PFAS, the product's label must include "an outline of an Erlenmeyer flask with the word 'PFAS'

inside the flask," displayed clearly and legibly prior to sale. 20.13.2.13(C)(1), (3)–(4) NMAC. The Regulation prescribes no minimum share of the packaging, the text need only be in the same size font as other consumer information, and manufacturers remain free to add their own text or graphics alongside the required elements. 20.13.2.13 NMAC. Indeed, Plaintiffs' Complaint does not allege the label burdens their other speech on the packaging, and instead alleges only financial costs to manufacturers. *See, e.g.*, Compl. ¶¶ 7, 80.

The Regulation "applies to manufacturers, distributors, and retailers that sell, offer for sale, distribute or distribute for sale in the state of New Mexico, directly or indirectly or through intermediaries," covered products containing intentionally added PFAS. 20.13.2.2 NMAC. In other words, the Act applies *only* to the "sale or distribution of such products in New Mexico . . . ." Compl. ¶ 45 (describing N.M. Stat. Ann. § 74-15-3(B)–(D)). A manufacturer's obligation to label their product is therefore triggered by the sale or distribution of its covered product, directly or through intermediaries, within New Mexico—regardless of where the product is made.

The labeling requirement is cabined by a series of narrowing provisions codified in the Regulation itself. Certain products, including medical devices, drugs, and used products, are exempt altogether. 20.13.2.13(A)–(B) NMAC. Complex durable goods need not carry the label on the product or packaging at all; disclosure is, instead, confined to the product specification sheet and manual. 20.13.2.13(D) NMAC. A manufacturer may apply for a waiver of the labeling requirement for a product or product class whose PFAS "will never come into direct contact with a consumer." 20.13.2.13(F) NMAC. A timely application is deemed approved pending review, and if denied, a manufacturer has a ninety-day period to cure their label. *Id.* Alternatively, a manufacturer may seek approval to comply with another state's PFAS labeling requirements—

including text-only formats, *see, e.g.*, Conn. Gen. Stat. § 22a-903(c)(1). 20.13.2.13(E) NMAC. Here, too, a manufacturer need not wait on the Department—its application to use another state's label constitutes compliance unless denied within ninety days. *Id.*

The label's minimalism is deliberate. As the Complaint admits, NMED revised the proposed rule during the rulemaking to remove "language concerning health or environmental effects of PFAS" and "any language that communicates a hazard." Compl. ¶ 59; *see also* Compl. ¶¶ 55–58 (describing the narrowing revisions). What remains is a label that informs consumers that the product contains a chemical known as PFAS.

Plaintiffs, nine trade associations suing on behalf of their members, filed this pre-enforcement action challenging the labeling mandate. Count One alleges that the labeling requirement compels speech in violation of the First Amendment. *See* Compl. ¶¶ 94–102. Counts Two and Three assert dormant Commerce Clause theories. Compl. ¶¶ 103–114. Plaintiffs moved for a preliminary injunction ("PI Mot.") (ECF No. 3), Defendants responded ("PI Resp.") (ECF No. 32), and Plaintiffs replied ("PI Reply") (ECF No. 37).

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although the Court accepts well-pleaded factual allegations as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). On a 12(b)(6) motion, courts should "disregard all conclusory statements of law and consider whether the remaining *specific* factual allegations, if assumed to be true, plausibly suggest the defendant is liable." *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d

1210, 1214 (10th Cir. 2011) (emphasis added). "Labels, conclusions, formulaic recitations of elements, and naked assertions will not suffice," *Brooks v. Mentor Worldwide LLC*, 985 F.3d 1272, 1281 (10th Cir. 2021), and conclusory allegations are not entitled to the assumption of truth, *Khalik v. United Air Lines*, 671 F.3d 1188, 1191, 1993 (10th Cir. 2012); *Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1144 (10th Cir. 2023). In other words, it is Plaintiffs' burden to "nudge[] their claims across the line from conceivable to plausible . . . ." *Twombly*, 550 U.S.at 570.

To survive a Rule 12(b)(1) motion, Plaintiffs must meet their "burden to demonstrate standing for each form of relief sought." *Collins v. Daniels,* 916 F.3d 1302, 1314 (10th Cir. 2019) (quoting *Lippoldt v. Cole*, 468 F.3d 1204, 1216 (10th Cir. 2006)).

## ARGUMENT

### 1. The labeling mandate does not violate the First Amendment.

Plaintiffs do not and cannot state a claim for facial or as-applied violations of the First Amendment. Plaintiffs concede this is a commercial speech case, and commercial speech "occupies 'a subordinate position in the scale of First Amendment values.'" *United States v. Wenger*, 427 F.3d 840, 846 (10th Cir. 2005) (citation omitted); Compl. ¶¶ 81–83. "[T]he extension of First Amendment protection to commercial speech is justified principally by the value to consumers of the information such speech provides," not the First Amendment rights of advertisers. *Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*, 471 U.S. 626, 651 (1985). In other words, "protection of commercial speech largely derives from the listener's First Amendment interests" as well as the speaker's. *Wenger*, 427 F.3d at 847 (cleaned up). And, "the State's power to regulate commercial transactions justifies its concomitant power to regulate commercial speech that is linked inextricably to those transactions." *Id.* at. 846 (citation omitted).

So, most commercial speech must satisfy a "form of intermediate scrutiny." *Id.* (quoting *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 564–65 (1980)).

New Mexico's label requirement, however, is not like most commercial speech—it is a disclosure requirement and subject to a lower form of scrutiny. Within commercial speech regulations, the Supreme Court distinguishes between restrictions on speech and requirements to disclose because "the First Amendment interests implicated by [commercial] disclosure requirements are substantially weaker than those at stake when speech is actually suppressed." *See Zauderer*, 471 U.S. at 651 n.14. Because commercial speech jurisprudence recognizes "societal interest in the fullest possible dissemination of information," *Cent. Hudson*, 447 U.S. at 561–62, the label at issue here is subject to less stringent *Zauderer* scrutiny. *See Zauderer*, 471 U.S. at 651.

Under *Zauderer*, because a seller's interest in *not* providing "purely factual and uncontroversial information" about their products "is minimal"—the government can require (1) factual and uncontroversial disclosures that are (2) reasonably related to sufficient governmental interests and (3) are not "unjustified or unduly burdensome." *Id.* at 651.

