**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

| | |
|---|---|
| AMERICAN CHEMISTRY COUNCIL, ALLIANCE FOR AUTOMOTIVE INNOVATION, AMERICAN COATINGS ASSOCIATION, ASSOCIATION OF HOME APPLIANCE MANUFACTURERS, NATIONAL ASSOCIATION OF MANUFACTURERS, NATIONAL ELECTRICAL MANUFACTURERS ASSOCIATION, NATIONAL FEDERATION OF INDEPENDENT BUSINESS, INC., NEW MEXICO RETAIL ASSOCIATION, and POWER TOOL INSTITUTE,<br>*Plaintiffs*,<br>v.<br>JAMES C. KENNEY, *in his official capacity as Secretary of New Mexico Environment Department*; and RAÚL TORREZ, *in his official capacity as Attorney General of New Mexico*,<br>*Defendants*. | Case No. 1:26-cv-02130-MIS-SCY |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS**

**TABLE OF CONTENTS**


INTRODUCTION ... 1

BACKGROUND ... 1

I. PFAS Is A Broad Category Encompassing Substances Used In Many Everyday Products With No Established Health Risk. ... 1

II. New Mexico's PFAS Protection Act And The Challenged Regulation. ... 2

LEGAL STANDARD ... 3

I. Plaintiffs Sufficiently Plead A First Amendment Claim. ... 4

A. The mandated label does not satisfy any elements of the *Zauderer* test. ... 4

1. The required pictograph does not convey purely factual information. ... 5

2. The mandated label conveys a message that lacks scientific consensus. ... 9

3. The mandated label is unduly burdensome. ... 10

4. *Zauderer* does not permit the State to compel speech about PFAS that is disconnected from the consumer transaction. ... 12

5. The mandated label does not survive First Amendment scrutiny. ... 13

B. Plaintiffs properly seek facial and as-applied relief. ... 15

C. Plaintiffs' First Amendment claim is ripe. ... 16

II. Plaintiffs Have Plausibly Alleged A Violation Of The Dormant Commerce Clause. ... 18

III. Plaintiffs Have Associational Standing. ... 23

CONCLUSION ... 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Laboratories v. Gardner*,
387 U.S. 136 (1967) .....17

*ACLU v. Johnson*,
194 F.3d 1149 (10th Cir. 1999) .....18

*Air Transp. Ass'n of Am. v. Moss*,
2024 WL 4369137 (D. Colo. Sept. 30, 2024) .....21

*Am. Ass'n of People with Disabilities v. Herrera*,
690 F. Supp. 2d 1183 (D.N.M. 2010) .....5

*Am. Beverage Ass'n v. City & Cnty. of S.F.*,
916 F.3d 749 (9th Cir. 2019) .....16

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .....3

*Ass'n for Accessible Medicines v. Bonta*,
766 F. Supp. 3d 1020 (E.D. Cal. 2025) .....20

*Ass'n for Accessible Meds. v. Ellison*,
140 F.4th 957 (8th Cir. 2025) .....18, 20

*Ass'n of Home Appliance Mfrs. v. Weiser*,
826 F. Supp. 36 1302 (D. Colo. 2025) ..... *passim*

*Awad v. Ziriax*,
670 F.3d 1111 (10th Cir. 2012) .....17

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .....3

*Brewer v. City of Albuquerque*,
18 F.4th 1205 (10th Cir. 2021) .....13, 14

*Cal. Chamber of Com. v. Bonta*,
781 F. Supp. 3d 1071 (E.D. Cal. 2025) .....24

*Cal. Chamber of Com. v. CERT*,
29 F.4th 468 (9th Cir. 2022) ....................4, 11, 13, 16

*Cal. League of Food Producers v. Bonta*,
2026 WL 2055589 (S.D. Cal. July 14, 2026) ....................15, 24

*California v. Trump*,
2026 WL 1826535 (D. Mass. June 24, 2026) ....................17

*Chamber of Com. v. EPA*,
2026 WL 2409748 (D.C. Cir. Aug. 18, 2026) ....................10

*Colon Health Ctrs. of Am. v. Hazel*,
733 F.3d 535 (4th Cir. 2013) ....................21

*Cressman v. Thompson*,
719 F.3d 1139 (10th Cir. 2013) ....................7

*CTIA - The Wireless Ass'n v. City of Berkeley*,
928 F.3d 832 (9th Cir. 2019) ....................11, 12

*Disc. Tobacco City & Lottery, Inc. v. United States*,
674 F.3d 509 (6th Cir. 2012) ....................13

*Edgar v. MITE Corp.*,
457 U.S. 624 (1982)....................19

*Energy & Env't Legal Ins. v. Epel* (*EELI*),
793 F.3d 1169 (10th Cir. 2015) ....................20

*Ent. Software Ass'n v. Blagojevich*,
469 F.3d 641 (7th Cir. 2006) ....................13

*Free Speech Coalition, Inc. v. Paxton*,
95 F.4th 263 (5th Cir. 2024) ....................4

*Fuqua v. Santa Fe Cnty. Sheriff's Off.*,
157 F.4th 1288 (10th Cir. 2025) ....................1

*Grand River Enters. Six Nations, Ltd. v. Boughton*,
988 F.3d 114 (2d Cir. 2021)....................23

*Grocery Mfrs. Ass'n v. Sorrell*,
102 F. Supp. 3d 583 (D. Vt. 2015)....................7, 10, 11, 22

*Harvey E. Yates Co. v. Cimarex Energy Co.*,
2014 WL 11512599 (D.N.M. Mar. 5, 2014)....................6

*Henderson v. Springfield R-12 Sch. Dist.*,
163 F.4th 478 (8th Cir. 2025)....................23

*Holt v. United States*,
46 F.3d 1000 (10th Cir. 1995)....................4

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977)....................23

*Jewell v. Herke*,
526 F. Supp. 3d 459 (D. Minn. 2021)....................4

*Kansas Jud. Rev. v. Stout*,
519 F.3d 1107 (10th Cir. 2008)....................16

*Kimberly-Clark Corp. v. Dist. of Columbia*,
286 F. Supp. 3d 128 (D.D.C. 2017)....................13, 14, 16

*KT&G Corp. v. Oklahoma*,
535 F.3d 1114 (10th Cir. 2008)....................18

*Legato Vapors, LLC v. Cook*,
847 F.3d 825 (7th Cir. 2017)....................20, 21

*Marchi v. Bd. of Coop. Educ. Servs. of Albany*
173 F.3d 469 (2d Cir. 1999)....................18

*McCullen v. Coakley*,
573 U.S. 464 (2014)....................15

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024)....................15

*N. N.M. Stockman's Ass'n v. U.S. Fish & Wildlife Serv.*,
494 F. Supp. 3d 850 (D.N.M. 2020)....................24

*Nat'l Ass'n of Mfrs. v. SEC*,
800 F.3d 518 (D.C. Cir. 2015)....................16

*Nat'l Ass'n of Wheat Growers v. Bonta*,
85 F.4th 1263 (9th Cir. 2023).................... *passim*

*National Council for Improved Health v. Shalala*
122 F.3d 878 (10th Cir. 1997) ....................................................................................17

*Nat'l Elec. Mfrs. Ass'n v. Sorrell*,
272 F.3d 104 (2d Cir. 2001)....................................................................................21, 22

