**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

AMERICAN CHEMISTRY COUNCIL, *et al.*,
Plaintiffs

v.

Case No. 1:26-cv-02130-MIS-SCY

JAMES C. KENNEY, *in his official capacity as Secretary of the New Mexico Environment Department,* and RAUL TORREZ, *in his official capacity as Attorney General of New Mexico,*

Defendants.

**ORDER GRANTING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

THIS MATTER is before the Court on Plaintiffs' Motion to for Preliminary Injunction ("the Motion") that they filed on July 1, 2026. ECF No. 3. Defendants responded ("Response") on August 3, 2026, and Plaintiffs replied ("Rep.") on August 17, 2026. ECF Nos. 32, 37. The Court held arguments during an August 27, 2026, hearing. ECF No. 41. The Court, having reviewed the Motion and the applicable law, and being otherwise sufficiently advised, finds that the Motion is well taken and therefore GRANTS the Motion for Preliminary Injunction.

## I. Factual Background

Thousands of substances are broadly categorized as Per- or Poly- Flouroalkyls ("PFAS"). ECF No. 3-2 ("Korzeniowksi Decl.") at ¶¶ 17, 21; ECF No. 32-1 ("Chapman Decl.") at ¶ 75. In an effort to regulate PFAS, New Mexico passed the Per- and Poly-Flouroalkyl Protection Act ("PFAS Protection Act" or "Act") in April 2025. N.M. Stat. Ann. §§ 74-15-1 to -7 (2025). The PFAS Protection Act imposes three obligations on manufacturers, only one of which Plaintiffs

challenge here. First, it bans[1] the sale, offering for sale, or distribution of products that contain intentionally added PFAS, with certain exceptions. *Id.* § 74-15-3. One exception allows for the sale products that "contain fluoropolymers,"[2] a subclass of PFAS. *Id.* § 74-15-3(A)(16). Second, the Act requires manufacturers to report the amount of PFAS in their products. *Id.* § 74-15-5. Finally, the Act allows the Environmental Improvement Board ("Board") to make rules to carry out the provisions of the Act, including requiring the labeling of products. *Id.* § 74-15-4(B)(1). It is the Board's labeling requirement that Plaintiffs challenge in this case. ECF No. 3 at 1.

The PFAS Protection Act defines PFAS as "a substance in a class of fluorinated organic chemicals containing at least one fully fluorinated carbon atom." N.M. Stat. Ann. § 74-15-2(S). Colorado, California, and Connecticut, all states that have also passed statutes regulating PFAS, define it the same way. *See* Colo. Rev. Stat. § 25-5-1302(7); Cal. Health & Safety Code (104-3-15) § 109000(a)(2); Conn. Gen. Stat. § 22a-903c(a)(20). Plaintiffs' expert acknowledges that at the broadest general definition, PFAS, as a class of substances, is characterized by the presence of covalent bonds between carbon and fluorine atoms, the strongest single bond in organic chemistry, making it useful in the manufacturing of products across many industries. Korzeniowksi Decl. at ¶¶ 18, 20. In addition, the United States Environmental Protection Agency ("EPA") has a similar, though slightly more complex definition, that in part relies upon the existence of a bond between carbon and fluorine atoms. ECF No. 3-1 ("Snyder Decl.") at ¶ 16 (citing to 2021 EPA study); *see also EPA, Per- and Polyfluoroalkyl Substances*, https://tdb.epa.gov/tdb/contaminant?id=11020 [https://perma.cc/26UW-WY2P] (last visited Sep.

[1] The bans are staggered, coming fully into effect through January 1, 2032. N.M. Stat. Ann. § 74-15-3.

[2] The fluoropolymer must consist of "polymeric substances for which the backbone of the polymer is either a per- or polyfluorinated carbon-only backbone or a perfluorinated polyether backbone that is a solid at standard temperature and pressure." N.M. Stat. Ann. § 74-15-3(A)(16).

16, 2026) (describing PFAS as Per- and polyfluoroalkyl substances (PFASs) are fluorinated aliphatic substances with unique properties, such as being both hydrophobic, lipophobic, and extremely stable due to the strength of the C-F bond). Likewise, the Organisation for Economic Cooperation and Development (the "OECD") also defines PFAS as including the presence of a fully fluorinated carbon atom, stating that "with a few noted exceptions, any chemical with at least a perfluorinated methyl group (–CF3) or a perfluorinated methylene group (–CF2–) is a PFAS." Snyder Decl. at ¶ 13 (citing OECD report, Reconciling Terminology of the Universe of Per- and Polyfluoroalkyl Substances: Recommendations and Practical Guidance).

Because of the strength of the carbon-flourine bond, PFAS is durable, which makes it useful across many industries. Korzeniowksi Decl. at ¶¶ 18, 20; Our Current Understanding of the Human Health and Environmental Risks of PFAS, https://www.epa.gov/pfas/our-current-understanding-human-health-and-environmental-risks-pfas [https://perma.cc/T4KW-98QC] (last visited Sep. 15, 2026). At the same time, PFAS' durability makes it persistent, degrading slowly and some classes of PFAS pose health and environmental safety concerns. Chapman Decl. at ¶¶ 16-17; Our Current Understanding of the Human Health and Environmental Risks of PFAS, https://www.epa.gov/pfas/our-current-understanding-human-health-and-environmental-risks-pfas [https://perma.cc/T4KW-98QC] (last visited Sep. 15, 2026).[3]

---

[3] Although the EPA's website acknowledges that we know some PFAS at some levels have adverse health and environmental impact, the EPA acknowledges that because PFAS are a broad class of substances, the impact of any individual PFAS varies and that there is not yet scientific consensus about the impact of all classes or types of PFAS. Our Current Understanding of the Human Health and Environmental Risks of PFAS, https://www.epa.gov/pfas/our-current-understanding-human-health-and-environmental-risks-pfas [https://perma.cc/T4KW-98QC] (last visited Sep. 15, 2026); *see also* Korzeniowksi Decl. at ¶¶ 33-37 (collecting scientific studies on health and safety of PFAS). Similarly, Defendants' expert acknowledges that not all classes of PFAS have been studied or show the same toxicity. ECF No. 32-2 ("DeWitt Decl.") at ¶¶ 13, 18 (though stating that the vast majority have some toxicological hazard).

