**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

AMERICAN CHEMISTRY COUNCIL, *et al.*,

*Plaintiffs*,

v.

JAMES C. KENNEY*, in his official capacity as Secretary of the New Mexico Environment Department*; and RAÚL TORREZ, *in his official capacity as Attorney General of New Mexico*,

*Defendants*.

Case No.: 1:26-cv-02130

**ORAL ARGUMENT REQUESTED**

**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS**

## ARGUMENT

### I. *Zauderer* applies, and the label survives scrutiny as a matter of law.

#### A. The label is factual and uncontroversial.

The Complaint does not dispute that Plaintiffs' products contain "covalent bonds between carbon and fluorine atoms," or PFAS. Compl. ¶¶ 27-29. New Mexico's label, which signals that a product contains PFAS, is therefore factual and uncontroversial. *See* Doc. 42 (Mot.) at 5-13.

In arguing otherwise, Plaintiffs submit that "[i]t will be a rare case in which a government can prove a warning label is based on settled science using only the allegations in a plaintiff's own complaint." Doc. 45 (Resp.) at 5. Plaintiffs misstate the *Zauderer* inquiry. New Mexico has no burden to show that any and all aspects of PFAS research, science, or regulation are categorically undisputed. *Zauderer* instead asks whether the information conveyed by the label is factual and uncontroversial—a legal question that can be answered at the pleading stage.

To that end, this Court has already rejected Plaintiffs' attempts to manufacture controversy or assign universal "warning" meaning into the label. *Compare* Resp. at 5-10 *with* Doc. 46 (PI Order) at 9-17. In doing so, this Court aptly recognized that labels with ingredient or process disclosures are factual and uncontroversial under *Zauderer* even where those labels could carry negative connotation for some consumers. PI Order at 11 (citing *Disc. Tobacco City & Lottery, Inc. v. United States*, 674 F.3d 509, 569 (6th Cir. 2012)). Thus, it does not matter that the Complaint reads into the label a "warning,"[1] or that Plaintiffs' products are not made with Erlenmeyer flasks.

---

[1] Plaintiffs' reliance on cases dealing with actual warning labels are inapposite here, where New Mexico's label's message does not invite hair-splitting scientific debates regarding specific propositions as labels in Proposition 65 cases did. Mot at 10-11 (collecting cases). And Plaintiffs' arguments regarding a theoretical label that does not warn of a specific hazard but states "Danger: PFAS!" concern a label that is not before this Court or alleged in the Complaint.

It also follows that Plaintiffs arguments regarding scientific dispute over regulatory definitions of PFAS or purported debate regarding acute toxicity of certain species of PFAS (Resp. at 8-10) are insufficient to survive Defendants' Motion. PI Order at 17.

**B. The label is not unduly burdensome.**

Plaintiffs argue that the label imposes significant burdens on its member companies' speech, again premising its argument on unfounded and cursory allegations that the Erlenmeyer flask pictogram categorically conveys a warning of health hazard. Resp. at 10-11.

At worst, and taking the Complaint as true, the flask could be construed by some consumers as potentially carrying negative connotation—but mere potential for negative interpretation is not enough to establish unconstitutional burden on Plaintiffs' speech or show that the label forces manufacturers to deliver a controversial message with which they disagree. PI Order at 15-17. Any burden on Plaintiffs' speech[2] is at worst de minimis. *See* Mot. at 14.

The label here is nothing like labels that courts have struck down for their burdens on speech. For example, the regulation in *Nat'l Inst. of Fam. and Life Advocs. v. Becerra*, 585 U.S. 755 (2018) (*NIFLA*) imposed a 29-word licensure notice and another 39-word notice directly controverting the plaintiff's views regarding abortion, an issue of great social and political debate. 585 U.S. at 763. Those messages easily drowned out NIFLA's two-word "choose life" message. *Id*. at 778. In contrast, the label here does not require manufacturers to submit a grossly