**A. New Mexico's PFAS label is purely factual and uncontroversial.**

The flask pictogram and text 'PFAS' conveys the factual and uncontroversial information that a labeled product contains a chemical known as PFAS. "A disclosure is 'purely factual' if it only requires 'the disclosure of accurate, factual information.'" *NetChoice, LLC v. Weiser*, 808 F. Supp. 3d 1223, 1235 (D. Colo. 2025), *appeal docketed*, No. 25-1456 (10th Cir. Dec. 9, 2025) (quoting *Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1276 (9th Cir. 2023)). A statement "is 'uncontroversial' for purposes of *Zauderer* where the truth of the statement is not subject to good-faith scientific or evidentiary dispute and where the statement is not an integral part of a live,

contentious political or moral debate." *Id.* (quoting *Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 281-82 (5th Cir. 2024), *aff'd*, 606 U.S. 461 (2025)). At the pleading stage, courts will dismiss a compelled speech claim that is based on "entirely speculative" claims about how consumers will react to a label that is factually true. *Nat'l Retail Fed'n v. James*, 806 F. Supp. 3d 427, 436-37 (S.D.N.Y. 2025), *appeal docketed*, No. 25-2818 (2d Cir. 2025). And conclusory allegations of "controversy" are insufficient too—Plaintiffs must assert *both* that the label is a "subject of 'robust public debate'" *and* that the label's statement is itself at issue in that debate. *Id.* at 438.

To start, the label is factually accurate: Plaintiffs and Defendants agree that Plaintiffs' products contain PFAS. There is simply no daylight between Plaintiffs' and Defendants' definitions of the word "PFAS." *Compare* N.M. Stat. Ann. § 74-15-2(S) (2025), *with* Compl. ¶ 27. Plaintiffs and Defendants both agree that PFAS are chemicals with fully fluorinated carbon atoms—in other words, "covalent bonds between carbon and fluorine atoms." Compl. ¶ 27. It is products with these, and only these features, that *may* be covered as products under the Regulation, requiring labeling with a flask pictogram enclosing the word "PFAS." 20.13.2.13(C) NMAC.

But Plaintiffs' *Zauderer* claim instead is premised on the narrow idea that even if the label may be "literally true," the flask pictogram is "nonetheless misleading" because it will "trigger an emotional response that labeled products contain a dangerous chemical." Compl. ¶¶ 86 (quoting *Wheat Growers*, 85 F.4th at 1276), 97. Put another way, Plaintiffs are concerned with the implication of identifying PFAS in their products, and what the Erlenmeyer flask might imply about PFAS. But Plaintiffs' "entirely speculative" allegations "about how consumers will react to the disclosure" are insufficient to avoid dismissal, even at the pleading stage. *Nat'l Retail Fed'n*, 806 F. Supp. 3d at 436–37.

Courts agree. In *National Retail Federation*, the Southern District of New York considered a state law requiring vendors who used algorithmic pricing to disclose as much ("This price was set by an algorithm using your personal data"). *Id.* at 436. Retailers sued, arguing that "the overall statement 'gives the misleading, imaginary and "unsubstantiated" impression that price-setting algorithms are "dangerous,"' that they involve 'non-consensual invasive surveillance,' and that they set prices in ways that are harmful to the consumer." *Id.* But, absent specific aspects of the label that would affirmatively mislead consumers, the court found these concerns did "not rise above the level of speculation or conjecture about how consumers will react to the mandated disclosure," and should be dismissed. *Id.* at 436 & n.4; *see also Grocery Mfrs. Ass'n v. Sorrell*, 102 F. Supp. 3d 583, 627 (D. Vt. 2015) (where statute required only the disclosure of the use of genetic engineering in food, rejecting Plaintiffs' concern about the alleged implicit message of the label that "consumers . . . *should not buy* the product because of unfounded concerns about the safety of [genetically engineered] food," because it "ascribe[d] negative connotations to [the genetic engineering] disclosure that d[id] not otherwise exist").

Here, Plaintiffs speculate, without support, that the PFAS label "conveys a sense of chemical danger" and "[c]onsumers therefore will understand there must be something unusually dangerous about all types of PFAS." Compl. ¶¶ 4, 7. Imaginary consumers' speculative concerns about PFAS are not enough—even at the pleading stage. *Nat'l Retail Fed'n*, 806 F. Supp. 3d at 436. Plaintiffs mere claim that the depiction of a "flask" is "designed to trigger an emotional reaction in consumers and customers," Compl. ¶ 77, is conclusory and unsupported. Even so, an emotion response "does not magically turn such fact[] into opinion[]." *Disc. Tobacco City & Lottery, Inc. v. United States*, 674 F.3d 509, 569 (6th Cir. 2012), *cert. denied*, 569 U.S. 946 (2013).

Even if the Court accepts Plaintiffs' allegation the flask is "plainly designed to trigger an emotional response," Compl. ¶ 97, it would not change the analysis because a consumer's "emotional response to a statement is irrelevant to its truth." *R J Reynolds Tobacco Co. v. FDA*, 96 F.4th 863, 880 (5th Cir. 2024), *cert. denied*, 145 S. Ct. 592 (2024).

The cases Plaintiffs cite do not aid their position. Plaintiffs' Complaint relies on *Wheat Growers* to argue the PFAS label is misleading. Compl. ¶ 86. There, the Court considered a label required by California's Proposition 65 that read: "**WARNING**," and explained that the product contained glyphosate, a chemical that is "known to the state to cause cancer." 85 F.4th at 1268. That statement was true but nevertheless misleading, the Court found, because "an ordinary consumer would not understand the nuance between 'known' as defined in the statute and 'known' as commonly interpreted without knowledge of the scientific debate on that subject." *Id.* at 1278. The word "known" suggested that glyphosate causes cancer in humans, but the science viewed by the court only confirmed that conclusion for animals. So, it was the word "known" that made the label misleading. *Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics (CERT)*, 29 F.4th 468, 479 (9th Cir. 2022). But reading the label, a "reasonable person" would assume a "known" carcinogen would increase *their* risk of cancer. *Id.*