*Nat'l Inst. of Fam. and Life Advocs. v. Becerra*,
585 U.S. 755 (2018)..........................................................................................11, 12, 14, 16

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
538 U.S. 803 (2003)..............................................................................................................17

*Nat'l Pork Producers Council v. Ross*,
598 U.S. 356 (2023)...................................................................................................19, 20, 21

*Nat'l Retail Fed'n v. James*,
806 F. Supp. 3d 427 (S.D.N.Y. 2025)..................................................................7, 8, 10

*NetChoice v. Bonta*,
761 F. Supp. 3d 1202 (N.D. Cal. 2024) ...........................................................................24

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*,
475 U.S. 1 (1986)....................................................................................................................11

*Pers. Care Prods. Council v. Bonta*,
799 F. Supp. 3d 1075 (E.D. Cal. 2025)...........................................................................16

*Pike v. Bruce Church, Inc.*,
397 U.S. 137 (1970).........................................................................................................18, 21

*R.I. Truck Ctr., LLC v. Daimler Trucks N. Am., LLC*,
180 F.4th 365 (1st Cir. 2026).................................................................................................21

*R.J. Reynolds Tobacco Co. v. FDA*,
696 F.3d 1205 (D.C. Cir. 2012) ........................................................................... *passim*

*R.J. Reynolds Tobacco Co. v. FDA*,
845 F. Supp. 2d 266 (D.D.C. 2012) ........................................................................................8

*Rocky Mountain Farmers Union v. Corey*,
730 F.3d 1070 (9th Cir. 2013) ................................................................................................21

*Sabri v. United States*,
541 U.S. 600 (2004)..................................................................................................................17

*Truesdell v. Friedlander*,
80 F.4th 762 (6th Cir. 2023) ....................22

*Turtle Island Foods Inc. v. Shuford*,
818 F. Supp. 3d 846 (W.D. Tex. 2026)....................15

*Turtle Island Foods, SPC v. Thompson*,
725 F. Supp. 3d 963 (W.D. Mo. 2024) ....................22

*United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*,
550 U.S. 330 (2007)....................18, 22

*Utah Ass'n of Cntys. v. Bush*,
455 F.3d 1094 (10th Cir. 2006) ....................24

*X Corp. v. Bonta*,
116 F.4th 888 (9th Cir. 2024) ....................15

*Zauderer v. Office of Disciplinary Counsel*,
471 U.S. 626 (1985).................... *passim*

**Statutes**

Cal. Health & Safety Code § 109011....................14

Cal. Health & Safety Code § 109011(a) ....................15

Cal. Health & Safety Code § 109011(c) ....................15

Colo. Rev. Stat. § 25-15-604 ....................15

Colo. Rev. Stat. § 25-15-604(2)(a) ....................15

Colo. Rev. Stat. § 25-15-604(2)(c) ....................15

Conn. Gen. Stat. § 22a-903c ....................15

Conn. Gen. Stat. § 22a-903c(c)(1) ....................15

Conn. Gen. Stat. § 22a-903c(c)(3) ....................15

N.M. Stat. § 74-15-3 ....................2

N.M. Stat. § 74-15-3(A)(16) ....................2

N.M. Stat. § 74-15-4(B)....................2

N.M. Stat. § 74-15-7 .......................................................2, 3

**Regulations**

NMAC § 20.13.2.2.......................................................19, 20

NMAC § 20.13.2.9(C) .......................................................2

NMAC § 20.13.2.13.......................................................3

NMAC § 20.13.2.13(A) .......................................................3, 19

NMAC § 20.13.2.13(B) .......................................................3

NMAC § 20.13.2.13(C)(1).......................................................3

Federal Rule of Civil Procedure 12(b)(1) .......................................................4

Federal Rule of Civil Procedure 12(b)(6) .......................................................3, 21

## INTRODUCTION

Defendants devote most of their motion to dismiss to improperly disputing the *merits* of Plaintiffs' claims, recycling arguments they made in opposition to Plaintiffs' preliminary injunction motion. Their arguments were wrong then and they are wrong now. Defendants bear the burden of proving their compelled speech mandate survives First Amendment scrutiny under *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985). They cannot meet that burden by disputing Plaintiffs' factual allegations in a motion to dismiss. Defendants' argument for dismissal of Plaintiffs' dormant Commerce Clause claims has no more merit. Nor is there any merit to Defendants' cursory jurisdictional arguments relating to ripeness and associational standing. Pre-enforcement challenges by trade groups to government mandated warning labels are normally decided on the merits and routinely prevail. Defendants provide no basis for treating this case any differently. The Court therefore should deny the motion to dismiss.

## BACKGROUND

Because this is a motion to dismiss, the Court "accept[s] the complaint's well-pleaded allegations as true and consider[s] them in the light most favorable to the non-moving party." *Fuqua v. Santa Fe Cnty. Sheriff's Off.*, 157 F.4th 1288, 1295 (10th Cir. 2025).

### I. PFAS Is A Broad Category Encompassing Substances Used In Many Everyday Products With No Established Health Risk.

PFAS is a catchall term for a broad category of substances with diverse physical, chemical, and toxicological properties. Compl. ¶¶ 26-27. There is no consistently-deployed meaning for PFAS; depending on context, it might be used to refer to several hundred substances or more than 14,000. *Id.* International bodies and federal agencies have recognized there are significant differences between substances sometimes included under the broad PFAS label, and that those

differences should be taken into account in defining "PFAS" for regulatory purposes. *Id.* ¶ 39.

There is ongoing scientific debate about how different types of PFAS interact with human health and the environment. Scientists, government agencies, and international organizations agree that statements suggesting all PFAS are bioaccumulative and toxic are overgeneralized. *Id.* ¶¶ 38-43. For example, fluoropolymers are a subcategory of PFAS that includes materials such as PTFE used in a wide range of consumer products. *Id.* ¶ 40. They are chemically and toxicologically distinct from other PFAS. *Id.* ¶¶ 40-42. The FDA has recognized they "are very unlikely to cause toxicity to patients." *Id.* ¶ 42. And the EPA has stated they are "believed to pose less risk to human and ecological health relative to nonpolymer PFAS." *Id.*

## II. New Mexico's PFAS Protection Act And The Challenged Regulation.

In April 2025, New Mexico enacted the Per- and Poly-Fluoroalkyl Substances Protection Act (the "PFAS Act"). N.M. Stat. § 74-15-3; Compl. ¶ 44. The PFAS Act's core feature is a phased ban on the sale of products with intentionally-added PFAS, which begins in January 2027 and is fully phased-in by 2032. N.M. Stat. § 74-15-3; NMAC § 20.13.2.9(C); Compl. ¶ 45. The ban is not universal—it exempts many types of products, including any "product that contains fluoropolymers," such as PTFE. N.M. Stat. § 74-15-3(A)(16); Compl. ¶ 46.

The PFAS Act delegates rulemaking authority to the EIB, providing, in most relevant part, that the EIB "may" "adopt rules … requiring the labeling of products in English and Spanish." N.M. Stat. § 74-15-4(B); Compl. ¶ 47. The Act also establishes enforcement mechanisms, including steep civil penalties, for each day a violation occurs. N.M. Stat. § 74-15-7; Compl. ¶ 48.