In May 2026,[4] the Board adopted the final rule governing the labelling of products with intentionally added PFAS ("the Regulation"), which is at issue in this litigation. N.M. Code R. § 20.13.2.13. The Regulation's labeling requirement requires manufacturers of products with intentionally added PFAS to label their product. *Id.* § 20.13.2.13(A). The Regulation contains several exceptions to the labeling requirement, including used items, products regulated by the Federal Insecticide, Fungicide, and Rodenticide Act, and its implementing regulation, veterinary products, and medical devices (including drugs). *Id.* § 20.13.2.13(B). The Regulation specifies that the label "shall be an outline of an Erlenmeyer flask with the word 'PFAS' inside the flask." *Id.* § 20.13.2.13(C). For products other than "complex durable goods" the label must be "affixed to the product such that the label is clearly visible and legible prior to sale." *Id.* § 20.13.2.13(C)(1). For complex durable goods, the label must be "included in the consumer facing product specification sheet[.]" *Id.* § 20.13.2.13(D)(1).

In addition, the Regulation contains two waiver provisions. *Id.* § 20.13.2.13(E)-(F). First, the Regulation allows states to comply with another state's labeling requirement and seek a waiver of New Mexico's labeling requirement. *Id.* § 20.13.2.13(A)(2) & (E). In order to secure such a waiver, a manufacture must submit a copy of the proposed compliant label and a narrative explanation as to "how it fulfills the intent" of the Regulation's requirements. *Id.* § 20.13.2.13(E)(1). In addition, where a labeling plan includes other state-specific elements (e.g., statutory references or public outreach measures), the manufacturer must submit a description of the adjustments to be made to the Regulation's labeling plan. *Id.* § 20.13.2.13(E)(2). The Regulation states that submitting these documents constitutes compliance with the Regulation's

---

[4] During the rulemaking process, the Board received numerous comments regarding an initially proposed rule drafted by the New Mexico Environment Department ("NMED") and upon several revisions. EIB Docket No. 25-61(R). In addition, the Board held a hearing and received evidence regarding PFAS and products that contained intentionally added PFAS. EIB Docket.

labeling requirement unless the NMED notifies the manufacturer in writing within 90 days that the alternative labeling plan violates New Mexico law. *Id.* § 20.13.2.13(E). The Regulation does not specify any standard the NMED will use to determine whether labeling products consistent with another state's regulation would "violate New Mexico law." *See id.* Currently three states, California, Colorado, and Connecticut, require labels on some products with intentionally added PFAS. Cal. Health & Safety Code §§ 109010–12; Colo. Rev. Stat. § 25-15-604; Conn. Gen. Stat. § 22a-903c(2)–(3). However, these statutes are far more limited than the Regulation, which requires any product with intentionally added PFAS to be labeled. California's and Colorado's statutes, for example, require a label only for cookware where intentionally added PFAS is on the handle or a surface that comes into contact with food or beverage. Cal. Health & Safety Code § 109011(a); Colo. Rev. Stat. § 25-15-604(2)(a). Connecticut's statute, while broader, requires labels for the following products that contain intentionally added PFAS: apparel, carpets, cleaning products, cookware, cosmetics, dental floss, fabric treatment, juvenile products, menstruation products, textile furnishings, ski wax, or upholstered furniture. Conn. Gen. Stat. § 22a-903c(c)(1).

Second, manufacturers can seek to waive the labeling requirements for products that are exempt from the PFAS Protection Act's ban, including products that contain fluoropolymers. N.M. Code R. § 20.13.2.13(F) (referencing *id.* § 20.13.2.10). For a product to be eligible for a waiver under this provision, the manufacturer must represent that "none of the product's material containing intentionally added per- or poly-fluoroalkyl substances will ever come into direct contact with a consumer while the product is being used as intended . . . ." *Id.* § 20.13.2.13(F)(3). In addition, the waiver request must report information about the product and contain an explanation of why it should not require a label. *Id.* § 20.13.2.13(F)(1) through (4). The NMED

considers waiver requests received prior to October 31, 2026, approved pending review and final determination by June 1, 2027, *id.* § 20.13.2.13(F)(5); however, the Regulation does not explain how such final determinations will be made, *see id.*

## II. Legal Standards

### A. Preliminary Injunction

"To obtain a preliminary injunction, the moving party must demonstrate: (1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest." *Att'y Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 776 (10th Cir. 2009) (quotation marks omitted). Preliminary injunctions are extraordinary remedies, so plaintiffs must show their right to relief is clear and unequivocal. *Nat'l Ass'n for Gun Rts. v. Polis*, 173 F.4th 1317, 1331 (10th Cir. 2026). However, "the burdens at the preliminary injunction stage track the burdens at trial." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006). It is well-established that the party seeking to uphold a restriction on commercial speech carries the burden of justifying it. *See Ibanez v. Fla. Dep't of Bus. & Prof. Reg., Bd. of Accountancy*, 512 U.S. 136, 142-43 (1994).