[2] The "staggering implementation costs" Plaintiffs allege (Compl. ¶ 100) and argue for (Resp. at 10-11) are not material burdens on speech. *See Am. Hosp. Ass'n v. Azar*, 983 F.3d 528, 541 (D.C. Cir. 2020). And the Response (at 11) misuses *California Chamber of Commerce v. CERT*, 29 F.4th 468, 478-470 (9th Cir. 2022). That case does not stand for the proposition that financial costs are a burden on speech. The *CERT* court was discussing the *litigation burden* created by the specific regime in that case, which required manufacturers to show that their products did not pose health risks in the instance the manufacturers sought to omit the required warning label. *Id*.

disproportionate message, let alone one that directly controverts their views on politically significant issues. It instead requires manufacturers to disclose that their products contain PFAS, in text that may be as small as other labeling text. *See Am. Beverage Ass'n v. City and Cnty. of San Francisco*, 916 F.3d 749, 757 (9th Cir. 2019). Nor is the label's imagery sensational, as it is not comparable to inflammatory imagery from labels considered in other cases, such as those depicting a woman crying or a man smoking a cigarette out of a tracheotomy tube. *See* PI Order at 14.

Further, Plaintiffs' ability to qualify or contextualize the label makes a difference in the constitutional analysis, as they can eliminate any burden they perceive through their own speech. *See* PI Order at 13; Mot. at 14. Yet Plaintiffs argue that their ability to qualify the label should make no difference because qualifications could not have cured the constitutional problems with the mandates at issue in *NIFLA*. (Resp. at 10-11). Even assuming Plaintiffs read or apply *NIFLA* correctly (they do not), this case is distinct. The regulations in *NIFLA* required the plaintiffs to endorse specific views regarding abortion that they disagreed with. 585 U.S. at 778. Among other differences between this case and *NIFLA* (*infra* I(C)), Plaintiffs' analogy fails because New Mexico's label does not "require mandated speech to weigh in on [a] scientific debate" or "require Plaintiffs to convey any information at all about any alleged risks or harms that PFAS might cause." PI Order at 16. The label is not unduly burdensome as a matter of law.

**C. Plaintiffs misapprehend the law in submitting that a label can only relate to the useful life of a product.**

Plaintiffs ask this Court to adopt and apply a legal rule based on their reading of *NIFLA*: that under *Zauderer*, a government can only mandate ingredient disclosures that relate to the product's useful life. Resp. at 12-13. The Court should reject this argument.

To start, any argument suggesting that a product's ingredients do not relate to the "terms" of the transaction (Resp. at 12-13) borders on absurd. The ingredients or components of a product are inherently part of the proposed transaction, because when a consumer buys a product, they also buy the ingredients or components of the product. That simple logic is consistent with the premise that manufacturers have no First Amendment interest in withholding factual information about their products. *See* Mot. at 5-6. Even if Plaintiffs' reading of *NIFLA* was correct, it still would not aid them here.

In any event, Plaintiffs' reading of *NIFLA* is incorrect. First, the specific reasoning Plaintiffs cite concerns the threshold question of whether the regulated speech is commercial or not. *See NIFLA*, 585 U.S. at 768-69. That threshold question is decided *before* engaging in the *Zauderer* inquiry. *See, e.g., U.S. v. Wenger*, 427 F.3d 840, 845-47 (10th Cir. 2005). In this case, that threshold question is not at issue—there is no dispute that the label is compelled commercial speech that is first evaluated under *Zauderer*.[3] *See, e.g.*, Complaint, ¶ 86. Second, the *NIFLA* court reasoned that *Zauderer* did not apply at threshold because the required message pertained to alternative reproductive care services offered by California, not to the services provided by the plaintiff, and therefore was wholly untethered from the proposed transaction. 585 U.S. at 769. That is distinct from this case (and all cases concerning product ingredient labels) because a product's ingredients or components are inherently part of the transaction to purchase the product. And here, New Mexico does not require that manufacturers disclose some alternative service offered by the

[3] Notwithstanding, Defendants maintain that current Supreme Court precedent is inconsistent with the original meaning of the First Amendment, as there is little or no evidence that the Founders intended the First Amendment to protect commercial speech at all. The protections of *Zauderer* and *Central Hudson* are not based on any meaningful originalist analysis of the First Amendment.