This case is not like *Wheat Growers*. There is no representation in New Mexico's labeling mandate of 'known' hazards like the label in *Wheat Growers*. But in their desperate search to find a statement they can disprove under *Zauderer*, Plaintiffs' Complaint reads "known" hazard language into the label that is simply not there. New Mexico's label does not say that PFAS are "a dangerous chemical." *See* Compl. ¶ 97. It does not say PFAS have a "demonstrated risk [to consumers] from products in which PFAS is found only in internal components with no exposure

to consumers." *Id.* ¶ 98. And it does not say that all PFAS pose the same "risk[s] to human health." *Id.* ¶ 98. Plaintiffs allege as much, but the Court is permitted to look at the labeling mandate itself. All that is required is a flask and the text "PFAS."[2]

So, Plaintiffs must now rely on the alleged implications of the label rather than its text because, as far as counsel has been able to locate, there has been *no* case striking down a labeling mandate that requires only the disclosure of a product's uncontested ingredients or processes on the basis the label is not factual or uncontroversial.[3] Plaintiffs do cite cases holding that where a

---

[2] The PFAS label is as limited as it is because the Board was responsive to industry concerns and removed "'language concerning health or environmental effects of PFAS' and 'any language that communicates a hazard.'" Compl. ¶ 59. But Plaintiffs' Complaint now attempts to hold the Department liable for assertions that (1) the label does not make and (2) the Board jettisoned at industry's urging.

[3] Courts have routinely upheld pure disclosure laws. *Am. Meat Inst. v. U.S. Dep't of Agric.* (*AMI*), 760 F.3d 18, 24 (D.C. Cir. 2014) (en banc) (upholding labeling mandate requiring statement of the country-of-origin of meat products); *N.Y. State Rest. Ass'n v. N.Y City Bd. of Health*, 556 F.3d 114, 134–36 (2d Cir. 2009) (upholding mandate that restaurant menus contain calorie counts); *NEMA*, 272 F.3d at 107 (upholding disclosure that products "contain[ed] mercury and, on disposal, should be recycled or disposed of as hazardous waste"); *Nat'l Retail Fed'n*, 806 F. Supp. 3d at 436 (upholding disclosure that a price "was set by an algorithm using your personal data"); *Grocery Mfrs. Ass'n*, 102 F. Supp. at 623 (upholding disclosure of genetically engineered ingredients).

To be sure, in some of Plaintiffs' cited cases, pure disclosure requirements have been struck down, but these are all cases where manufacturers contested the disclosure's truth itself. *Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 530 (D.C. Cir. 2015) (striking down label that required manufacturers to state if their products were "DRC conflict free" because the label claimed that products had a connection to the Congo war with which a manufacturer "may disagree"); *Kimberly-Clark Corp. v. Dist. of Columbia*, 286 F. Supp. 3d 128, 141 (D.D.C. 2017) (preliminarily enjoining labeling requirement that stated certain wipes "should not be flushed" because the parties disputed whether the wipes were, in fact, "flushable"); *see also Entm't Software Ass'n*, 469 F.3d at 652 (invalidating "a subjective and highly controversial" disclosure requiring an "18" label to indicate "adults only" on video games because the "State's definition of [sexually explicit] is far more opinion-based than the question of whether a particular chemical is within any given product"). Plaintiffs do not dispute their products contain PFAS.

labeling mandate asserts an ingredient poses *a specific hazard*, and there is no basis to support that assertion, a labeling mandate may, in some cases, be struck down.[4] In other words, such particular

---

[4] Plaintiffs' other cited cases are all about labels that identify a *specific* health or environmental hazard posed by the ingredient, and that statement of hazard lacks scientific support. *Ass'n of Home Appliance Mfrs. v. Weiser*, 826 F. Supp. 3d 1302, 1321 (D. Colo. 2025) (preliminarily enjoining label that stated indoor gas stoves posed the specific health hazards such as "headaches, nausea, eye, nose, or throat irritation, . . . chronic heart and lung diseases, asthma, impacts to the immune system, and some cancers, such as leukemia, or cancers of the nose and throat" *because* there was "robust scientific disagreement" as to the health effects of pollutants from gas stoves, *not* whether gas stoves emitted pollutants); *R.J. Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205, 1208, 1216 (D.C. Cir. 2012) (striking down graphic labeling requirement for tobacco where graphic label required the use of images depicting specific health hazards such as "smoking through a tracheotomy hole" that were not "a common consequence of smoking"), *overruled in part by AMI*, 760 F.3d at 22–23; *Pers. Care Prods. Council v. Bonta*, 799 F. Supp. 3d 1075, 1085–86 (E.D. Cal. 2025) (striking down label that states the specific hazard that titanium dioxide is "known to the State of California to cause cancer," *not* because label requires the disclosure of titanium dioxide in the product); *CERT*, 29 F.4th at 479 (9th Cir. 2022) (preliminarily enjoining label that states the specific hazard that acrylamide is "known to the State of California to cause cancer," *not* because label requires the disclosure of acrylamide in the product); *Wheat Growers*, 85 F.4th at 1276–78 (striking down label that states the specific hazard that glyphosate is "known to the State of California to cause cancer," *not* because label requires the disclosure of glyphosate in the product). This label contains no statement of a specific hazard caused by PFAS.

Plaintiffs' remaining cases are distinguishable because they do not govern product ingredient disclosures, *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 765 (2018) (striking down disclosure mandate that required pro-life clinic to disclose state-sponsored abortion services, because seeking abortion services was antithetical to the mission of the clinic), or were decided on other *Zauderer* prongs, *Am. Beverage Ass'n v. City & Cnty. of S.F.*, 916 F.3d 749, 753, 757 (9th Cir. 2019) (en banc) (striking down label that required companies advertising "Sugar-Sweetened Beverage[s]" to disclose that "[d]rinking beverages with added sugar(s) contributes to obesity, diabetes, and tooth decay" *because* it was unduly burdensome, without reaching the question of whether the label was factual and uncontroversial).