In October 2025, NMED petitioned the EIB to adopt a rule mandating labeling of products containing any intentionally-added PFAS, as PFAS is defined by the PFAS Act. Compl. ¶ 49.

Unlike the PFAS Act, the labeling rule would not differentiate between types of PFAS—it would not carve out, *e.g.*, products containing only fluoropolymers. NMAC § 20.13.2.13; Compl. ¶¶ 49-50. As it evolved, the mandate would require that covered products be labeled with a pictograph comprising "an outline of an Erlenmeyer flask with the word 'PFAS' inside the flask." *Id.* ¶ 56.

During hearings before the EIB, trade organizations presented evidence regarding the lack of a scientific consensus about the risks of PFAS, and evidence showing that certain PFAS, like fluoropolymers and PFAS sealed within a product, pose little to no risk to human health or the environment. *Id.* ¶ 63. NMED witnesses admitted the lack of a scientific consensus concerning all PFAS, conceding that "the vast majority of PFAS have not been studied at all," and that the study of PFAS "continue[s] to evolve as additional data becomes available." *Id.* ¶ 64. They also admitted that "[i]f there is zero exposure" to PFAS from a product then "there is zero risk." *Id.*

In May 2026, the EIB adopted a final version of the Regulation, requiring manufacturers to label nearly all products containing any amount of any PFAS with the Erlenmeyer flask pictograph. NMAC § 20.13.2.13(C)(1); Compl. ¶¶ 69-70. The mandate includes only narrow exemptions for used products and certain products already subject to federal regulations. NMAC § 20.13.2.13(B). The labeling mandate becomes effective on January 1, 2027. *Id.* § 20.13.2.13(A); Compl. ¶ 74. Starting then, manufacturers who fail to comply will be subject to civil penalties of up to $15,000 for each day a violation occurs. N.M. Stat. § 74-15-7.

**<u>LEGAL STANDARD</u>**

To survive a motion to dismiss under Rule 12(b)(6), a complaint need only contain sufficient factual matter to state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In resolving

Defendants' Rule 12(b)(1) attack on Plaintiffs' associational standing, the Court must accept the Complaint's allegations as true. *Holt v. United States*, 46 F.3d 1000, 1002-03 (10th Cir. 1995). In resolving Defendants' attack on ripeness, the Court has "wide discretion" to consider extra-Complaint evidence to resolve disputed facts. *Id.* at 1003.

## ARGUMENT

### I. Plaintiffs Sufficiently Plead A First Amendment Claim.

#### A. The mandated label does not satisfy any elements of the *Zauderer* test.

Under *Zauderer*, a state may compel commercial speech only if the disclosure is "purely factual and uncontroversial information about the terms under which … services will be available," and not "unjustified or unduly burdensome." *Zauderer*, 471 U.S. at 651. Compelled commercial speech that meets that standard is subject to heightened scrutiny, under which the state must show, at a minimum, that the law is narrowly tailored to directly advance a substantial government interest. *Free Speech Coalition, Inc. v. Paxton*, 95 F.4th 263, 283 (5th Cir. 2024).

Defendants ask the Court to resolve Plaintiffs' First Amendment claim on the pleadings—without taking into account, *e.g.*, the evidence introduced in connection with Plaintiffs' preliminary injunction motion. This request is meritless. Courts are "better positioned to resolve" whether a "state-mandated disclosure" goes "beyond providing 'purely factual and uncontroversial information'" "after [they] ha[ve] a factual record." *Jewell v. Herke*, 526 F. Supp. 3d 459, 468 (D. Minn. 2021). For that reason, courts rarely resolve challenges to compelled commercial speech at the pleadings stage. This is unsurprising since the *government* bears the burden of proving a compelled commercial disclosure satisfies *Zauderer*. *See, e.g.*, *Cal. Chamber of Com. v. CERT*, 29 F.4th 468, 480 (9th Cir. 2022). It will be a rare case in which a government can prove a warning

label is based on settled science using only the allegations in a plaintiff's own complaint. *See Am. Ass'n of People with Disabilities v. Herrera*, 690 F. Supp. 2d 1183, 1219-20 (D.N.M. 2010) (denying motion to dismiss First Amendment claim that required "further factual development").

Here, the Complaint alleges more than enough facts to state a claim under the First Amendment. Defendants' arguments to the contrary lack merit.

**1. The required pictograph does not convey purely factual information.**

A disclosure is "purely factual" if it is "indisputably accurate and not subject to misinterpretation by consumers." *R.J. Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205, 1216 (D.C. Cir. 2012). Even a disclosure that is "literally true" may be "nonetheless misleading" and therefore *not* purely factual. *Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1276 (9th Cir. 2023) (quotation marks omitted). In considering this *Zauderer* factor, courts do not review compelled messages in isolation, but rather "consider whether the totality of the disclosure is misleading." *Ass'n of Home Appliance Mfrs. v. Weiser*, 826 F. Supp. 36 1302, 1315 (D. Colo. 2025) ("*AHAM*"). Graphic warnings raise special concerns, since they may "evoke an emotional response" rather than convey purely factual information. *See R.J. Reynolds*, 696 F.3d at 1216.

Defendants contend (at 7) "the label is factually accurate" because it only requires manufacturers to communicate that "products contain PFAS." But the label is not unadorned text saying, "this product contains PFAS." It is an Erlenmeyer flask pictograph that says "PFAS." That pictograph conveys no "literally true" information. *Wheat Growers*, 85 F.4th at 1276. As alleged, "commercial-scale manufacturing does not *actually* use Erlenmeyer flasks." Compl. ¶ 7. The label therefore does not "communicate that Erlenmeyer flasks were used in the manufacture of the product, which would be untrue for commercial-scale manufacturing." *Id.* ¶ 97.

Defendants argue (at 12) the flask neutrally conveys "that PFAS are a synthetic, manufactured chemical present in the product." But "*no* government—including New Mexico—requires use of the pictograph for *any* other chemical." Compl. ¶ 7; *see also id.* ¶ 97 (similar). The Court must "consider whether the totality of the disclosure is misleading." *AHAM*, 826 F. Supp. 3d at 1315. Plaintiffs plausibly allege that the unique flask pictograph appearing on consumer products will lead "[c]onsumers [to] understand there must be something unusually dangerous about all types of PFAS." Compl. ¶ 7; *see also id.* ¶¶ 4, 60-61, 67, 97 (similar). Defendants argue (at 8) this allegation is "speculative" and "conclusory and unsupported." But as detailed in Plaintiffs' preliminary injunction motion filed concurrent with the Complaint, it is supported by opinions from Plaintiffs' consumer perceptions expert, admissions from Defendants' own witnesses, and characterizations of the label as a "warning" on Defendants' own website.[1]

Defendants assert (at 8-13) the label cannot pose a First Amendment problem because it does not describe a "specific hazard." But Defendants cite no precedent supporting that position, which is plainly wrong. A label stating "Danger: PFAS!" would obviously communicate the opinion that PFAS are dangerous, even if it is not "specific" about the hazard. Defendants provide no cogent explanation why such a mandated warning should be immune from First Amendment scrutiny simply because it is vague. If anything, such a vague warning poses even greater First Amendment concerns: "Danger!" does not deliver purely factual information, but is a naked attempt to "evoke an emotional response" of fear. *R.J. Reynolds*, 696 F.3d at 1216. The flask

[1] Unlike a moving defendant, "[a] plaintiff … may submit materials outside the pleadings to illustrate facts the party expects to be able to prove, so long as the elaborations are consistent with the pleadings." *Harvey E. Yates Co. v. Cimarex Energy Co.*, 2014 WL 11512599, at *2 (D.N.M. Mar. 5, 2014) (citing *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012)).

label, which conveys that PFAS poses some sort of unspecified chemical risk, is no different.