When a state agency is the defendant, the third and fourth factors "merge." *Rocky Mtn. Gun Owners v. Polis*, 121 F.4th 96, 112 (10th Cir. 2024). Further, in First Amendment cases, the likelihood of success on the merits will often be the determinative factor because a loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury and it is in the public interest to prevent the violation of a party's constitutional rights. *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013), *aff'd sub nom.*

*Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014) (internal citations and quotation marks omitted).

B. Relevant First Amendment Law

The First Amendment protects commercial speech. *Bigelow v. Virginia*, 421 U.S. 809, 818 (1975); *see also Bates v. State Bar of Ariz.*, 433 U.S. 350, 363-64 (1977) (discussing the Supreme Court's history of protecting commercial speech). More, because the First Amendment protects the right "to refrain from speaking at all," the First Amendment's protections extend to the right to refrain from speech that a speaker would not otherwise make. *Wooley v. Maynard*, 430 U.S. 705, 714 (1977); *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 797-98, (1988) (holding that the First Amendment protects statements of fact that the speaker would rather avoid); *Hurley v. Irish–Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 573 (1995).

Nevertheless, First Amendment protection is not absolute, and commercial speech enjoys "'a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values[.]'" *Bd. of Trs. of State Univ. of N.Y. v. Fox,* 492 U.S. 469, 477 (1989) (quoting *Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 456 (1978)); *see also Bolger v. Youngs Drug Prods. Corp.,* 463 U.S. 60, 64-65 (1983); *In re R.M.J.,* 455 U.S. 191, 203 (1982). Given this subordinate position in the First Amendment hierarchy, courts apply less rigorous scrutiny to regulation of commercial speech. *Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*, 471 U.S. 626, 637 (1985); *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.,* 447 U.S. 557, 562-63 (1980).[5]

---

[5] Although the Supreme Court did not explicitly rule on when courts should apply *Zauderer* as opposed to *Central Hudson*, it suggested that *Zauderer* governs compelled speech, and *Central Hudson* governs restrictions on speech. *See Glickman v. Wileman Bros. & Elliott, Inc.*, 521 U.S. 457, 474 n.18 (1997) ("The Court of

*Zauderer* creates an exception to heightened First Amendment scrutiny where compelled speech is involved. *Zauderer*, 471 U.S. at 651; *see also Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 768 (2018) ("*NIFLA*") (describing *Zauderer* as applying a lower level of scrutiny in certain contexts); *Natl' Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1275 (9th Cir. 2023) ("*Wheat Growers*"). To qualify for a lower level of scrutiny, compelled disclosures must mandate "purely factual and uncontroversial information." *Zauderer*, 471 U.S. at 651; *see also United States v. Wenger,* 427 F.3d 840, 849 (10th Cir. 2005). If the compelled disclosure meets these requirements, courts evaluate whether there is a reasonable fit between the means the state employs to achieve the end, i.e. the state interest, and whether the compelled speech is not so "unjustified or unduly burdensome" that it "chill[s] protected commercial speech." *Zauderer*, 471 U.S. at 651; *see also NIFLA*, 585 U.S. at 768 (citing *Zauderer*, 471 U.S. at 651). Although deferential, some courts have described the *Zauderer* standard as "akin to" rational basis review but one that asks something slightly more. *See*, *e.g.*, *DoorDash, Inc. v. City of New York*, 185 F.4th 1, 7 n.5 (2d Cir. 2026); *Volokh v. James*, 148 F.4th 71, 85 n.6 (2d Cir.), *certified question accepted*, 267 N.E.3d 1245 (2025), and *certified question answered*, No. 58, 2026 WL 1790976 (N.Y. June 23, 2026) (describing *Zauderer* scrutiny as slightly more stringent than traditional rational basis review); *Amarei v. City of Chicago*, No. 13 C 2805, 2015 WL 7251940, at *3 (N.D. Ill. Nov. 17, 2015) (commenting that *Zauderer* does not set forth a rational basis review, but rather requires a "reasonable fit" between means and end.)

Although the government interest in *Zauderer* concerned consumer confusion and deceptions, courts have regularly applied *Zauderer* where the government asserts other interests. *See Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 310 n.8 (1st Cir. 2005) (noting that it

---

Appeals fails to explain why the *Central Hudson* test, which involved a restriction on commercial speech, should govern a case involving the compelled funding of speech.").

found no cases limiting the application of *Zauderer* to the prevention of deceptive advertising); *CTIA - The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 844 (9th Cir. 2019) ("*CTIA*") (collecting cases). Courts have held that public health and safety, information about manufacturing processes, and environmental impact are legitimate state interests under *Zauderer*. *CTIA*, 928 F.3d at 844 (health and safety); *Am. Beverage Ass'n v. City and County of S.F.*, 916 F.3d 749, 756-57 (9th Cir. 2019) (health and safety); *Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18, 22-23 (D.C. Cir. 2014) ("*AMI*") (country-of-origin of product); *N.Y. State Rest. Ass'n v. N.Y.C. Bd. of Health*, 556 F.3d 114, 134 (2d Cir. 2009) (health and safety); *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 115 (2d Cir. 2001) ("*NEMA*") (environmental impact). Still, disclosures must "remedy a harm that is 'potentially real, not purely hypothetical[.]'" *NIFLA*, 585 U.S. at 776 (quoting *Ibanez v. Fla. Dep't of Bus. & Prof'l. Reg.*, 512 U.S. 136, 146 (1994)). Thus, consumer curiosity is not a sufficient government interest to sustain the compulsion of even a factually accurate and non-controversial statement. *Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 74 (2d Cir. 1996) ("*Int'l Dairy*") (applying intermediate scrutiny set forth in *Central Hudson*); *see also NEMA*, 272 F.3d at 115 n.6 (explaining that where a state disclosure requirement is supported by no interest other than the gratification of "consumer curiosity" the Second Circuit would apply intermediate scrutiny).