State (indeed, New Mexico does not offer any such services, nor does the Complaint allege that it does). *NIFLA* does not support Plaintiffs' rule, let alone its application here.

Plaintiffs' new rule is also controverted by other label cases employing *Zauderer*. For example, in *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104 (2d Cir. 2009), the label was upheld even though the label furthered purposes that are not necessarily related to the product's useful life, including product disposal. And in *Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18 (D.C. Cir. 2014), country of origin labeling for meat products was upheld even though raising cattle and processing meat pertains to production of the product rather than the customer's purchase and use of the product. These outcomes confirm a commonsense premise: ingredient or process labeling can permissibly relate to the entire product lifecycle under *Zauderer*. There is no principled basis to adopt or impose Plaintiffs' limiting rule.

**D. The label is rationally related to New Mexico's interests in consumer and environmental protection and public health.**

The label survives rational basis review as a matter of law. Mot. at 15-16. Plaintiffs do not even attempt to address rational basis (Resp. at 13-15), implicitly conceding that if the label is factual, uncontroversial, and presents no undue burden, it is almost guaranteed to be constitutional.

However, Defendants understand that the Court, in its PI Order, opined that the label likely does not survive *Zauderer*'s rational basis inquiry. *See* PI Order at 17-22. Defendants respectfully ask the Court to reconsider its reasoning in that portion of the PI Order, at least for the purpose of granting Defendants' Motion (if not dissolving the injunction as well)[4] for the following reasons.

[4] The Court would be well within its equitable power to *sua sponte* dissolve the injunction on the grounds presented here. *See* Fed. R. Civ. P. 54; *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 12-13 ("every order short of a final decree is subject to reopening at the direction

First, non-binding dicta from the Second Circuit suggesting that *Zauderer*'s rational basis review "asks more" of the government is not persuasive. PI Order at 8. That is especially true where the Second Circuit "express[es] no view" on whether *Zauderer* demands "rational basis review or something more." *See DoorDash, Inc. v. City of N.Y.*, 185 F.4th 1, 7 n.5 (2d Cir. 2026); *see also* Mot. at 16 (citing cases that employed routine rational basis review under *Zauderer*). And in failing to define what that heightened standard might be or how to apply it, such dicta invite inconsistent results. Such unclear standards should not be employed in this or any case.

Second, the PI Order misunderstood *Zauderer*'s rational basis inquiry. The label need not *itself* do the work to connect to or further the State's interests. *Compare* PI Order at 18-22 (reasoning that because the label does not warn of health or environmental risks, the label does not connect to the State's interests) *with* Mot. at 16 (discussing labels upheld even where they made no warning or assertion about health effects). Nor does it matter how Defendants characterize the label. *See* PI Order at 19-22 (also reasoning that a label characterized as a consumer awareness label cannot further an interest in public health or environmental protection). While the first *Zauderer* prong looks at the label itself (Mot. at 10-11 (citing examples)), the subsequent rational basis inquiry does not hinge solely on what the label itself contains. Mot. at 16 (citing examples). In other words, the first prong looks only at what the label *says*, but the rational basis inquiry looks more broadly at what the label *does*. And rational basis scrutiny is satisfied where even "common sense" and logic, rather than some "quantum of proof," connect the label to the government's

---

of the district judge"); *Pueblo of Pojaoque v. New Mexico*, 21 F.Supp.3d 1028, 1090-92 (D.N.M. 2016).

interests. Mot. at 16 (internal citations omitted).[5] That New Mexico's label is a consumer awareness label does not "destroy" (PI Order at 20) its connection to the State's interests.