And, although the label here does not require Plaintiffs to state that PFAS pose a specific hazard, a statement of a specific hazard is not immediately fatal to a labeling requirement. Courts have upheld labeling requirements, including graphic labels, that require statements of a specific hazard where the statement enjoys scientific or regulatory support. *See, e.g.*, *R J Reynolds*, 96 F.4th at 878–80 (tobacco health hazards); *CTIA - The Wireless Ass'n v. City of Berkeley, Cal.*, 928 F.3d 832, 846–47 (9th Cir. 2019) (cell-phone radiation hazards); *Disc. Tobacco*, 674 F.3d at 562 (6th Cir. 2012) (tobacco health hazards).

labels invite scrutiny of their specific hazard message. But the PFAS label does not state a specific hazard, and Plaintiffs do not dispute their products contain a synthetic chemical called PFAS.

The presence of a graphic component—the flask—does not change the factual prong of the *Zauderer* analysis. Courts have held that, just as text can convey factual information, so too can images. *Disc. Tobacco*, 674 F.3d at 559, 569; *see Zauderer*, 471 U.S. at 647; *cf.* N.M. Stat. Ann. § 74-15-4(B)(1) (requiring that any label reach both English and Spanish speakers). Plaintiffs cannot get their story straight on what exactly the flask means. Plaintiffs seem to acknowledge the link between flasks and the chemical nature of PFAS. Compl. ¶ 97. But in other representations, Plaintiffs have stated the flask does not contain "any real information," or alternatively, the flask indicates that PFAS "pose[] a direct risk." PI Mot. at 15–16. If, as Plaintiffs suggest, the flask contains *no information at all*, it is hard to see how it conveys a statement that PFAS pose a specific hazard of the kind that courts have previously invalidated. *See supra* note 3.

Regardless, whatever meaning Plaintiffs ascribe to the flask,[5] it would be "error" to "consider[] the possible different interpretations of the image bereft of the text." *R J Reynolds*, 96 F.4th at 881. Here, the flask image "does not impart distinct, novel meaning." *Id.* The flask affirms the label's meaning that PFAS are a synthetic, manufactured chemical present in the product.

And even if the Court accepts as true Plaintiffs' allegations that the label could suggest PFAS are a "dangerous chemical," the regulation does not prevent Plaintiffs from adding their own message regarding PFAS. *See* Compl. ¶ 97. Contrary to Plaintiffs' (incorrect) representations

[5] In previous briefing, Plaintiffs have focused on whether the Department has previously referred to the PFAS label as a "warning label." But what matters to the "factual and uncontroversial" analysis is not the words the parties use to refer to the label in other contexts, but whether the content of the label itself is "factual and uncontroversial." The PFAS label does not, like other cases, use the word "warning" or identify a specific hazard. *See* supra notes 3–4.

otherwise, PI Reply at 4, courts have held that if plaintiffs are concerned about the emotional reaction to the label, the ability to "add to the compelled disclosure any further statement" can defeat a plaintiff's claims that a label is ambiguous or misleading. *CTIA—The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 848 (9th Cir. 2019).

Finally, the label is not controversial. Courts are hesitant to "affix[] the 'controversial' label lightly, and the fact that Plaintiffs would prefer not to make the required disclosure is insufficient to render it 'controversial.'" *Grocery Mfrs. Ass'n*, 102 F. Supp. 3d at 597, 628 (finding no controversy even with "conflicting studies" and "public and political controversy" about the safety of genetic engineering); *R J Reynolds*, 96 F.4th at 882. Plaintiffs' dislike of the label does not give them veto authority over the State's police power. *See id.* at 881 n.58.

Even if Plaintiffs were correct that the label conveys that *all* PFAS pose a specific health or environmental hazard, that message is not controversial. The D.C. Circuit has explained, using the same definition of PFAS as the Act ("[p]erfluoroalkyl and [p]olyfluoroalkyl [s]ubstances"), that "PFAS take hundreds of years to degrade in the environment and take decades to be eliminated from human bodies, earning them the title 'forever chemicals[.]' PFAS have also been linked to many adverse health effects, including cancer, developmental effects in children, and cardiovascular conditions." *Chamber of Com.*, 2026 WL 2409748, at *2. If courts can recognize the growing health and environmental concerns with this family of uniquely persistent chemical compounds, New Mexico can at least require manufacturers to say if their products contain them.

Plaintiffs' conclusory allegations of controversy and emotional reactions are not enough under *Zauderer*, even at the pleading stage. The PFAS label is factual and uncontroversial. The Court should dismiss Plaintiffs' Complaint.

**B. The labeling requirement poses a de minimis burden on Plaintiffs' speech.**

The labeling requirement presents a de minimis intrusion on Plaintiffs' already "minimal" First Amendment interest in "*not* providing any particular factual information." *Zauderer*, 471 U.S. at 651. In *NIFLA*, the Supreme Court found compelled speech unduly burdensome when it "drown[ed] out" a speaker's message, requiring that a two-word advertisement be accompanied with "a 29-word statement from the government, in as many as 13 different languages," in larger text than the advertisement itself. 585 U.S. at 778. New Mexico's labeling requirement is not nearly as onerous. The pictogram and text need only be the same size the manufacturer uses for other consumer information text. And the label is a single acronym identifying PFAS in a flask.

Tellingly, Plaintiffs do not allege that the label's form or design requirements are unduly burdensome to commercial speech. Instead, Plaintiffs complain "[i]t imposes staggering implementation costs and commercial ramifications on Plaintiffs' member companies." Compl. ¶ 100. But economic burdens are nowhere to be found in *Zauderer*'s analysis: "To prevail in a First Amendment challenge, . . . the [plaintiff] must demonstrate a burden on *speech* . . . ." *Am. Hosp. Ass'n v. Azar*, 983 F.3d 528, 541 (D.C. Cir. 2020) (disregarding financial burden arguments). Plaintiffs' economic claims are of no moment.

Not only do Plaintiffs fail to identify a burden on their speech, they again ignore the fact that they can qualify the label with their own speech. That matters in the constitutional analysis. Plaintiffs can "correct[]" the purportedly negative connotations of the Erlenmeyer flask with their own message, in the same font, *Grocery Mfrs. Ass'n*, 102 F. Supp. 3d at 630, so their own message is not "drown[ed] out," *NIFLA*, 585 U.S. at 778; *R J Reynolds*, 96 F.4th at 886. Plaintiffs have not identified a burden on their speech.

### C. The labeling requirement is rationally related to the State's interest in consumer protection, public health, and environmental protection.