Defendants' argument that the label does not violate the First Amendment because its warning message is not explicit is similar to the argument the Tenth Circuit rejected at the motion to dismiss stage in *Cressman v. Thompson*, 719 F.3d 1139 (10th Cir. 2013). The court recounted that "the Supreme Court has long recognized that [the First Amendment's] protection does not end at the spoken or written word." *Id*. at 1148 (quotations and citation omitted). It explained that, at the motion to dismiss stage, the district court needed to credit allegations that the depiction of a tribal sculpture on a license plate "conveys a message that promotes 'pantheism, panentheism, polytheism, and/or animism,'" and "that others will perceive that the image conveys the message to which he objects." *Id*. at 1154. So too here, the Court must credit Plaintiffs' plausible allegation that requiring *only* products containing one category of chemicals—PFAS—to bear an Erlenmeyer flask label conveys a message to consumers that there is something hazardous about PFAS as a class, a message that is not "indisputably accurate." *R.J. Reynolds*, 696 F.3d at 1216.

The cases on which Defendants rely (at 8) do not involve comparable labels or allegations. In *Grocery Mfrs. Ass'n v. Sorrell*, 102 F. Supp. 3d 583, 635 (D. Vt. 2015), the court *denied* the state's motion to dismiss the compelled-commercial-disclosure claim—despite simultaneously denying the plaintiff's motion for a preliminary injunction—in part "because the factual record [wa]s undeveloped." As for *Nat'l Retail Fed'n v. James*, 806 F. Supp. 3d 427, 436 (S.D.N.Y. 2025), the plaintiff there challenged a disclosure required when a published price had been generated using a consumer's personal data: "this price was set by an algorithm using your personal data." *Id.* (capitalization omitted). The court explained that "plaintiff stops short of alleging that the meaning of those individual terms, as used in the disclosure, is demonstrably [at]

odds with their ordinary meaning and, in that sense, misleading," and plaintiff "has not pointed to any part of the disclosure here that communicates anything but 'literally true' information about its members' practices." *Id*. at 436-37 (rejecting analogy to *R.J. Reynolds Tobacco Co. v. FDA*, 845 F. Supp. 2d 266, 273 (D.D.C. 2012)). Here, in contrast, Plaintiffs have pled that the Erlenmeyer flask pictograph does not communicate any "literally true" message, and instead misleadingly conveys a sense of chemical danger about *all* PFAS that is contrary to science. Compl. ¶¶ 4, 7, 60-61, 67, 97. That case also did not include any pictographic element—the statement about "personal data" was not coupled with any pictograph suggesting danger, unlike the pictograph at issue here. *Nat'l Retail Fed'n*, 806 F. Supp. 3d at 431-32.

Defendants' remaining attempts (at 10-12) to analogize the mandated pictographic label to disclosures that have survived in other cases falls flat. A pictograph of a flask with the word "PFAS," which conveys a sense of chemical hazard, is nothing like an anodyne disclosure of an ingredient, country of origin, or calorie content. *Cf.* Mot. 10 n.3 (addressing several decisions).

Importantly, even the phrase "PFAS" as used in a label on a consumer product is "subject to misinterpretation by consumers" and so is not purely factual. *R.J. Reynolds*, 696 F.3d at 1216. As the Complaint alleges in its opening paragraph, there are many thousands of types of PFAS, and "[w]hile health and environmental concerns have been raised for *some* types of PFAS, the evidence does not support such concerns for all types of PFAS." Compl. ¶ 1. Accordingly, "[g]overnment entities have cautioned against regulating all PFAS as a singular, sweeping category." *Id.* ¶ 39. For example, fluoropolymers have not been shown to pose a risk to consumers, and for the fluoropolymer PTFE, decades of evidence is to the contrary. *Id.* ¶¶ 40-42. A label on a consumer product that simply says "PFAS" does not specify what type of PFAS is present—

whether it is PFAS for which concerns have been raised, or instead fluoropolymers like PTFE. A consumer could misinterpret the label as conveying that the type of PFAS in the product poses a hazard—otherwise, why call out its presence with a warning label? *Id*. ¶ 61. But a message that any PFAS in a consumer product is hazardous is not a purely factual statement. *Id*. ¶ 97.

**2. The mandated label conveys a message that lacks scientific consensus.**

The mandated label also is not "uncontroversial." *Zauderer* 471 U.S. at 651. A disclosure is "uncontroversial" if "the truth of the statement is not subject to good-faith scientific or evidentiary dispute and where the statement is not an integral part of a live, contentious political or moral debate." *AHAM*, 826 F. Supp. 3d at 1316 (alteration and citation omitted). A disclosure is "controversial" if there is "robust disagreement by reputable scientific sources" or a lack of "strong scientific consensus." *Wheat Growers*, 85 F.4th at 1277-78 (citation omitted).

Defendants do little to engage with the Complaint's allegations on this point, ignoring allegations detailing the scientific debate about the health and environmental risks of PFAS and the propriety of classifying all PFAS as hazardous. Compl. ¶¶ 1, 7, 26-27, 38-43, 63-64, 98. For example, they do not address the allegation that PFAS vary widely in physical and chemical characteristics, which means a similarly wide variety in toxicological risk. *Id*. ¶¶ 38, 63-64, 98. They do not address the allegation that international organizations and federal agencies caution against using broad generalizations about PFAS to make regulatory decisions. *Id.* ¶¶ 39, 40, 42, 64. And they do not address the allegation that many experts have concluded that fluoropolymers are chemically and biologically inert and thus pose little risk of contaminating the environment. *Id*. ¶¶ 40-42, 98. At the very least, these allegations show there is a robust scientific and regulatory controversy regarding the hazards of PFAS and the propriety of regulating all PFAS as a class.

Defendants nonetheless insist (at 13) the label is uncontroversial even if it conveys that "*all* PFAS pose a specific health or environmental hazard." That position, contradicted by the allegations cited above and by evidence from the preliminary injunction proceeding, is meritless. Defendants' sole support is dicta in a recent decision dealing only with two types of PFAS: PFOA and PFOS. *Chamber of Com. v. EPA*, 2026 WL 2409748, at *1 (D.C. Cir. Aug. 18, 2026). But, as discussed at the preliminary injunction hearing, there is no settled science tying the alleged risks of PFAAs such as PFOA and PFOS to all PFAS. For other PFAS, Defendants' experts conceded the evidence is at best "emerging." DeWitt Decl. ¶¶ 13, 14, 18, 77; Chapman Decl. ¶¶ 84, 93, 98. Indeed, the state legislature even recently recited that "additional health and environmental studies are needed to understand more fully the toxicological profiles, exposure risks and public health implications of fluoropolymers." House Jt. Memorial 3, 2d Session, New Mexico Leg. (2026).