## III. Analysis

A. <u>Likelihood of Success on the Merits</u>

The starting point for the Court's analysis is to determine whether the rational basis scrutiny set forth in *Zauderer* is applicable, i.e. whether the mandated disclosure requires purely factual information that is non-controversial.[6] If the required disclosure is both purely factual and

[6] Defendants argue without explanation in a footnote that the Court should abstain from considering whether to grant an injunction in the first instance. ECF No. 32 at 7-8 n.3 (citing *Burford v. Sun Oil Co.*, 319 U.S.

non-controversial, then there must be a reasonable fit between the means the state employs to achieve the end, i.e. the state interest and must also not be unduly burdensome. *Zauderer*, 471 U.S. at 651; *AMI*, 760 F.3d at 26.

In arguing that *Zauderer* scrutiny does not apply, Plaintiffs first argue that the Regulation's required label does not convey purely factual information, in part because there is no universally accepted definition of PFAS and in part because they argue the graphic image conveys a warning that all PFAS that are labelled are dangerous, which, they argue, is not accurate. ECF No. 3 at 12-16. Plaintiffs also argue that *Zauderer* scrutiny does not apply because the required label is controversial, again in part because it falsely conveys the idea that all PFAS are dangerous, which they say is subject to scientific debate. *Id.* at 17. Defendants argue that Plaintiffs' argument that the Regulation does not meet the elements of *Zauderer* is flawed because the Regulation's labeling requirement mandates only purely factual information, in that it requires a PFAS label for products that contain a compound with at least one carbon and fluorine bond, ECF No. 32 at 10-11, and that the required label is non-controversial because it is only a consumer awareness label, *id.* at 11-14. The parties also contest, both with little explanation, whether there is a reasonable fit between the Regulation's label requirement and the state's purported interest, with Plaintiffs asserting that the Regulation is disconnected from its alleged purpose, ECF No. 3 at 18-19, and Defendants arguing that there is a rational relationship between the Regulation's labeling requirement and New Mexico's interest in protecting consumer and environmental health, ECF No. 32 at 20-21.

---

315 (1943); *R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 501 (1941); *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976)). Putting aside the cursory nature of the argument, *Pullman* and *Burford* abstention are clearly not relevant. There is no underlying complex question about the applicability of New Mexico's law or regulatory scheme whose resolution would obviate the need for the constitutional inquiry. *See Caldara v. City of Boulder*, 955 F.3d 1175, 1179 (10th Cir. 2020) (describing requirements of *Pullman* abstention); *Lehman v. City of Louisville*, 967 F. 2d 1474, 1478 (10th Cir. 1992) (describing requirements of *Burford* abstention). The Court summarily rejects these undeveloped arguments.

For the reasons that follow, the Court finds that Plaintiffs are unlikely to establish that (1) the mandated disclosure requires more than simply purely factual information (2) that is controversial, but further finds that Plaintiffs are likely to establish that there is no reasonable fit between the means the compelled speech employs and New Mexico's stated interest.

*1. Whether the Regulation Requires a Purely Factual Disclosure*

Neither the Supreme Court nor the Tenth Circuit has set forth an explanation of what it means for a required disclosure to be "purely factual." *Ass'n of Home Appliance Mfrs. v. Weiser*, 826 F. Supp. 3d 1302, 1315 (D. Colo. 2025). At a minimum, information that is purely factual necessarily must be "factually accurate[.]" *Wheat Growers*, 85 F.4th at 1276. In addition, courts examine the entire context of the mandated disclosure because "a statement may be literally true but nonetheless misleading and, in that sense, untrue." *CTIA*, 928 F.3d at 847. However, a factual disclosure does not reflect an opinion merely because it compels a speaker to convey information contrary to its interests or because a listener may impute a negative connotation. *See Disc. Tobacco City & Lottery, Inc. v. United States,* 674 F.3d 509, 569 (6th Cir. 2012) (holding that merely because facts "disconcert, displease, provoke an emotional response, [or] spark controversy" did not turn them into opinions); *CTIA*, 928 F.3d at 847-48 (rejecting argument that the phrase "RF radiation" was not purely factual because it had negative associations); *see also Nat'l Retail Fed'n v. James*, 806 F. Supp. 3d 427, 436 (S.D.N.Y. 2025) (rejecting speculative assertion that consumers would react negatively to purely factual statement).

Plaintiffs offer two reasons[7] to suggest the Regulation's required disclosure is not purely factual: (1) the absence of consensus about what substances qualify as PFAS renders the required

[7] Plaintiffs argue that the pictograph itself makes the mandated disclosure non-factual because "[n]o manufacturer is making products at commercial scale using Erlenmeyer flasks[.]" ECF No. 3 at 13. This argument borders on absurd. Taken to its logical extreme, Plaintiffs' argument would mean any labeling requirement mandating the use of pictographs would become nonfactual. For example, toxic substances, sometimes labeled with

label inaccurate; and (2) the required label is an implicit warning, and since not all PFAS are dangerous, it is inaccurate. ECF No. 3 at 12-16.