Here, the disclosure of PFAS empowers consumers to make different choices about which products they purchase or expose themselves to. Because that information naturally helps consumers abstain from PFAS products, it inherently furthers both the State's public health and environmental protection interests. Although that conclusion is self-evident, it is also supported by the preliminary injunction record.[6] For example, consider that consumers are willing to pay more for products that do not contain PFAS. *See* Doc. 32-4 at pdf pages 7-9. A logical inference from that evidence is that at least some consumers will use information in the label to abstain from certain products. In other words, the label need not contain a warning to help curb the health or environmental impacts of PFAS. But following the Court's prior reasoning, an ingredient disclosure could never survive rational basis scrutiny without an accompanying warning. That cannot be right, and such reasoning is inconsistent with cases upholding process or ingredient disclosures that contain no warning.

For example, in *New York State Restaurant Ass'n v. New York City Bd. of Health*, 556 F.3d 114, 134 (2d Cir. 2009) (*NYSRA*), decided after *Int'l Dairy Foods Ass'n v. Amestoy*,[7] the Second

---

[5] Even if *Central Hudson* were to apply, the label merely "must do more than provide 'only ineffective or remote support for the government's purpose.'" *Wenger*, 427 F.3d at 849 (citation modified).

[6] Plaintiffs' Response (at 6, 10, and 17) opens the door to discussion of the preliminary injunction record. Defendants note, however, that the Court need not rely on extraneous record (or convert the Motion) to find that the label survives scrutiny. Defendants offer this example only to further demonstrate a self-evident conclusion.

[7] The PI Order's reliance on *Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 74 (2d Cir. 1996) (*IDFA*) is misplaced. *IDFA* has been repeatedly cabined by subsequent decisions. "In *Sorrell,* we

Circuit upheld a requirement that food menus disclose calorie counts "to promote informed consumer decision-making so as to reduce obesity and the diseases associated with it." That disclosure requirement did not need to make any statements about obesity to further the state's interest. 556 F.3d at 136. This is just one example demonstrating that a label need not comment on a specific interest to advance it. *See also Grocery Manufacturer's Association*, 102 F. Supp. 3d at 631 (disclosure of genetically engineered ingredients served the state's interest in human health, safety, and religion even without the disclosure making any statement about those topics).

## III. Plaintiffs' Commerce Clause claims should be dismissed.

### A. Plaintiffs' strained reading of the regulations is wrong and does not show direct extraterritorial regulation.

The Response's attempts to expand the scope of regulation (at 18-20) are telling: Plaintiffs know they can only sustain their exterritoriality claim if the regulations *directly* regulate purely out of state transactions that have no connection to New Mexico. *See* Resp. at 18-19 (citing *Edgar v. MITE Corp.*, 457 U.S. 624, 642-43 (1982) (plurality opinion)). Indeed, any extraterritorial *effects* of the labeling regulations, including those resulting from self-inflicted business decisions to use black box supply chains, are categorically insufficient to state a claim under precedents like *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356 (2023). *See* Mot. at 20-26.

---

explained that our decision in *IDFA* 'was expressly limited to cases in which a state disclosure requirement is supported by no interest other than the gratification of 'consumer curiosity.''' *NYSRA*, 556 F.3d at 134 (quoting *Sorrell,* 272 F.3d at 115 n. 6.). Here, New Mexico has not disclaimed any interest other than consumer curiosity. Further, unlike rBST (the ingredient at issue in *IDFA*), PFAS are not ingredients that have "no discernable impact on [the] final product." 92 F.3d at 73. As the State showed in the preliminary injunction record, the characteristics that make PFAS useful in the "final product" are also what pose health risks (for many species of PFAS) and environmental persistence (for all species of PFAS).

So, Plaintiffs now ask this Court to read the rules as regulating commerce with no connection to New Mexico. Resp. at 18-20. This Court should reject Plaintiffs' tortured reading as contrary to basic canons of interpretation and common sense.

Under New Mexico law,[8] courts interpreting a statue or regulation must give effect to the intent of the Legislature. *WildEarth Guardians v. N.M. Env. Improvement Bd.*, 2024-NMCA-021, ¶ 12, 542 P.3d 820. To do so, New Mexico courts read regulations as a whole and in relation to other parts. *Baker v. Hedstrom*, 2013-NMSC-043, ¶ 15, 309 P.3d 1047. And while plain language is often the first indicator of intent, New Mexico courts will not accept an overtechnical construction of plain language that leads to absurd results or otherwise conflicts with the purpose of the enactment. *Id*. ¶ 15.