Under *Zauderer*, the government may mandate commercial disclosures if they are reasonably related to the State's interest in informing and preventing deception of consumers. *See Zauderer*, 471 U.S. at 651. That State interest is at its highest when the information being conveyed to consumers involves matters of public health, safety, and the environment. *See NIFLA*, 585 U.S. at 775; *AMI*, 760 F.3d at 24. Accordingly, the State's labeling requirement need not meet a least restrictive means analysis. The First Amendment is satisfied "by a rational connection between the purpose of a commercial disclosure requirement and the means employed to realize that purpose." *NEMA*, 272 F.3d at 115. Plaintiffs, however, allege the label is justified only by "speculative upstream and downstream environmental impacts from manufacturing and incineration that are disconnected from actual consumer use," and the government cannot regulate anything beyond "terms of service between manufacturers and consumers." Compl. ¶ 7.

Plaintiffs are wrong. Courts have held that concerns about (1) manufacturing and (2) environmental contamination due to disposal are cognizable goals under *Zauderer*. *AMI*, 760 F.3d at 24 (manufacturing); *NEMA*, 272 F. 3d at 115–16 (disposal). Circuits agree: the State can use labeling mandates to protect public health, the environment, and consumer choice. *CTIA*, 928 F.3d at 843–44 (collecting cases and citing *NIFLA*, 585 U.S. at 775). Even Plaintiffs agree that some PFAS raise health and environmental concerns, and that all PFAS feature the "strongest single bond in organic chemistry"— a characteristic that is certainly useful to industry, but whose impact on people and the environment is amplified by the persistence of all PFAS. *See* Compl. ¶¶ 1, 27.

Plaintiffs argue that even if the label only makes the statement that their products contain a chemical called PFAS, then it is hard to see how the label contains enough information to serve

the State's interest in protecting the health and environment. Two issues: First, courts have held that ingredient or process disclosure labels (algorithmic pricing, genetic engineering, country-of-origin) can serve a variety of states' interests (consumer protection, environmental protection, and health concerns) *without* the label making a specific statement about that type of hazard. *See, e.g.*, *AMI*, 760 F.3d at 24–27; *Nat'l Retail Fed'n*, 806 F. Supp. 3d at 439; *see also Grocery Mfrs. Ass'n*, 102 F. Supp. 3d at 630–32 (finding requirement to disclose if food is genetically engineered furthered state's interest in health *even* where label made no assertion about the health of genetically engineered food *and* there was "scientific debate about the safety of [genetically-engineered] ingredients"). Second, if the Court reaches the state's interest, it is a rational basis test. The government can satisfy this standard based on "common sense" rather than "some quantum of proof that a disclosure will realize the underlying purpose[,] . . . [a]nd the disclosure has to advance the purpose only slightly." *Disc. Tobacco*, 674 F.3d at 557 (citing *NEMA*, 272 F.3d at 115).

The labeling requirement is, thus, rationally related to New Mexico's vital interests in the protection of consumers, public health, and the environment. Because it is also purely factual and uncontroversial, the Court must dismiss Count One. [6]

### D. Plaintiffs' Complaint does not support the facial and as-applied relief they request.

Plaintiffs request sweeping relief. While Plaintiffs' Complaint only references injunctive relief for "Plaintiffs and their members," their motion for a preliminary injunction reveals they are

---

[6] Plaintiffs have also suggested that the labeling requirement should be invalidated because the label emphasizes PFAS as opposed to other chemicals that impact human health and the environment. But the State's regulation of other chemicals does not matter because a commercial disclosure requirement need "not get at all facets of the problem it is designed to ameliorate." *Zauderer*, 471 U.S. at 651 n.14.

seeking broader relief on their First Amendment claim—an injunction against the labeling mandate "in its entirety" because "no one should be compelled" to apply the label. PI Mot. at 27; Compl. Prayer for Relief ¶ D (requesting "all other and further relief"). Plaintiffs have not established they are entitled to facial or as-applied relief, even at the pleading stage.

Plaintiffs' facial challenge "cannot succeed" unless they "establish[] that no set of circumstances exists under which the [law] would be valid," or show that the law "lacks a 'plainly legitimate sweep.'" *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (citations omitted).[7] Plaintiffs' challenge is premised on the idea that *some* products with PFAS, like fluoropolymers and no-consumer-contact PFAS, do not pose the same health risks as other PFAS. Compl. ¶¶ 38, 42, 53. But that itself is an admission that the label—even if construed as communicating a specific hazard—is at least accurate as applied to *some* PFAS-containing products. To the extent Plaintiffs challenge the Act's application to no-consumer-contact products, Plaintiffs can request an exception. 20.13.2.13(E) NMAC. And to the extent the flask is at issue, Plaintiffs can seek to use other states' text only labels. 20.13.2.13(F) NMAC. Thus, even assuming some PFAS are "safer," Plaintiffs still have not shown there are no circumstances under which the law is valid.

Plaintiffs' requests for relief as to fluoropolymers and no-consumer-contact PFAS products fare no better. At the outset, Plaintiffs' claims for different relief for these allegedly "safer" types

---

[7] The facial challenge standard is sometimes formulated differently in the First Amendment context, as an overbreadth challenge. Under the "less demanding but still rigorous" overbreadth standard, a plaintiff must show that "a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep," *Ortiz y Pino v. Oliver*, ___ F.4th ___, 2026 WL 2318219, at *5 (10th Cir. Aug. 11, 2026) (citation modified). Plaintiffs do not state they are making an overbreadth challenge, but in any event, "the overbreadth doctrine does not apply to commercial speech." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 497 (1982) (citing *Cent. Hudson*, 447 U.S. at 565 n.8). The Complaint should be dismissed under either standard.

of PFAS are based on the idea that the PFAS label conveys a message about the specific health or environmental hazards. But as discussed above, *supra* § 1(A), it does not, so the Court can dismiss Plaintiffs' Complaint on that ground alone. And if the Court is inclined to consider Plaintiffs' allegations that fluoropolymers and no-consumer-contact PFAS products are "safer," it would still need to consider that courts have already concluded that PFAS, as a "broad category," pose serious health and environmental effects. *Chamber of Commerce*, 2026 WL 2409748, at *2–*3.