Defendants' cited cases do not support their motion on this point. In *National Retail Federation*, the court found the plaintiff proffered "no more than a conclusory assertion" that artificial intelligence was "controversial." 806 F. Supp. 3d at 438. That is a far cry from the allegations and evidence discussed above. And in *Grocery Mfrs. Ass'n*, the court explained that "the compelled information must, itself, be 'controversial.'" 102 F. Supp. 3d at 628. In that case, a label compelling the disclosure of genetically engineered ingredients was not controversial where the parties did not dispute that the food did, in fact, contain such ingredients. *Id.* at 628-30. Here, the compelled disclosure includes an Erlenmeyer flask pictograph that "itself" conveys that all PFAS poses some unspecified chemical danger. *See supra* pp. 5-9.

**3. The mandated label is unduly burdensome.**

Defendants woefully underplay the burdens imposed by the label, which include

"staggering implementation costs and commercial ramifications on Plaintiffs' member companies." Compl. ¶¶ 7, 100. Contrary to Defendants' contention (at 14) that such burdens are irrelevant, courts consider such burdens in applying *Zauderer*. *See, e.g.*, *CERT*, 29 F.4th at 479-80 (noting that enforcement regime imposed costly litigation burdens on manufacturers).

In any event, the label imposes significant burdens on Plaintiffs' member companies' speech. The label forces them to apply a counterfactual, misleading label with which they disagree and which will confuse consumers. The label takes up significant visual space on many products, especially smaller products that may not currently carry a label at all. Compl. ¶ 75. And these labels must be placed not only on products, but also—in certain circumstances—on a product's packaging. *Id.* ¶ 70 (citing NMAC § 20.13.2.13(C)(2)-(3), (5)).

Defendants' suggestion (at 13, 14) that Plaintiffs' members can "qualify" the label with "their own speech" does not help them. The First Amendment's protections would "be empty" if the government "could require speakers to affirm in one breath that which they deny in the next." *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 16 (1986). Thus, *none* of the many Prop 65 cases suggest that a controversial warning label can be cured in this manner. The Supreme Court in *NIFLA*, for its part, did not hold that the clinic challenging the compelled-speech law should just add its own anti-abortion speech to the state's compelled message about abortion. *Nat'l Inst. of Fam. and Life Advocs. v. Becerra*, 585 U.S. 755, 768 (2018) ("*NIFLA*"). Defendants' cited cases (at 13-14) do not help it. Both *CTIA* and *Grocery Mfrs. Ass'n* involved disclosures that passed the *Zauderer* test because the court found they were purely factual and uncontroversial—a threshold showing the label here fails. *See CTIA - The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 846-48 (9th Cir. 2019); *Grocery Mfrs. Ass'n*, 102 F. Supp. 3d at 630.

**4. *Zauderer* does not permit the State to compel speech about PFAS that is disconnected from the consumer transaction.**

Defendants' motion also fails to show how the mandated label necessarily relates to "the terms under which … services will be available." *NIFLA*, 585 U.S. at 768 (quoting *Zauderer*, 471 U.S. at 651); *see also* Compl. ¶¶ 83, 85, 95, 99; PI Mot. 18-19; PI Reply 11. Simply put, the government cannot compel even truthful and uncontroversial speech when that speech has nothing to do with "the terms" of the service being provided. In *NIFLA*, for example, the Court held that clinics providing pregnancy services could not be required to post notices about state-provided abortions. 585 U.S. at 775. The Court explained that, because the mandatory notice "in no way relates to the services that licensed clinics provide," "*Zauderer* ha[d] no application." *Id.* at 769.

So too here, the mandated PFAS disclosure is not strictly tied to "the terms under which … services will be available." *NIFLA*, 585 U.S. at 768. Specifically, when it comes to fluoropolymers, Defendants rely (at 15-16) on alleged upstream manufacturing and downstream disposal risks. But the manufacture and disposal of PFAS products may be far removed from New Mexico and have no impact on consumers.[2] Defendants cannot use Plaintiffs' member companies as mouthpieces for these hypothetical emissions-control issues unconnected to a consumer's use of the products.[3] Indeed, the state cannot truly believe the alleged upstream and downstream impacts justify messaging to New Mexico consumers, since the Regulation envisions waivers for

[2] Defendants assert (at 18) a PFAS disclosure may lead consumers themselves to dispose of PFAS-containing products differently. But on the motion to dismiss record that is entirely speculative—Defendants point to no allegation supporting this point.

[3] The sole post-*NIFLA* case cited in Defendants' motion (at 15) does not excuse this attenuation. There, the disclosure was connected to "the terms upon which cell phones are offered" because the FCC required disclosure of "appropriate *use* of the product [consumers] are about to buy." *CTIA*, 928 F.3d at 848 (emphasis added).

products containing fluoropolymers, so long as the fluoropolymers do not come into contact with consumers. Likewise, the waiver provision for non-consumer-facing fluoropolymers belies Defendants' argument, at the preliminary injunction hearing and now in their motion to dismiss (at 15), that environmental "persistence" is sufficient to support the label mandate for all PFAS.

**5. The mandated label does not survive First Amendment scrutiny.**

Where compelled commercial speech is not purely factual, uncontroversial, or about "the terms under which … services will be available," some form of heightened scrutiny applies. Compl. ¶¶ 83-84. Some courts, including the District of Colorado last year, have applied strict scrutiny. *See AHAM*, 826 F. Supp. 3d at 1318; *see also Disc. Tobacco City & Lottery, Inc. v. United States*, 674 F.3d 509, 554 (6th Cir. 2012); *Ent. Software Ass'n v. Blagojevich*, 469 F.3d 641, 652 (7th Cir. 2006). At a minimum, "intermediate scrutiny" applies. Compl. ¶¶ 83-84, 95; *see, e.g.*, *Wheat Growers*, 85 F.4th at 1282; *CERT*, 29 F.4th at 480. Because the Regulation cannot survive even intermediate scrutiny, Plaintiffs address only that standard here. Intermediate scrutiny requires the government to "show 1) a substantial interest that 2) its restriction directly and materially advances and 3) that the regulation is not more extensive than is necessary to serve that interest." *Kimberly-Clark Corp. v. Dist. of Columbia*, 286 F. Supp. 3d 128, 144 (D.D.C. 2017) (quotations and citation omitted); *Brewer v. City of Albuquerque*, 18 F.4th 1205, 1221 (10th Cir. 2021) (the government "bears the burden of making the requisite narrow tailoring showing" under intermediate scrutiny). That test "is significantly more stringent" than *Zauderer*'s more relaxed standard for purely factual and uncontroversial speech. *R.J. Reynolds*, 696 F.3d at 1212, 1218.

The Complaint sufficiently alleges facts establishing that the mandated label cannot survive heightened scrutiny. To start, Defendants cannot identify a compelling or substantial interest in

requiring products containing *any* type of PFAS *anywhere* in the product to bear the mandated warning. Compl. ¶ 101. Defendants' asserted interests in human health and the environment are not vindicated by requiring the labeling of products containing only fluoropolymers or PFAS that do not come into contact with consumers, neither of which poses a demonstrated risk to human health or the environment. Compl. ¶¶ 1, 38-43. The mandated warning label therefore does not solve "an actual concrete problem." *AHAM*, 826 F. Supp. 3d at 1319 (citation omitted).