Plaintiffs contend that the acronym, "PFAS" is not purely factual because there is no agreed-upon definition of what constitutes "PFAS." *Id.* at 13. Plaintiffs point to the declaration of one of their experts, who states:

> There is a legitimately unresolved scientific debate about how to define which substances can be described as PFAS. Some scientists, regulators, non-governmental organizations, and others apply broad definitions that capture more than 14,000 potential PFAS substances, while others use more precise definitions that encompass hundreds of substances. But these definitions ultimately do not reflect the differences in chemical properties[.]

Korzeniowski Decl. at ¶ 21. The expert further opines that not all PFAS substances contain the same chemical properties, toxicology, health hazards, or environmental effects. Id. at ¶¶ 21, 31-32. Thus, Plaintiffs argue, because there are varying definitions of PFAS, selecting a single definition renders the Regulation's definition an opinion. Plaintiffs argue further that Defendants cannot work around the uncertainty surrounding the definition of PFAS by defining it in the PFAS Protection Act. ECF No. 3 at 13 (citing *Kimberly-Clark Corp. v. District of Columbia*, 286 F. Supp. 3d 128, 142 (D.D.C. 2017) and *Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 530 (D.C. Cir. 2015)).

At the outset, the Court finds that neither *Kimberly-Clark* nor *National Association of Manufacturers* are relevant here, as both cases involved required disclosures that contained a subjective assessment of the qualities of a product, which is not the case here. In *Kimberly-Clark*, the regulation required that certain products, including baby wipes, be labeled with an explicit warning that they "should not be flushed." *Kimberly-Clark Corp.*, 286 F. Supp. 3d at 140. The

---

a skull and crossbones, do not literally contain human skeletal matter. The Court has located, and Plaintiffs point to, no case requiring that a pictograph completely capture the manufacturing process or a product's contents in order to be purely factual.

court noted that the accuracy of the required statement itself was in dispute for the plaintiff believed it had successfully "designed its wipes to be flushable" and thus whether the wipes were flushable was thus a matter opinion, and not fact. *Id.* at 140-41 (noting that as a matter of opinion it also could be considered controversial). Similarly, *National Association of Manufacturers*, in dicta, noted that the term "conflict free" was neither factual nor non-ideological – and the regulation at issue could not make it so merely by defining it. 800 F.3d at 529-30. In both instances, the regulation attempted to take a matter of opinion and render it fact by defining a term used in the required label.

That is not the case here; although Plaintiffs assert that different classes of PFAS have different qualities, the required label does not speak to the qualities or characteristics of PFAS; rather it merely identifies the product as containing one substance that could be considered PFAS. The First Amendment does not bar a state from compelling "under-inclusive" factual disclosures. *N.Y. State Rest. Ass'n*, 556 F.3d at 134, and to the extent Plaintiffs disagree with the definition or believe it to be incomplete, they remain free to supplement the required label with additional information explaining that not all PFAS share the same qualities. Moreover, that not all PFAS share the same qualities does not transform a factual statement – that the products contain a substance in a class of fluorinated organic chemicals containing at least one fully fluorinated carbon atom – into an opinion. *See, e.g., CTIA*, 928 F.3d at 847 (declining to impute opinion about negative connotations into a purely factual statement).

In addition, the mere fact that *some* definitions of PFAS are more limited or that the required label employs one definition of PFAS and not others does not move the Regulation's mandate from the realm of fact to the realm of opinion. *See Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 251-52 (2010) (holding that people may interpret "debt relief

agency" in many ways but disclosing that a business is one is still purely factual). To hold otherwise would likely render any definition of complex chemical substances "non-factual." Indeed, to this point, Plaintiffs' own expert acknowledges that "PFAS are characterized simply by the presence of covalent bonds between carbon and fluorine atoms, the strongest single bond in organic chemistry." Korzeniowski Decl. at ¶ 18. The EPA also employs a definition that also relies, in part, upon the existence of a bond between carbon and fluorine atoms. Snyder Decl. at ¶ 16 (citing to 2021 EPA study); *see also EPA, Per- and Polyfluoroalkyl Substances*, https://tdb.epa.gov/tdb/contaminant?id=11020 [https://perma.cc/26UW-WY2P] (last visited Sep. 16, 2026). And at least three other states define PFAS in substantially the same was as New Mexico has done. Colo. Rev. Stat. § 25-5-1302(7); Cal. Health & Safety Code (104-3-15) § 109000(a)(2); Conn. Gen. Stat § 22a-903c(a)(20).

Plaintiffs also argue that because the pictograph of the Erlenmeyer Flask is "designed as a warning," consumers will "only assume it poses some unspecified risk of harm[,]" similar to a skull and crossbones for poison, or fire for flammables or explosives. ECF No. 3 at 14-15. In making the argument, Plaintiffs' expert opines that consumers are accustomed to seeing pictographs as warnings. ECF No. 3-4 ("Wilcox Decl.") at ¶¶ 29-33. Plaintiffs conclude that courts have recognized that consumers may misinterpret images and may evoke an emotional response. ECF No. 3 at 13 (citing *R.J. Reynolds Tobacco Co. v. Food & Drug Admin.*, 696 F.3d 1205, 1216-17 (D.C. Cir. 2012), <u>overruled on other grounds by</u> *AMI*, 760 F.3d 18).

But *R.J. Reynolds* does not stand for the proposition that *all* graphic images or pictographs evoke emotion, express warnings, or present something other than neutral, factual information. 696 F.3d at 1216-17. Indeed, the images found to be non-factual in *R.J. Reynolds* were a picture of a woman crying or man smoking through a tracheotomy hole. *Id.* The court

held, and the holding requires little further explanation, that these images were inflammatory and "unabashed attempts to evoke emotion." *Id.* at 1217. In other words, while *some* images may cross the line and present non-factual information with an inflammatory and attention-grabbing design, not all images do so, and Plaintiffs point to no case law to suggest otherwise. More, Plaintiffs present no evidence that consumers actually find the required Erlenmeyer Flask image to be inflammatory or even that it warns of hazard; rather they present only the declaration of an expert who suggests that generally consumers find some images to be warnings. Without more, the mere picture of an Erlenmeyer Flask is not sufficient to render the Regulation's required label something other than purely factual.