Plaintiffs argue that the regulations require manufacturers to label products that are not destined for sale in New Mexico. Resp. at 18-20. They submit that the word "manufacturers" as used in the regulations means that a company selling even one product in New Mexico must comply with its labeling requirements for all products it manufactures, regardless of their destination. Resp. at 18-19. Plaintiffs also argue that the labeling provision is unlimited in geographic scope by its plain language, and thus the labeling mandate requires products with no connection to New Mexico whatsoever to be labeled. Resp. at 19.

To the contrary, the regulations define their scope, stating that they apply to "manufacturers, distributors, and retailers that sell, offer for sale, distribute or distribute for sale in the state of New Mexico, directly or indirectly or through intermediaries, certain products to which per- or poly-fluoroalkyl substances (PFAS) are intentionally added." 20.13.2.2. NMAC. By its

[8] New Mexico canons apply here. *See Phelps v. Hamilton*, 59 F.3d 1058, 1072 (10th Cir. 1995).

plain language, the "scope" provision limits the regulated entities to those that "offer for sale, distribute or distribute for sale [PFAS products] in the state of New Mexico[.]" The regulations clearly do not apply to products manufactured for sale *anywhere*, and manufacturers are not obligated to label products not destined for sale in New Mexico. *Contra* Resp. at 18-20. Plaintiffs' reading of the word "manufacturers," and their derivative logic regarding "companies" (Resp. at 18-19), is irreconcilable with any common understanding of that limiting language. Moreover, such reading would produce the absurd result of regulating products with no relationship to New Mexico. Nor could Plaintiffs' construction be consistent with the intent and purpose of the regulations and their enacting authority, which is to protect New Mexicans and New Mexico's environment from cumulative PFAS contamination and exposure while eventually phasing out non-essential PFAS use altogether. *See* Compl. ¶ 4 (alleging that the purpose of the labeling provision is to "turn off the spigot" of PFAS specifically in New Mexico); *Baker*, 2013-NMSC-043, ¶ 15.

Plaintiffs' argument that the labeling provision, 20.13.2.13(A) NMAC, does not itself contain geographic limits (Resp. at 18-19), ignores that regulations must be read in relation to other parts. *Baker*, 2013-NMSC-043, ¶ 15. While it is true that the labeling provision does not limit itself geographically, the preceding "scope" provision does that work. 20.13.2.2 NMAC.

In addition, the doctrine of constitutional avoidance counsels against any reading of the regulations that could present constitutional infirmity. *See I.N.S. v. St. Cyr*, 533 U.S. 289, 299-300 (2001) ("if an otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative interpretation of the statute is fairly possible, we are obligated to construe the statute to avoid such problems" (cleaned up)).

Finally, the cases Plaintiffs rely upon (Resp. at 20) do not save their claim from dismissal. Instead, they confirm that extraterritoriality claims are generally limited to price fixing laws. Plaintiffs' reliance on *Legato Vapors, LLC v. Cook*, 847 F.3d 825 (7th Cir. 2017) is especially remarkable, as the opinion all but states that labeling laws are beyond "the dormant Commerce Clause['s] prohibition." *Id*. at 832.

**B. Plaintiffs' *Pike* balancing arguments likewise lack merit.**

Plaintiffs argue that *Pike* balancing is too "fact-intensive" to be resolved at the pleading stage, pointing to cases decided on summary judgment. Resp. at 21-22. But this case's early posture does not diminish Plaintiffs' burden to plead with specificity and to state valid legal claims. And the legal propositions from those summary judgment decisions, as used in the Motion, are useful for the Court regardless of this case's procedural posture. Mot. at 22-26.