Facially or as-applied, there is no dispute that Plaintiffs' products contain PFAS, even if those PFAS are fluoropolymers or will have no contact with consumers during the products' useful life. And even if fluoropolymers and no-consumer-contact PFAS products might have *different* health and environmental effects than other PFAS, Plaintiffs do not allege they have *no* health or environmental effects. Even if, as Plaintiffs suggest, some facilities can avoid that type of pollution, the label may serve to help consumers "properly dispose of [PFAS-containing products] and thereby reduce [PFAS] pollution." *NEMA*, 272 F.3d at 115. And Plaintiffs say nothing about the environmental impacts of no-consumer-contact PFAS products. Plaintiffs' fluoropolymer and no-contact arguments do not save their Complaint from dismissal.

**E. The case is not ripe.**

While pre-enforcement First Amendment challenges are sometimes ripe if there is a credible threat of enforcement, the Court may decline jurisdiction here because this case is not ripe. *Nat'l Park Hospitality Ass'n v. DOI*, 538 U.S. 803, 808 (2003). The ripeness doctrine exists "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977).

Under *Moody*, a court cannot strike down a law facially without assessing its full scope of permissible and impermissible applications. 603 U.S. at 744. Indeed, "before a court can do anything else with these facial challenges, it must 'determine what [the law] covers.'" *Id.* at 725 (quoting *United States v. Hansen*, 599 U.S. 762, 770 (2023)). When faced with "factually bare-bones records" and an analysis that "would rest on mere speculation," courts often find facial claims not ripe for judicial review. *See, e.g.*, *Sabri v. United States*, 541 U.S. 600, 609 (2004); *Nat'l Council for Improved Health v. Shala*, 122 F.3d 878, 883 n.7 (10th Cir. 1997); *see also Marchi v. Bd. of Coop. Educ. Svcs. of Albany*, 173 F.3d 469, 478 (2d Cir. 1999) (finding First Amendment claim unripe when the court "would be forced to guess at how [the defendant] might apply the [challenged] directive and to pronounce on the validity of numerous possible applications of the directive, all highly fact-specific and, as of yet, hypothetical").

As with any challenged law, a comprehensive analysis of the labeling mandate, along with its exemptions, waivers, exceptions, and the like, 20.13.2.13(B), (E), (F) NMAC, "is bound to be fact intensive." *Moody,* 603 U.S. at 747 (Barrett, J., concurring). *Moody* mandates that the Court determine the full scope and full range of applications—a particularly onerous task in light of the disfavored status of facial challenges. Given that Plaintiffs' Complaint does not develop (much less engage with) the realm of possible applications of the Regulation, the Court may not resolve Plaintiffs' facial First Amendment challenge and should hold it is constitutionally unripe.

**2. The PFAS labeling mandate does not violate the dormant Commerce Clause.**

Under the dormant Commerce Clause, a state may exercise its traditional "legislative power . . . to act upon persons and property within the limits of its own territory," *Hoyt v. Sprague*, 103 U.S. 613, 630 (1881), so long as the exercise does not "unjustifiably . . . discriminate against

or burden the interstate flow of articles of commerce." *Green Room LLC v. Wyoming*, 157 F.4th 1196, 1209 (10th Cir. 2025) (quoting *Blue Circle Cement, Inc. v. Bd. of Cnty. Comm'rs of Cnty. of Rogers*, 27 F.3d 1499, 1511 (10th Cir. 1994)). The dormant Commerce Clause is not "a roving license for federal courts to decide what activities are appropriate for state and local government to undertake," and courts are "particularly hesitant to interfere" with traditional state power. *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 343 (2007).

Plaintiffs raise two dormant Commerce Clause claims: that the labeling mandate regulates extraterritorial conduct, and that it unduly burdens the interstate flow of commerce. Compl. ¶¶ 103–14. But the labeling mandate does not discriminate against out-of-state manufacturers, so their claims fall "well outside" the dormant Commerce Clause's "heartland," and should be dismissed. *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 380 (2023).

### A. The labeling mandate is not extraterritorial. It regulates only manufacturers who choose to sell products in New Mexico.

Plaintiffs theorize the labeling mandate "directly regulate[s] transactions which take place wholly outside the State." Compl. ¶ 104 (quoting *Pork Producers*, 598 U.S. at 376 n.1). But extraterritorial *effects* alone are insufficient to plausibly plead an extraterritorial *control* claim.

Plaintiffs' extraterritorial control challenge draws from the "most dormant" strand of dormant Commerce Clause jurisprudence. *Energy & Env't Legal Inst. v. Epel* (*EELI*), 793 F.3d 1169, 1172 (10th Cir. 2015). Under this strand, the Supreme Court has mostly invalidated state laws that fix prices of in-state transactions to out-of-state transactions. *Id.* at 1172–73 (collecting cases); Compl. ¶ 91 (citing *Ass'n for Accessible Meds. v. Ellison*, 140 F.4th 957, 960 (8th Cir. 2025) (extraterritorial price control)). And it has once applied it to a regulation that "*directly* regulate[s] out-of-state transactions by those with *no* connection to the State." *Pork Producers*, 598 U.S. at

376 n.1 (citing *Edgar v. MITE Corp.*, 457 U.S. 624, 641 (1982) (plurality opinion) (striking down Illinois statute that directly regulated transactions between out-of-state corporations and out-of-state shareholders). So, when a statute (1) does not fix prices and (2) does not regulate wholly out-of-state transactions, it does not violate the extra-territorial control prong.

The Court should dismiss Plaintiffs' extraterritorial control claim because the labeling mandate only applies once a transaction occurs within New Mexico's borders. As circuit precedent explains, the extraterritorial control doctrine does not implicate "state laws setting non-price standards for products sold in-state," including "labeling" standards. *EELI*, 793 F.3d at 1173. And *Pork Producers* confirms this point, explaining that non-price standards for goods that "companies choose to sell 'within'" a State, like livestock welfare requirements, are not impermissible extraterritorial control laws. *See* 598 U.S. at 376 n.1.

The PFAS labeling mandate does not directly regulate out-of-state transactions. As Plaintiffs concede, the law applies only to "manufacturers, distributors, and retailers that sell, offer for sale, distribute or distribute for sale *in the state of New Mexico*, directly or indirectly or through intermediaries." 20.13.2.2 NMAC (emphasis added); Compl. ¶ 106; *see also Kmart Corp. v. Tax'n & Revenue Dep't*, 2006-NMSC-006, ¶ 18, 139 N.M. 172 (holding that statute governing "selling property in New Mexico" applied to only transactions that occurred "within the borders of New Mexico" (internal quotation marks omitted)). As such, because liability can only attach once something has been sold, offered for sale, distributed, or distributed for sale *in New Mexico*, the regulation does not reach wholly out-of-state transactions.