What's more, "there is no indication the State tried—or even considered—less burdensome alternatives," confirming that the mandated label is not narrowly tailored. *AHAM*, 826 F. Supp. 3d at 1319. Witnesses for NMED at the EIB hearing admitted that NMED did not consider the burdens that the labeling mandate imposed on manufacturers, or alternatives to that mandate. Compl. ¶ 68. This "merely underscores the fact that the [State] did not meaningfully tailor [the challenged law]." *Brewer*, 18 F.4th at 1226. In fact, New Mexico could achieve its objectives in less burdensome fashion by "communicating its concerns about PFAS on its website, using public service announcements," or using "social media." Compl. ¶ 101; *see, e.g.*, *Wheat Growers*, 85 F.4th at 1283 (state could have used its own "advertising campaign"); *NIFLA*, 585 U.S. at 775; *Kimberly-Clark Corp.*, 286 F. Supp. 3d at 145. To the extent Defendants suggest they will accept labels from other states that do not require an Erlenmeyer flask, that begs the question why the flask is necessary for the many categories of products that do not qualify for that compliance pathway (because there is no applicable labeling requirement for such products in another state).

NMED's failure to consider narrower alternatives is particularly stark in comparison to how other jurisdictions have approached this same issue. Only three other states (California, Connecticut, and Colorado) have adopted any sort of PFAS labeling mandate. *See* Cal. Health &

Safety Code § 109011; Colo. Rev. Stat. § 25-15-604; Conn. Gen. Stat. § 22a-903c. Those states have limited their labeling mandates to narrower product categories. *See* Cal. Health & Safety Code § 109011(a); Colo. Rev. Stat. § 25-15-604(2)(a); Conn. Gen. Stat. § 22a-903c(c)(1). And none *require* a pictographic warning (though Connecticut *permits* it as an option): they require only a statement that PFAS is present. *See* Cal. Health & Safety Code § 109011(a); Colo. Rev. Stat. § 25-15-604(2)(a), (2.5); Conn. Gen. Stat. § 22a-903c(c)(3). Moreover, California and Colorado exempt products that are too small to fit a label and do not have exterior packaging that can be labeled. *See* Cal. Health & Safety Code § 109011(c); Colo. Rev. Stat. § 25-15-604(2)(c). The State's failure to "consider[] different methods that other jurisdictions have found effective" confirms a lack of narrow tailoring. *McCullen v. Coakley*, 573 U.S. 464, 495 (2014).

**B. Plaintiffs properly seek facial and as-applied relief.**

Defendants argue (at 16-18) that Plaintiffs can seek neither facial nor as-applied relief. They are wrong. For facial First Amendment challenges, the relevant "question is whether 'a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024) (citation omitted). Contrary to Defendants' contention (at 17 & n.7) that this standard is inapplicable in the commercial-speech context, *Moody* itself was a commercial-speech case. *See id*. at 725; *see, e.g.*, *Cal. League of Food Producers v. Bonta*, 2026 WL 2055589, at *21 (S.D. Cal. July 14, 2026); *Turtle Island Foods Inc. v. Shuford*, 818 F. Supp. 3d 846, 863 (W.D. Tex. 2026).

Plaintiffs can bring a facial challenge to the Regulation's labeling mandate because if the message that all PFAS pose some unspecified hazard is not "purely factual and uncontroversial," then *nobody* can be forced by the government to repeat that message. *See X Corp. v. Bonta*, 116

F.4th 888, 899 (9th Cir. 2024) (in post-*Moody* compelled speech case, explaining "the Content Category Report provisions raise the same First Amendment issues for every covered social media company," and so "we conclude that a facial challenge is permissible here"). Defendants do not cite a single case rejecting a challenge to a compelled warning under *Zauderer* because the challenge was filed on a facial basis. To the contrary, such challenges are the norm in this context and commonly prevail. There are many examples of courts striking down speech mandates—for example, mandated warnings under California's Prop 65—on a facial, pre-enforcement basis.[4]

Defendants' attack (at 17-18) on Plaintiffs' as-applied claim regarding fluoropolymers and no-consumer contact PFAS also fails. The Complaint sufficiently alleges why the mandated label is particularly misleading and controversial as to these types of PFAS. Compl. ¶¶ 1, 38-43. Defendants' sole response to these allegations (at 18) is to point to a D.C. Circuit decision that addressed only PFOS and PFOA, which is meritless as explained above. *See supra* pp. 10.

### C. Plaintiffs' First Amendment claim is ripe.

Defendants contend (at 18-19) Plaintiffs' First Amendment claim is not ripe given the existence of exemptions and waivers. That argument is meritless. Courts considering the ripeness of a claim look to two factors: "the fitness of the issue for judicial resolution and the hardship to the parties of withholding judicial consideration." *Kansas Jud. Rev. v. Stout*, 519 F.3d 1107, 1116 (10th Cir. 2008) (citation omitted). "[R]ipeness analysis is 'relaxed somewhat' in the context of a

---

[4] *AHAM*, 826 F. Supp. 3d at 1321 (pre-enforcement facial challenge); *Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 530 (D.C. Cir. 2015) (same); *NIFLA*, 585 U.S. at 765 (2018) (same); *Am. Beverage Ass'n v. City & Cnty. of S.F.*, 916 F.3d 749, 757-58 (9th Cir. 2019) (same); *R.J. Reynolds*, 696 F.3d at 1208 (same); *Pers. Care Prods. Council v. Bonta*, 799 F. Supp. 3d 1075, 1085-86 (E.D. Cal. 2025) (pre-enforcement as-applied challenge); *CERT*, 29 F.4th at 472-73, 479 (same); *Wheat Growers*, 85 F.4th 1263 (same); *Kimberly-Clark*, 286 F. Supp. 3d at 148 (same).

First Amendment facial challenge." *Id.* (citation omitted).

Here, Defendants cannot contest that withholding judicial consideration will impose a hardship on Plaintiffs. Courts routinely conclude that "considerable implementation costs" impose a hardship for purposes of ripeness. *See, e.g.*, *California v. Trump*, 2026 WL 1826535, at *10 (D. Mass. June 24, 2026). Plaintiffs' members are already incurring implementation costs as they prepare to come into compliance before the January 1, 2027 deadline—assuming they can even make that deadline. Compl. ¶¶ 7, 75, 100; *see also* PI Mot. 26 ("Preliminary injunctive relief is needed well before January 1, 2027, because of the lead time Plaintiffs' members otherwise will need to come into compliance."); PI Mot. 20 (discussing evidence of compliance costs and requirements detailed in company declarations filed in support of Plaintiffs' motion).