In the end, it remains that the Regulation requires only a statement that the product contains PFAS, a substance in a class of fluorinated organic chemicals containing at least one fully fluorinated carbon atom. The Court finds that Plaintiffs are unlikely to establish that the required statement is not purely factual.

2. *Whether the Regulation Requirements are Controversial*

A statement "is 'uncontroversial' for purposes of *Zauderer* where the truth of the statement is not subject to good-faith scientific or evidentiary dispute and where the statement is not an integral part of a live, contentious political or moral debate." *Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 281-82 (5th Cir. 2024) (citations omitted). A statement can be controversial if it forces someone to "convey a message fundamentally at odds with its mission." *Wheat Growers*, 85 F.4th at 1277 (citing *NIFLA*, 585 U.S. at 778). A statement can also be controversial if there is "robust disagreement by reputable scientific sources" as to the certainty of the statement. *Cal. Chamber of Com. v. Council for Educ. and Rsch. on Toxics*, 29 F.4th 468, 478 (9th Cir. 2022) ("*CERT*") (noting that the science surrounding the health impact of an ingredient

that must be disclosed was unsettled); *Wheat Growers*, 85 F.4th at 1278 (same); *but see CTIA*, 928 F.3d at 848 (finding neither that mandate that cell phones emit radiation nor advice that consumers store cell phones at a certain distance from their bodies was controversial, in part because it was settled that radiation is dangerous).

Like Plaintiffs' argument regarding whether the required disclosure contains purely factual information, their argument regarding whether the disclosure is controversial rests upon their assertion that the required disclosure is a warning, for they assert that the science regarding PFAS, and particularly their risks either to human health or the environment, is unsettled. ECF No. 3 at 17. However, the Regulation does not require Plaintiffs to convey any information at all about any alleged risks or harm that PFAS might cause. Instead, the required label merely requires Plaintiffs' companies to state that a product contains PFAS. *Cf. Nat'l Retail Fed'n*, 806 F. Supp. 3d at 438 (requirement that retailer disclosed that they used algorithmic pricing did not require plaintiffs to take sides as to whether algorithmic pricing was good or bad). Unlike other regulations found to be controversial, the Regulation does not require mandated speech to weigh in on the scientific debate, i.e. whether certain classes of PFAS are dangerous or why. *Cf. Wheat Growers*, 85 F.4th at 1277-78 (reviewing a regulation that contained a warning about the health impact of glyphosate and finding warning controversial because of live scientific debate); *CERT* 29 F.4th at 478 (reviewing a regulation that contained a warning about the health impact of acrylamide and finding warning controversial because of live scientific debate); *Ass'n of Home Appliance Mfrs.*, 826 F. Supp. 3d at 1316 (reviewing warning about the health impact of gas stoves and finding warning controversial because of live scientific debate).

The Regulation requires only a statement that the product contains PFAS. N.M. Code R. § 20.13.2.13. The Regulation simply does not require Plaintiffs to assert that PFAS as a class of

substances are dangerous, toxic, or environmentally destructive, and the Court will not impute such statements to the label. Because the existence of PFAS in the product is not, itself, part of an unsettled debate, the Court finds that Plaintiffs are unlikely to establish that the required statement is controversial.

#### 3. *Whether there is a Reasonable Fit between the Means the Regulation Employs and the State Interest*

Having found the Regulation is purely factual and noncontroversial, the Court turns to whether there is a reasonable fit between the means the Regulation employs and New Mexico's interest. Plaintiffs argue that the Regulation is not reasonably related to a substantial state interest, asserting that *Zauderer* allows government mandated speech to "ensure that consumers received accurate information related to their transactions, and nothing more than that." ECF No. 3 at 19. Defendants assert that New Mexico's has interests in protecting consumer health and safety, protecting the environment, and providing relevant information about the manufacturing process to consumers. ECF No. 32 at 21. Underpinning this dispute is the Parties' running disagreement as to whether the Regulation requiring the PFAS label is a warning label, as Plaintiffs suggest, or if it is a consumer awareness label, as Defendants suggest. ECF No. 3 at 13-14; ECF No. 32 at 10.

One question can be settled easily: although *Zauderer* reviewed a regulation that sought to prevent consumer deception, courts have regularly applied *Zauderer* where the state asserts other interests, including those related to consumer health and safety and the protection of the environment. *See CTIA*, 928 F.3d at 844; *NEMA*, 272 F.3d at 115; *AMI*, 760 F.3d at 24. That a state's interest is substantial, however, is not sufficient to survive a First Amendment challenge; rather, the First Amendment is satisfied where there is "a rational connection between the purpose of a commercial disclosure requirement and the means employed to realize that

purpose." *NEMA*, 272 F.3d at 115. Thus, the question for the Court is whether the Regulation's labelling requirement is rationally connected to New Mexico's asserted interests in consumer health and safety and the protection of the environment. In other words, does the Regulation employ a means reasonably calculated to achieve the professed state interest. Defendants argue that it does, suggesting that when informed that a product contains intentionally added PFAS consumers may "reduce their environmental footprint" or "make healthier lifestyle choices." ECF No. 32 at 1. In making their argument that the Regulation's labeling requirement "is rationally related to New Mexico's interests in consumer awareness, public health, and environmental protection" Defendants rely heavily on both *NEMA* and *AMI*. ECF No. 32 at 20-21. The Court finds this reliance unpersuasive.