*Pork Producers* confirms that claims such as Plaintiffs' can be dismissed at the pleading stage, as "[b]oth the district court and court of appeals dismissed the producers' complaint for failing to state a claim," and the Supreme Court affirmed, explaining that a claim resting on nondiscriminatory burdens "falls well outside *Pike*'s heartland." 598 U.S. at 364, 379-81.

The Response is also unpersuasive in asserting burdens on interstate commerce. To start, Plaintiffs' allegations of nationwide impact on manufacturers (Resp at 21-22, citing Complaint, ¶¶ 76, 110) are conclusory and are not entitled to a presumption of truth. The Complaint does not give the Court any product-by-product, company-by-company analysis of how the regulations will truly be "impossible" for manufacturers to comply with, or explain how the regulations themselves—rather than Plaintiffs' business decisions—are the cause of any specific burdens on each respective manufacturer. Mot. at 22-25. That lack of detail is fatal to Plaintiffs' claim, as vague theoretical

burdens cannot begin to achieve the "nearly impossible task" of establishing a *Pike* balancing claim. *See* Mot. at 23 (internal citation omitted). Importantly, that is more than a pleading deficiency—Plaintiffs' undetailed allegations of burden speak to the standing problems that permeate their case. Those problems remain despite any standing arguments they now submit. *See* Mot. at 26-27.

Even if Plaintiffs' Complaint did adequately allege burdens on its member companies, that still would not be enough because *Pike* balancing asks whether the regulation poses "burdens on interstate commerce that exceed the burdens on intrastate commerce," not simply whether any burdens exist at all. *See, e.g.*, *V-1 Oil Co. v. Utah State Dep't of Pub. Safety*, 131 F.3d 1415, 1425 (10th Cir. 1997) (cleaned up). And the Commerce Clause "protects the interstate market, not particular interstate firms," so allegations that particular manufacturers will bear costs plead no actionable burden on interstate commerce. *Kleinsmith*, 571 F.3d at 1043 (quoting *Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 127-28 (1978)); *Truesdell v. Friedlander*, 80 F.4th 762, 774-75 (6th Cir. 2023). It follows that Plaintiffs' arguments attempting to compare burdens on its member companies against local benefits (Resp. at 21-22) fail to engage with the relevant inquiry and present no basis for this Court to deny the Motion.

The bottom line is that product labeling requirements, including those at issue here, do not resemble the type of regulations that implicate *Pike* balancing at all, like price fixing. Mot. at 22-26. The Complaint fails to state a *Pike* balancing claim as a matter of law.

## CONCLUSION

For the reasons here and in the Motion, the Court should dismiss Plaintiffs' Complaint in whole, or alternatively in part, with prejudice.

Respectfully submitted,

RAÚL TORREZ
Attorney General

JAMES C. KENNEY
Secretary of Environment

/s/Alexander W. Tucker
ALEXANDER W. TUCKER
*Assistant Solicitor General*
New Mexico Department of Justice
201 Third St. NW, Suite 300
Albuquerque, NM 87123
505-490-4060
atucker@nmdoj.gov

DANIEL AHRENS
*Assistant Solicitor General*
ESTHER C. JAMISON
*Assistant Attorney General*
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, NM 87501
505-490-4060
dahrens@nmdoj.gov
ejamison@nmdoj.gov

*Counsel for Defendants Raúl Torrez and James C. Kenney*

GREGORY S. SMITHKIER
*Assistant General Counsel*
*Special Assistant Attorney General*
New Mexico Environment Department
Office of General Counsel
1190 South St. Francis Drive
Santa Fe, New Mexico 87505
505-531-7736
gregory.smithkier@env.nm.gov

*Counsel for Defendant James C. Kenney*

CHAD E. MOLNAR
*Associate Attorney*
Kanner & Whiteley, L.L.C.
701 Camp Street
New Orleans, LA 70130
504-212-1753
cmolnar@kanner-law.com

*Counsel for Defendant James C. Kenney*

**CERTIFICATE OF SERVICE**

I certify that on September 25, 2026, I served the foregoing on counsel of record for all parties via the CM/ECF system.

*/s/ Alexander W. Tucker*
Alexander W. Tucker