Undaunted, Plaintiffs complain the labeling mandate applies liability to manufacturers who sell to distributors who may then make the "independent decision to sell products into New

Mexico." Compl. ¶ 106. So, Plaintiffs allege, they need to label *all* their products nationwide. *Id.* ¶¶ 76, 106. But the Tenth Circuit has already rejected this argument. The extraterritorial control strand simply "doesn't apply" when manufacturers choose to, instead of producing a state-specific product, "redesign their product as it's sold nationwide, with an increased cost felt by consumers everywhere." *EELI*, 793 F.3d at 1173–74. And Plaintiffs use of middlemen for convenience does not create an extraterritorial control claim: any regulation "is only because the manufacturers are unwilling to modify their production and distribution systems to differentiate between [New Mexico]-bound and non-[New Mexico]-bound [products]." *NEMA*, 272 F.3d at 110.

Ultimately, the labeling mandate falls into a tradition of "[i]nspection laws, quarantine laws, [and] health laws of every description" that are "long understood to represent valid exercises of the States' constitutionally reserved powers." *Pork Producers*, 598 U.S. at 375. Plaintiffs' extraterritorial control claim should be dismissed. *Id.*

**B. Plaintiffs have not articulated any burden on interstate commerce that exceeds the burden to intrastate commerce; much less one that is excessive in light of the State's interests in protecting consumers.**

For regulations that do not facially discriminate against or explicitly control wholly out-of-state commerce, what remains is the "second-tier" *Pike* inquiry. *Kleinsmith v. Shurtleff*, 571 F.3d 1033, 1040 (10th Cir. 2009); *Truesdell v. Friedlander*, 80 F.4th 762, 773 (6th Cir. 2023) ("To put things in perspective, the Supreme Court has not invalidated a law under *Pike* in more than 30 years."). Under *Pike*, a court must ask if "the burden imposed on [interstate] commerce is *clearly excessive* in relation to the putative local benefits." *Green Room*, 157 F.4th at 1209 (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)). Because the *Pike* test is an "'ineffable,' all-things-considered sort of test, one requiring judges (to attempt) to compare wholly

incommensurable goods for wholly different populations," *EELI*, 793 F.3d at 1171 (citation modified), courts are "reluctant to invalidate" regulations that touch "matters traditionally of local concern" like "safety." *Green Room*, 157 F.4th at 1209 (quoting *Kassel v. Consol. Freightways Corp. of Del.*, 450 U.S. 662, 670 (1981) (Powell, J.) (plurality op.)). So, courts "should not even attempt to quantify a state law's local benefits or compare those benefits to the law's costs unless a challenger has first shown that the law inflicts substantial burdens on interstate commerce." *Truesdell*, 80 F.4th at 774 (citation modified). Plaintiffs "bear[] the burden of establishing a *Pike* violation," *Kleinsmith*, 571 F.3d at 1043, a "nearly impossible task," *see Truesdell*, 80 F.4th at 773. Their Complaint fails to meet that burden.[8]

To begin, *Pike* balancing first asks only whether a regulation poses "burdens on interstate commerce that exceed the burdens on intrastate commerce," not whether it imposes *any* burden on Plaintiffs. *V-1 Oil Co. v. Utah State Dep't of Pub. Safety*, 131 F.3d 1415, 1425 (10th Cir. 1997) (citation modified); *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 298 n.12 (1997) (observing the Court has primarily applied *Pike* in the context of regulations on interstate transportation, such as for truck flaps or train lengths, where national uniformity is needed). Because the "focus of [the] disparate burden analysis is a state's shifting the costs of regulation to other states," regulations that impose nondiscriminatory non-price standards are generally permissible under *Pike*. *NEMA*, 272 F.3d at 109; *Nat'l Pork Producers Council v. Ross*, 6 F.4th 1021, 1033 (9th Cir. 2021) (holding "alleged cost increases to market participants and customers do not qualify as a substantial burden to interstate commerce"), *aff'd Pork Producers*, 598 U.S. 356.

[8] Plaintiffs do not allege the labeling mandate "impedes the flow of commerce" by regulating the instrumentalities of commerce. *See Pork Producers*, 598 U.S. at 379 n.2 ("Pigs are not trucks or trains.").

Plaintiffs' alleged burdens fail to clear *Pike*'s initial hurdle. Plaintiffs allege, due to the complexity of their supply chains, that they will have to label *all* their products in compliance with New Mexico's PFAS labeling mandate. Compl. ¶ 76. Even if true, this allegation is insufficient. Plaintiffs' alleged burden is self-inflicted. It is only because Plaintiffs choose to avail themselves of black-box supply chains that they do not know where their products are headed. *See id.* Plaintiffs can comply with the labeling mandate or "develop separate production and distribution systems to accommodate simultaneously the [New Mexico] market and other state markets." *NEMA*, 272 F.3d at 111. That cost to Plaintiffs is not enough to justify relief under the dormant Commerce Clause. *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 345 (2007). And if market share might allegedly shift to manufacturers willing to comply with New Mexico's PFAS labeling mandate, that injury is not cognizable under the dormant Commerce Clause either. *Truesdell*, 80 F.4th at 774. In other words, any "ero[sion] [of] manufacturers' profits" from labeling requirements "is an appropriate consideration for the [state] legislature, not the federal courts." *NEMA*, 272 F.3d at 112.[9] *See also Turtle Island Foods, SPC v. Thompson*, 725 F. Supp. 3d 963, 979 (W.D. Mo. 2024). The labeling mandate poses no "substantial burden" on interstate commerce in excess of the intrastate burden. *Truesdell*, 80 F.4th at 773.

Plaintiffs' other burden arguments are puzzling. They argue that "eliminating the Erlenmeyer flask pictograph" or "adopting requirements consistent with the less burdensome labeling obligations established by other jurisdictions" would reduce their burden. Compl. ¶ 113.