As for fitness for judicial resolution, facial First Amendment challenges "are generally considered to be strictly legal questions that do 'not involve the application of [the law] in a specific factual setting.'" *Awad v. Ziriax*, 670 F.3d 1111, 1124 (10th Cir. 2012) (citation omitted) (Establishment Clause claim). In fact, *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149 (1967), the leading ripeness case, involved a pre-enforcement facial challenge to a labeling requirement—and the dispute there was ripe. And there are many examples of courts striking down speech mandates on a facial, pre-enforcement basis. *See supra* at 16 n.4. None of Defendants' cases is to the contrary. Two do not involve First Amendment challenges at all. *See Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807-12 (2003) (administrative challenge); *Sabri v. United States*, 541 U.S. 600, 604 (2004) (Spending Clause challenge). *National Council for Improved Health v. Shalala* involved a standing issue, not a ripeness issue, because the plaintiff-association failed to identify an injury-in-fact. 122 F.3d 878, 883 & n.7 (10th Cir. 1997). And in *Marchi v. Bd. of Coop.*

*Educ. Servs. of Albany*, only the plaintiffs' as-applied challenge was held to be unripe—not his facial challenge, which the court reviewed on the merits. 173 F.3d 469, 478, 479-80 (2d Cir. 1999).

## II. Plaintiffs Have Plausibly Alleged A Violation Of The Dormant Commerce Clause.

The Supreme Court has "long interpreted the Commerce Clause as an implicit restraint on state authority, even in the absence of a conflicting federal statute." *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338 (2007). "A state violates the … dormant Commerce Clause by '(1) clearly discriminating against interstate commerce in favor of in-state commerce, (2) imposing a burden on interstate commerce that outweighs any benefits received, or (3) having the practical effect of extraterritorial control on interstate commerce.'" *Ass'n for Accessible Meds. v. Ellison*, 140 F.4th 957, 960 (8th Cir. 2025) (brackets and citations omitted); *accord KT&G Corp. v. Oklahoma*, 535 F.3d 1114, 1143 (10th Cir. 2008).

The Regulation here violates the last two of these proscriptions. First, the Regulation directly regulates commerce taking place wholly outside of New Mexico as it subjects out-of-state manufacturers to hefty fines if they do not use NMED's prescribed product warning. *See* Compl. ¶¶ 103-107 (the "extraterritorial claim"). Second, the Regulation imposes a substantial burden on interstate commerce that far exceeds any putative local benefits, in violation of *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). *See* Compl. ¶¶ 108-114 (the "*Pike* balancing claim").

### A. The complaint plausibly alleges that the Regulation directly regulates transactions wholly outside of New Mexico.

The Tenth Circuit has previously explained that "attempt[s]" by New Mexico "to regulate interstate conduct occurring outside New Mexico's borders" represent a "per se violation of the Commerce Clause." *ACLU v. Johnson*, 194 F.3d 1149, 1161 (10th Cir. 1999). This proscription follows from Supreme Court precedent recognizing that the Commerce Clause "precludes the

application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State." *Edgar v. MITE Corp.*, 457 U.S. 624, 642-43 (1982) (plurality opinion); *see also Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 376 n.1 (2023) (describing *Edgar* as foreclosing state laws that "*directly* regulate[] out-of-state transactions by those with *no* connection to the State").

The Regulation fails that test, as it imposes a nationwide mandate for product labeling. Defendants argue (at 21) the Regulation is not impermissibly extraterritorial because "[t]he PFAS labeling mandate does not directly regulate out-of-state transactions," suggesting liability attaches only to products sold in New Mexico. That does not accurately describe what the Regulation says on its face. The Regulation's statement of "scope" provides that it "applies to manufacturers, distributors, and retailers that sell, offer for sale, distribute or distribute for sale in the state of New Mexico, directly or indirectly or through intermediaries, certain products to which per- or poly-fluoroalkyl substances (PFAS) are intentionally added." NMAC § 20.13.2.2. *Companies* thus fall within the "scope" of the regulation by selling any covered product in New Mexico. And once *companies* are subject to the Regulation, the operative labeling provision is not limited to their sales in New Mexico. Instead, the Regulation's operative labeling provision states, without geographic limitation, that "a manufacturer may not manufacture for sale or distribution a product containing intentionally added per- or poly-fluoroalkyl substances unless the manufacturer" complies with the labeling mandate. *Id.* § 20.13.2.13(A). Thus, on the Regulation's face, if a manufacturer based in Michigan sells one covered product in New Mexico, then the manufacturer falls within the scope of the law and must comply with New Mexico's labeling mandate for all the covered products it manufactures, even those destined for sale in Florida and Maine.

Even if the Regulation were construed to apply only to products ultimately sold in New Mexico, that would not solve the problem. Again, the Regulation does not regulate in-state sales; it specifically prohibits the out-of-state "*manufacture*" of an unlabeled product. NMAC § 20.13.2.2 (emphasis added). The transactions that result in product actually entering New Mexico might be the responsibility of some entirely different third party that purchased the products out-of-state. Courts repeatedly have held that laws that regulate out-of-state transactions in this manner are impermissible, even if the covered products "must eventually end up in" the state to trigger liability. *Ass'n for Accessible Meds.*, 140 F.4th at 960 ("Minnesota concedes that a Colorado manufacturer would be penalized if it sold drugs to a New Jersey distributor at prices above those proscribed by the Act and those drugs ended up in Minnesota. Minnesota 'cannot, even in an effort to protect its consumers from skyrocketing prescription drug costs, impose its preferences in this manner.'" (citation omitted)); *see also Legato Vapors, LLC v. Cook*, 847 F.3d 825, 831 (7th Cir. 2017) ("our review of prior dormant Commerce Clause decisions has not revealed a single appellate case permitting any direct regulation of out-of-state manufacturing processes and facilities comparable to the Indiana Act"); *Ass'n for Accessible Medicines v. Bonta*, 766 F. Supp. 3d 1020, 1032 (E.D. Cal. 2025) (direct regulation of settlement agreements entered outside of state is unconstitutional, despite alleged downstream impact on in-state drug prices).

For that reason, Defendants' reliance (at 20-22) on *Pork Producers*, 598 U.S. at 356, and *Energy & Env't Legal Ins. v. Epel* (*EELI*), 793 F.3d 1169 (10th Cir. 2015) (Gorsuch, J.), is misdirected. Those decisions involved challenges to state laws that directly regulated *in-state* transactions, not out-of-state manufacturing. *See Pork Producers*, 598 U.S. at 363 (ban on "in-state sale of certain pork products"); *EELI*, 793 F.3d at 1170 (law imposed standard for electricity

sold to in-state consumers). This case is about the inverse: a state law that directly regulates *out-of-state* manufacturing. Both before and after *Pork Producers*, courts have recognized this distinction and held that laws directly regulating out-of-state conduct may violate the Commerce Clause. *See, e.g.*, *R.I. Truck Ctr., LLC v. Daimler Trucks N. Am., LLC*, 180 F.4th 365, 375 (1st Cir. 2026) ("[W]e do not understand *Pork Producers* to resolve how we must address a Dormant Commerce Clause challenge to the enforcement of a law that … directly regulates out-of-state transactions."); *Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070, 1102-03 (9th Cir. 2013) (similar). Contrary to Defendants' argument (at 21), the rule is no different for labeling mandates. Even if a state could impose labeling requirements directly applicable to the in-state *sale* of a product, *see Legato*, 847 F.3d at 832 (distinguishing, *e.g.*, *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 107 n.1 (2d Cir. 2001), which concerned a law providing "a manufacturer or wholesaler may not sell at retail in this state, to a retailer in this state, or for use in this state, and a retailer may not knowingly sell"), the Regulation here applies directly to out-of-state *manufacturing*.