In *NEMA*, Vermont imposed a labeling requirement on mercury-containing products, including fluorescent light bulbs. *NEMA*, 272 F.3d at 107. Vermont stated an interest in "protecting human health and the environment from mercury poisoning[.]" *Id.* at 115. Importantly, Vermont's mercury regulation did more than convey to consumers that certain products contained mercury; it required a label that not only informed consumers about the presence of mercury in manufactured products but also informed them about steps necessary to safely dispose of it. *NEMA*, 272 F.3d at 107 n.1.[8] The Second Circuit observed that the goal of the statute, to reduce the amount of mercury released into the environment, was "inextricably intertwined with the goal of increasing consumer awareness of the presence of mercury in a variety of products" because it was "probable that some mercury lamp purchasers, newly

---

[8] The statute stated stating in relevant part:

> the label must clearly inform the purchaser or consumer that mercury is present in the item and that the item may not be disposed of or placed in a waste stream destined for disposal until the mercury is removed and reused, recycled, or otherwise managed to ensure that it does not become part of solid waste or wastewater.

*NEMA*, 272 F.3d at 107 n.1.

informed by the Vermont label, will properly dispose of them and thereby reduce mercury pollution." *Id.* at 115. *NEMA* simply does not stand for the proposition that states can impose unfettered labelling requirements that compel disclosure of the contents of manufactured products. *See id.*

Unlike in *NEMA*, the Regulation here, as noted previously, does not comment on whether PFAS poses a risk to consumer or environmental health and safety. It contains no information about the manufacturing process or its impacts on the environment or the products themselves. In Defendants' own words, the required label "simply inform[s] consumers if their products contain intentionally added PFAS" and does not warn consumers about health and safety hazards related to PFAS, describe negative consequences from exposure, or instruct consumers how to avoid exposure. ECF No. 32 at 1, 12. Indeed, Defendants proclaim that this "lack of characterization" "is a feature, not a bug." *Id.* at 12. This assertion, however, distinguishes New Mexico's regulation from the regulation at issue in *NEMA*, which employed a rational connection between the means used – advising consumers how to dispose of mercury – and the end to be achieved – reducing the presence of mercury in the environment. No such connection exists here.

Defendants also assert that *AMI* is instructive. *Id.* at 21. Defendants reason that a state's interest in providing consumers information about the manufacturing process is a cognizable goal under *Zauderer*. *Id.* (citing *AMI*, 760 F.3d at 24). Again, Defendants read too much into the court's decision. In *AMI*, the court relied in major part on "the context and long history of country-of-origin disclosures to enable consumers to choose American-made products" to find that the state's interest was not mere "idle curiosity." *AMI*, 760 F.3d at 23. The court also noted a state interest in protecting consumer health and markets that could arise during food-borne illness outbreaks. *Id.* No such context, history, or connection to consumer health is present here,

and Defendants point to no case where states could single out a particular ingredient in a product solely for the purpose of making consumers aware of that ingredient. Thus, unlike *AMI*, there is no "reasonable fit" or obvious connection between the Regulation's required speech and a the "goal of informing consumers about a particular product trait" to further a long-standing consumer goal to buy American products. *See AMI*, 760 F.3d at 26-27.

In the attempt to characterize the Regulation as a mere consumer awareness label, Defendants repeatedly disavow that the PFAS label constitutes a warning. Defendants open their brief with such a statement, asserting that "New Mexico does not require manufacturers to *warn* consumers that PFAS in their products may be harmful" and instead suggest that some consumers "may simply want to know what is in the product." ECF No. 32 at 1. Later, they assert that the required label helps consumers make "informed decisions." *Id.* at 10. Building upon this theory, Defendants assert (while arguing that the Regulation is purely factual and uncontroversial) that the required PFAS label conveys no information about the manufacturing process or PFAS' effect on the environment or consumer health. *Id.* at 11. Rather, Defendants repeatedly assert that the required PFAS label indicates only that a product contains PFAS. *Id.* Bluntly, Defendants' characterizations of the innocuous nature of the label suggests the state's interest is akin to mere consumer curiosity that the *AMI* court warned could not stand. 760 F.3d at 23.

In characterizing the required label as a "consumer awareness label," and not a "warning label," Defendants destroy the connection between the purpose of the required disclosure – to promote consumer and environmental health – and the means employed to realize that purpose, which in other instances is achieved with a warning. Put another way, if the Court construes the Regulation as a consumer awareness label, as Defendants encourage the Court to do, it begs the

questions: how then is the purported state interest in protecting consumer and environmental health served and how are consumers to know that it may impact their health or the environment if the required label provides no such information? A label that conveys no information cannot, be "inextricably intertwined" with the goal of reducing the health and environmental impact of PFAS for the label does not provide any advice or information about PFAS. Defendants don't answer these questions or grapple at all with how the required label is a rational vehicle to achieve the goals of protecting consumer and environmental health. To the extent that Defendants assert that the Regulation's labeling requirement serves New Mexico's interests in protecting consumer and environmental health, the Court finds, for all the reasons set forth herein, that the Regulation is not reasonably connected to those interests, as required by *Zauderer*.[9]