[9] And, the labeling mandate is "evenhanded" because "producers both inside and outside [New Mexico]" are forced to "develop separate production and distribution systems to accommodate simultaneously the [New Mexico] market and other state markets." *NEMA*, 272 F.3d at 111; 20.13.2.2 NMAC.

But Plaintiffs' alleged burden is premised on the costs of applying *any* PFAS label to their products, Compl. ¶ 75, not the differing ink costs of labeling PFAS *differently*. Compl. ¶ 110. And New Mexico's regulation already permits Plaintiffs to seek an exemption by complying with another state's label. 20.13.2.13(E) NMAC. If anything, Plaintiffs' own allegations concede their ability to "navigat[e] a host of other legal requirements for physical materials" including "other state and federal requirements" of their labeling. Compl. ¶ 79.

The nature of the internet does not aid Plaintiffs' claims of burden either. Plaintiffs "maintain a single, unified product-detail page for items" nationwide but do not want to display the PFAS label on that page. Compl. ¶ 78. The dormant Commerce Clause does not prohibit state regulations "just because the parties use the Internet to communicate." *Quik Payday, Inc. v. Stork*, 549 F.3d 1302, 1312 (10th Cir. 2008). There is no reason that Plaintiffs cannot create a differentiated product page for New Mexicans in the same way they collect differentiated sales taxes for New Mexico or comply with a panoply of state regulations online. *See, e.g.*, *Greater L.A. Agency on Deafness, Inc. v. Cable News Network, Inc.*, 742 F.3d 414, 433 (9th Cir. 2014).

But even if Plaintiffs were to allege the burden necessary for this Court to inquire into New Mexico's "local interest," the Court should still dismiss their Complaint because their alleged burden is not "clearly excessive" in relation to New Mexico's local interest. New Mexico adopted the labeling mandate to protect the environment and human health. *See, e.g.*, Compl. ¶¶ 4, 7, 10, 53. When forced to weigh the two, a court should "not second-guess legislative judgment about the[] importance [of safety] in comparison with related burdens on interstate commerce." *Green Room*, 157 F.4th at 1209–10 (quoting *Kassel*, 450 U.S. at 686–87 (Brennan, J., concurring)).

New Mexico has exercised the traditional "legislative power of a State to act upon persons and property within the limits of its own territory." *Hoyt*, 103 U.S. at 630. Plaintiffs' concerns should be addressed by the Legislature, not the courts. This Court should dismiss their Complaint.

**3. Plaintiffs' Complaint does not establish associational standing.**

Alternatively, the Court could dismiss the Complaint because Plaintiffs lack associational standing. An association has standing when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). But if the participation of individual members "is essential to a proper understanding and resolution" of the claims at issue, then the association lacks standing. *Harris v. McRae*, 448 U.S. 297, 321 (1980); *see also Rent Stabilization Ass'n v. Dinkins*, 5 F.3d 591, 596 (2d Cir. 1993) (no associational standing when court must perform "an *ad hoc* factual inquiry for *each* [member]").

If any prong of the *Hunt* test is missing, associational standing should be denied, and the complaint dismissed. *Doe v. Sch. Bd. for Santa Rosa Cnty.*, 264 F.R.D. 670 (N.D. Fla. 2010). Conclusory allegations as to theoretical members' injuries are insufficient. *But see* Compl. ¶ 25 ("The Regulation . . . harms many of each Plaintiff's members, who manufacture or sell products that contain intentionally added PFAS that are sold and distributed in New Mexico.").

Courts demand more from associations. For example, in the context of ruling on a motion for preliminary injunction, in *NetChoice, LLC v. Bonta*, a court determined NetChoice lacked associational standing to assert as-applied challenges for media platforms to restrictions on personalized feeds because such challenges would require "deep factual inquiries into how a

particular social media feed works," and each separate as-applied challenge on behalf of each separate NetChoice member require[d] its own '*ad hoc* factual inquiry.'" 761 F. Supp. 3d at 1230 (citation omitted); *aff'g in relevant part, rev'd on other grounds, remanded NetChoice, LLC v. Bonta*, 152 F.4th 1002, 1014 (9th Cir. 2025) ("After *Moody*, the district court's holding was not arbitrary, irrational, or contrary to law.").

Plaintiffs' members' claims here would likewise necessarily "require[] [their] own '*ad hoc* factual inquiry'" into how New Mexico's labeling requirements would impact their respective packaging and products. *Bonta*, 761 F. Supp. 3d at 1231. Allegations in the Complaint are wholly insufficient as to which unnamed members, or even category of members (or the number of them), would have traditional standing to pursue their alleged First Amendment or dormant Commerce Clause injuries if they were to file the Complaint individually. And Plaintiffs' speculative and conclusory allegations as to potential compliance costs and business disruptions as to said unnamed members have no place in a First Amendment analysis where the burden is on speech and not finances. For example, there is no meaningful way to discern which members, or category of members, would qualify for future exemptions, what might apply for compliance with another state's PFAS labeling requirements in lieu of New Mexico's, or which members would choose to additionally include contextualizing qualifying language to their respective packaging.

## CONCLUSION

The Court should dismiss Plaintiffs' Complaint with prejudice.

Respectfully submitted,

RAÚL TORREZ
Attorney General

JAMES C. KENNEY
Secretary of Environment

ALEXANDER W. TUCKER
Assistant Solicitor General
New Mexico Department of Justice
201 Third St. NW, Suite 300
Albuquerque, NM 87123
505-490-4060
atucker@nmdoj.gov

/s/ Daniel Ahrens
DANIEL AHRENS
Assistant Solicitor General
ESTHER C. JAMISON
Assistant Attorney General
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, NM 87501
505-490-4060
dahrens@nmdoj.gov
ejamison@nmdoj.gov

*Counsel for Defendants Raúl Torrez and James C. Kenney*

GREGORY S. SMITHKIER
Assistant General Counsel
Special Assistant Attorney General
New Mexico Environment Department
Office of General Counsel
1190 South St. Francis Drive
Santa Fe, New Mexico 87505
505-531-7736
gregory.smithkier@env.nm.gov

*Counsel for Defendant James C. Kenney*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 28, 2026, a true and correct copy of the foregoing was electronically filed and served on all parties of record via the Court's CM/ECF system.

/s/Daniel Ahrens
Daniel Ahrens