**B. The complaint states a plausible *Pike* balancing claim.**

The Regulation also violates the Commerce Clause because the burden imposed on interstate commerce "is clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142. The *Pike* balancing test requires "fact-intensive inquiries that do not lend themselves to judgment on the pleadings." *Air Transp. Ass'n of Am. v. Moss*, 2024 WL 4369137, at *6 (D. Colo. Sept. 30, 2024); *see also Colon Health Ctrs. of Am. v. Hazel*, 733 F.3d 535, 546 (4th Cir. 2013) (similar). Yet Defendants' argument (at 22-26) never meaningfully engages with the Rule 12(b)(6) standard.

The labeling mandate imposes a substantial burden on interstate commerce, requiring manufacturers nationwide to add New Mexico-specific disclosures for a wide range of products.

Compl. ¶ 110. Manufacturers operating with national and international supply chains will find it practicably impossible to segment products for the New Mexico market. *Id.* ¶ 76.

Conversely, the Regulation's local benefits are marginal and speculative. Compl. ¶ 112. Defendants assert (at 25) that "New Mexico adopted the labeling mandate to protect the environment and human health." But as discussed above, Defendants insist that the mandated label does not convey any kind of warning and does not provide consumers any actual information about the alleged hazards of any PFAS. Defendants cannot have it both ways. If the label does not provide consumers any meaningful message about PFAS, then its utility in protecting the environment and human health is at best uncertain. Weighing that uncertain utility against the mandate's certain costs is not something that can be done at the motion to dismiss stage.

Defendants try (at 24) contradicting Plaintiffs' allegations, arguing manufacturers can develop state-specific production and distribution systems. But that is at best a contested factual question unfit for a motion to dismiss. Defendants' argument rests on a single preliminary injunction decision, not a motion to dismiss decision. *See Sorrell*, 272 F.3d 104. In *Sorrell*, the court relied on the asserted "fact" that "lamp manufacturers could arrange their production and distribution processes to produce labeled lamps solely for the Vermont market." *Id.* at 110. Defendants cannot simply assert (at 24) the same is true here, when the Complaint alleges the opposite, *see* Compl. ¶ 76. Other decisions on which Defendants rely are *summary judgment* decisions. *See United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 337 (2007); *Truesdell v. Friedlander*, 80 F.4th 762 (6th Cir. 2023); *Turtle Island Foods, SPC v. Thompson*, 725 F. Supp. 3d 963 (W.D. Mo. 2024).

Defendants argue (at 25) companies can reduce compliance costs by using a label required

by some other state. But this only works if some other state *actually requires* a label for the products in question. As discussed above, the few other states with labeling mandates do not require labels for the vast sweep of products covered by Defendants' mandate.

**III. Plaintiffs Have Associational Standing.**

"[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Plaintiffs readily satisfy all three requirements.

First, Plaintiffs' members have standing to sue because they are being forced to parrot a controversial message that is not purely factual. "Compelled speech in violation of the First Amendment is an injury in fact." *Henderson v. Springfield R-12 Sch. Dist.*, 163 F.4th 478, 494 (8th Cir. 2025). Plaintiffs' members also engage in conduct covered by the Regulation, and will need to incur significant costs to come into compliance with the Regulation. *See* Compl. ¶¶ 29-37, 75, 79; *see also, e.g.*, Bhalla Decl. ¶¶ 22-30, ECF No. 3-5; Yon Decl. ¶¶ 12-19, ECF No. 3-7; Hall Decl. ¶¶ 14-22, ECF No. 3-8; Bowers Decl. ¶¶ 15-20, ECF No. 3-9; Thompson Decl. ¶¶ 10-20, ECF No. 3-10; Espinoza Decl. ¶ 11, ECF No. 3-6. These costs are "a classic injury-in-fact." *Grand River Enters. Six Nations, Ltd. v. Boughton*, 988 F.3d 114, 121 (2d Cir. 2021).

Second, this lawsuit is "germane" to the Plaintiffs' organizational purposes. Plaintiffs "express the[] collective views" of their members, and they "protect their [members'] collective interests" by challenging governmental mandates. *See Hunt*, 432 U.S. at 345; Compl. ¶¶ 11-19, 25.

Finally, "[i]ndividual participation of members is not normally necessary when an association

seeks prospective or injunctive relief for its members." *N. N.M. Stockman's Ass'n v. U.S. Fish & Wildlife Serv.*, 494 F. Supp. 3d 850, 961 (D.N.M. 2020); *Food Producers*, 2026 WL 2055589, at *8. Courts do not, as Defendants claim (at 26), "demand more from associations"; associational standing's "third element" is a "lenient standard" that "does not pose a high burden on associations." *Stockman's Ass'n*, 494 F. Supp. 3d at 961-62.

Defendants assert (at 27) "Plaintiffs' members' claims here would necessarily require their own *ad hoc* factual inquiry into how New Mexico's labeling requirements would impact their respective packaging and products." But *Zauderer* decisions do not typically delve into evidence about individual companies. The constitutional violations here arise from the identical label conveying the same message about PFAS to consumers.[5] Defendants' observation that *some* companies might qualify for waivers or satisfy an alternative form of compliance does not defeat Plaintiffs' standing, as some members indisputably will need to comply with the Regulation. Not all products are covered by other states' labeling requirements or are eligible for waivers, and a waiver means "incurring attendant costs"—a $2,000 application fee—which itself is a form of injury. *Cal. Chamber of Com. v. Bonta*, 781 F. Supp. 3d 1071, 1082 (E.D. Cal. 2025). "[I]f even one member of the association would have had standing to sue in [its] own right," as is the case here, "that is sufficient." *Utah Ass'n of Cntys. v. Bush*, 455 F.3d 1094, 1099 (10th Cir. 2006).

## CONCLUSION

The Court should deny Defendants' motion to dismiss.

---

[5] *NetChoice v. Bonta*, 761 F. Supp. 3d 1202 (N.D. Cal. 2024), *aff'd in part, rev'd in part*, 152 F.4th 1002 (9th Cir. 2025), is inapposite. Plaintiff there all but conceded member participation was needed because, *inter alia*, "each of its members [was] unique." 152 F.4th at 1014.

Dated: September 11, 2026

Respectfully submitted,

/s/ *John C. Anderson*
JOHN C. ANDERSON
**HOLLAND & HART LLP**
215 Lincoln Ave., Suite 100
Santa Fe, NM 87501
Phone: +1 505 988 4421
jcanderson@hollandhart.com

KEVIN P. MARTIN (*pro hac vice*)
**GOODWIN PROCTER LLP**
100 Northern Avenue
Boston, MA 02210
Phone: +1 617 570 1000
KMartin@goodwinlaw.com

BRIAN T. BURGESS (*pro hac vice*)
ANDREW KIM (*pro hac vice*)
CASSANDRA SNYDER (*pro hac vice*)
NOELLE WILSON (*pro hac vice*)
**GOODWIN PROCTER LLP**
1900 N Street NW
Washington, DC 20036
Phone: +1 202 346 4000
BBurgess@goodwinlaw.com
AndrewKim@goodwinlaw.com
CassandraSnyder@goodwinlaw.com
NWilson@goodwinlaw.com

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 11, 2026, a true and correct copy of the foregoing was electronically filed and served on all parties of record via the Court's CM/ECF system.

*/s/John C. Anderson*
John C. Anderson