One court has wrestled with a similar regulation, where on the surface the state proclaims the regulation exists to raise consumer awareness, but underneath intends the label to operate as a warning in disguise. *Int'l Dairy*, 92 F.3d at 73. The court recognized that the state disavowed an interest in protecting consumer health and instead asserted a generalized consumer right to know and reasoned that to let such the state's proposed consumer awareness interest support a First Amendment intrusion would mean there would be "no end" to the type of labelling requirements the state could impose. *Id.* at 74. The court explained that where mandated speech does little more than satisfy consumers' idle "curiosity," the government interest is not sufficient to justify requiring a product's manufacturer to publish "the functional equivalent of a warning about a production method that has no discernable impact on a final product." *Id.* at 73. It then applied

[9] As noted previously, if the Defendants were to mandate a warning label in order to protect consumer health and safety, those are legitimate state interests. *See CTIA*, 928 F.3d at 844; *NEMA*, 272 F.3d at 115; *AMI*, 760 F.3d at 24. Another labeling requirement may or may not survive *Zauderer* scrutiny. However, the Court takes no position on whether such a hypothetical warning label that would be purely factual and non-controversial, for that is not the label that has been presented to the Court.

*Central Hudson*, rather than *Zauderer*, to evaluate the regulation, in the end finding consumer interest in the contents of the product were not sufficient interests to mandate an intrusion upon First Amendment rights. *Id.* at 73-74.

Defendants defend the Regulation as a consumer awareness label, even though they desire for it to operate, as in *Int'l Dairy*, as the functional equivalent of a warning. The evidence they submit reveals this to be the case. Their expert describes the required label as a "single, uniform warning" and further suggests that as such, it is an effective mechanism to allow consumers to make "informed decisions about products to purchase or avoid their own PFAS exposures." ECF No. 32-2 ("DeWitt Decl.") at ¶ 15. Indeed, publicly, NMED's own website characterizes the PFAS label as a warning label and advises consumers to "**Look** for warnings about PFAS in products." ECF No. 37-1 ("Suppl. Snyder Decl.") at ¶ 3 (citing https://perma.cc/N3C9-N3KP (emphasis on website)). Elsewhere, NMED's website warns "[c]ertain PFAS are associated with negative human health effects such as thyroid disease, cancer, liver disease, birth defects, and increased risk of miscarriage." Id. at ¶ 4 (citing https://perma.cc/EB7H-KC8C). However, the Regulation cannot simultaneously, as Schrödinger would have it, be merely a consumer awareness label and not a warning label, and if it is a consumer awareness label it serves to promote consumer curiosity about the contents of various products.

Because there is no such reasonable fit between the Regulation and the state interest, the Regulation also could not survive more heightened scrutiny, whether the Court were to apply the intermediate scrutiny of *Central Hudson* or strict scrutiny applied to other impositions on First Amendment rights. Thus, for all the reasons set forth herein, the Court concludes that Plaintiffs are likely to prevail on the merits.

B. Irreparable Harm

A moving party must also demonstrate a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief. *Tyson Foods, Inc.*, 565 F.3d at 776. Defendants suggest, wrongly, that the Court may overlook a minimal First Amendment intrusion. ECF No. 32 at 23 (citing *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003)). Notably, *Heideman*, acknowledged minimal harm did not mean the harm was nonexistent. 348 F.3d at 1190. *Heideman* held that courts must treat possible First Amendment harms gingerly and that even where the First Amendment intrusion was minimal, the element of irreparable harm tilted towards plaintiffs. *Id.* Indeed, the Supreme Court has made clear that a loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Wheat Growers*, 85 F.4th at 1283; *Nat'l Ass'n of Mfrs.*, 800 F.3d at 559; *Hobby Lobby Stores, Inc.*, 723 F.3d at 1145; *Ass'n of Home Appliance Mfrs.*, 826 F. Supp. 3d at 1320; *see also Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012) ("[W]hen an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.") Thus, given that the Court has found that Plaintiffs are likely to succeed on the merits, the Court further finds that this factor weighs in favor of preliminarily enjoining the Regulation's labeling requirement.

C. Balance of Equities and Public Interest

When a state agency is the defendant, the balance of equities and public interest factors "merge." *Rocky Mtn. Gun Owners*, 121 F.4th at 112. As noted, *supra*, the potential intrusion upon Plaintiffs' First Amendment rights, whether minimal or brief, if the Regulation's labeling mandate goes into effect suggests both irreparable harm and that the balance of equities leans in favor of Plaintiffs. Although the Court recognizes that New Mexico undoubtedly has a strong

interest in protecting consumer and environmental health, Defendants here defend the Regulation as merely promoting consumer awareness, which is not as strong an interest, and one generally insufficient to warrant First Amendment intrusions. *NEMA*, 272 F.3d at 115. Moreover, New Mexico remains free to enforce the parts of the PFAS Protection Act that were not challenged – in particular the ban on certain products containing certain classes of PFAS – and free to promote its interests in protecting consumer and environmental health on the NMED's website, and thus those interests are not wholly impaired. *See Nat'l Ass'n of Mfrs.*, 800 F.3d at 559 (noting where bulk of the rule remained in place the balance of equities and consideration of public interest favored granting the stay). Thus, the Court concludes that that this factor also weighs in favor of preliminarily enjoining the Regulation's labeling requirement.

## IV. Conclusion

In summary, the Court finds that the four equitable factors supporting a preliminary injunction weigh in favor of GRANTING the preliminary injunction. For the foregoing reasons, **IT IS HEREBY ORDERED** that

1. Plaintiff's Motion for a Preliminary Injunction (ECF No. 3) is **GRANTED**; and
2. The Court **ENJOINS** enforcement of the Regulation's labeling mandate, N.M. Code R. § 20.13.2.13, during the pendency of this lawsuit.

Margaret Strickland

**MARGARET STRICKLAND**
UNITED STATES DISTRICT JUDGE